# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

-----------------------------------x

NORTHSTAR AVIATION, LLC, et al.,    :

 Plaintiffs/Counterclaim Defendants,: Civil Action

            vs.                     : No. 1:18cv191-

ALDEN BURT ALBERTO,                 : TSE-JFA

 a/k/a Reno Alberto,                :

  Defendant/Counterclaim Plaintiff. :

-----------------------------------x


VIDEOTAPED DEPOSITION OF ALDEN BURT ALBERTO

Leesburg, Virginia

Wednesday, November 28, 2018

10:02 a.m.


Reported by:  Elizabeth Mingione, RPR

No.: 44524

**2**

1
2        Videotaped deposition of ALDEN BURT
3    ALBERTO, held at the offices of Dunlap, Bennett &
4    Ludwig, PLLC, 211 Church Street, S.E., Leesburg,
5    Virginia, commencing at 10:02 a.m., Wednesday,
6    November 28, 2018, before Elizabeth Mingione,
7    Registered Professional Reporter and Notary Public for
8    the Commonwealth of Virginia.
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**4**

1
2              A L S O   P R E S E N T
3          Patt Ruffner, Videographer
4          Salem AlDhaheri
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1    A P P E A R A N C E S   O F   C O U N S E L:
2    ON BEHALF OF NORTHSTAR AVIATION, PLAINTIFFS/
3    COUNTERCLAIM DEFENDANTS:
4        DUNLAP, BENNETT & LUDWIG, PLLC
5        Ellis L. Bennett, Esquire
6        Mary Witzel, Esquire
7        211 Church Street, S.E.
8        Leesburg, Virginia  20175
9        (703) 777-7319
10       Ebennett@dbllawyers.com
11
12   ON BEHALF OF DEFENDANT/COUNTERCLAIM PLAINTIFF:
13       BERENZWEIG LEONARD, LLP
14       Declan C. Leonard, Esquire
15       Nick Johnson, Esquire
16       Samantha Collins, Esquire
17       8300 Greensboro Drive, Suite 1250
18       McLean, Virginia  22102
19       (703) 760-0402
20       Dleonard@berenzweiglaw.com
21       Njohnson@berenzweiglaw.com
22       Scollins@berenzweiglaw.com

**5**

1              C O N T E N T S
2        WITNESS:  ALDEN BURT ALBERTO
3    EXAMINATION BY:                    PAGE
4    Mr. Ellis ...................................... 8
5
6                  * * *
7
8            DEPOSITION EXHIBITS
9            ALDEN BURT ALBERTO
10   NUMBER        DESCRIPTION            PAGE
11   Exhibit 1   Services Agreement, NSA001596 ....... 55
12   Exhibit 2   NorthStar Aviation Facts and Solution  73
13   Exhibit 3   E-Mail, September 24, 2017,
14       Alberto_00092 ............................ 77
15   Exhibit 4   Wells Fargo VISA Card Statement ..... 82
16   Exhibit 5   Wells Fargo Checking Statement,
17       NSA000732 ................................ 92
18   Exhibit 6   Wells Fargo Checking Statement,
19       Alberto_00134 ............................ 121
20   Exhibit 7   E-Mail, 9/17/2017 NSA001727 ......... 125
21   Exhibit 8   Bank Payment Voucher, NSA0020349 .... 127
22   Exhibit 9   E-Mail, Sept. 24, 2017, Alberto_05531 130

Alberto, Alden Burt

November 28, 2018

3 (Pages 6 to 9)

---

**6**

1  NUMBER      DESCRIPTION            PAGE

2  Exhibit 10  Messages Between Terry, Reno, and

3      Hichem KEY001300 ....................... 134

4  Exhibit 11  Vulcan Aviation Incorporation

5      Certificate ............................ 155

6  Exhibit 12  E-Mail Chain, 9/25/2017, NSA014790  157

7  Exhibit 13  E-Mail Chain, 10/9/2017, NSA014848  159

8  Exhibit 14  NSA Future Document, NSA014793 ...  160

9  Exhibit 15  Revocation of Power of Attorney ..  187

10  Exhibit 16  Letter to MG Toumajan, 25 October

11      2017 ....................................  188

12  Exhibit 17  Application for Telegraphic Transfer 193

13  Exhibit 18  Multipage Document NSA000417 .....  198

14  Exhibit 19  E-Mail 7/1/2017, NSA001757, with

15      Attachments ............................. 213

16  Exhibit 20  Employment Agreement ............. 241

17  Exhibit 21  E-Mail, 10/20/2016, NSA009402 ....  251

18  Exhibit 22  E-Mail, 2/14/2107, NSA014807 .....  252

19  Exhibit 23  E-Mail, Aug. 22, 2016, NSA00200089  254

20  Exhibit 24  Copies of Photographs, NSA000142 ..  257

21

22

---

**7**

1        P R O C E E D I N G S

2        VIDEOGRAPHER: Here begins disc 1 in the

3  video deposition of Alden Burt Alberto, a/k/a Reno

4  Alberto, taken in the matter of NorthStar Aviation,

5  LLC, et al. versus Alden Burt Alberto, a/k/a Reno

6  Alberto, in the United States District Court for the

7  Eastern District of Virginia, Alexandria Division,

8  Civil Action Number 118-cv-191-TSE-JFA.

9        Today's date is November 28, 2018.  The

10  time is 10:02 a.m.  This deposition is being held at

11  211 Church Street, Southeast, Leesburg, Virginia.  The

12  court reporter is Liz Mingione.  The videographer is

13  Pat Ruffner, both representing on behalf of Henderson

14  Legal Services.

15        Will counsel please introduce themselves

16  and state whom they represent.

17        MR. BENNETT:  Good Morning.  Ellis Bennett

18  for the plaintiffs.

19        MS. WITZEL:  Good morning.  Mary Witzel for

20  the plaintiffs.

21        MR. JOHNSON:  Good morning.  Nick Johnson

22  with the law firm Berenzweig Leonard on behalf of Mr.

---

**8**

1  Alberto.

2        MR. LEONARD:  Declan Leonard on behalf of

3  Mr. Alberto.

4        MS. COLLINS:  Samantha Collins, also on

5  behalf of Mr. Alberto.

6        VIDEOGRAPHER:  Will the court reporter

7  please swear in the witness.

8        - - -

9  Whereupon,

10        ALDEN BURT ALBERTO,

11  Having been duly sworn was examined

12  and testified as follows:

13        - - -

14  EXAMINATION CONDUCTED

15  BY MR. BENNETT:

16    Q.   Good morning, Mr. Alberto.  We've met

17  before.

18    A.   Of course.  Morning, Ellis.

19    Q.   Good morning.  Could you please state your

20  name, your full legal name.

21    A.   Alden Alberto.

22    Q.   Okay.  And you go by Reno sometimes?

---

**9**

1    A.   I go by Reno.

2    Q.   Okay.  And is it okay if I refer to you as

3  Reno or Mr. Alberto?

4    A.   Reno is fine.

5    Q.   Okay.  Thank you.  And I know you have had

6  your deposition taken at least once as a corporate

7  representative for Vulcan in this case.  Besides that,

8  have you ever been deposed before?

9    A.   No.

10    Q.   Having had your deposition taken in the

11  corporate capacity, I'm sure I believe my colleague

12  went over the ground rules during that deposition, but

13  I'll just kind of briefly go over them, not in as much

14  detail as I might otherwise, but it's important that

15  we not talk over each other because the court reporter

16  is taking down everything that we say.  And it's

17  important that you allow me to finish my question

18  before you answer, and even if you think you know what

19  the question is going to be.

20        If you need a break at any time, just ask.

21  We can take a break at any time.  We'll take a lunch

22  at approximately 12:30.  I think arrangements are

---

Alberto, Alden Burt

November 28, 2018

6 (Pages 18 to 21)

---

**18**

1    A.   There were multiple changes in government
2    contracts.  And it was kind of seamless to us.  They
3    just paid our paychecks.
4        Q.   You were doing the same mission no matter
5    who was paying your paychecks?
6        A.   Exactly.  Exactly.  And then in 2005 I
7    joined the State Department as well for the
8    Antiterrorism Assistance Program.  I was an embedded
9    advisor for -- in Afghanistan for President Karzai's
10   protective detail.
11       Q.   Were you a government employee or
12   contractor?
13       A.   No.  Contractor.
14       Q.   Okay.  And who did you work for?  Who paid
15   your paycheck at that time?
16       A.   At that time I believe it was Kaseman.  I
17   believe it was Kaseman at the time.
18       Q.   Okay.
19       A.   So I eventually became the program manager,
20   essentially the top contractor in country in charge of
21   all the antiterrorism assistance training that we were
22   providing our partner nation, Afghanistan.  So I

---

**20**

1        Q.   Okay.
2        A.   A year or 18 months.
3        Q.   And are you -- did you become friends?
4        A.   We -- yeah, we became friends.
5        Q.   You mentioned the company Blackwater.  Is
6    that how you became a associated with Blackwater
7    through your friendship with Erik?
8        A.   No.  I mean, not necessarily.  I mean,
9    that's who had the contract, you know, at that point.
10   And, you know, I'm sure the association helped, you
11   know.
12       Q.   So what specifically did Erik ask you to do
13   when you came over or when he presented the
14   opportunity for R2 to you?
15       A.   He asked me over a course of several
16   months, actually multiple times, to come over and help
17   him run and actually fix a company that he had -- he
18   was having issues with in Abu Dhabi.  And I declined
19   several times and, you know, came to a point where he
20   said, Reno, I really need your help.
21       So it was, you know, I felt kind of an
22   obligation because of our friendship and our time in

---

**19**

1    managed all the contractors that were on that program
2    that helped provide security, as well as training to
3    President Karzai.
4        Q.   And how long were you the program manager?
5        A.   I was the program manager from I believe
6    2006 to 2010.
7        Q.   And after around 2010 when you left that
8    role, what did you do next?
9        A.   I worked -- or I transferred to Abu Dhabi
10   and was the CEO, general manager of Reflex Responses.
11       Q.   And how -- how did you find that position?
12       A.   I was asked -- by name or --
13       Q.   Sure.  Who asked you?
14       A.   Erik Prince.
15       Q.   And how do you know Erik Prince?
16       A.   I know Erik Prince from when I was a Navy
17   Seal.  We were on the same team.
18       Q.   On the same Navy Seal team?
19       A.   Yeah, same Navy seal team, Seal Team A.
20       Q.   And how long did you serve with him?
21       A.   Served directly under him for about 18
22   month or so.

---

**21**

1    the teams try to help him out and --
2        Q.   Did he say why he was specifically
3    targeting you?  Did he give you any reasons about why
4    he really wanted you to come on board to help him?
5        A.   I think mostly because of my reputation,
6    you know, as far as, you know, my leadership
7    capabilities in the teams.  And he saw me in probably
8    the worst conditions that you can see anybody operate
9    under, you know.  And he had a lot of confidence in my
10   abilities to, you know, basically execute.
11       Q.   And the company that he was having trouble
12   with that he wanted your help with was R2?
13       A.   Yes.  It was R2, Reflex Responses.
14       Q.   And do you recall when you finally accepted
15   his proposal?
16       A.   I can't remember an exact date, Ellis, but
17   eventually I accepted the proposal.  And I was in Abu
18   Dhabi, I believe, by 2011 sometime.
19       Q.   Okay.  And when you came on board, what was
20   your job with R2?
21       A.   The -- there were a lot of issues at R2
22   that needed to be fixed.  So I was there to basically

---

22

1  fix the issues.  I was the CEO, general manager of R2.
2  And it only took a couple weeks as CEO of R2 to
3  determine all the issues that were happening.  There
4  was no ITAR licenses for defense services, as well as
5  no licenses for defense articles that were contracted
6  for.
7           There was embezzlement occurring.  And the
8  leadership that was in place at the time had its
9  basically tentacles throughout the organization to
10  control it and essentially embezzle money from the
11  company.
12      Q.   And who -- who was embezzling at that point
13  when you came over?
14      A.   The CEO, the CEO or the general manager at
15  the time was a person named Fouad.  I don't remember
16  his last name.
17      Q.   Was he your predecessor, the predecessor
18  CEO?
19      A.   He was there in place yes.  He was
20  responsible for R2's operations at that point.
21      Q.   And did you replace him?
22      A.   Eventually, I did.  There was a point where

23

1  I was trying to fix things and he was trying to keep
2  things status quo.  And it got to a point where we
3  both had to approach -- it got to a point where it was
4  him leaving or myself leaving.
5      Q.   What was -- what was Erik Prince's role
6  with R2?  Is that -- I've seen his name in an article
7  or two about it, but he's -- as far as I know, he's
8  not -- wasn't an owner of the company?
9      A.   He was a consultant, you know, to the UAE
10  government and R2.
11      Q.   Okay.  Who were the owners of R2?
12      A.   The owners of R2 were basically two -- two
13  different shareholders.  And one was Autumn,
14  A-U-T-U-M-N, and that was a shareholder.  And two
15  individuals as the other shareholder, I believe 50/50,
16  Michael Roumi, R-O-U-M-I.  And I believe his name was
17  Juma Al Kabi.
18      Q.   And Autumn is a company, correct?
19      A.   Yes.
20      Q.   Okay.  And Roumi, and the other gentleman
21  that I won't try to pronounce his name, were
22  individuals?

