# EXHIBIT 2

Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS

NORTHSTAR AVIATION, LLC,    )
et al.,                     )
                            )
            Plaintiffs,     )
                            ) No.
        -vs-                ) 1:18cv-00191-TSE-JFA
                            )
ALDEN BURT ALBERTO,         )

            Defendant.
```

The videotaped deposition of TERRY KEY, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions before MAUREEN A. WOODMAN, a notary public within and for the County of Cook and State of Illinois, at Suite 3800, 55 East Monroe Street, Chicago, Illinois, on the 19th day of November, 2018, at the hour of 9:31 o'clock a.m.

## Page 2

```
 1   APPEARANCES:
 2    DUNLAP BENNETT & LUDWIG
      BY:  MR. NICHOLAS A. KURTZ
 3       55 East Monroe Street
         Suite 3800
 4       Chicago, Illinois  60603
         312.858.6747
 5       Nkurtz@dbllawyers.com,
 6          on behalf of the Plaintiffs;
 7    BERENZWEIG LEONARD
      BY:  MR. DAVID DEITCH and
 8       MR. NICK JOHNSON
         8300 Greensboro Drive
 9       Suite 1250
         McLean, Virginia  22102
10       703.760.0402
         Ddeitch@berenzweiglaw.com
11       Njohnson@berenzweiglaw.com,
12          on behalf of the Defendant;
13    ODIN, FELDMAN & PITTLEMAN, P.C.
      BY:  MR. CRAIG J. FRANCO
14       1775 Wiehle Avenue
         Suite 400
15       Reston, Virginia  20190
         703.218.202
16       Craig-franco@ofplaw.com,
17          On behalf of the Deponent.
18
     ALSO PRESENT:
19    Mr. Stephen Goethals,
       Videographer, Thompson Court
20     Reporters, Inc.
21
22
23
24
```

## Page 3

```
 1               I N D E X
 2   WITNESS                       PAGE
 3   TERRY KEY
 4     Examination by Mr. Kurtz ..........4-146
       Examination by Mr. Deitch..........146-199
 5     Examination by Mr. Kurtz...........200-205
 6
             - - - - - - - - - - - - - - - - -
 7
 8              E X H I B I T S
 9   DEPOSITION EXHIBIT              PAGE
10     1 ..................10
       2 ..................38
11     3 ..................50
       4 ..................59
12     5 ..................70
       6 ..................73
13     7 ..................80
       8 ..................86
14     9 ..................88
       10 ..................105
15     11 ..................108
       12 ..................115
16     13 ..................126
       14 ..................128
17     15 ..................129
       16 ..................132
18     17 ..................160
       18 ..................173
19     19 ..................179
       20 ..................182
20     21 ..................185
21
22
23
24
```

## Page 4

 1       THE VIDEOGRAPHER:  We are on the record.
 2   Here begins the videotaped deposition of Terry
 3   Paul Key, tape one, volume one, in the matter
 4   of NorthStar Aviation, LLC, et al, versus Alden
 5   Burt Alberto, case number 1:18cv-00191-TSE-JFA.
 6   Today's date is November 19th, 2018, and the
 7   time on the video monitor is 9:31 a.m.
 8       My name is Stephen Goethals and
 9   the court reporter is Maureen Woodman of
10   Thompson Court Reporters.
11       Today's deposition is taking
12   place at Dunlap, Bennett & Ludwig in Chicago,
13   Illinois.
14       Will counsel please introduce
15   themselves and state whom they represent.
16       MR. KURTZ:  Nicholas Kurtz for the
17   plaintiffs.
18       MR. FRANCO:  My name is Craig Franco.  I
19   represent the deponent, Terry Key.
20       MR. DEITCH:  My name is David Deitch.  I
21   represent Mr. Alberto.  And with me is Nicholas
22   Johnson.
23       THE VIDEOGRAPHER:  Thank you, counsel.
24   Will the court reporter please swear in the

## Page 5

 1   witness.
 2            (Witness was duly
 3              sworn.)
 4            PAUL KEY,
 5   called as a witness herein, after having been
 6   first duly sworn, was examined and testified as
 7   follows:
 8              EXAMINATION
 9   BY MR. KURTZ:
10     Q.  Mr. Key, like I said, I'm Nicholas
11   Kurtz.  I represent the plaintiffs in this
12   matter.  Have you ever had your deposition
13   taken before?
14     A.  No.
15     Q.  Have you ever been in a deposition
16   before?
17     A.  No.
18     Q.  Okay.  Like everybody does, I'll give
19   you some ground rules.  Your counsel can fill
20   you in if I left out anything.  Even though
21   we're not in a courtroom, there's a court
22   reporter here taking down everything you'll
23   say.  There's a videographer taking video of
24   you.  You are under oath.  So while there is no

Page 18

1    Q. So what does that entail, director of
2  operations?