24

1      A.   Juma Al Kabi were individuals, right.
2      Q.   Were you ever a shareholder of R2?
3      A.   I was not.
4      Q.   Okay.  What was R2's mission?  And I know
5  that's a broad question, but what was the -- what was
6  R2's purpose?
7      A.   I would like to preface my answer, Ellis,
8  is that this was a -- although there were articles put
9  out in the newspaper, personally I would like to
10  refrain from getting into the details of what R2 did
11  in respect of -- for the UAE's privacy and security
12  concerns, but in general R2 was set up to do training.
13      Q.   Military training?
14      A.   Military training.
15      Q.   And did R2 -- as I understand it, and
16  correct me if I'm wrong, R2 was -- had several
17  different components to it, if I understand things
18  correctly.  There was to be an aviation component, for
19  instance, and several other projects.  For instance,
20  I've seen one called Fuses, and some others.  Am I
21  correct in that?
22      A.   That's correct.

25

1      Q.   Okay.
2      A.   There were different I would say segments
3  or divisions of R2, different revenue sources.
4      Q.   Okay.  Can you -- besides the ones I've
5  mentioned, can you describe what they were, without --
6  I mean, I understand your sensitivity to security, but
7  generally, I guess first how many different revenue
8  sources were there?
9      A.   There were several.  I can't remember all
10  of them, but one was aviation.  One was military
11  training.  One was IT or training for one of UAE's
12  government agencies on the nuclear and power side.
13  And right now that's all I recall.
14      Q.   Is it fair to say that R2 had a broad
15  mandate from the UAE government?
16           MR. JOHNSON:  Objection to form.  You can
17  answer.
18      A.   You know, I don't know what the UAE's
19  mandate was, but it was a -- I would say a diverse
20  company.
21      Q.   A broad scope of work?
22      A.   Yeah.  I'll agree with that.

**38**

1  transferred over to Vulcan Management; is that right?
2  **A.   Yes, but it was more than $30 million.**
3  Q.   Okay.
4  **A.   Eventually it was about $100 million that**
5  **transferred from R2 to Vulcan, and some to NorthStar,**
6  **and eventually all to NorthStar.**
7  Q.   Whose money was that roughly $100 million
8  that came over to Vulcan?
9  MR. JOHNSON:  Objection to form.  You can
10  answer.
11  **A.   Can you be a little bit more specific as**
12  **far as whose money?**
13  Q.   Was it UAE government money?
14  **A.   It was -- speculate -- I guess it was UAE**
15  **government money.**
16  Q.   And roughly $100 million came into Vulcan?
17  **A.   In cash and assets.**
18  Q.   Do you recall how much cash there was,
19  roughly?  I don't expect an exact number.
20  **A.   Maybe around 50 million or so.**
21  Q.   Fifteen?
22  **A.   Fifty.**

**39**

1  Q.   Fifty.  Okay.  And what assets were there
2  that came over to Vulcan?
3  **A.   Helicopters for the training contract.**
4  **Deposits were made on 30 helicopters for the mission**
5  **aircraft, for 30 mission aircraft.  I can't remember**
6  **what all the assets were, but --**
7  Q.   The deposits on the 30 mission aircraft,
8  were those the 407 helicopters?
9  **A.   They are.**
10  Q.   The Bells?  Okay.  Was that deposit made
11  similar to the fuses before while R2 was still in
12  existence?
13  **A.   Yeah.  Deposits were made with R2 money.**
14  Q.   Okay.
15  **A.   But with the understanding that R2 was**
16  **being wound down.**
17  Q.   Do you recall when the deposit was made?
18  **A.   No, I don't.**
19  Q.   Okay.  Was NorthStar already in existence
20  when that deposit on those 30 helicopters was made?
21  **A.   No.**
22  Q.   Was it prior to the time where you were

**40**

1  given direction from the Brigadier to wind down the
2  company that the Bell deposit was made?
3  **A.   I can't recall specifically, Ellis.**
4  Q.   All right.  So help me understand what
5  Vulcan's management did.
6  **A.   I set up Vulcan to -- after R2, I set up**
7  **Vulcan Management Consulting really to target**
8  **potential military contracts in the UAE.  That's what**
9  **it was set up for originally.  The most immediate**
10  **opportunity was that the Presidential Guard Command,**
11  **they needed a training facility.  So that was one of**
12  **the opportunities I identified to -- for Vulcan to**
13  **undertake.**
14  Q.   Did that project come to fruition?
15  **A.   It did not.**
16  Q.   And who were the owners of Vulcan?
17  **A.   One of the holding companies for the**
18  **sheikh.**
19  Q.   Is that --
20  **A.   I believe it was ABS Holdings, I believe,**
21  **which the sheikh opened for me.**
22  Q.   And by the sheikh you are referring to

**41**

1  Sheikh Dr. Bin Saif?
2  **A.   Yeah.  I refer to him as Sheikh Ahmed.**
3  Q.   Sheikh Ahmed.  And I'll --
4  **A.   A-H-M-E-D.**
5  Q.   Was he -- was he or his companies a hundred
6  percent owner of Vulcan?
7  **A.   Yeah.  When you trace it back to him, it**
8  **was either his or companies were -- I'm sorry.  He or**
9  **his companies were a hundred percent owner of Vulcan.**
10  Q.   And is the same true of the ownership for
11  NorthStar?
12  **A.   It is.**
13  Q.   Okay.  And I think I asked you this, you
14  have never been an owner of Vulcan or NorthStar?
15  **A.   I have not.**
16  Q.   Did the two companies come into existence
17  around the same time?  I'm just trying to understand
18  the relationship between Vulcan and NorthStar north.
19  **A.   Yes.  So, as I said, I was responsible for**
20  **the orderly liquidation of R2.  I had -- I was given a**
21  **about 30, 34 million dollars to start a new company,**
22  **including the cash and assets remaining from the R2 --**

## 42

1  from R2.  And I made a determination that I would open
2  a company to do military training and another company
3  to open -- to do aviation.
4  Wasn't sure at the time, but Vulcan was
5  opened first.  And Sheikh Ahmed was one of several
6  potential sponsors that essentially that I was looking
7  at to sponsor the new companies.  And after
8  interviewing a couple, and reviewing some other
9  potential Emirati sponsors, I decided on -- to work
10  with Sheikh Ahmed.  And I asked him to open up Vulcan
11  Management Consulting and eventually NorthStar
12  Aviation.
13     Q.   So the assets and the cash that came over
14  from R2 before it was liquidated went into Vulcan
15  first, all of them; is that right?
16     A.   Some of it went into NorthStar.
17     Q.   Okay.
18     A.   Yeah.  I believe it's stated in the
19  liquidation instructions, but at the end of the day
20  all the money -- all the money came from R2.
21     Q.   And I think you said earlier it was UAE
22  government money that came over?

## 43

1     A.   I'm assuming it's UAE government money that
2  came over.
3     Q.   And what's the current status of Vulcan?
4  Does it still exist?
5     A.   I believe it was -- once its trade license
6  was expired, it -- you know, I believe it was
7  liquidated, terminated, et cetera.  It was originally
8  set up, as I said, to do military training, build a
9  military training facility.  That didn't materialize,
10  so that was eventually closed.
11     Q.   And did the assets that were in Vulcan make
12  their way over to NorthStar when Vulcan ceased to
13  exist?
14     A.   Yes.
15     Q.   Okay.  All of them?
16     A.   Yes.  I was CEO of both companies.
17     Q.   Were you CEO of both companies
18  simultaneously?
19     A.   Yes.
20     Q.   Okay.  And you set them up around the same
21  time, maybe Vulcan slightly sooner?
22     A.   Yeah.  Maybe NorthStar was a little bit

## 44

1  behind as far as timing.
2     Q.   So Vulcan was going to be the military
3  training company, if that materialized, and NorthStar
4  was going to be the aviation company?
5     A.   Yes.
6     Q.   Okay.  Do you recall when you learned that
7  the aviation opportunities that you were looking at
8  were going to materialize?
9     A.   Can you be a little bit more specific?
10     Q.   Yeah.  Essentially, as I understand it, the
11  UAE government and NorthStar at some point entered
12  into a contract with respect to 30 or so Bell
13  helicopters, the 407 contract, I'll call it.  So I'm
14  just -- roughly when did you learn that that contract
15  was going to come to be?
16     A.   It was never a sure thing.  You know, I
17  went -- at extreme risk, you know, as I was dissolving
18  R2 and setting up Vulcan and NorthStar Aviation, I
19  decided to use some of the funds to actually put
20  deposits on 30 helicopters.  There was no open
21  solicitation for those 30 helicopters, no contract, no
22  licensing.

## 45

1     So I took an enormous risk by basically
2  leaning forward, you know, with the conviction that I
3  knew I could execute that contract if I win it.  And
4  eventually we -- NorthStar did land that contract in
5  August 2013.
6     Q.   Did anyone direct you to make the deposit
7  on the 30 Bell helicopters?
8     A.   No.  As CEO of R2, I had full authority to
9  do so.
10     Q.   Do you remember approximately when you made
11  that deposit?
12     A.   Sometime in 2011.  I can't remember,
13  because we started getting deliveries of those
14  helicopters, fall 2011 sometime.
15     Q.   How many helicopters did you get at around
16  that time?
17     A.   In the Fall 2011, or throughout the --
18     Q.   In Fall 2011.
19     A.   Fall 2011, we I believe received initial
20  four or five helicopters initially, and then one or
21  two after every month or every several weeks.
22     Q.   And that's when R2 was still in existence?

46

1    A.   R2 was still in existence.  It took four --
2  probably around four years to actually dissolve R2
3  officially.
4    Q.   About how many helicopters did R2 have at
5  the time it was dissolved?
6    A.   At the time it was dissolved, there were 15
7  training aircraft that were being provided to Horizon
8  Flight Training Academy, and whatever Mission Aircraft
9  would receive before R2 was dissolved.  I can't recall
10 exactly.
11   Q.   What happened to those flight aircraft for
12 the Horizon Training Project?
13   A.   They were actually delivered, you know.
14 The -- R2 had executed a contract to provide 15
15 training aircraft to Horizon Flight Academy.  And
16 because R2 was being liquidated, they wouldn't be able
17 to obviously perform the contract.
18       So, you know, I set up NorthStar to provide
19 the services that required additional work to finish
20 that contract.  And eventually it was delivered and
21 completed.
22   Q.   For those 15 training aircraft, who was the

47

1  owner of those?  Was it R2 at the beginning?
2    A.   R2.
3    Q.   Okay.  And how did the ownership get
4  transferred of those aircraft?
5    A.   That -- I was CEO of R2, as I said, and I
6  made that decision to transfer those assets either to
7  Vulcan or NorthStar.  I can't remember, you know,
8  exactly which entity it went to.
9    Q.   And did those 15 training aircraft,
10 eventually were those part of the assets that made
11 their way over to NorthStar?
12   A.   Yes.
13   Q.   So I'm going to take you forward a little
14 bit.
15   A.   Okay.
16   Q.   To around the end of your time with
17 NorthStar, around summer of 2017 into the fall.  And I
18 just want to briefly get, you know, your perspective
19 of what happened where -- because you obviously
20 separated from NorthStar around October, November time
21 frame in 2017.  What led to that?
22   A.   Can you be more specific?

48

1    Q.   Well --
2    A.   You mean my -- I'm sorry.
3    Q.   Yeah.  I've seen several e-mails.  Things
4  obviously, you know, went south.  How did things get
5  there, just from your perspective?
6        MR. JOHNSON:  Objection to form.  But you
7  can answer, if you can.
8    A.   How did things get there.  Well, I'll give
9  you my opinion.  You know, you have the sheikh as a
10 silent essentially absentee owner from 2012 to 2017
11 and not involved in the business.  I ran all the
12 day-to-day operations, made all the operational and
13 financial decisions.
14       And summer of 2017, you know, it's
15 publicized both in Arabian business, as well as talk,
16 in the warehouse between employees of Rotana Jet as
17 well as NorthStar that Sheikh Ahmed's company, Rotana
18 Jet, was suffering from operational issues and
19 financial issues, summer 2017.  I can't remember what
20 month that was.  Additionally, I was made aware of a
21 PowerPoint presentation from -- by Ali -- Ali didn't
22 prepare it, but he provided me the PowerPoint

49

1  presentation that showed a plan or scheme to
2  essentially oust me as CEO, close U.S. -- potentially
3  close U.S. operations.  And in the end it would save
4  the sheikh 15, 17 million dollars, et cetera.
5        So, you know, having this knowledge, I was
6  getting -- I was really getting the big picture that
7  the sheikh was suffering financial difficulties and
8  operational issues with his own company.  And there
9  was a plot to essentially oust me as the CEO and
10 basically take over the bank accounts.  A board
11 meeting was called, I believe in September, early
12 October time frame, by the sheikh, which I believe was
13 a setup.
14       An agenda was put out on -- agenda items
15 were put out by the sheikh.  And many of those items
16 were -- or questions were provided to the sheikh by
17 NorthStar's CFO, Ali, but I think it was just a ploy
18 to, you know, make this whole plot, give it
19 validation.  So October 17 I believe is when the board
20 meeting occurred and to address those -- to address
21 those agenda items.
22       And some of those agenda items were

**50**

compensation, some other financial documents that he
wanted, and a lot of those answers and responses were
provided by Ali.  And there's e-mail threads on it in
the discovery.  So he was providing all the
information that he needed.  But it was a little bit
suspicious to me because after five, six years, there
had never been a board meeting.