3    A. You are the representative for the
4  company with the FAA. So you are required to
5  make sure that all legal -- legal regulations,
6  all air regulations are complied with with the
7  FAA. So you interact with the FAA, make sure
8  all the pilots, everything is done in
9  accordance with the FARs, Part 135 and 133.
10   Q. At that time, 2011, you were still
11 flying for the company?
12   A. Yeah, absolutely.
13   Q. Did you manage any people? Have
14 anyone under you?
15   A. Yes.
16   Q. What were their roles?
17   A. Pilots, flight attendants.
18   Q. Whom did you report to at AAR?
19   A. Andy Meloni.
20   Q. What was his position?
21   A. He was COO.
22   Q. So after 2011, what did you do?
23   A. In 2011 I was recruited to go to the
24 UE for Reflex Responses.

Page 19

1    Q. Is that the name of the company?
2    A. That was the name of the actual
3  company I worked with over there. They were
4  going to buy a helicopter company, and they
5  wanted me to come over there and be the chief
6  pilot.
7    Q. Did you do that?
8    A. I went over there. The purchase fell
9  through on that, so I still worked for Reflex
10 Responses. We had a contract with the UE
11 government to provide them 15 training
12 helicopters to Horizon Flight Academy, which my
13 job was to program manage that and deliver
14 those aircraft.
15   Q. What did you do after Reflex
16 Responses?
17   A. The company was shut down at the
18 request of the UE government, so stood up a new
19 company called NorthStar Aviation.
20   Q. Who was your supervisor, if there was
21 one, at Reflex Responses?
22   A. Reno Alberto was the CEO of that. He
23 was just coming in as I was coming over there.
24 But I had John Hight, he was my supervisor

Page 20

1  initially.
2    Q. What was his position?
3    A. He was vice-president. I was just
4  chief pilot. I worked with him before.
5    Q. So were you doing any operations with
6  Reflex Responses or were you just the chief
7  pilot?
8    A. Just delivering aircraft.
9    Q. Did everybody from Reflex Responses
10 transition over no NorthStar?
11   A. No.
12   Q. How did that transition happen, to the
13 best of your knowledge?
14   MR. FRANCO: Object to the form. Go ahead
15 and give an answer to the extent you
16 understand.
17   THE WITNESS: As much as I remember about
18 it, Reflex Responses was asked to be shut down
19 because of an article that came out in the New
20 York Times. Okay to answer all that? Because
21 of Erik Prince, they said that he started a
22 private army over there. So the government
23 seen that as embarrassment -- although it was
24 true, seen it as embarrassment, so they said,

Page 21

1  Hey, shut down R2 Reflex Responses. You can
2  start a new company, but you can't do anything
3  in defense services type of stuff, security and
4  weapons.
5        So NorthStar was started up at
6  that point, because we were starting to
7  negotiate a contract for 30 helicopters for
8  their military over there, armed helicopters
9  for their military over there.
10       So NorthStar was stood up at that
11 point, which Mr. Alberto went out and recruited
12 the shareholder, because in the UE, you can't
13 be a majority owner of a company unless you are
14 an Emirate over there. So we had to find a
15 shareholder to be that. That's where the
16 current shareholder came in on that recruiting
17 on that.
18       So we stood that up and -- 2012
19 NorthStar. All the aviation personnel that was
20 in R2, most of those moved over, but there were
21 other folks that moved into a company called
22 Vulcan over there. And then they eventually
23 went away, and NorthStar was just an aviation
24 company.

Page 22

1  BY MR. KURTZ:
2      Q.  So in 2012, a company Vulcan existed?
3      A.  Yeah.  There was an initial company
4  developed, Rotana Jet.  That was the
5  short-term, because we were still working for
6  R2 until we got NorthStar stood up, which was
7  going to be an aviation company.  And so those
8  folks that were not aviation were in the Vulcan
9  company.  I was never part of the Vulcan.  And
10 until NorthStar USA got -- NorthStar got stood
11 up.
12     Q.  When you say aviation, are you talking
13 about pilots?
14     A.  Pilots, aircraft specific,
15 aviation-related products and services.
16     Q.  Pilots, mechanics?
17     A.  Pilots, mechanic, logistics, aviation
18 logistics.
19     Q.  Do you know the full name of the
20 Vulcan company at that time?
21     A.  No.  I just know it as Vulcan.  Didn't
22 react -- interact with those folks very much at
23 all.
24     Q.  Do you know who was in charge of the

Page 23

1  Vulcan company at that time?
2      A.  Mr. Alberto.
3      Q.  Was there a second in command that you
4  know of at that time?
5      A.  There was a ground guy in there, but I
6  do not really recall his name.  But he left
7  shortly after R2 was shut down.
8      Q.  And then NorthStar USA, that was
9  created at that time in 2012, is that the same
10 as you became employed by?
11     MR. FRANCO:  Object to the form.  Lack of
12 foundation.  Go ahead and answer.