He, from the very early stages of our
relationship in the business, you know, he wanted to
dispense with all those formalities; although I kept
him apprised, you know, all the time of the financial
conditions and the status of the contract, et cetera.
So at this board meeting, he stayed maybe less than
ten minutes for something that, you know, he says was
critical and important information that he needed.
Board meeting lasted about an hour.  And there were --
the people in attendance were Hani Farag, which was
his personal finance person, the sheikh, for about ten
minutes, myself, Ali, NorthStar's CFO, as well as
Jalal Mohammed, a Deloitte -- the senior auditor from
Deloitte Touche.

And I had concerns about going to the board

**51**

meeting from the U.S. because I had heard from Ali
that the sheikh was meeting with the auditors several
days and several times before this board meeting,
trying to find any fraudulent activity or issues with
the way I was handling the financial management of the
company.  And, you know, he was trying to find any
improprieties that I believe he could get me in jail
for.  And so I had concerns from my personal safety
going over there, but I wanted to address this
face-to-face.

And this board meeting was conducted and,
you know, I left Abu Dhabi with the understanding that
we'd address all the concerns that he had.  And as I
landed in Milan, which was a layover I had from Dubai,
you know, my -- I got an e-mail saying that he revoked
my power of attorney.

Q.   Did he have the right to revoke your power
of attorney?

MR. JOHNSON:  Objection to form.  Also
objection to the extent it calls for a legal
conclusion.  You can answer, if you can.

A.   Legally, I guess he did as a shareholder

**52**

but, you know, he -- it was definitely a material
breach of our agreements.

Q.   And what agreements are you referring to?

A.   Well, you know, our business relationship
was memorialized in a services agreement between
Rotana Jet and R2, or Newco, as it was referred to as
well, which was eventually NorthStar, dated December
4, 2011.

Q.   In what capacity did you enter that
December 4, 2011 document that you are referring to?

A.   In what capacity?  Well, as CEO of Reflex
Responses, CEO of Newco, or eventually NorthStar, CEO
of Vulcan Management Consulting.

Q.   Not as owner of any of those?

A.   Not as owners.

Q.   And what is the significance of this
December 4, 2011 document that you executed as CEO of
R2?

A.   I think why it's important, Ellis, it
really captures the intent of our initial business
relationship.  You know, profits were supposed to be
split 80/20; 80 percent going to the manager who was

**53**

NorthStar, or Newco, 20 percent to the shareholder.
And that was on net profits.  And essentially one of
our agreements when I started the company is that I
would run the company, run the company both
financially and operationally without limitation.  The
only thing I couldn't do was sell the company.  And it
was really a business opportunity that I presented to
the sheikh.

I brought him in.  I asked him to be my
sponsor after -- after interviewing several potential
sponsors.  I secured the funding.  I staffed it.  I
took the enormous risk in actually signing this
contract, and had all the liability.  You know, the
sheikh provided zero capital, aside from the $40,000
that he used to -- 40,000 U.S. dollars that he used
especially that was a requirement to -- to open the
company up.  And, you know, he did nothing.

He provided, you know, he provided no
assistance as far as opening any doors in the UAE,
which was one of the things I asked him to do to get
other contracts.  Essentially he was an absentee owner
for five, six years.

---

**58**

1    A.   Yeah.  These should be two separate
2  exhibits.
3    Q.   Two separate documents, correct?
4    A.   Right.
5    MR. JOHNSON:  I'm just going to object.
6  The Document speaks for itself, but...
7    Q.   And, Mr. Alberto, I'm going to refer you to
8  page 1623.
9    A.   Yes.
10   Q.   Are there any signatures on those signature
11  blocks?
12   A.   There are not.
13   Q.   Do you -- and I realize it's a lengthy
14  document.  Do you see any signatures anywhere on that
15  document?
16   A.   No.
17   Q.   I don't have any more questions about the
18  document.  Thank you.
19   That's Fine.  Just make sure she gets to
20  keep them all.  The court reporter's nightmare is to
21  lose the exhibits.  And I don't think we'll be looking
22  at that one again.

---

**59**

1    So we were talking about summer, fall, of
2  2017, shortly before we went on break.  And you
3  mentioned what you thought about the situation.  And I
4  appreciate the explanation.  I've also been used in
5  this case -- and I think in some of your interrogatory
6  answers, and also the Vulcan deposition, reference to
7  a Plan B.
8    My first question is what was Plan B?
9    A.   Discussions with the sheikh sometime in
10  2017 or earlier.  He discussed possibilities of
11  closing down U.S. operations, you know, once the
12  contract was delivered.  I had to explain to him that
13  one of the requirements for the licensing is that
14  NorthStar USA had to exist because NorthStar UAE was a
15  foreign-owned corporation and couldn't apply for ITAR
16  licensing.  And -- I'm sorry, I just lost track.
17  Could you repeat the exact question.
18   Q.   Yeah.  My question essentially is what was
19  Plan B?
20   A.   So after -- as I discussed earlier, I was
21  made aware of that PowerPoint to oust me as CEO, close
22  down the USA office.  And my concern was for employees

---

**60**

1  having jobs, and the desire to continue operations in
2  the U.S. both personally and for employees.  So Plan B
3  was to set up a new company, either set up a new
4  company, or have the ability to continue run NorthStar
5  USA possibly independently from -- from NorthStar UAE.
6  Those were the thoughts that were going through my
7  mind to continue operations for NorthStar USA.
8    So Vulcan Aviation was formed with that
9  intent as a Plan B.  In the event that the sheikh
10  closed down U.S. operations, I would be able to
11  provide jobs to a lot of loyal employees that we've
12  had for, you know, several years.
13   Q.   So after you saw the PowerPoint
14  presentation, you took steps to form Vulcan.  What did
15  you do to do that?  What steps did you take?
16   A.   Well it wasn't, you know, it wasn't until
17  the sheikh revoked -- wrongfully revoked my power of
18  attorney.  I believe that was October 17, that I
19  actually -- excuse me.  That was October 19, I
20  believe, is when my revocation of power of attorney
21  was actually signed, that I set up Vulcan Aviation as
22  that Plan B.

---

**61**

1    Q.   After you received the revocation of power
2  of attorney?
3    A.   There were discussions, I believe, before
4  that to potentially do that, in the event, you know,
5  he decided to close U.S. operations.  After he revoked
6  my power of attorney, that's kind of what triggered,
7  you know, my desire to set up Vulcan.
8    Q.   Now, at some point you resigned from
9  NorthStar Aviation.  And I've seen a couple
10  resignation documents in the file.
11   Can -- first of all, when did you resign?
12   MR. JOHNSON:  Objection to form.  Which
13  entity?
14   A.   I resigned as CEO for NorthStar UAE, as I
15  recall, October 24, 2017.
16   Q.   And when did you resign from NorthStar USA
17  as CEO?
18   A.   I resigned from NorthStar USA as CEO, I
19  believe it was November 6, 2017.
20   Q.   And how do you distinguish between
21  resigning from one role versus the other role?
22   A.   Can you clarify?

---

Alberto, Alden Burt

November 28, 2018

17 (Pages 62 to 65)

---

**62**

1  Q.   As I understand it, you were CEO of both
2  NorthStar UAE and NorthStar USA simultaneously,
3  correct?
4  A.   Yeah.  I was -- if I may.
5  Q.   Sure.
6  A.   I was CEO of NorthStar UAE.  I was managing
7  director of UAE.  I was a board member of UAE.  I was
8  a manager of NorthStar USA.  I was a CEO of NorthStar
9  USA.
10         NorthStar USA was a subsidiary of NorthStar
11  UAE, but a separate company.
12         Q.   And as I understand it, your position is
13  that you resigned only from NorthStar UAE on October
14  24?
15         A.   Yes.
16         Q.   And as I understand it, your position is
17  that you resigned as a board member and an employee
18  and CEO of UAE on October 24?
19         A.   No.  That's not true.
20         Q.   Okay.
21         A.   As you mentioned, I only resigned as CEO of
22  NorthStar UAE on October 24.  And I was -- resigned

---

**63**

1  from NorthStar USA as CEO on November 6.  I never
2  resigned or was formally discharged from my other
3  roles.
4         Q.   Is it your position you are still on the
5  board of NorthStar UAE?
6         A.   No.  I mean, I don't serve in that
7  capacity, but there was never any formal resignation
8  or discharge that I'm aware of, except the document I
9  was made aware of, the addendum to the Memorandum of
10  Association that was essentially used to supersede the
11  original Memorandum of Association that granted me
12  full authority to run all the financial and
13  operational issues for the company.  And I believe I
14  was formally discharged as NorthStar UAE managing
15  director as of May 23, 2018, is what I recall.
16         Q.   Why did you choose to resign only from UAE
17  on October 24?
18         A.   For a couple different reasons.  First of
19  all, I consulted with at the -- then at the time with
20  corporate counsel Akin Gump, and made them aware of
21  what was going on.  And, you know, my employment
22  contract, which Akin Gump had drafted, was that I was

---

**64**

1  an employee of NorthStar USA.  So, and I was advised
2  that I was still, you know, had all the power, you
3  know, within them that -- excuse me.  I still had the
4  power and authority to run NorthStar USA as a CEO and,
5  you know, so I was taking, you know, small steps.
6         You have got to understand my mind set, you
7  know.  I'm the founder.  I founded this company,
8  NorthStar USA, in 2012.  And, you know, then my power
9  is revoked, you know, after running this company for
10  several years with a totally absentee owner who was
11  never involved in the company.  You know, so I'm in
12  damage control, you know.  I'm not sure exactly where
13  this is leading to, but it kind of plays into that
14  whole PowerPoint, you know, that I was made aware of
15  that the sheikh was having operation -- financial
16  issues with his company.
17         He was, you know, essentially wanted to
18  hijack NorthStar's bank accounts.  So I consulted with
19  the then corporate counsel, Akin Gump.  They told me
20  essentially to take it step by step, you know, and
21  valuate it.  And so that was the first step, you know,
22  I performed was to resign from -- as NorthStar's CEO

---

**65**

1  because of concerns of -- one of the major concerns
2  was potential ITAR violations because, you know, I was
3  a senior official for NorthStar as far as ITAR
4  licenses.  And my senior vice president Terry Key
5  resigned on October 24.  And he was responsible for
6  the day-to-day oversight of ITAR activities in the
7  UAE.
8         So I took steps -- and we can get into more
9  detail, I interpret it, that was one of the steps I
10  took to mitigate that risk of potential liability.
11         Q.   Now, was Terry Key only an employee of
12  NorthStar UAE?
13         A.   I believe he was an employee of NorthStar
14  USA as well.
15         Q.   Okay.  Were you an employee of both
16  NorthStar USA and NorthStar UAE?
17         A.   My employment agreement states that I was
18  an employee of NorthStar USA.  And that was a
19  requirement by the State Department, to essentially be
20  compensated directly and be an employee of a U.S.
21  company to avoid any potential conflicts of ITAR
22  issues where there could be any undue influence from

---



**66**

the UAE side.

Q.    What exactly is it that you were resigning from on October 24 from your perspective?  Because I think I heard you just say you were only an employee of NorthStar USA, so I'm trying to understand what you resigned from on October 24 from your standpoint?

A.    Well, I was still CEO of NorthStar -- before I resigned, I was CEO of NorthStar UAE.  I was still responsible for all the day-to-day management of NorthStar in the UAE, as well as continue to deliver any contractual obligations on our current contracts there.  I was the one that signed the $300 million contract, you know.  So, yeah, ultimately I was responsible.

Q.    And the $300 million contract, just so the record is clear, what contract are you referring to?

A.    That's for the 30 mission aircraft that was being provided to the Joint Air Command.

Q.    With the UAE government?

A.    With the UAE government.

Q.    So your October 24 resignation, from your standpoint, was resigning from the role of chief

**67**

executive officer of NorthStar UAE?

A.    That's correct.

Q.    And again, you do not contend that you were ever an owner of NorthStar UAE, correct?

A.    Well, let me go on record and just clarify that, because you keep going back that I was not an owner of NorthStar UAE, right.  First of all, you know, when I first set up Vulcan and NorthStar, you know, the sheikh wasn't the only person that I was considering as a sponsor.  I had the money.  I had assets to transfer from R2.

And the government was allowing me to do that because of my performance, you know, under R2, and my success there.  And, you know, I couldn't as a non-Emirati citizen, at the very least become a non-majority -- excuse me -- a majority owner of a company, you know.  I could have been a 49 percent owner, but early on I was advised that, you know, he's part -- Sheikh Ahmed is part of the royal family.  And it would be kind of an affront to him if I wanted to be an owner.