13     THE WITNESS:  It was NorthStar UE, that was
14 the base company, which is a subsidiary of
15 Rotana Jet, which the Sheikh owns.  We had to
16 stand up NorthStar USA to satisfy the U.S.
17 State Department for ITAR purposes, because
18 U.S. persons and ITAR equipment was going to go
19 on to these aircraft, so the State Department
20 made the stand up NorthStar USA as a separate
21 entity from that, to make sure all that the
22 U.S. persons and U.S. equipment had to be
23 licensed through a U.S. company.
24          So that's when NorthStar USA was

Page 24

1  stood up.  And that's the only reason USA was
2  stood up, to satisfy that.
3  BY MR. KURTZ:
4      Q.  When was the first time you met
5  Mr. Alberto?
6      A.  Must have been June, late June, early
7  July of 2011.
8      Q.  With Reflex Responses?
9      A.  Yes.
10     Q.  And what was his position again at
11 Reflex Responses?
12     A.  CEO or president.  I think he was CEO.
13 Once again, I didn't have very much interaction
14 with the leadership because I was working on
15 delivering these aircraft.  I wasn't at
16 headquarters very much.
17     Q.  So then with NorthStar you were --
18 transitioned from Reflex Responses into
19 NorthStar.  What was your position at that
20 time?
21     A.  Originally chief pilot and then
22 promoted up to vice-president.
23     Q.  Do you recall about when that was?
24 Was it immediate or --

Page 25

1      A.  I don't recall exactly when it was.
2  It was in 2012 at some point after we stood up
3  the company.  I don't know if it was late
4  summer.  I was always the chief pilot, but
5  I -- I don't remember exactly when I was
6  promoted to vice-president.  Probably in my
7  agreement -- the original agreement that I had
8  over there when NorthStar stood up.
9      Q.  So just in general as vice president,
10 what were your duties?
11     A.  I was the vice president of
12 operations, so I had everything to do with
13 aircraft deliveries, parts, the contract
14 negotiation for the sale of the aircraft and
15 services associated with that.
16     Q.  And at that time, so 2012, did you
17 have anybody working under you?
18     A.  Yes.
19     Q.  Who were they?
20     A.  They are mechanics.  Mainly mechanics
21 and logistics personnel working under me.
22     Q.  Okay.  Was there a department name or
23 title?
24     A.  Just operations.

7 (Pages 22 to 25)

Page 54

1  bonds were?
2      A.  I think it's $28 million.  28 million
3  overall.
4      Q.  Okay.  During your tenure at
5  NorthStar, did NorthStar deliver all the
6  helicopters?
7      A.  Yes, on time.
8      Q.  Were there any rejections?
9      A.  Not for the aircraft.
10     Q.  Were there -- were there rejections
11 for other things?
12     A.  Spare parts, some of the spare parts
13 on there.
14     Q.  Do you have any reason to believe that
15 the second part of the performance bond based
16 on the warranty will not be satisfied?
17     MR. FRANCO:  Object to the form.  Go ahead.
18     THE WITNESS:  I believe that if the company
19 carried on the way I was running it, it
20 absolutely will be paid out.
21 BY MR. KURTZ:
22     Q.  Do you think because you're not there
23 or -- that it may not be paid out?
24     A.  I can't speculate on that.  I don't

Page 55

1  know how they're operating the company.
2      Q.  What would cause the second
3  performance bond not to be paid out?
4      MR. FRANCO:  Objection.  Calls for
5  speculation.  Go ahead.
6      THE WITNESS:  There's one aspect of the
7  contract that is going to be very difficult.
8  We were working towards that.  That we had to
9  put a mod on the aircraft, which was Comsec
10 equipment, which is controlled by the NSA and
11 also State Department.  And that's a
12 government-to-government event to where the
13 U.S. government and the UE government through
14 FMS provides that crypto-gear.  We're talking
15 encrypted voice for IFF things.  We were going
16 to be the integrators of that equipment.
17        So that was going to be the
18 hardest part for us, to make sure we got
19 licensed with the NSA, especially when you're
20 an Emirate entity, even though you have a U.S.
21 side of it, is get licensed to put that on.
22 But we were already down there -- we were going
23 down that, and it was on target to meet the
24 requirement to have that done.

Page 56

1      It took the Emirate government
2  probably three years to get the FMA -- SKs
3  approved.  That was the long pull for them to
4  get that approved.  Because that aircraft
5  wasn't a standard U.S.-type military aircraft.
6  So that was the hardest part for them.  But I'm
7  sure we'd have had it done.  That would have
8  been the only thing that would have maybe
9  extend out paying out the performance bond.
10 BY MR. KURTZ:
11     Q.  So upon your exit from NorthStar, that
12 wasn't a hundred percent completed yet?
13     A.  No.
14     Q.  Do you have any information or
15 understanding whether that has been completed
16 and gone forward?