And, secondly, is I was advised -- and I

**68**

believed, that if this was -- if this company, both Vulcan and NorthStar was 100 percent owned by a UAE citizen, specifically a member of the royal family, that would set us up for success in possibly opening more doors in UAE and getting more contracts.  So I wanted to set us up for success.  I was not technically an owner, but I was responsible for setting this company up.

It could have been another Emirati citizen that was my sponsor, but I chose the sheikh.  And he became my sponsor.  And that's why, you know, Vulcan Management was set up, and NorthStar.

Q.    And Sheikh Ahmed owned 100 percent of Vulcan, and he owned 100 percent of NorthStar, correct?

MR. JOHNSON:  Objection.  Asked and answered.

A.    Yes.

Q.    You mentioned earlier that you said, I think -- I think this was your words, or something like this, that I have the money.  It wasn't your money, was it?

**69**

MR. JOHNSON:  Objection to form.

A.    It wasn't my money, but I secured the funding, because of the confidence that I had with the UAE government based on my performance at R2.  So, no, technically it wasn't my money.  It wasn't the sheikh's money.  But because of my performance, I was able to secure that funding and set up Vulcan and NorthStar to receive that money to essentially get other contracts in the UAE.

Q.    Who told you that it was your performance that led to the government transferring the money into Vulcan and to NorthStar?

A.    Well, I think it's -- I think it's obvious, but I was told directly by my -- number 1, I was told by my -- the person I was directly interfacing with, which was Brigadier Hamid, who's responsible for all the R2 programs.  He was on the UAE government, slash, military side.

And, number 2, think if you look at the facts, is if I didn't perform well, if I didn't perform well in R2, you know, why would they allow me to take approximately $100 million in cash and assets,

**70**

1  be a CEO of another company, and be able to use that
2  $100 million in assets and start, you know, basically
3  two new companies.  Common sense says if I did a poor
4  job at R2, I wouldn't have been allowed to essentially
5  open two new companies and be CEO from, you know, the
6  funding that came from R2.
7          Does that make sense?
8      Q.  I'll stick to answering the questions, but
9  I understand your explanation, and I appreciate it.
10         There were other employees in the companies
11  that were set up, correct?  Vulcan and NorthStar, you
12  weren't the only person?
13     A.  Yes.  There were other employees.
14     Q.  And in NorthStar specifically there were
15  many employees with significant aviation experience,
16  correct?
17     A.  Yes, that I -- that I hired.
18     Q.  You don't have any aviation experience?
19     A.  I have zero aviation experience except for
20  me riding in helicopters and airplanes.  That's the
21  most aviation experience that I have.
22     Q.  And who were some of the individuals with

**71**

1  significant aviation experience that you hired in
2  NorthStar?
3      A.  Terry Key, Lyle Becka, James Jett, Karl
4  Schuman, Steve Champley, Adam Gunn, Steven Rogason,
5  Greg Huber.  That's it.  That's all I recall.
6      Q.  Was it significant at all to the UAE
7  government, when they decided to fund NorthStar, that
8  you had within your employment at NorthStar several
9  individuals, the ones you just named, as employees of
10  NorthStar?
11         MR. JOHNSON:  Objection to form.
12  Speculation.
13     A.  Yeah.  Can you clarify, Ellis?  I'm not --
14  specifically what were you looking for?
15     Q.  In your opinion --
16     A.  Right.
17     Q.  -- was it significant to the UAE government
18  that you had employees with significant aviation
19  experience when they funded NorthStar?
20     A.  I don't -- ask it a different question.  I
21  don't understand exactly what you are asking.
22     Q.  Essentially what I'm asking is would the

**72**

1  UAE governments have given NorthStar Aviation money
2  for an aviation contract if you didn't have employees
3  with significant aviation experience?
4          MR. JOHNSON:  Same objection.  Calls for
5  speculation.
6      A.  I don't know what they would have done.  I
7  don't think that played a role in whether that money,
8  you know, came to NorthStar or Vulcan.  When I met
9  with Brigadier Hamid and he asked me to essentially
10  unwind R2, he gave me broad parameters on what I could
11  do.
12         It could have been, you know, a restaurant.
13  You know, the only two mandates he gave was -- or
14  boundaries he gave me was don't involve Erik Prince,
15  and don't do anything that's hot or that could bring
16  bad publicity to the UAE.  And I respected that.  And
17  I decided to open an aviation company because I heard
18  of a potential requirement by the Presidential Guard
19  that they were looking for a light attack helicopter.
20         And, you know, and when you look at that,
21  with no aviation experience, it was an enormous risk
22  that I undertook by opening an aviation company with

**73**

1  no experience.  So, you know, that was my decision.
2      Q.  Did you --
3      A.  Did I answer your question?
4      Q.  I think so.  Did you involve Erik Prince at
5  all after you were told not to?
6      A.  No.  No.
7      Q.  If I understand correctly, Erik Prince goes
8  by the handle or the acronym C2; is that correct?
9      A.  In some of the e-mails, yes, he's C2.
10     Q.  So if there's a reference in an e-mail to
11  C2, that would be Erik Prince?
12     A.  Right.
13     Q.  So we've been talking about this PowerPoint
14  a lot.
15     A.  Yes.
16     Q.  And I just want to put what I believe is
17  that PowerPoint in front of you.  And we'll mark this
18  as Exhibit 2.
19             - - -
20         (A document was marked as Deposition
21  Exhibit Number 2.)
22             - - -

---

**82**

1       (A document was marked as Deposition
2   Exhibit Number 4.)
3           -  -  -
4       BY MR. BENNETT:
5       Q.   Mr. Alberto, do you recognize Exhibit 4?
6       **A.   I recognize it as a Wells Fargo banking**
7   **statement for NorthStar Aviation.**
8       Q.   Okay.  And if you look at the top
9   right-hand corner, it says Wells Fargo Business Card
10  Visa.  And then there's an account number to the left
11  of that.
12          Do you recognize this statement to be for
13  the Wells Fargo credit card for NorthStar USA?
14      **A.   Yes.**
15      Q.   Okay.  And if you look at the statement
16  closing dates on the left-hand side, the date
17  reflected on there is November 24, 2017, top left-hand
18  corner.
19      **A.   Yes.  11/24/2017.**
20      Q.   And I want to ask you about some of the
21  transactions on this statement.
22      **A.   Sure.**

---

**83**

1       Q.   If you look down toward the bottom of the
2   page, there's a -- an October 26 transaction that's
3   the third transaction from the top of the list.
4       **A.   Yes.**
5       Q.   To Bergstrom Attorneys Trust for $5,000.
6   Do you have any knowledge of what that charge was for?
7       **A.   It was work for -- I can't tell**
8   **specifically.  If you have got follow-on**
9   **documentation, I can tell you exactly.**
10      Q.   Bergstrom is the firm that you hired to set
11  up Vulcan for you, correct?
12      **A.   Yes.  They are the law firm.**
13      Q.   Do you know whether that $5,000 charge was
14  for the services in connection with setting up Vulcan?
15      **A.   It could have been.**
16      Q.   And there's another entry directly
17  underneath that for $1,140 to Bergstrom as well.  Do
18  you -- do you know what that charge was for?
19      **A.   Not with looking -- not without looking at**
20  **the follow-on documentation.**
21      Q.   Okay.  Could it have also been in relation
22  to your setting up of Vulcan?

---

**84**

1       **A.   It could have been.**
2       Q.   And then on the next page, on October 27,
3   the first transaction, first full transaction is a
4   charge for Bergstrom attorneys for $10,000.
5           Could that have also been to set up Vulcan?
6       **A.   I believe that $10,000 charge was -- it**
7   **could have been, but I believe that was a retainer.**
8   **I'm not sure.**
9       Q.   You've mentioned you think it was a
10  retainer, for what type of work?
11      **A.   Consulting.  It could have been Vulcan**
12  **Aviation.  They performed other work besides Vulcan**
13  **Aviation.**
14      Q.   Now the dates of all these transactions we
15  are talking about, that start on the 26th of October
16  2017, you had already submitted your resignation to --
17  your first resignation document dated October 24,
18  2017, that you contend was only for NorthStar USA?
19      **A.   As CEO of NorthStar USA, yes, October 24.**
20      ==Q.   So it's your position that during these==
21  ==transactions from October 26 through November 6 you==
22  ==were still the CEO of NorthStar USA?==

---

**85**

1       ==A.   That's correct.==
2       Q.   And after November 6, 2017, you were no
3   longer the CEO or an employee of NorthStar USA; is
4   that right?
5       **A.   I was no longer the CEO of NorthStar USA.**
6       Q.   Okay.  Were you an employee or -- an
7   employee after November 6, 2017 of NorthStar  USA?
8       **A.   Well, by title I was still managing --**
9   **manager of NorthStar USA, still a board member of**
10  **NorthStar UAE, still managing director of NorthStar**
11  **UAE until May 23, 2018, when I was discharged.**
12      Q.   There is a charge on the 26th of October to
13  Peter Balciunas, I don't know if I'm pronouncing that
14  correctly, for $5,000.
15          Do you have any  understanding of what that
16  charge was for?
17      **A.   I believe it was in -- connected to doing**
18  **work for brochures.**
19      Q.   For Vulcan brochures?
20      **A.   He was doing work for both.  He did work**
21  **for Vulcan brochures as well as NorthStar.**
22      Q.   Were NorthStar funds used to pay

---

---

**110**

1   President Ghani was visiting New York for UNGA, the
2   U.N. General Assembly.  So, initially, I met with
3   Ambassador Mohib, or had calls.  I can't remember if I
4   met with him in DC first, and he said he would like to
5   present this to President Ghani for approval.  And
6   timing was critical because President Ghani was
7   meeting with President Trump and UNGA, and he wanted
8   to ask for financial assistance.
9       So I went to New York as a follow on, both
10  Hillary and myself made a presentation to Ambassador
11  Mohib in New York.  And he took one of the proposals
12  to President Ghani to discuss that so we could bring
13  that up on his agenda with President Trump.
14      Q.   And where did those discussions go?
15      A.   There was some continued follow-up.  There
16  was some continued follow-up, but obviously I wasn't
17  involved in those.  I'm not sure where they ended up,
18  but I believe that, again, if I was still the CEO of
19  NorthStar, that we'd be very close to having a
20  contract with Afghanistan.
21      Q.   Were -- would ITAR, having an ITAR license,
22  been important to procuring either of those contracts?

---

**111**

1       A.   It would --
2       MR. JOHNSON:  Objection to form.
3       A.   It would have been a requirement.  As you
4   know, Ellis, it's a military helicopter, so it would
5   be considered a defense article.  So ITAR would play
6   into both of those.
7       Q.   There was a point in time where you made
8   efforts to transfer NorthStar USA's ITAR license over
9   to Vulcan USA.  What was your reason for doing that?
10      MR. JOHNSON:  Objection to form.
11      A.   Could --
12      Q.   I guess the first part of that, did you
13  attempt to transfer NorthStar USA's ITAR license over
14  to your new company, Vulcan USA?
15      A.   There was discussions.  No attempt was
16  made, but discussions with the State Department, as
17  well as with Akin Gump, as an option to transfer
18  licenses.  The situation as I alluded to earlier is in
19  the event that Sheikh Ahmed closed down NorthStar USA,
20  as he was thinking about.  I wanted to provide
21  continuity to the operations.  I wanted to keep
22  NorthStar USA alive, whether through NorthStar USA or

---

**112**

1   a new company like Vulcan.
2       So I consulted with corporate counsel at
3   the time, which was Akin Gump, as well as the State
4   Department.  And discussions and conference calls were
5   made.  And it ended up that the State Department --
6   basically the final advice that the State Department
7   said was there could be risk to the new company if
8   there are any ITAR violations committed in the UAE.
9   And that would carry with the new company, whether
10  it's a new NorthStar USA or Vulcan.
11      So I was advised to register Vulcan
12  independent -- basically Vulcan to apply for its own
13  licensing.  And in the end, that's what I did.
14      Q.   And you paid the registration fee with the
15  State Department, I believe it was around $2,500 to
16  register NorthStar USA's ITAR license number with
17  Vulcan?
18      A.   Somewhere around there, Ellis.  I can't
19  tell you if 22 or 25 hundred but, you know, I can
20  confirm that if you show me something, but yes.
21      Q.   And the exact amount is not important, so
22  what -- what happened with that paperwork that you

---

**113**

1   submitted to transfer the ITAR license over to Vulcan?
2       A.   There was never any paperwork.  It was only
3   consultations.  And it was me evaluating what our
4   options were to continue operations in the U.S.,
5   whether it was under NorthStar USA or whether it was
6   through Vulcan it is -- and that was it.
7       Q.   You did submit the application along with
8   the registration fee to the State Department to make
9   the transfer though, correct?
10      A.   No, I didn't.  I submitted a -- I submitted
11  an application for NorthStar to obtain its own
12  license.  As far as transferring NorthStar's license
13  to another entity or Vulcan, that was just
14  exploratory.
15      Q.   But you did pay the registration fee that
16  the State Department required to make that transfer or
17  not?
18      A.   No.
19      Q.   Okay.
20      A.   The fee was paid for Vulcan, independent
21  from NorthStar, for a new license, if that makes it
22  clearer.  It wasn't NorthStar USA's current license.