17     A.  I have no idea.
18     Q.  Were you ever guaranteed any
19 percentage or any compensation directly linked
20 to the performance bonds?
21     A.  In 2016, Reno said, If you deliver the
22 contract, I'll give you a million dollar bonus.
23 That was the only time that anything was said
24 about that.  Once again, per the -- my

Page 57

1  employment agreement, bonuses were
2  discretionary.  And that there I consider
3  discretionary.  I wasn't expecting it.
4      Q.  I believe you said in 2016 NorthStar
5  delivered the aircrafts, correct?
6      A.  We started delivering in 2014.  We
7  delivered the last one in February of 2017.
8      Q.  Did you get the $1 million bonus?
9      A.  No, not all of it.
10     Q.  Did you receive some of it?
11     A.  Yes.
12     Q.  How much did you receive?
13     A.  Total of $850,000.
14     Q.  And was that in one payment or
15 multiple payments?
16     A.  Two payments.
17     Q.  And when were those?
18     A.  I can't recall exactly the dates of
19 it.  500,000 after we got the performance bond.
20 I don't know if it was July, June, July time
21 frame.  And then $350,000 I think it was in
22 September of 2017.  Not exactly sure.
23     Q.  That's fine.  And you're saying July
24 of 2017 for the --

15 (Pages 54 to 57)

Page 58

1  A. Yes.
2  Q. Have you discussed with Mr. Alberto
3  the fact that you have not received the $1
4  million bonus he promised?
5  A. No.
6  Q. Do you have anything in writing
7  guaranteeing you the $1 million bonus?
8  A. No.
9  Q. Do you know of anyone else at
10 NorthStar that was guaranteed a bonus based on
11 the performance bond?
12   MR. DEITCH: Objection to form.
13   MR. KURTZ: If you know.
14   THE WITNESS: Once again, the -- not a
15 bonus, but a payout. Again, my understanding
16 was between Mr. Alberto and the Sheikh is they
17 were going to split that performance bond, and
18 that million dollars that Reno promised me he
19 said would come out of his portion of that
20 split.
21 BY MR. KURTZ:
22 Q. Okay. So let's talk about that. Who
23 told you that there was this agreement between
24 Mr. Alberto and the Sheikh to split the

Page 59

1  performance bond?
2  A. Mr. Alberto.
3  Q. Did you have any discussions with
4  anyone else about that?
5  A. No.
6  Q. And when did he -- Mr. Alberto, when
7  did he tell you this arrangement?
8  A. That was very early on. After we got
9  the contract. So that would have been like
10 probably in '14. 2014 sometime.
11 Q. Did anyone else at NorthStar know of
12 this arrangement?
13 A. I have no idea if he confided in
14 anybody else about that agreement.
15 Q. Were these performance bond bonuses,
16 were they something the finance department
17 would know about?
18   MR. FRANCO: Objection. Calls for
19 speculation. But if you know.
20   THE WITNESS: I would assume they would,
21 because all payments were gone through finance.
22   MR. KURTZ: Mark this as Exhibit No. 4.
23       (WHEREUPON, said
24       document was marked as

Page 60

1       Deposition Exhibit No. 4
2       for Identification.)
3  BY MR. KURTZ:
4  Q. Have you ever seen this document
5  before?
6  A. No.
7  Q. While at NorthStar, were you generally
8  aware of bonuses given to employees besides
9  yourself?
10 A. Yes, but not quantity, amount.
11 Q. Okay. Just whether a bonus was or was
12 not given?
13 A. Yeah, yeah.
14 Q. What about people in your operations
15 staff, did you have any role in determining the
16 amount of bonuses for those individuals?
17 A. Yes.
18 Q. And how did you make those
19 determinations?
20 A. Usually the sheet would come out
21 through HR, through Hani Farag, on there
22 with -- based on -- Reno would set the
23 percentage based on their base pay, whether
24 like six percent, they are going to get six

Page 61

1  percent of their base pay for a bonus. And
2  then he would give that to me. I'd go through,
3  and I would try to adjudicate with him, okay,
4  this guy is a rock star. I want to give him a
5  larger bonus. Instead of 7 percent, I want to
6  give him 14 percent, and I'd pass that back to
7  Hani and go back to Reno and said what was
8  going to be paid.
9  Q. Did you have any say as far as any
10 other employees besides your operations staff
11 as far as bonuses?
12 A. No.
13 Q. Did Mr. Alberto ever consult you about
14 bonuses for any other individuals?
15 A. No, just for operations.
16 Q. Did anyone at NorthStar consult with
17 you about bonuses for other individuals besides
18 operations?
19 A. Not that I can recall.
20 Q. Do you recall bonuses you received
21 while at NorthStar?
22 A. Yes.
23 Q. If you can recall general ballpark of
24 bonuses you received from NorthStar, what were

16 (Pages 58 to 61)

Page 102

1  meeting of an intention by the Sheikh to audit
2  the company?