---

Alberto, Alden Burt

November 28, 2018

42 (Pages 162 to 165)

---

162

1 to continue operations in the U.S. And one of those
2 options was to, as you see, an offer to buy out Sheikh
3 Ahmed.
4    Q. In the next page, the title of the slide is
5 How Did We Get Here. And there are three bullet
6 points there. Is this a slide that you put together?
7    A. It's -- this was Terry, but I was present.
8    Q. Okay. Do you have any understanding of
9 what the first bullet point references?
10    A. Reno -- I'm sorry. I think essentially
11 what Terry's referencing is based on my original
12 agreement with the sheikh was that I'd run all company
13 operations, you know, independent from him. He would
14 remain a -- basically a shareholder that had the air
15 operation certificate and trade license for NorthStar.
16 And both myself and Terry would run all the day-to-day
17 -- make all the day-to-day management decisions, run
18 operations, and execute the UAE contract and
19 potentially other contracts.
20        And for the first -- from 2012 to October
21 2017, everything worked great. We delivered a very
22 complex contract on time and on schedule, making our

---

163

1 last delivery February 2017. We were on the verge of
2 landing -- actually, now that jogs my memory, three
3 contracts which were the block 2 upgrades, the BLOS
4 contract for 29 to 30, Beyond Line of Sight systems
5 with Hughes -- Hughes -- I believe it is Hughes
6 Network, and the Iraq project for I believe it was
7 initially 10 light attack helicopters.
8        So I think he's referencing the fact that,
9 you know, the way things were running, it was
10 successful.
11    Q. And the next slide, there's a slide that
12 says available options. I think it's on the next
13 page.
14    A. Yes.
15    Q. Are those the options that you and Mr. Key
16 and Mr. Ali were considering at that time?
17    A. I think it was one of -- there were a few
18 of a number of options we were considering. This one
19 made it to paper.
20    Q. The bullet points on the left-hand side of
21 the bottom says CEO and SVP dismissed.
22        What does that mean?

---

164

1    A. SVP, senior vice president. And I think
2 he's referencing myself and Terry being dismissed.
3    Q. And what are the three bullet points
4 underneath that statement?
5    A. The way Terry looked at it is that if
6 myself and Terry were dismissed like we were, there
7 was a potential interruption in the business and, you
8 know, the contract -- the remaining parts of the
9 contract wouldn't be delivered. It says we would have
10 to establish a new company and apply for license to
11 execute future foreign sales.
12        So that's where we didn't want to go. We
13 were really trying to see what would be an agreeable
14 solution with the sheikh.
15    Q. And what was it at this point in time
16 around the tenth of October 2017 that led to your
17 impression that you may end up being dismissed, you
18 along with Mr. Key?
19    A. Well, you know, we were given that
20 PowerPoint that was prepared by Marwan that we looked
21 at earlier by the direction of Salem. And it clearly
22 states the intentions of that, you know, but that

---

165

1 wasn't just done in isolation. You know, there were
2 other things that were happening.
3        As I said, like, earlier I referred to,
4 you know, the issues that he was having with his own
5 company, Rotana Jet, and as well as Ali's
6 communication with me that the sheikh was essentially
7 trying to get the senior auditor, Deloitte Touche,
8 Jalal Mohammed at Deloitte Touche to basically shape
9 the financials of the company so that it reflected
10 poorly against me. And, you know, along with that
11 conversation Ali told me that Jalal Mohammed said,
12 listen, something to this effect: I've been the
13 senior auditor for NorthStar UAE since 2012, since you
14 won -- NorthStar was opened, and as well as NorthStar
15 UAE which was opened a little bit earlier. But he's
16 been audited -- auditing NorthStar UAE financials
17 since -- since the beginning.
18        And he said, Every single year I have
19 signed off on that audit. If there were any issues, I
20 would have raised them at that point. He says, I'm a
21 senior auditor at Deloitte Touche, you know, a global,
22 recognized audit firm. And when -- once I put my

---

---

166

1  signature on it, that is essentially my approval that,
2  you know, the financials, the financials are good.
3  And there's nothing that would basically highlight any
4  issues with the financials.  And he said I sign every
5  one of those every single year.
6      And when he was doing the financials for
7  2016, which was obviously in 2017, he said the assets
8  -- and I'm just kind of paraphrasing what Ali told me
9  that Jalal Mohammed was telling the sheikh, is that
10  the company's solvent.  It's on solid financial
11  footing.  Assets cover liabilities three to one.
12      And Reno, because of his power of attorney,
13  had the power and authority to run the company as he's
14  been doing.  He had -- there were no issues.  And so
15  -- did that answer your question?
16      Q.   Yes, it did.  But speaking of the
17  financials, at any point before you gave yourself a
18  bonus, did you call a board meeting?
19      A.   No.  I didn't have to.  I was -- I had the
20  full authority to issue my compensation, but it was
21  still a process just, you know, it was still a process
22  where I would confer with Ali.  Ali would tell me the

---

167

1  liquidity position of the company.  And I'll speak
2  both for myself and the employees, because it was done
3  in conjunction.  And he'd tell me what the liquidity
4  position was for NorthStar to be able to pay bonuses
5  for that year.
6      And he'd give me parameters.  This is how
7  much we have to pay bonuses.  And, you know, so with
8  that, both with my bonuses and the company bonuses I
9  paid, were always within that parameters.  Bonuses
10  were never paid either to myself or the company that
11  jeopardized the solvency or liquidity of NorthStar
12  UAE.
13      Otherwise, you know, I'm sure Deloitte
14  Touche would have, you know, brought up those issues
15  in their financial audits every year.
16      Q.   Do you recall signing documents when you
17  issued bonus payments to yourself?
18      A.   Yes.
19      Q.   That said something to the effect that you
20  had obtained the necessary approvals?
21      A.   Yes.
22      Q.   And what approvals did you obtain?

---

168

1      A.   Again, I -- the approval -- I didn't need
2  approvals to pay bonuses.  It was well within my power
3  of attorney that was issued to me to approve bonuses
4  for myself, approve bonuses for all company employees.
5  And that all fell under compensation.
6      Q.   Why did you sign a document that said you
7  obtained necessary approvals if you didn't need
8  approval?
9      A.   That was a document that Hani Farag
10  generated, and that made him feel better.  He in
11  actuality was a board member as well, a senior
12  corporate resource.  And, secondly, the sheikh knew we
13  were paying bonuses.  He had no issue with them.
14      Every single year he received financial audits
15  from Deloitte Touche.  He received company financials
16  every single year.  Secondly, he had access.  If there
17  was any information that the sheikh wanted, he had
18  freedom of access to go to Ali and obtain that
19  information.
20      From 2012 all the way up to, you know,
21  until 2017, he had no issues.  He certainly had no
22  issues receiving large dividend checks that he

---

169

1  received that I approved.  And he didn't have any
2  issues with the bonuses.
3      Q.   Is there any line item on any financial
4  statement anywhere for NorthStar showing your specific
5  amount of bonuses?
6      A.   I'm sorry.  Could you --
7      Q.   Is there anywhere --
8      A.   -- clarify?
9      Q.   -- on the financial statements that says
10  Reno Alberto, bonus in amount of X?
11      MR. JOHNSON:  Objection to form.  Which
12  financial statements?
13      Q.   Any.  Any financial statement in the
14  company that you have seen, is there any documents
15  that shows the specific amount of your individual
16  bonuses?
17      A.   I believe in employee records or Finance,
18  you know.  I don't know, but I assume they keep track
19  of all the bonuses each employee is paid.  And I would
20  ask Ali.
21      Q.   The financial documents that Deloitte and
22  Touche audited showed a line item for all employee

---

Alberto, Alden Burt

November 28, 2018

44 (Pages 170 to 173)

---

**170**

1  bonuses combined, correct?

2  **A.  Yes, it did.**

3  Q.  It didn't show what the individual amounts

4  were, correct?

5  **A.  I don't recall, but that could be the case.**

6  Q.  So Dr. Ahmed wouldn't have been able to

7  tell what your specific bonus amounts were from

8  looking at the Deloitte and Touche financial

9  statements?

10  MR. JOHNSON:  Objection to form.  Calls for

11  speculation.

12  **A.  I don't know.  I don't know.  He never**

13  **raised any concerns, you know, until 2017.  And so my**

14  **assumption is he had access.  He had the -- he could**

15  **have asked me.  I'd have no issue telling him.**

16  Q.  Did you ever tell him any amount of bonus

17  that you took?

18  **A.  I don't recall specifically.**

19  Q.  Did you ever ask for his permission to take

20  a bonus?

21  **A.  No.  I didn't need to.  I had full**

22  **authority to do so.**

---

**171**

1  ==Q.  And that authority, your position is that==

2  ==authority came from your power of attorney?==

3  ==A.  It did.  Otherwise there wouldn't be an==

4  ==addendum to, you know, the MOA making changes to my==

5  ==original power of attorney or the original MOA.  You==

6  ==know, I believe the addendum to the Memorandum of==

7  ==Association, you know, it gives a specific paragraph==

8  ==there where it says the board shall approve all==

9  ==bonuses in writing to the CEO, the manager, the==

10  ==managing director and all employees.==

11  MR. LEONARD:  We've been going for a while.

12  Shall we take a take a break?

13  MR. BENNETT:  Sure.

14  VIDEOGRAPHER:  Off the record at 15:44.

15  - - -

16  (Recessed at 3:44 p.m.)

17  (Reconvened at 3:59 p.m.)

18  - - -

19  VIDEOGRAPHER:  On the record at 15:59.

20  BY MR. BENNETT:

21  Q.  Mr. Alberto, I'm putting Exhibit 10 back in

22  front of you, which is the chain of text with Terry

---

**172**

1  Key and yourself and a few other individuals.  Looking

2  at the second page of the exhibit, about midway down

3  the page, it's a 10/25/17 message from -- looks like

4  from you to Terry at 12:53 is the time stamp on it.

5  Do you see that one?

6  **A.  12:53.**

7  Q.  Correct.

8  **A.  Yes.**

9  Q.  And it looks like Terry's writing to you,

10  and the message reads, I think we asked them to change

11  the prime to Vulcan and then submit once we are

12  registered.  Thoughts.

13  And then you respond, Agreed, but I was

14  trying to remember what you were going to try and find

15  out first.

16  So any recollection about what the subject

17  matter of that is?

18  **A.  Yeah.  It never materialized, but there was**

19  **a -- a JTech proposal that was basically ran by my**

20  **desk through a colleague that I had known for a few**

21  **years.  It was a military-type training, had nothing**

22  **to do with aviation, but we never submitted a**

---

**173**

1  proposal.  And I think Terry was suggesting that, you

2  know, if Vulcan actually got up and operating, that we

3  would be able to do this contract.

4  Q.  And that was on the 25th of October 2017,

5  so you had -- you had just resigned from NorthStar UAE

6  the day before that?

7  **A.  As the CEO.  Yes.**

8  Q.  And you were still employed by NorthStar

9  USA on 10/25/17?

10  **A.  Right.**

11  Q.  There's an entry on the next page.  It's

12  11/2 of '17 at 8:58, Terry writing to you.  It says, I

13  don't think they realize you still control the USA

14  side.  You going to confront HH.

15  Do you have any understanding of what that

16  context of that conversation means?

17  **A.  As far as where he says, "I don't think**

18  **they realize you still control the USA side," that**

19  **references I was still the CEO of NorthStar USA.**

20  **Where he says, "You going to confront HH," I don't**

21  **recall what he was referencing to.**

22  Q.  Then you responded, the first sentence you

---

Alberto, Alden Burt

November 28, 2018

45 (Pages 174 to 177)

---

174

1  responded with is HH clearly doesn't understand.  And
2  then there's some more that follows that.  What is it
3  that you can't think HH understood at that point in
4  time?
5      A.  HH -- I'm just reading this out loud, HH
6  clearly doesn't understand.  Once he speaks with AG,
7  which is Akin Gump, he will then understand.  Not sure
8  what that will accomplish except wants me to give him
9  and Salem an ass beating.
10      That references -- I think that's clear,
11  that statement.  But I think he's referencing the --
12  the licensing is, you know, I was the senior empowered
13  official.  And, you know, there would be no senior
14  empowered official.  He was -- and Terry was senior
15  vice president overall in charge of oversight of ITAR
16  activities in the UAE.  I think he wanted me to make
17  that clear with HH.
18      Q.  And so it was your understanding that if
19  you weren't working for NorthStar USA, NorthStar USA
20  would not be able to continue to use its ITAR license?
21      A.  No.  I mean, all they would have to do was
22  a name change.  And in fact that's what they ended up

---

175

1  doing.
2      Q.  Well, and that's what I'm trying to clarify
3  with you is what is it that you believe that HH didn't
4  understand?
5      A.  Well, from the very beginning, like I said,
6  he wanted to shut down U.S. operation, U.S. office.
7  When that was one of the requirements by the State
8  Department is to basically maintain independence of
9  any undue influence for export control for a foreign
10  company, one of the requirements State Department put
11  forth is that NorthStar needs a USA entity.
12      Q.  And what is the line that you still control
13  the USA mean?
14      A.  As I said earlier, I hadn't resigned as
15  NorthStar USA CEO yet.  I still had full authority to
16  run NorthStar USA as a CEO.
17      Q.  Did Dr. Bin Saif understand at that point
18  that your position was that you had not resigned from
19  NorthStar USA?
20      MR. JOHNSON:  Objection.  Calls for
21  speculation.
22      A.  I don't know.  I would -- I don't know what

---

176

1  his mind set was at that point.
2      Q.  But you had submitted a resignation already
3  at that point in time?
4      A.  Yes.  It was very clear that I was
5  resigning from NorthStar UAE as CEO.
6      Q.  And the statement that you still controlled
7  the USA means that you were still, from your
8  perspective --
9      A.  Had authority, had full control of
10  NorthStar USA.
11      Q.  And at that point in time you had already
12  been implementing Plan B, correct?
13      A.  It was put forth in motion.  Yes.
14      Q.  Did you ask for the board's permission to
15  implement Plan B?
16      A.  I was a board member, and I didn't need the
17  board's permission to do that.
18      Q.  How was forming Vulcan and taking contract
19  work over to Vulcan in the best interest of NorthStar
20  Aviation USA?
21      MR. JOHNSON:  Objection.  Mischaracterizes
22  prior testimony.