3      MR. DEITCH:  Objection to form.
4      MR. FRANCO:  I'll join.  Go ahead and
5  answer.
6      THE WITNESS:  Yeah, I heard there was going
7  to be an audit, that he wanted the financials
8  of the company to look at.
9  BY MR. KURTZ:
10     Q.  When did you look at that?
11     A.  I can't give you a specific time.  I
12  don't remember exactly when it was.  It was
13  prior to the board meeting.
14     Q.  Was there an occasion aside from the
15  board meeting that you had heard that the
16  Sheikh wanted to audit the financials?
17     MR. DEITCH:  Objection to form.
18     THE WITNESS:  I believe -- yeah, prior to
19  the board meeting, I think the Sheikh asked
20  for -- if I remember right, asked for the
21  financials of the company where he can look at
22  them.  I think it included Price, Waterhouse,
23  and Deloitte Touche who was our auditors and
24  finance folks on there.  But also every year

Page 103

1  the Sheikh got the full financials of the
2  company as part of the agreement on it.  So
3  every year he was offered the financials to
4  review.
5  BY MR. KURTZ:
6      Q.  Were you offered the financials on a
7  yearly basis?
8      A.  Absolutely not.
9      Q.  Was it -- even if you didn't get the
10  financials, was it something you discussed with
11  Mr. Alberto?
12     A.  No, not specific on the finances.  My
13  biggest thing was getting paid by the customer
14  and making sure my vendors and personnel were
15  paid.  I never knew exactly how much cash we
16  had.  I just told our finances, let me know
17  when I get below 3 million in cash flow being
18  able to pay out, because that's when I would go
19  over and really hound the customer for payments
20  at that point.
21     Q.  Had you heard from any other employees
22  at NorthStar about the company being in
23  financial problems?
24     MR. FRANCO:  Objection.  Asked and

Page 104

1  answered.  Go ahead and answer.
2      THE WITNESS:  Mr. Ali assumed he was in
3  financial trouble.  Reno briefed me that he
4  thought he was in financial trouble, based on
5  what Ali told him.
6           Also, once again, my guy's
7  telling me he hadn't paid his employees for two
8  to three months, leads us to believe there were
9  financial issues.  And that's pretty much how I
10  surmised that.
11  BY MR. KURTZ:
12     Q.  What about NorthStar as a company, did
13  you hear anything from any employees about
14  NorthStar having financial difficulties?
15     A.  No.  I mean there was one -- well, in
16  2012, I knew we had financial difficulties
17  before we signed a contract.  I had to sell 11
18  helicopters that we already purchased to keep
19  the company going, because the Sheikh would not
20  put any money into the company on it.  So I had
21  to do that prior to getting the contract signed
22  in August of '13.
23          So, yes, absolutely there.  I
24  think Reno was at a meeting with the Sheikh in

Page 105

1  2016 at one point to talk about compensation,
2  because I don't think he liked how much he paid
3  them, but Reno told him you had U.S. persons,
4  high-quality persons.  Everything's being
5  delivered on time, especially aircraft, and
6  that's how you did it, by paying your people
7  well.
8      Q.  So when you say compensation,
9  compensation for everybody at NorthStar?
10     A.  I'm assuming so.
11     Q.  Do you know if Mr. Alberto ever had a
12  discussion with the Sheikh about Mr. Alberto's
13  compensation?
14     A.  I have no idea.
15     Q.  What about 2017, did you hear from
16  anyone at NorthStar about NorthStar being in
17  financial trouble?
18     A.  No.
19     Q.  Have you ever heard from anyone at
20  NorthStar about financial improprieties
21  occurring at NorthStar?
22     A.  No.
23     MR. KURTZ:  Mark this as Exhibit No. 10.
24          (WHEREUPON, said

Page 154

1      MR. DEITCH: Let me ask the question
2  differently.
3  BY MR. DEITCH:
4      Q.  Let me withdraw the question.
5          Had you participated in efforts
6  to obtain the block two upgrade contract before
7  your departure?
8      A.  Absolutely.
9      Q.  Can you describe that a little bit?
10     A.  I had -- I had Lyle Becka start
11 writing the proposal.  I tweaked the proposal,
12 worked with our vendor, subcontractors on
13 there, and we presented the proposal with the
14 pricing on it.  They went back and forth a
15 couple of times, because when they seen what
16 they're asking for scope wise and the price tag
17 associated with that, they said, Well, maybe we
18 don't want this, this and this.  And then
19 they -- you know, they come back and said, Hey,
20 we want to put a different weapon system in the
21 aircraft.  I said, We can't do that.  I have a
22 teaming agreement with Cantine Armament out of
23 Tennessee.  For that region over there, I had
24 to put Cantine Armament equipment into that

Page 155

1  aircraft.  And so I said, you know, that's the
2  way it is.  I mean I can't do it.  Another
3  company could do it if you went with another
4  company.  But I told them why would you want to
5  do that when all that stuff's been integrated
6  into it the way we put in there.  It would be
7  kind of a nightmare to try to maintain it after
8  that if you start switching all this stuff.  We
9  can upgrade the stuff and make it better, pay
10 more money for it and go from there.