---

177

1      A.  Ellis, all I can say is Vulcan was a Plan
2  B.  As I said, there was a possible scenario where the
3  sheikh was going to close down NorthStar USA and its
4  operations.  And I put Plan B in motion after he
5  revoked my power of attorney to hopefully keep some of
6  the NorthStar employees employed.  But that never
7  materialized.  It remained a shell company.
8      Q.  And my question is how did those actions
9  benefit the company NorthStar USA?
10      A.  Well, it was going to benefit -- I'm sorry.
11  Go ahead.
12      Q.  No.  That's it.
13      A.  It was going to benefit the company because
14  it would provide continuity of operations, you know.
15  All the loyal employees that we would have would still
16  -- would still have jobs.  And, you know, we could
17  potentially go after other contracts, you know, from
18  that NorthStar USA.
19      Q.  But that would have been to the benefit of
20  Vulcan, your company that you owned, correct, not the
21  benefit of NorthStar USA?
22      A.  As I said, it's -- it was seamless to me.

---

186

1    Hichem through Vulcan?
2        A.   As I said, I had talked to him previously,
3    a few years -- a couple years before that, before this
4    date.  And he was looking to pitch a number of
5    countries in the Middle East that he said he had close
6    ties with.  And, as I said, it never materialized.
7        Q.   And at that point in time on 11/7 of '17
8    you had resigned from -- or, no, actually 10/25/17,
9    you had only resigned from NorthStar UAE at that point
10   but not NorthStar USA?
11       A.   That's correct.
12       Q.   Did you explore any business opportunities
13   with Hichem after you resigned from NorthStar USA
14   about the --
15       A.   I think there were -- I think there were
16   conversations, you know.  He continued to, you know,
17   pitch me on opportunities in the Middle East, and
18   wanted to essentially go after other opportunities
19   that he was aware of and -- but it never materialized.
20       Q.   There's been a lot of talk today about
21   revocation of your power of attorneys.  I want to put
22   an exhibit in front of you, and she'll have to mark

---

187

1    it.  I think we are up to 15 now.
2            -  -  -
3            (A document was marked as Deposition
4    Exhibit Number 15.)
5            -  -  -
6        BY MR. BENNETT:
7        Q.   Mr. Alberto, you have in front of you
8    Deposition Exhibit 15.  Do you recognize that
9    document?
10       A.   As I read it, it's the revocation of the
11   power of attorney.
12       Q.   And is the date that you received this
13   document October 19, 2017?
14       A.   I believe that's accurate.
15       Q.   How did you become aware of this revocation
16   of power of attorney?
17       A.   Both through e-mail and through Ali.  This
18   was sent to my e-mail as I was landing in Milan.  And
19   Ali had I believe called me as well and let me know.
20       Q.   And on that same date I think you testified
21   to this earlier, you -- you obtained the registration,
22   which is an exhibit in the file, for Vulcan Aviation,

---

188

1    correct?
2        A.   Yes.  It was later on in the day, or early
3    evening that that happened.
4        Q.   And even before receiving the revocation of
5    the power of attorney, you'd put steps in place with
6    your attorneys to be able to pull the trigger
7    essentially to finalize Vulcan Aviation's registration
8    station?  I believe that's what you testified to.  If
9    I'm incorrect, just let me know.
10       A.   I believe that's correct.
11       Q.   So I'm going to ask you about this letter
12   that will be marked as Exhibit 16.
13           -  -  -
14           (A document was marked as Deposition
15   Exhibit Number 16.)
16           -  -  -
17       BY MR. BENNETT:
18       Q.   Do you recognize Exhibit 17, Mr. Alberto?
19       A.   Give me a minute.
20       Q.   Oh, 16.  I'm sorry.  Exhibit 16.
21       A.   Okay.  Ellis, I do recognize it.
22       Q.   What is it?

---

189

1        A.   This is a letter informing the client,
2    Major General Toumajan, who represents -- he's the
3    commander of the Joint Aviation Command, of my
4    resignation from NorthStar Aviation UAE and
5    essentially what led up to that.
6        Q.   And did you deliver this message to the
7    Joint Aviation Command?
8        A.   I believe I did.  I believe it was through
9    e-mail.
10       Q.   Okay.  Why did you write this letter to the
11   Joint Aviation Command?
12       A.   I -- after consultations with Akin Gump, as
13   well as Amy, our compliance officer, I wanted to
14   inform the client, especially because I was no longer
15   empowered to provide overall oversight as the senior
16   official for ITAR activities, I wanted to give them a
17   heads up that all ITAR activities will cease as of
18   October 25.  You know, I believe I -- I had a good
19   relationship with the client.  We had contractually
20   did everything that we said we would deliver on time.
21   And, more importantly, the helos that we delivered
22   actually worked and operated and they were satisfied.

Alberto, Alden Burt                                    November 28, 2018

---

190

1    And I think much more important was my
2    reputation.  And it was important for me, for them to
3    know that whatever he's hearing from the NorthStar
4    side is not true.  And I'm going to let him know that
5    these were the conditions that, you know, I resigned
6    under.
7    Q.    The second paragraph, it's a short one, it
8    says, Our shareholder HH, Sheikh Ahmed Bin Saif Al
9    Nahyan is having major financial issues with his own
10   company, Rotana Jet.  And his civil aviation license
11   has been suspended by the GCAA.
12          What, if anything, did you do to verify the
13   truth of that paragraph?
14   A.    I mean, it -- there was well-known, it was
15   -- you can look at Arabian Business, you know, it was
16   mentioned in there.  It was verified and confirmed to
17   me from a prominent attorney in the UAE that works
18   with the executive council, that Sheikh Ahmed was
19   having issues with Rotana Jet, and that he owed a lot
20   of money to Al Bateen Airport because he wasn't paying
21   ground crews and maintenance crews.  His employees
22   weren't getting paid.  And that was well-known because

---

191

1    we had NorthStar employees colocated with Rotana Jet
2    employees at the hangar and they talked.
3    Q.    What documents did you look at to verify
4    those factual statements in that -- in paragraph 2 of
5    the letter?
6    A.    I believe I was shown something by -- could
7    have been Terry, confirming that civil aviation
8    license was suspended.  Rotana Jet was having
9    operational issues.
10   Q.    What was your purpose in making the
11   representations you made in the second paragraph of
12   the letter?
13   A.    Again, as I said, it was to protect my
14   reputation as well.  You know, I know that I wasn't
15   being discussed in the best light from the Emirati
16   side, and I wanted to clear my name that these events
17   were not of my doing, and this is why it occurred.
18   Q.    Do you know whether the Joint Command had
19   any idea before receiving this letter what the
20   circumstances with NorthStar were?
21   A.    I was told that Salem had visited GHQ, or
22   the Joint Air Command, and informing people that

---

192

1    changes were going to be made at -- personal changes
2    were going to be made at NorthStar UAE.  I wasn't
3    privy to those conversations but it -- it made its way
4    to Terry, who works with the client every day and
5    interfaces with them, and that was told to him because
6    they questioned Terry about it.  And everyone's going
7    what changes are you talking about.  What's going on.
8    So it caused some red flags with the client.
9    Q.    The last paragraph you recommended that all
10   further payments from NorthStar Aviation be ceased.
11   What was your purpose in making that recommendation?
12   A.    Essentially I -- more so from a compliance
13   aspect, you know, I was concerned either defense
14   articles or defense services would be paid for without
15   proper oversight.  And, you know, I made that
16   statement to -- to as a -- basically something to
17   watch out for.  What he did with that, it was -- was
18   up to him.
19   Q.    I'm going to hand you what will be marked
20   as Exhibit 17.
21                    -  -  -
22          (A document was marked as Deposition

---

193

1    Exhibit Number 17.)
2                    -  -  -
3          BY MR. BENNETT:
4    Q.    Mr. Alberto, and I'm not going to ask you
5    questions about every page of this document.  I just
6    have a few pointed questions.  But I'll represent to
7    you that these documents have to do with your tax
8    reimbursements.
9    A.    Okay.
10   Q.    And which is something we were talking
11   about just earlier.
12   A.    Right.
13   Q.    If you could take a look at the third page
14   of -- actually, the fourth page of the document.  It's
15   a November 18, 2015, e-mail.  And it's a short e-mail.
16   A.    The one to Ali?
17   Q.    Yeah.  It's to Ali, yup, from you.  First
18   of all, do you remember the e-mail?
19   A.    Yes.
20   Q.    What is it that you were requesting of Ali
21   in that e-mail?
22   A.    It looks like that it's a follow-up e-mail

---

198

Ali would hear from PWC and --

Q.   And then on --

A.   I wasn't involved in those communications with PWC.

Q.   And then if you just look at the page before that ending with 427, it looks like Ali confirmed on December 21 that that $171,000 payment was in fact made --

A.   Right.

Q.   -- for your taxes?

MR. BENNETT:  How are you feeling?  Are you good or do you need a break?

THE WITNESS:  I think I'm probably good through my next questions, so...

MR. BENNETT:  Okay.

THE WITNESS:  Thank you for asking.

MR. BENNETT:  You are welcome.  So the next exhibit will be marked as Exhibit 18.

- - -

(A document was marked as Deposition Exhibit Number 18.)

- - -

199

BY MR. BENNETT:

Q.   Mr. Alberto, I realize this is a lengthy document.  And, don't worry, I'm not going to ask you about every page of it.

A.   Okay.

Q.   And if you flip to the second page of the exhibit, there's I guess my first question is do you recognize that page?

A.   I don't recognize it, I mean, the details of it but, yeah, I mean, I trust that this is true.

Q.   Do you recognize your signature?

A.   Yes.  That's my signature.

Q.   And this looks to be a document associated with a bonus payment you took.  It says discretionary bonus of 1.2 million dollars on January 27, 2014.  Doe that appear to be the case?

A.   Yes.  This was part of the bonus process for employees as well as myself.

Q.   And what was that bonus process?  We talked about bonuses, but what was the process within the company of -- of determining what the bonuses were?

A.   Well, I think I discussed that earlier,

200

Ellis, but I said that I'd have a -- I'd confer with Ali, the CFO of NorthStar.  He would have a -- based on the liquidity of NorthStar at that time is -- he would have essentially an amount of money that we could pay bonuses both to company and myself.

Q.   Did --

A.   And then --

Q.   Did you go through a process of evaluating the performance of individuals to determine their amount of bonuses?  Was it tied to their salary in any way?  I'm just trying to get an idea of how you determined --

A.   You mean for --

Q.   -- who would --

A.   -- like other employees?

Q.   Other employees besides yourself.

A.   Yeah.  It was a multistep process.  As I said, the first person I discussed this with would be Ali.  And in conjunction with that, the functional managers at NorthStar would make recommendations to -- to Hani, on who were the top performers, and their recommendations for bonuses for their subordinates.

201

And --

Q.   Oh, I'm sorry.  I didn't mean to cut you off.  Sorry.

A.   That's all right.  And then Hani would review these with Ali.  And then at that point it would go to myself for approval and review.  And typically, you know, that would take a couple days. And then I'd either change or modify their recommendations, and then I would send it back down to Ali for processing.

Q.   And were all employee bonuses typically done at the same time of each year?

A.   Sometimes bonuses were taken early.  There were occasions that I took a bonus early in lieu of end of the year.

Q.   How about for other employees besides yourself?  Was there -- was it typically were they all done at the same time?

A.   Typically, but there -- I can think of at least maybe one or two occasions that we gave performance bonuses early, or -- that happened a couple times, I believe.