11     Q.  If I refer to Dr. Bin Saif, you
12 understand that's the Sheikh?
13     A.  Yes.
14     Q.  What role, if any, did Dr. Bin Saif
15 play in the negotiations for the original
16 contract for the 30 helicopters?
17     A.  I don't remember him participating at
18 all in the contract negotiations, because I was
19 at every contract negotiation on it.  From when
20 we were talking the Joint Aviation Command at
21 the lower level to Sheikh, the requirements for
22 the aircraft, the initial pricing that we were
23 going to push on that, and then when we
24 actually started negotiating the contract,

Page 156

1  which was done at GHQ, Brigadier Waheed and his
2  folks up there, it was me, our lawyer, Gary
3  Hasson, who's a British national, and I'd bring
4  Salam Al Dhaheri once in a while for that local
5  flavor.
6      Q.  And what -- in terms of the operations
7  portion of the execution of the contract, what
8  role, if any, did Dr. Bin Saif play in
9  operations?
10     A.  I'm not aware of any.
11     Q.  In terms of either the financial
12 management of the company or other -- other
13 things that had to be done with the company for
14 the contract to be performed, are you aware of
15 any role that Dr. Bin Saif played?
16     MR. KURTZ:  Objection to form.
17     THE WITNESS:  I'm not aware of anything
18 that he had --
19 BY MR. DEITCH:
20     Q.  In your testimony you mentioned a 2016
21 meeting that you attended with Mr. Alberto with
22 Dr. Ben Saif, and I think you said that one of
23 the topics of discussion had to do with the
24 compensation that was paid to NorthStar

Page 157

1  employees.
2      A.  I was not there.  I said Reno was
3  called to a meeting with Dr. Ben Saif in New
4  York, I believe it was, to discuss
5  compensation.
6      Q.  And the information you have about
7  that meeting, is that based on what Mr. Alberto
8  told you afterwards?
9      A.  Yes.
10     Q.  Can you describe what questions were
11 asked, what answers were given and what
12 discussion there was about compensation at that
13 meeting?
14     A.  Not very much, other than Reno had to
15 justify why he was paying the employees the
16 amount he was doing and the bonuses that he was
17 doing.  And that's where I said he told him
18 like there's a lot of failures in the Middle
19 East on contracting, and the only way to do
20 better is make sure you hire the right people,
21 compensate them well and perform.  And it was
22 very easy to show him by '16 we probably
23 delivered at least 20 aircraft, 15, 20 aircraft
24 on time, and the customer's very happy.  So

Page 158

1  it's proof that what he was doing was working.
2      Q.  Is it your understanding based on Mr.
3  Alberto's statements to you about that meeting
4  that Dr. Ben Saif was satisfied by that
5  explanation at the time?
6      MR. KURTZ:  Objection.
7      THE WITNESS:  Yes.
8  BY MR. DEITCH:
9      Q.  Were you involved at all with the --
10 strike that.
11         Am I correct that the UA
12 company -- NorthStar UAE was audited each year
13 by -- outside auditors?
14     **A.  Yes.**
15     Q.  And that was Deloitte Touche?
16     **A.  Yes.**
17     Q.  Were you involved at all with the
18 audit process?
19     **A.  Only if they needed documentation on**
20 **things that were -- were purchased for the**
21 **contract.  I'd have to have my guys dig up,**
22 **might be an invoice or something like that that**
23 **the finance folks didn't have to show the**
24 **payment.**

Page 159

1      Q.  And let me just -- aside from being
2  asked occasionally for documentation of that
3  sort, did you have any other involvement in the
4  audits from year to year?
5      **A.  No.**
6      Q.  Are you aware of any significant
7  issues that were raised during the audits of
8  NorthStar in any way?
9      MR. KURTZ:  Objection.  Vague, calls for
10 speculation.
11     THE WITNESS:  No.
12 BY MR. DEITCH:
13     Q.  The last of the 30 helicopters was
14 delivered near the beginning of 2017, correct?
15     **A.  2017.**
16     Q.  And that was on time, correct?
17     **A.  Yes.**
18     Q.  And payments were made, according to a
19 schedule, upon delivery and acceptance,
20 correct?
21     **A.  We had a delivery payment for the**
22 **customer to sign the delivery acceptance on it**
23 **and take the application and get paid a certain**
24 **amount, that was like 2 point something million**

Page 160

1  dollars for delivery payment.  And then after a
2  certain amount of time, there's a final
3  acceptance certificate that was signed, and
4  that was a payment of like 7 -- a little over
5  $700,000.