Alberto, Alden Burt

November 28, 2018

52 (Pages 202 to 205)

---

**202**

1  Q.  Do you specifically remember what those
2  occasions were?
3  A.  No.  I know that it had to -- involved
4  someone in Operations that Terry Key had recommended.
5  And I can't remember specifically.
6  Q.  And what was the process, and you may have
7  testified to this already, if there's more to it than
8  I understand it, for yourself personally in taking
9  bonuses, how did you determine what to give yourself
10  and when to do it?
11  A.  Again, it -- it was -- as I testified
12  earlier, it was conferring with Ali to determine our
13  liquid position.  And most of the time it was, you
14  know, after the company was paid bonus, what was left
15  over.  And I would at that point provide a number for
16  my bonus.  It would go to Hani review.
17      He would produce one of these sheets, and I
18  would sign it, and then it goes back to Ali for
19  processing.
20  Q.  And where you signed, there's a statement
21  here, right above your signature that says, I confirm
22  that I have received all necessary authorized

---

**203**

1  approvals for this bonus payout.
2      I think you testified earlier that you
3  actually didn't get any approvals.  You approved these
4  bonuses yourself?
5      MR. JOHNSON:  Objection to the extent it
6  mischaracterizes prior testimony.
7  A.  Yeah.  I think that's a mischaracterization
8  of what I said, Ellis.
9  Q.  Okay.  Well, explain to me what you said
10  about that.
11  A.  Yeah.  What I did say is that I didn't need
12  that approval.  I didn't need any further approvals to
13  approve my bonus.
14  Q.  And then on the following page there's a
15  subsequent July 2014 bonus of 1.4 million dollars, it
16  looks like.
17  A.  Where are you?
18  Q.  The very next page.
19      MR. JOHNSON:  420?  Sorry.
20  Q.  419.  I'm sorry.
21  A.  The 419?
22  Q.  Correct.

---

**204**

1  A.  Okay.
2  Q.  Yeah.  Do you recall that bonus payment in
3  July of 2014?
4  A.  And I believe this is what I was
5  referencing is that I took an early bonus in lieu of
6  the bonuses that were going to be paid in January
7  2015.
8  Q.  And this one was in the amount of 1.4
9  million dollars?
10  A.  That's correct.
11  Q.  And you recognize your signature on that
12  document?
13  A.  I mean, it's a little bit -- that's not my
14  signature as I read it, but I am assuming if it was a
15  legible copy, it would be my signature.
16  Q.  It's a bad copy.  Besides it being a bad
17  copy, any reason to think that's not your signature
18  on --
19  A.  No.
20  Q.  -- on the signature line?  Okay.  And then
21  the following page, 420, there appears to be another
22  bonus of 1.5 million dollars.

---

**205**

1      What was that bonus for?
2  A.  It doesn't say here exactly what it was.
3  Usually there's a detail there.  I don't know if that
4  -- where that -- I mean, it says right there it's a
5  discretionary bonus for December 2015.
6  Q.  And do you recognize your signature on the
7  signature line of the document?
8  A.  Yes.
9  Q.  And flipping to the next page, 421, there's
10  a discretionary bonus to yourself of two million
11  dollars.  Do you see that?
12  A.  Yes.  This was a bonus that was originally
13  from R2, performance bond.  One of the performance
14  bonds, I believe that's a training aircraft that got
15  released and transferred to Vulcan Management.  And
16  this two million dollars is a result of essentially an
17  R2 project that was completed.
18  Q.  So did a performance bond in the amount of
19  around two million dollars get released around August
20  23 of 2015?
21  A.  I don't remember the date that the
22  performance got released, but because it went to

---

Alberto, Alden Burt

November 28, 2018

53 (Pages 206 to 209)

---

**206**

1  Vulcan Management, that's my indicator that that was
2  the performance bond that got released from R2.
3  Q.   Was that two million dollars released
4  sometime around the time you took the two million
5  dollar bonus from Vulcan?
6  A.   It -- I'm sure it was very close to that
7  date, but I cannot tell you definitively.
8  Q.   And again above the signature line -- well,
9  do you recognize your signature on that document?
10  A.   Yes.
11  Q.   And again it says, I confirm that I
12  received all necessary approvals for this bonus
13  payout.
14      Did you seek the approval of anyone before
15  taking that two million dollars?
16  A.   As I said in my earlier testimony, I didn't
17  require any approvals.  The sheikh was aware that
18  bonuses were paid, and he was fine with it.  He never
19  made any indications that there were any issues of
20  bonuses being paid.  He certainly didn't disagree with
21  the dividend payments that he received every year.
22  Q.   How was the sheikh made aware of this

---

**207**

1  two-million-dollar payment that you received from
2  Vulcan in August to 15?
3  A.   Well, he had freedom of access to
4  information to all the company financials, which he
5  received at least annually.  But at any time he could
6  go to NorthStar finance and request Ali, I would like
7  to see the financials.  All the bank records were
8  kept.  He had access to that.
9      He had access to all the banks.  And of
10  course the year end -- the year-end audits by Deloitte
11  Touche, which gave I believe the total amounts of
12  bonuses for the company that were paid that year.
13  Q.   Was Vulcan operational in August of 2015?
14  A.   Apparently it was still operational.  It
15  may not have had any contracts, but have Vulcan
16  Management as a company was still pure.
17  Q.   Why didn't you tell Dr. Bin Saif that two
18  million dollars came into his company in August 2015?
19  A.   I didn't say I didn't.  I mean, two million
20  dollars actually was paid to me.  That wasn't --
21  that's not what came into Vulcan.
22  Q.   But you said a performance bond was

---

**208**

1  released in the amount --
2  A.   Right.
3  Q.   -- of two million dollars.  And then you
4  took a two-million-dollar bonus?
5  A.   Yes.
6  Q.   So I'm assuming those two events were
7  connected, were they not?
8  A.   Those were connected.  I'm not sure if a
9  communication -- I don't recall any communication made
10  to the sheikh.  It could have been, it could have not.
11  I don't remember.
12  Q.   Simple question.  Did you tell the sheikh
13  that two million dollars came into his company that
14  had no contracts in August 2015?
15  A.   This two million dollars was paid to me,
16  Ellis, not the --
17  Q.   I understand that.
18  A.   Not to --
19  Q.   Why wasn't it paid to Dr. Saif?
20  A.   Why wasn't he paid to Dr. Saif?
21  Q.   Correct.  He's the owner of the company.
22  Why did you take the money?

---

**209**

1  A.   Well, I'll tell you why is, first of all,
2  it was for work that I completed.  When I was CEO of
3  R2, I was responsible for that success.  The sheikh
4  had nothing to do with R2.  He had nothing to do with
5  the contracts that were awarded to R2.  So he was well
6  compensated.
7      I mean, he got almost $15 million in total,
8  you know.  He's got no room to complain.  He got very
9  well compensated and above and beyond, you know, what
10  we agreed on.  And that doesn't include our agreement
11  to split the net proceeds of the performance bond
12  50/50.  To me --
13  Q.   We'll talk about that.
14  A.   To me, he got a great deal, you know.  You
15  can sit here and argue all day, but the sheikh got a
16  great deal.  For not -- for not contributing very
17  minimal capital, $40,000, he got close to a 300-to-1
18  return based on -- I'm not even using all $50 million.
19  I'm talking about eleven and a half, twelve million
20  dollars that he received in dividends.  That doesn't
21  include the three million we paid up front from R2
22  side to get the trade license, get the air operations

---

**222**

1  full authority to do so.
2     Q.   So I'm going to refer you forward in the
3  exhibit to page number 505.  And this appears to be
4  payroll records for NorthStar Aviation USA.
5        Do you have any understanding of what this
6  2.3 million dollar payment was for?
7     A.   It looks like it's characterized as a bonus
8  made out on 11/28/2016 for 2.3 million dollars.
9     Q.   And it says after that, pay period,
10 1/1/2014.  Do you see that, like right after the date
11 of the document?  Any idea what that date represents?
12    A.   I'm sorry.  Where are you looking?
13    Q.   Just right after the check date of
14 11/28/2016, there -- the words pay period follow, and
15 then there's a date 1/1/2014.
16    A.   I'm sorry, Ellis.  I'm not following you.
17    Q.   It's right there.
18    A.   Okay.  Okay.  I see that.
19    Q.   Any understanding why there's a January
20 2014 date on that record?
21    A.   I don't know.  This is Wells Fargo payroll
22 services.  How they reference different payments, I

**223**

1  don't know why.  I couldn't answer that.
2     MR. JOHNSON:  Ellis, whenever you are at a
3  good spot.
4     MR. BENNETT:  Yeah.  Now is fine.
5     VIDEOGRAPHER:  Off the record at 17:14.
6                    - - -
7        (Recessed at 5:14 p.m.)
8        (Reconvened at 5:39 p.m.)
9                    - - -
10    VIDEOGRAPHER:  On the record at 17:39.
11    BY MR. BENNETT:
12    Q.   Mr. Alberto, just want to go back over a
13 few things we covered that may not have been entirely
14 clear.
15        During your time with NorthStar, the
16 company essentially had one large contract, and that
17 was with the UAE Air Force; is that right?
18    A.   The main contract was with the UAE Armed
19 Forces.  The end user was the joint-- excuse me, Joint
20 Air Command.
21    MR. BENNETT:  Do you need another break?
22    THE WITNESS:  Yeah.  Just one minute.

**224**

1     VIDEOGRAPHER:  Off the record at 17:40.
2                    - - -
3        (Discussion off the Record)
4                    - - -
5     VIDEOGRAPHER:  On the record at 17:41.
6     BY MR. BENNETT:
7     Q.   Mr. Alberto, before the last short break --
8     A.   Excuse me.
9     Q.   It's okay.  No problem.  We were talking
10 about what contracts NorthStar had while you were CEO.
11 And I think we had both agreed that there was one main
12 contract, and that was the contract for the -- the 407
13 contract for the 30 Bell helicopters, correct?
14    A.   That's correct.
15    Q.   And that contract value was approximately
16 $280 million, as I understand it?
17    A.   Yeah.  280, 285, somewhere around there.
18    Q.   What other contracts were procured during
19 the time you were CEO of NorthStar?
20    A.   A follow-on support contract, a follow-on
21 support contract 2, which I believe includes training
22 as well.  And I believe that was it.

**225**

1     Q.   And those follow-on support contracts are
2  associated with the 30, 407 helicopters, correct?
3     A.   Right.  Providing support services, spare
4  parts, but had we not performed on the main contract,
5  we would never have gotten that follow-on support
6  contract.
7     Q.   What's the value of the two follow-on
8  support contracts?
9     A.   I don't recall the exact contract values.
10    Q.   And what was the duration of those
11 follow-on contracts?
12    A.   I believe they were year to year, but I
13 could be wrong.  I can't remember the contract period.
14    Q.   The value of those contracts, while I
15 understand you don't remember exactly what it was, was
16 nowhere close to the large $280 million contract?
17    A.   No, it was not.
18    Q.   And as I understand that, much of your time
19 while you were CEO at NorthStar, you resided in the DC
20 area, I think starting in 2014 or somewhere in that
21 ballpark.
22        What was your reason for residing in the DC

226

1    area while serving as NorthStar's CEO?

2        A.   It was actual -- an actual requirement as a

3    condition to NorthStar receiving its licensing.  And I

4    believe that was produced in -- either in the

5    NorthStar side or my side in the e-mail thread with

6    the State Department.  And as I said earlier, the

7    State Department wanted a -- the CEO to be compensated

8    by a USA-based company, which was NorthStar USA.

9        So it wasn't really by choice, but as a --

10   as a condition to get our licensing.  The -- it

11   actually came from the enforcement side, not the

12   licensing side, that we establish a U.S. entity.  And

13   we did that here in DC.

14       Q.   And your main U.S. operation was run out of

15   Melbourne, Florida, correct?

16       A.   Melbourne, Florida.

17       Q.   And what facilities did you have in

18   Melbourne?

19       A.   We had a hangar and office.

20       Q.   And just as far as the -- how the contract

21   was performed, as I understand it you were essentially

22   supplementing a Bell 407 helicopter with military

227

1    equipment.  And is that essentially what the contract

2    was for, and then delivering them to the UAE?

3        A.   Yeah.  We were taking receipt and delivery

4    of the helicopters from Bell here in the U.S.  They

5    would be integrated in Melbourne, Florida, and I

6    believe that tests flown and validated, make sure all

7    the systems are working.

8        And then the helicopter would be taken

9    apart and then shipped to the UAE.  And we'd have a --

10   that helicopter reassembled in the UAE in Al Bateen.

11   And then it would go through an acceptance period with

12   the customer where they tested and validated the

13   systems.

14       Q.   You used the term integrated.  Does that

15   mean the parts that were added pursuant to the specs

16   in the contract were added in Florida?

17       A.   Yes.  I mean, our helicopter was

18   essentially a commercial platform with commercial

19   off-the-shelf products that were integrated into the

20   407.

21       Q.   And not expecting you to name everything

22   that was added to the 407 -- to the basic 407, but

228

1    what were some of the kinds of things that were

2    integrated into the base 407 to perform under your

3    contract?