6      Q.  In early 2017, were there any concerns
7  about cash flow in the company?
8      **A.  No, I mean we were in between**
9  **contracts, you know.  I was concerned about not**
10 **being paid the money I was being paid, but**
11 **nothing was brought up where red flags or**
12 **anything like that.**
13     Q.  As of the time that that last
14 helicopter was delivered, do you know whether
15 NorthStar's vendors had been paid?
16     **A.  They've always been paid.  Like I**
17 **said, there were a couple of times there before**
18 **we got the contract where we'd have to juggle a**
19 **few payments around and talk to Bell on it.**
20 **That was one of the things I was very adamant,**
21 **make sure you pay vendors on time, where you**
22 **don't become a cash-only customer.**
23     MR. DEITCH:  Let's mark this as an exhibit.
24 17.

Page 161

1                (WHEREUPON, said
2                document was marked as
3                Deposition Exhibit No.
4                17 for Identification.)
5  BY MR. DEITCH:
6      Q.  So, Mr. Key, you've been handed what
7  was marked as Exhibit 17, and do you recognize
8  this as a chain of e-mails between you and
9  primarily Mr. Ali regarding cash flow?
10     **A.  Yes.**
11     Q.  So the e-mail, if you look at the
12 second page where it starts, is an e-mail from
13 you on January 8th asking about can I get our
14 cash flow status and then it continues with
15 Mr. Ali responding.  Was this a -- let me word
16 this correctly.  Was this a typical or an
17 atypical exchange between you and Mr. Ali about
18 cash flow?
19     **A.  Pretty typical.**
20     Q.  So does this e-mail -- is this a sign
21 of some significant concern about cash flow?
22     **A.  No, no.  Like I said, the initial one,**
23 **we should be significantly in the black since**
24 **we just delivered the 29 aircraft, which was**

Page 166

1  Mr. Agha to create that presentation?
2      A.  That's what I was briefed by Ali and
3  Reno, and I don't know what specifically was in
4  the e-mail chain that they looked at on the
5  computer but -- I'll answer that if you ask me.
6  Sorry.
7      Q.  Do you recall that the presentation
8  included a proposal that there be a new CEO for
9  the company?
10     A.  What I was briefed, it said in there
11 shut down NorthStar USA, change out the
12 management at NorthStar UE, which you would
13 assume it would be me, Reno and all that, and
14 concentrate on UAE by running UAE business.
15     Q.  If you go back to Exhibit 7, on that
16 same page ending with 35 in the
17 bottom-right-hand corner, do you see the next
18 line, you wrote, "RJ is going to take control
19 of NSA finances to control cash flow (my
20 thoughts)."  RJ is Rotana Jet?
21     A.  Yes.
22     Q.  Which was the company owned by Dr. Ben
23 Saif, correct?
24     A.  Yes.

Page 167

1      Q.  What does it mean that you included
2  that parenthetical, my thoughts?
3      A.  Based on what the discussions going
4  on, that he was in financial trouble, things
5  like that, and that he wanted to audit the
6  books and all that, my thoughts are he is going
7  to come here and take control of the company,
8  take over the finances and that was my thoughts
9  on it.
10     Q.  When you say that Dr. Ben Saif wanted
11 to audit the company, at the time that you sent
12 this to Mr. Alberto in early October, do you
13 know if Mr. Alberto had already been told about
14 the board meeting that was going to take place?
15     A.  I believe so.  I believe so.  I think
16 September I think is when they arranged the
17 board.  And I think first one might have got
18 canceled.  Seemed like it was going to be in
19 the U.S.  I can't totally remember.  Then it
20 was over in the UA, they rescheduled for over
21 in the UA.
22     Q.  Do you know whether financial
23 information had been provided to Dr. Ben Saif
24 prior to the board meeting?

Page 168

1      A.  I'm assuming so, because every year he
2  got -- as the shareholder, he got the financial
3  results of the company.
4      Q.  Do you know whether he had made any
5  special requests in the week or two coming up
6  to the board meeting for additional
7  information?
8      A.  I was briefed that he had.
9      Q.  And briefed by whom?
10     A.  By Reno.
11     Q.  And do you know whether he was
12 provided with all of the information that he
13 requested?
14     A.  I'm assuming so.
15     Q.  Who would have provided that
16 information, financial information, about the
17 company to Dr. Ben Saif?
18     A.  Ali.  And if I remember right, they
19 also brought in the lead auditor from Deloitte
20 Touche to sit in on a meeting with Dr. Saif.
21     Q.  During your tenure at NorthStar, are
22 you aware at any time when Dr. Ben Saif
23 requested information about the company's
24 finances or the company's operations and that

Page 169

1  information was not provided to him?
2      A.  No.
3      MR. KURTZ:  Objection.  Calls for
4  speculation.