4        A.   Some of the -- I'll just stick with the

5    main systems, the sensor, the flare sensor, the

6    weapons plank.  There was a four-station weapons plank

7    that gave you the ability to configure four different

8    weapon stations with either hydro 70 rockets, a GAU-19

9    made by General Dynamics, which is essentially a

10   gatling gun, a Dillon 7.62 mini gun.  And, more

11   importantly, the laser-guided munitions which were the

12   Hellfires.

13       In addition to that, there was a weapons

14   management system, a mission management system, and

15   those were the -- really the main systems.

16       Q.   And as I understand it, those different

17   systems that were added to the Bell were obtained and

18   purchased from various vendors?  You mentioned General

19   Dynamics was one.  And I'm assuming that some of the

20   other things were obtained from other vendors as well?

21       A.   General Dynamics made the GAU-19 which --

22   and I don't know if you'll get to it, but that was one

229

1    of the reasons why we were looking to get an MFL.  We

2    didn't provide the GAU-19 to the UAE.  They already

3    had it in their inventory.

4        Q.   You mentioned the FFL, the Federal Firearms

5    License.

6        A.   Right.

7        Q.   And I remember seeing those communications.

8    And think that was kind of toward the end of the time

9    you were CEO there.  What were the circumstances that

10   led you to -- what was your goal in obtaining that

11   license?

12       A.   The goal was really -- the requirement

13   really came up when we were -- when we were competing

14   for the Egypt contract.  We wanted to be more -- we

15   were competing with Bell, AgustaWestland, Aerobus, and

16   we wanted to be able to be a little bit more

17   competitive against these OEMs and make it easier for

18   the Egyptians to be able to get essentially a -- we

19   wanted to be the one-stop shop for the client, being

20   able to provide both our helicopter as well as the

21   weapons, because if we didn't have an FFL, they would

22   actual actually have to purchase the weapons systems

230

1  either through FMS, foreign military sales, and there
2  were some munitions like the hellfires that you would
3  have go through FMS; but anything 50 cal and below,
4  you could, you know, we could have got an FFL and
5  provided -- purchased those weapons so the Egyptians
6  wouldn't have to get separate licensing, or a separate
7  vendor to provide those weapons.
8      Q.   And just while we were on the topic, what
9  steps did you take toward getting the FFL?
10     A.   I consulted with Bergstrom Taylor on the
11 requirements to get an FFL license.  And they had
12 background and experience doing that, so they advised
13 me of certain steps that we would have to take.  And
14 one of those being the Articles of Incorporation, I
15 believe that they are called, for NorthStar USA would
16 need to be amended.
17     Q.   And do you recall generally what the
18 amendment would entail?
19     A.   Yeah.  It was changing it to I believe
20 manager managed LLC, to -- to satisfy the -- to
21 satisfy the ATF that day-to-day operations were
22 controlled by the U.S. side and not the foreign side,

231

1  which is the UAE.
2      Q.   And you did eventually get the FFL, as I
3  recall?
4      A.   Yes.  We were successful in getting the FFL
5  eventually.
6      Q.   Do you remember about when you got that?  I
7  can't remember off the top of my head.
8      A.   I want to say maybe November 2016, November
9  2016, maybe fall 2016 sometime.
10     Q.   Okay.  Did you -- you ultimately did not
11 end up getting the Egypt contract, as I understand it,
12 but did that FFL help make your bid more competitive
13 or, you know, did it provide dividends to have that
14 FFL?
15     A.   Absolutely for future contracts.  The
16 ability for NorthStar to be able to provide a one-stop
17 shop to the client.  If you can imagine selling a
18 helicopter to let's say Afghanistan, that -- let's say
19 that didn't have these weapons in their inventory, the
20 Afghan government would have to tough reach out to the
21 U.S. government to -- or each of those vendors to get
22 each of those individual weapons systems, if they were

232

1  allowed to do a direct commercial sale.
2      Q.   Which can be complicated by the ITAR laws
3  and --
4      A.   Yes.
5      Q.   -- U.S.?
6      A.   It would make it very complex.  So by
7  getting the FFL, I think that made NorthStar more
8  competitive and an easier, I think, buying decision
9  from a potential client.
10     Q.   Getting back to the day-to-day operations,
11 you were in the U.S. running operations for DC
12 essentially, and you had two locations, one in
13 Melbourne, Florida, one in Abu Dhabi.  How did you go
14 about doing that?  I'm assuming you had to rely on
15 your people underneath you, so I'm just generally, you
16 know, how did you run things on a day-to-day basis and
17 who did you rely upon in those locations?
18     A.   Well, in the UAE, as I said Terry Key
19 actually bounced back between the UAE and the U.S.
20 multiple times, keeping oversight both over Melbourne
21 as well as the UAE.  When Terry was in the UAE, Lyle
22 was in charge there in Melbourne.  And I was here in

233

1  the DC office or Northern Virginia.
2      Q.   And generally -- and I'm not expecting you
3  to say what you did every day, but generally what were
4  your day-to-day activities as CEO?  What did you?
5      A.   Yeah.  I mean, a couple of my primary roles
6  were developing a licensing strategy which required,
7  you know, lobbying efforts on Capitol Hill.  I met
8  with probably 25 to 30 embassies here in DC to --
9  trying to establish potential requirements for a light
10 attack helicopter and introduce NorthStar to these
11 embassies, and additionally meeting with key members
12 of the House of Armed Services Committee, as well as a
13 Senate Foreign Relations Committee, especially because
14 we were getting -- trying to get licensing, or trying
15 to do business in countries that weren't basically an
16 automatic check in the box to get licensing.
17         Egypt certainly wasn't an automatic check
18 in the box.  So I had to, you know, we spent a lot of
19 time meeting with members of those committees and
20 essentially informing them of potential areas we want
21 to do business, and trying to get a feel for would we
22 get resistance in licensing.

Alberto, Alden Burt

November 28, 2018

62 (Pages 242 to 245)

---

**242**

1    A.  Okay.

2    Q.  -- discovery that's --

3    A.  So it's my employment agreement.

4    Q.  If you could turn in that document to the

5 page that ends in the numbers 436.

6    A.  Okay.

7    Q.  And I'm specifically looking at Section 11.

8    A.  Okay.

9    Q.  That reads -- the title of it is

10 Restrictive Covenants.  What's your understanding of

11 Section 11, your obligations under that section?

12    A.  Give me a minute to read it.  Okay.

13    Q.  What's your -- and I'm not asking for a

14 legal opinion, but I'm just asking what --

15    A.  I mean, yeah, my interpretation is that I

16 had access to confidential information while I was

17 CEO, and not to disclose any non-public information or

18 knowledge of data, trade secrets, you know,

19 confidential information.

20    Q.  And have you had a chance to look at

21 Sections 11.2 and 11.3?

22    A.  I'll read that now.

---

**243**

1    Q.  And we can just take them one at a time.

2    A.  Okay.  Okay, Ellis.

3    Q.  Okay.  Have you had a chance to look at

4 Sections 11.2 at this point?

5    A.  I did.

6    Q.  And again, not asking for your legal

7 opinion, but what's your impression of your

8 obligations under Section 11.2?

9    A.  That for a period of 12 months that -- that

10 I will not own a -- I'm sorry.  Essentially that I

11 won't be employed by own or have any proprietary

12 interest in any entity that is a client or customer of

13 the company, which being NorthStar.

14    I believe that's A.  And, B, engaged in a

15 business that is competitive with the company or any

16 group company in any state within the United States or

17 other country in which a company or any group company

18 has business operations.

19    Q.  And in well less than a year, actually

20 while you were still employed by Vulcan USA, you

21 formed another company and actually owned.  And

22 that was Vulcan USA, correct?

---

**244**

1    A.  Vulcan USA.

2    Q.  If you could take moment to look at Section

3 11.3.

4    A.  Okay.

5    Q.  What's your understanding of the

6 obligations under Section 11.3?

7    A.  For 12 months after termination date --

8 I'll just read it.  It's a little bit easier for me

9 than me trying to figure out, without getting into --

10 without sounding confusing.  Be easier for me just to

11 read it.

12    Q.  Sure.

13    A.  During the term of this agreement and for

14 12 months after the termination date, executive shall

15 not solicit, call on, or in any other way contact,

16 either directly or indirectly, any supplier, customer,

17 licensee, franchisee, or other person or entity that,

18 A, executive contacted, called on, or conducted

19 business with during his employment with the company;

20 B, executive learned of or received confidential

21 information about during his employment or as a result

22 of his employment with the company; or, C, has or had

---

**245**

1 a business relationship with the company or any group

2 company at any time within the 12 months preceding

3 such solicitation, in each case with an intention of

4 inducing or attempting to induce such person or entity

5 to cease doing business with the company, or any group

6 company, or in any way interfere with such business

7 relationship between the company or any group company

8 and such person or entity.

9    Q.  And during the time you were still employed

10 by NorthStar USA, you -- on October 25 specifically,

11 you wrote a letter to a customer of NorthStar's, the

12 Joint Aviation Command for the UAE, correct?

13    A.  Yes.  After consulting with Akin Gump and

14 being advised to contact the customer.

15    Q.  And during and shortly after the time you

16 were employed by NorthStar USA, you contacted several

17 people that you come to know through your employment

18 with NorthStar USA, including Hichem, for instance,

19 and others about potentially doing business going

20 forward?

21    MR. JOHNSON:  Objection to form.  Vague.

22    A.  I know.  Could you be a little bit more

---

246

1    specific?  You talk about people.
2        Q.   Yeah.  For instance, did you talk to Hichem
3    about doing business around the time you left
4    NorthStar USA?
5        A.   Yeah.  He approached me.  I listened to
6    hem.  But it never went further than that.
7        Q.   And then the last section about this
8    document I'll ask you about is Section 11.4.
9        A.   Okay.
10       Q.   And if you would like, you can read it.
11   It's pretty short.
12       A.   Okay.
13       Q.   So my question about Section 11.4 is did
14   you approach any NorthStar employees about coming to
15   work with your new company Vulcan?
16       A.   I don't remember directly, Ellis.  But, you
17   know, as I said, it was a Plan B to continue
18   operations, whether that would be under NorthStar USA
19   or Vulcan.  And that never materialized.  So I didn't
20   -- I don't see this as a breach.  You know, I heard
21   the sheikh wanted to shut down U.S. operations, and I
22   wanted to continue operations.

247

1    So I didn't see that as competing with a
2    company that may or may not exist.
3        Q.   You have mentioned a few times during your
4    testimony about a desire to keep the people who work
5    for NorthStar Aviation in employment in some capacity.
6    What led to the layoffs in summer of 2017 of Lyle
7    Becka, for instance?  And there were several others.
8    I think Hani was part of that and Marwan.
9        What led to those layoffs in the summer of
10   2017?
11       A.   It's just the nature of the aviation
12   business.  You know, employment levels at all aviation
13   companies, I mean, Bell fired -- laid off 2,500 people
14   a couple years ago because of lack of contracts.  And
15   we were going through a similar thing.  We had -- you
16   know, aviation companies grow when they have got
17   contracts, and they shrink when they don't.
18       And we were going through that period where
19   we had to make some layoffs and, you know, that was a
20   hard decision, but I had -- it had to be done.
21       Q.   And during that same month that you laid
22   those people off, you took a 4.5 million dollar

248

1    payment, correct?
2        A.   Yes.  As per my agreement with the sheikh.
3    He only took his dividend payment as well.
4        Q.   And you gave several other large bonuses to
5    other employees.  For instance, you gave Terry Key I
6    think $300,000 in that same month you paid off these
7    people?
8        A.   As it's not only a bonus for performance,
9    but it's an incentive to retain key people.  Terry was
10   -- everyone I paid there was a key person.  Because at
11   the end of the day, NorthStar doesn't own anything.
12   We integrate commercial off-the-shelf products.
13       We don't own any intellectual capital or
14   IP.  That's owned by all our subcontractors.  So, you
15   know, at the end, all we have are employees.  And
16   because everyone -- it was very well-known that we
17   were on the tail end of our contract.  If all these
18   key employees left, there wouldn't be anything left of
19   NorthStar.
20       So, yes, I had to make a hard decision, lay
21   off people.  At the same time, I needed to retain
22   certain people, certain key people that I felt were

249

1    critical to the operation.  And that's what CEOs do.
2    They make the hard decisions.  And that's what I did.
3        Q.   And I think you gave Ali a large bonus at
4    that time as well, correct, in July 2017?
5        A.   I give him a bonus.  I can't remember what
6    the amount was.
7        Q.   And I think you also gave Hillary Holcombe
8    a $100,000 bonus at that time?
9        A.   Yes.
10       Q.   Was she a key person to the company?
11       A.   Absolutely.  She was probably, in my eyes,
12   one of the hardest working individuals.  She was
13   available seven days a week.  She -- if I call her on
14   Saturday, hey, I need a presentation -- and this
15   happened quite a few times.  I need a presentation
16   ready by Monday.  We are going to Egypt.  I need four
17   or five marketing brochures completed.  She played,
18   you know, a few different roles besides being my
19   executive assistant.  She did website design.  She did
20   mobile website design.  She was in charge of our media
21   campaign.  And the bonus that she deserved, and -- I'm
22   sorry, the bonus that she received was deserved.