5      THE WITNESS:  No, I'm not aware.
6      MR. DEITCH:  How does that call for
7  speculation?  Asked if he was aware whether an
8  event took place.
9      MR. KURTZ:  Well, if the Sheikh had
10 requested something, you're speculating that it
11 took place and that he would have knowledge
12 about it.
13 BY MR. DEITCH:
14     Q.  Do you see -- going back to Exhibit 7
15 again, the page that ends with 35, that the
16 last bullet point there says, "If Reno and
17 Terry are forced out, the company will collapse
18 due to the loss of institutional knowledge and
19 the licensing requirements to service the
20 current contract and warranty requirements."
21         To the extent that you referred
22 to the loss of institutional knowledge there,
23 can you explain why that would lead to the
24 company's collapse?

43 (Pages 166 to 169)

Page 194

1  insert it," where did he want the name?
2      A.  Salem's name in there to the letter
3  that we sent General Toumajan about what was
4  going on with the company, because, once again,
5  we assume that Salem was power brokering and
6  was the one that presented that presentation to
7  the Sheikh and all that.
8      Q.  And if you'll go to the next page,
9  which has Key 1301 in the bottom-right-hand
10 corner, and about ten or so lines down, do you
11 see where 10/25/17 at 8:40, Mr. Alberto writes,
12 "Calling Tom for number" and it talks about a
13 call-in number and a pass code?
14     A.  Looks like it's for a conference call.
15     Q.  Do you know who Tom is in that e-mail?
16     A.  I assume Tom is the lawyer for Akin
17 Gump, and he was mainly -- had to do with
18 compliance, State Department.
19     Q.  Did you participate in a conference
20 call with lawyers at Akin Gump about the ITAR
21 issues that were proposed by the situation at
22 that time?
23     A.  I believe I was.  I don't remember the
24 total conversation.  But I think I was in on

Page 195

1  that phone call.
2      Q.  Is it your understanding that Mr.
3  Alberto was calling Akin Gump to get legal
4  advice about how to proceed?
5      A.  Yes.
6      MR. KURTZ:  Objection.  Speculation.
7  BY MR. DEITCH:
8      Q.  Let me ask the question differently.
9  Did Mr. Alberto seek legal advice from Akin
10 Gump during that call about how to proceed?
11     MR. KURTZ:  Same objection.
12     THE WITNESS:  I believe so.
13     MR. DEITCH:  How can that possibly be
14 speculation?  I asked if he sought legal advice
15 during that call that he participated in.  How
16 can that be speculation?
17     MR. KURTZ:  He said he didn't remember the
18 call I believe was his testimony.  So...
19     MR. DEITCH:  Okay.  Skip down about a dozen
20 lines to where it says 10/25/17, 16:35:31, do
21 you see that you write, "I think we better
22 assume HH has lawyers he uses in the U.S.  We
23 need to move at best speed to determine your
24 status of authority over NSA USA."  Do you see

Page 196

1  that?
2      A.  Yes.
3      Q.  At the time that Mr. Alberto sent his
4  resignation letter, was it your understanding
5  that he had resigned from NorthStar UAE?
6      A.  I think he sent in his resignation
7  letter, but it hadn't been accepted and
8  acknowledged yet.  But I think -- and NorthStar
9  UAE, and he felt -- still felt that he had
10 authority as NorthStar USA, based on the
11 documents that he had and agreed with.
12     Q.  And based on his position as the CEO
13 of the USA company?
14     A.  Yes.
15     Q.  Now, skip down a little further.  Do
16 you see 10/27/17, the first entry for that
17 date, do you see Mr. Alberto writes, "I felt
18 the same thing.  Suspicious for sure."  Do you
19 know what he is referring to there?
20     A.  I think it has to do with -- I'm
21 thinking -- once again, I can't totally
22 remember.  I think it had to do with talking
23 with Amy about license and moving license.  And
24 I think she called or asked something about the

Page 197

1  license on that.  Once again, I can't totally
2  recall that, but I think it's down a little bit
3  further.
4      Q.  Turn the page to the page that ends
5  with 1302, and there is an entry -- the first
6  entry on 10/29/17.  Do you see that you wrote,
7  "Thinking about it, I have a feeling Lyle was
8  in the middle of the TFG SEA and Bell proposal
9  for Iraq.  Probably why he was at USA," and Mr.
10 Alberto responds, "I don't doubt it now."
11         Can you just tell me, TFG, what
12 company is that?
13     A.  It's called Tek Fusion Global.
14     Q.  And that was a vendor that NorthStar
15 used?
16     A.  Yeah, subcontractor.
17     Q.  And is the SEA the same, also a
18 subcontractor?
19     A.  Southeast Aerospace.
20     Q.  And obviously Bell was also either a
21 vendor or subcontractor?
22     A.  Uh-huh.
23     Q.  Were you aware that when -- after
24 Mr. Becka was let go from the company, that he