**EXHIBIT 3**
**(Portions Filed**
**Under Seal)**

1

IN THE UNITED STATES DISTRICT COURT          11:25:00

FOR THE EASTERN DISTRICT OF VIRGINIA

NORTHSTAR AVIATION, LLC, :

et al.,                  :

            Plaintiffs, :

vs.                      :   Civil Action No.

ALDEN BURT ALBERTO,      :      1:18cv191-TSE-JFA

et al,                   :

            Defendants.  :

------------------------

            Videotaped Deposition of

              NRASIB ALI TAHIR

              McLean, Virginia

           Thursday, October 18, 2018

                 11:25 a.m.

Reported by:  Donna A. Peterson

## 2

1      Videotaped Deposition of NRASIB ALI

2 TAHIR, taken at the law offices of:

3

4      BERENZWEIG LEONARD, LLP

5      Suite 1250

6      8300 Greensboro Drive

7      McLean, Virginia  22102

8

9

10

11

12

13      Pursuant to Notice, before Donna Ann

14 Peterson, Notary Public in and for the Commonwealth

15 of Virginia.

## 3

1      A P P E A R A N C E S

2

3 ON BEHALF OF PLAINTIFFS:

4      ELLIS L. BENNETT, ATTORNEY at LAW

5      DUNLAP, BENNETT & LUDWIG, PLLC

6      211 Church Street S.E.

7      Leesburg, Virginia  20175

8      Telephone:  (703) 777-7319

9      ebennett@dbllawyers.com

10

11 ON BEHALF OF DEFENDANTS:

12      NICK JOHNSON, ATTORNEY at LAW

13      DECLAN C. LEONARD, ATTORNEY at LAW

14      SAMANTHA K. COLLINS, ATTORNEY at LAW

15      CLYDE FINDLEY, ATTORNEY at LAW

16      BERENZWEIG LEONARD, LLP

17      Suite 1250, 8300 Greensboro Drive

18      McLean, Virginia  22102

19      Telephone:  (703) 760-0402

20      njohnson@berenzweiglaw.com

21      dleonard@berenzweiglaw.com

## 4

1      A P P E A R A N C E S   C O N T I N U E D

2

3 ALSO PRESENT:  Alden Burt Alberto, Defendant

4      Lyle Becka, for NorthStar

5      Martin Sherrill, Videographer

## 5

1      C O N T E N T S

2 EXAMINATION OF NRASIB ALI TAHIR      PAGE

3 By Mr. Johnson      9

4 By Mr. Bennett      285

5 By Mr. Johnson      297

6 By Mr. Bennett      298

7

8      E X H I B I T S

9 ALI

10 EXHIBIT   DESCRIPTION      PAGE

11 Exhibit 1  E-mail w/attachment, Tahir-Alberto,    52

12      9-20-17, Alberto_07562-7563

13 Exhibit 2  E-mail w/attachment, Ali-renoax,    71

14      5-1-14, Alberto_05532-5536

15 Exhibit 3  Reflex Responses and Rotana Jet,    88

16      Services Agreement, December 4, 2011,

17      NSA001596-1627

18 Exhibit 4  E-mail string, Ali-Alberto, 8-27-13,   120

19      Alberto_05647

20 Exhibit 5  Issuance of performance bond, Emirates 120

21      NBD, August 27, 2013,

22      Alberto_06321-6322

6

1          E X H I B I T S   C O N T I N U E D

2    ALI

3    EXHIBIT    DESCRIPTION                        PAGE

4    Exhibit 6  E-mail w/attachment, Alberto-Ali,    126

5            7-1-17, NSA0001757-1759

6    Exhibit 7  E-mail string, Ali-Alberto, 7-16-17,  146

7            NSA0001752-1753

8    Exhibit 8  E-mail string w/attachment,          150

9            Alberto-Alberto, 12-22-15,

10           Alberto_05046, Alberto_05049

11   Exhibit 9  E-mail w/attachment, Tahir-Alberto,   186

12           9-24-17, Alberto_00092-102,

13           Alberto_00105-106

14   Exhibit 10 E-mail string, Agha-AlDhaheri, 8-1-17,  197

15           Alberto_00110

16   Exhibit 11 E-mail string, Talkhan-Ali, 9-14-17,   205

17           NSA001730

18   Exhibit 12 E-mail string, Talkhan-Ali, 9-19-17,   208

19           NSA001658-1665

20   Exhibit 13 E-mail w/attachment, Talkhan-Ali,      221

21           10-8-17, NSA001639-1643

22   Exhibit 14 Letter, Ahmed bin Saif                 247

7

1          E X H I B I T S   C O N T I N U E D

2    ALI

3    EXHIBIT    DESCRIPTION                        PAGE

4            Al Nehayan-Jallad, 10-18-17,

5            NSA001592

6    Exhibit 15 E-mail string, Ali-"Dear Rajiv,"      254

7            10-22-17, NSA001503-1510

8    Exhibit 16 E-mail, Ali-Alberto, 10-24-17,        266

9            NSA001548

10   Exhibit 17 Letter, Tahir-Albert, 10-24-17,       266

11           NSA000464-465

12

13

14

15

16

17

18

19

20

21

22

8

1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  We are going on the          11:25:21

3    record at 11:26 a.m., on October 18th, 2018.          11:25:22

4    This is the case of NorthStar Aviation,               11:25:32

5    LLC, et al., versus Alberto, et al.  This deposition  11:25:35

6    is being taken at Berenzweig Leonard, LLP.  The       11:25:41

7    witness today is Nrasib Ali.                          11:25:47

8          My name is Martin Sherrill, from USA Legal      11:25:55

9    Support, and I'm the video specialist.  The court     11:25:59

10   reporter today is Donna Peterson, also from Henderson 11:26:00

11   Legal Services.                                       11:26:07

12         Would the court reporter please swear in        11:26:08

13   the witness.                                          11:26:09

14   Thereupon,                                            11:26:09

15         NRASIB ALI TAHIR,                               11:26:09

16   was called as a witness by counsel for Defendants,    11:26:09

17   and having been duly sworn by the Notary Public, was  11:26:22

18   examined and testified as follows:                    11:26:22

19         THE VIDEOGRAPHER:  Will counsel please          11:26:22

20   swear in the witness -- I mean will counsel please    11:26:23

21   state their appearance for the record.                11:26:25

22         MR. JOHNSON:  Good morning.  Nick Johnson,      11:26:27

9

1    with Berenzweig Leonard, on behalf of Mr. Alberto.    11:26:30

2          MR. LEONARD:  Declan Leonard, from             11:26:34

3    Berenzweig Leonard, on behalf of Mr. Alberto.        11:26:36

4          MR. ALBERTO:  Reno Alberto.                    11:26:39

5          MS. COLLINS:  Samantha Collins, on behalf      11:26:43

6    of Mr. Alberto.                                       11:26:43

7          MR. FINDLEY:  Clyde Findley, also on           11:26:46

8    behalf of Mr. Alberto.                                11:26:47

9          MR. BENNETT:  I'm Ellis Bennett, here on       11:26:49

10   behalf of Plaintiffs.                                 11:26:51

11         MR. BECKA:  Lyle Becka, on behalf of           11:26:53

12   NorthStar Aviation.                                   11:26:58

13         THE VIDEOGRAPHER:  You may begin.              11:27:00

14         EXAMINATION BY COUNSEL FOR DEFENDANTS          11:27:00

15   BY MR. JOHNSON:                                       11:27:01

16   Q.  Good morning, sir.                                11:27:01

17         Once again, my name is Nick Johnson.  I'm      11:27:02

18   an attorney with the law firm Berenzweig Leonard, and 11:27:05

19   our Firm represents Mr. Alden Burt Alberto in a       11:27:07

20   lawsuit filed by NorthStar Aviation against him that  11:27:08

21   is currently pending in the Eastern District Of       11:27:12

22   Virginia in Alexandria.                               11:27:16

**30**

Q. Well, in your opinion, did Mr. Alberto  11:45:21
ever do anything inappropriate while he was CEO of  11:45:24
NorthStar?  11:45:28

A. Well, I would ask again, like will you be  11:45:30
specific about the question? Like what period, what  11:45:34
time are you talking about?  11:45:37

Q. Ever.  11:45:37

A. Then any sign, yes there were a few things  11:45:38
which, as a finance guy, I will not see proper  11:45:43
authorization of some transaction, you know. So I  11:45:46
will say like that's inappropriate to me because the  11:45:48
auditors won't find it, you know, as per the  11:45:51
accounting practices. So yes, up to that extent,  11:45:55
yes.  11:45:59

Q. And when were those transactions?  11:46:00

A. They were October 2017.  11:46:02

Q. Okay. Prior to October 2017, in your  11:46:06
opinion, was there anything that Mr. Alberto did that  11:46:11
you viewed as inappropriate?  11:46:13

A. No.  11:46:15

Q. Did you grow up in the UAE?  11:46:16

A. No.  11:46:29

**31**

Q. Where'd you grow up?  11:46:29

A. Pakistan.  11:46:31

Q. Okay. Did you go to school in Pakistan?  11:46:31

A. Yes.  11:46:33

Q. Okay. Starting after high school, can you  11:46:34
please just kind of tell us your educational  11:46:37
background.  11:46:40

A. Yeah. I had my bachelor's in commerce and  11:46:40
accounting, from University of the Punjab in Lahore.  11:46:44
And I did my ACCA from Lahore.  11:46:49

Q. I'm sorry, and that was ACCA?  11:46:52

A. ACCA. Association of Certified  11:46:54
Chartered [sic] Accountants. That's a U.K.-based  11:46:58
degree.  11:47:00

Q. Okay.  11:47:00

A. Yeah.  11:47:00

Q. Is that similar to kind of what we have in  11:47:00
the States, C.P.A.?  11:47:02

A. Yeah.  11:47:02

Q. Okay.  11:47:02

A. The same.  11:47:02

Q. Okay. Do you hold a CPA license?  11:47:03

**32**

A. I hold ACCA license.  11:47:06

Q. Okay. And that's the equivalent of a  11:47:09
C.P.A. over there?  11:47:11

A. Yeah, kind of, I mean.  11:47:12

Q. Okay.  11:47:12

A. It's just the same degree as.  11:47:13

Q. Okay. And when did you obtain those  11:47:15
degrees?  11:47:16

A. It was in 2003.  11:47:16

Q. Okay. And you mentioned some schooling  11:47:18
that you went to. When did you graduate from that  11:47:21
school?  11:47:22

A. I graduated in 2003. Same time.  11:47:24

Q. Oh, you graduated. Okay.  11:47:27
And when did you obtain the -- the license  11:47:28
that you mentioned?  11:47:30

A. Same time, 2003.  11:47:32

Q. Okay.  11:47:32

A. Actually I was studying my bachelor's and  11:47:34
ACCA at the same time.  11:47:38

Q. Okay. Any other certifications that  11:47:39
you've obtained?  11:47:43

**33**

A. Uh, no.  11:47:44

Q. Any other licenses that you hold?  11:47:45

A. No.  11:47:49

Q. After you graduated in 2003, walk me  11:47:52
through your employment history.  11:47:58

A. Yeah, my first internship was with  11:48:03
Deloitte, in Pakistan. And I don't remember the  11:48:06
exact period, but it was almost one year.  11:48:11
And then after that Porsche Pakistan, I  11:48:14
had been there as a finance manager.  11:48:--

THE REPORTER: Sorry --

THE WITNESS: Porsche Pakistan. Porsche,
the automobile.

MR. JOHNSON: Ah, Porsche.

THE WITNESS: Yeah. The company was Auto  11:48:25
Technique, by the way, there, but they were the  11:48:27
representative of Porsche there.  11:48:30

MR. JOHNSON: Okay.  11:48:32

THE WITNESS: So I was there almost one  11:48:32
year, one and a half year. I don't remember exactly.  11:48:34

MR. JOHNSON: Okay.  11:48:39

THE WITNESS: And after that, I moved to  11:48:39

46

```
1     Q.   Okay.                                    11:59:09
2     A.   But I have seen that.  I don't know how   11:59:09
3  did I receive it, I cannot.                       11:59:12
4     Q.   Okay.  To your knowledge, does NorthStar  11:59:19
5  possess a copy of the liquidation instructions?   11:59:21
6     A.   I'm not aware of that, if someone has it.  11:59:23
7     Q.   If -- if someone were to have it, who     11:59:26
8  would that be?                                    11:59:28
9     A.   Our legal department would have such kind 11:59:28
10 of documents before.  I don't know now.  Because we 11:59:31
11 don't have a specific department now, so --        11:59:33
12    Q.   As best you can recall, what was -- what   11:59:36
13 were the contents of the liquidation instructions? 11:59:43
14    A.   I can't recall much, but it was, just to  11:59:46
15 generalize, it was like how the liquidation would go. 11:59:51
16 And after the liquidation, where the funds will be  11:59:55
17 transferred and that's it.                         11:59:59
18    Q.   Okay.                                      12:00:03
19    A.   So in general, that's what it was, in two 12:00:03
20 or three pages.                                    12:00:04
21    Q.   Okay.  And where did the funds go?        12:00:05
22    A.   It was supposed to go in a new company set 12:00:07
```

47

```
1  up, and that company was Vulcan.  Vulcan Management 12:00:12
2  Consultancy, as I said before.                     12:00:15
3     Q.   Why did the money go to Vulcan?            12:00:17
4     A.   I have no idea about that.                 12:00:19
5     Q.   Was -- was Reno involved in               12:00:21
6  directing that money to Vulcan?                    12:00:24
7     A.   I'm not aware like who to pick to say it   12:00:26
8  at all.                                            12:00:30
9     Q.   Around the time that R2 was in            12:00:32
10 liquidation, are you aware of Mr. Alberto securing 12:00:39
11 funding for Vulcan?                                12:00:43
12    A.   I'm not aware of that.                     12:00:45
13    Q.   Okay.  Did you ever have a conversation   12:00:49
14 with Mr. Alberto about a Brigadier Hamid with the UAE 12:00:52
15 military?                                          12:00:55
16    A.   That name rings a bell.                    12:00:58
17    Q.   And are you aware that Alberto secured    12:01:04
18 funding from Brigadier Hamid?                      12:01:08
19    A.   What I recall, never heard of securing    12:01:10
20 funding.  But I remember with this name, he was the 12:01:13
21 person who we were dealing with for the last payments 12:01:16
22 we were supposed to receive from the GHQ, as part of 12:01:19
```

48

```
1  our previous contract with Reflex.                 12:01:23
2     Q.   Okay.                                      12:01:26
3     A.   So I remember that was the guy in contact, 12:01:26
4  so --                                              12:01:28
5     Q.   And to your knowledge, did Brigadier Hamid 12:01:29
6  in fact direct funds to go to R2?                  12:01:37
7     A.   That's not to my knowledge.               12:01:41
8     Q.   But you are aware of the fact that money  12:01:43
9  went from R2 to Vulcan, right?                     12:01:46
10    A.   Correct.                                   12:01:49
11    Q.   How much money?                            12:01:49
12    A.   I won't recall exactly, but it was a      12:01:50
13 hundred million dollars something.                 12:01:54
14    Q.   Okay.  And what was the source of that    12:01:56
15 money?                                             12:01:58
16    A.   That was all the money left in R2 after   12:01:59
17 the liquidation, after paying off all the          12:02:02
18 liabilities.                                       12:02:06
19    Q.   Okay.  Mr. Alberto ultimately went on,    12:02:06
20 went on to become CEO of Vulcan, correct?          12:02:12
21    A.   Correct.                                   12:02:15
22    Q.   Did Mr. Alberto direct the 100 million    12:02:16
```

49

```
1  dollars to go from R2 to Vulcan?                   12:02:21
2     A.   Yes, he was the authorized person.         12:02:23
3     Q.   Okay.  And Mr. Alberto had authorization  12:02:26
4  to send 100 million dollars from R2 to Vulcan?     12:02:29
5     MR. BENNETT:  Objection to form.                12:02:33
6     THE WITNESS:  That's -- I would say it's       12:02:34
7  not -- he was the CEO of Vulcan and, as per the    12:02:36
8  directions of the liquidation, he was the person to 12:02:44
9  sign to authorize.                                 12:02:44
10 BY MR. JOHNSON:                                    12:02:47
11    Q.   To your knowledge, was Mr. Alberto        12:02:48
12 authorized to initiate that transfer?             12:02:50
13    A.   As his position and authority, he had to  12:02:52
14 approve that.  Otherwise, no transaction could go  12:02:58
15 through.                                           12:03:00
16    Q.   Did anyone else authorize that            12:03:00
17 transaction?                                       12:03:03
18    A.   Not as far as I can recall.               12:03:04
19    Q.   So in your opinion, Mr. Alberto was solely 12:03:08
20 responsible for sending 100 million dollars from R2 12:03:10
21 to Vulcan?                                         12:03:16
22    MR. BENNETT:  Objection to form.               12:03:16
```

**50**

1  THE WITNESS:  That's as per the documents,   12:03:17
2  as I said, a person in charge who is authorized to   12:03:20
3  approve a transaction up to that extent, yes.  He was   12:03:23
4  authorized to approve that transaction and he had to.   12:03:27
5  BY MR. JOHNSON:   12:03:30
6      Q.   Was -- was the sheikh involved in any way   12:03:31
7  in that transaction?   12:03:33
8      A.   I never heard of that.   12:03:35
9      Q.   To your knowledge, did the sheikh   12:03:37
10  contribute any funds of any kind to Vulcan   12:03:38
11  Management?   12:03:43
12      A.   You may want to rephrase the question.   12:03:43
13  In --   12:03:47
14      Q.   Sure.   12:03:47
15      A.   In what way?   12:03:48
16      Q.   Sure.   12:03:48
17      Did the sheikh provide any funding to   12:03:49
18  Vulcan management?   12:03:51
19      A.   Again, I would like you to rephrase it.   12:03:53
20      Q.   Okay.   12:03:53
21      A.   Like from his personal account?  Like just   12:03:56
22  be specific.  It's quite general.   12:03:59

**51**

1      Q.   Did he provide any money to Vulcan?   12:04:03
2      A.   I can't answer, it's quite general.   12:04:06
3      Q.   Okay.  Sitting here today, can you point   12:04:07
4  to any funds that you are aware of the sheikh   12:04:10
5  directly contributing to Vulcan Management?   12:04:12
6      A.   Directly?  No, I can't recall any   12:04:14
7  transaction like that.   12:04:17
8      Q.   Okay.  Who would you attribute to funding   12:04:17
9  Vulcan Management?   12:04:30
10      A.   Reflex Responses.   12:04:31
11      Q.   Through Mr. Alberto, correct?   12:04:38
12      A.   Mr. Alberto being CEO there.   12:04:40
13      Q.   Why did Mr. Alberto decide to send the   12:04:44
14  money to Vulcan?   12:04:47
15      MR. BENNETT:  Objection to form.   12:04:48
16      THE WITNESS:  I wouldn't know that.   12:04:50
17  BY MR. JOHNSON:   12:04:59
18      Q.   Other than the funds that came over from   12:05:05
19  R2, are you aware of any other contributions,   12:05:06
20  monetary contributions, going to Vulcan Management?   12:05:11
21      A.   No.   12:05:15
22      MR. JOHNSON:  Okay.  I'd like to hand you   12:05:18

**52**

1  a document that will be marked as Exhibit 1.   12:05:30
2      (Ali deposition Exhibit 1 was   12:05:35
3  marked for identification and attached to the   12:05:35
4  transcript.)   12:06:06
5  BY MR. JOHNSON:   12:06:06
6      Q.   And Ali, please just take a minute to   12:06:08
7  familiarize yourself with that document.   12:06:11
8      Ali, do you recognize this document?   12:06:48
9      A.   Yes, I do.   12:06:48
10      Q.   What is this document?   12:06:49
11      A.   This is the detail of all that it says and   12:06:51
12  payments of R2.   12:06:57
13      Q.   And if you could go back to the first page   12:07:00
14  of the document, it has a Bates number on the bottom   12:07:03
15  right, it's Alberto 07562.  Do you see that?   12:07:06
16      A.   Yes.   12:07:11
17      Q.   And just throughout the course of today,   12:07:11
18  when I hand you a document, I may refer to Bates   12:07:14
19  numbers.  That will be found on the bottom right-hand   12:07:16
20  corner.   12:07:19
21      A.   Okay.   12:07:19
22      Q.   Just so you know for future reference.   12:07:20

**53**

1      Let's talk about the first page of this   12:07:22
2  document that's been marked as Exhibit 1.   12:07:24
3      Did you send this e-mail to Mr. Alberto?   12:07:29
4      A.   It looks like.   12:07:31
5      Q.   Okay.  And the -- the e-mail address   12:07:32
6  nrasib, N-R-A-S-I-B, @gmail.com, that's your e-mail   12:07:34
7  address, is that correct?   12:07:41
8      A.   Correct, nrasib.   12:07:43
9      Q.   Okay.  Why did you send Mr. Alberto this   12:07:48
10  e-mail in September of 2017?   12:07:50
11      A.   I can't recall, but as it seems, it's a   12:07:51
12  report request from Mr. Alberto which I prepared and   12:07:54
13  sent to him.   12:07:57
14      Q.   He requested this?   12:07:58
15      A.   It seems so.  Otherwise, I will not send   12:08:01
16  it.   12:08:04
17      Q.   What makes you think he requested it?   12:08:05
18      A.   As the CEO, he would like to see the   12:08:06
19  management reports, quite often, about anything, so I   12:08:09
20  think these will be one of that.  He would like to   12:08:13
21  see all the receipts and payments, that's how it   12:08:15
22  seems.   12:08:17

**58**

we could foresee at that time might happen to close
that.

Q.   Okay.  So just generally there were some
problems with the fuses?

A.   I can't recall exactly, but obviously
there were.  Yeah.

Q.   Okay.  Were those ever corrected or
addressed?

A.   Yeah.  We did finally deliver that to GHQ.
That's how we were able to close out the company.

Q.   And was that delivered while Mr. Alberto
was CEO?

A.   Yes.

Q.   Okay.  Was Mr. Alberto involved in
correcting the problem with the fuses?

A.   Yes.

Q.   Was that significant?

A.   Absolutely it was.

Q.   Okay.  And why do you say that?

A.   Because if we could not close this Fuzes
project, it was almost impossible to close the
company.  Otherwise, we had to pay this 35 million

**59**

back to the customer.

Q.   G&A over -- is that overheads or what is
that?

A.   Overheads, yeah.

Q.   Okay.

A.   Misspelled.

Q.   Okay.  And so if kind of moving down, you
see "payments."

A.   Yes.

Q.   And these are payments attributable to
each receipt, is that right?

A.   That's correct.

Q.   Okay.  Okay.
And then the -- what's left after the
liquidation was 107 million, is that right?

A.   Yeah.  As of this report, that would be
correct, yes.

Q.   Okay, okay.
And then moving down, it says "Cash and
Assets Transferred to VMC."
Is "VMC" Vulcan Management Consulting?

A.   That's correct.

**60**

Q.   Okay, okay.
And then it says "Net Cash Balance After
Liquidation, six."
I'm assuming that's six million.  Right?

A.   Yes.

Q.   What happened to that six million?

A.   I won't remember now.

Q.   Okay.  Did it go to another company?

A.   No.  As far as I can recall, all the
payments from Reflex went to Vulcan.

Q.   Okay.  So a hundred and one million, I
mean, that's a very specific number.  Any reason why
that amount went to Vulcan?

A.   It's as you initially stated, as per the
liquidation instructions, that's how it was supposed
to.

Q.   Okay.  So who made the decision to come to
the specific amount of a hundred and one million
dollar?

A.   No, it's -- it's not, it wasn't decided
what the amount would be.  It was whatever would be
left in the company would go to Vulcan.  So that,

**61**

that was the instruction.

Q.   I apologize.  Okay.

A.   This 101 could be 110 million.

Q.   Okay.  And then who made the decision to
decide where the money went?

A.   Again, I don't know about that.

Q.   Okay.

A.   About those instructions, where they
prepared, who decided about that, I'm not aware of
that.

Q.   Okay.  Are you aware of Mr. Alberto
considering transferring the money to other
companies, other than Vulcan?

A.   No.

62

1 ██████████████████████ ▬▬▬
   ██ ███          ▬▬
   █ ███              ▬▬▬
   ██ █████              ▬▬
   █ ████████████████      ▬▬▬
   █ ███████              ▬▬
   █ ████████████████      12:16:12

9    Q.   Okay.  And then looking at the notes, it    12:16:15

10  says "No capital contribution was made by the    12:16:16

11  shareholder."    12:16:18

12        Do you see that?    12:16:19

13    A.   Yes.    12:16:19

14    Q.   Who was the shareholder?    12:16:20

15    A.   Shareholder is Sheikh Ahmed, Rotana Jet    12:16:22

16  Aviation.

17    Q.   Okay.  Was the sheikh involved in any way    12:16:29

18  in the transfer of cash and assets to Vulcan    12:16:31

19  Management?    12:16:35

20    A.   No.    12:16:35

21    Q.   Did he, in any way, facilitate that    12:16:35

22  payment?    12:16:43

63

1    A.   No.    12:16:43

2    Q.   Okay.  So then let's kind of go    12:16:44

3  chronologically.    12:16:48

4        What was the plan with Vulcan Management?    12:16:48

5    A.   As finance director, I won't have much of    12:16:54

6  insight into that, what the company intended to do    12:16:58

7  with the activities we had on the license.  But it    12:17:02

8  was -- it was real broad, so we were sourcing quite a    12:17:12

9  different type of business.  It wasn't in one    12:17:15

10  direction, so --    12:17:19

11    Q.   And I apologize, I'm going to go back to    12:17:19

12  Exhibit 1 real quick.    12:17:21

13        Sitting here today, do you have any reason    12:17:23

14  to question the accuracy of the numbers that are    12:17:25

15  provided in Exhibit 1?    12:17:28

16    A.   As far as I can recall, they look to me,    12:17:30

17  these are the numbers.    12:17:34

18    Q.   So they're accurate?    12:17:37

19    A.   Because in September 2017, the liquidation    12:17:38

20  was done, so I would assume these were the final    12:17:41

21  numbers at that time.    12:17:44

22    Q.   Okay.  Thank you.    12:17:45

64

1        Going back to Vulcan.  When was Vulcan    12:17:49

2  formed?    12:17:53

3    A.   About May 2012.    12:17:57

4    Q.   Who formed it?    12:18:01

5    A.   I won't know that.    12:18:03

6    Q.   Why was it formed?    12:18:07

7    A.   As far as I can recall, this was to set up    12:18:11

8  a new company.    12:18:14

9    Q.   And I guess, what type of work were the    12:18:15

10  people involved in Vulcan contemplating doing?    12:18:20

11    A.   I cannot really recall that now.    12:18:24

12    Q.   Were they envisioning doing work with the    12:18:28

13  UAE military?    12:18:30

14    A.   I can't recall because we never had a    12:18:32

15  contract under Vulcan Management.    12:18:33

16    Q.   Did you submit any proposals on behalf of    12:18:35

17  Vulcan?    12:18:38

18    A.   I won't recall that, either.    12:18:38

19    Q.   Were you aware of ever an effort to -- to    12:18:40

20  submit a proposal for a training facility?    12:18:43

21    A.   A lot of things were going on which I can    12:18:46

22  recall, but I can't recall any specifics of any of    12:18:50

65

1  the proposals or anything.    12:18:53

2    Q.   Mr. Alberto worked for Vulcan, correct?    12:18:59

3    A.   Yes.  I can't recall exactly, but    12:19:01

4  initially I think he was on Vulcan payroll, as well.    12:19:03

5    Q.   Okay.    12:19:06

6    A.   I think so.  But, again, I would say I'm    12:19:07

7  not sure about that.    12:19:09

8    Q.   Okay.  And as best you can recall, what    12:19:10

9  was Mr. Alberto's position at Vulcan?    12:19:11

10    A.   He was CEO.  Yeah.    12:19:13

11    Q.   Okay.  Did he report to anybody?    12:19:15

12    A.   Mr. Alberto?    12:19:17

13    Q.   Yes.    12:19:18

14    A.   I wouldn't be able to tell.    12:19:19

15    Q.   Okay.  So sitting here today, are you    12:19:20

16  aware of him having to report to anyone at Vulcan?    12:19:22

17    A.   I wouldn't exactly know who he was    12:19:25

18  reporting to.    12:19:29

19    Q.   And how long did you work for Vulcan?    12:19:30

20    A.   It was almost one year.    12:19:37

21    Q.   You never landed a contract with Vulcan?    12:19:39

22    A.   As far as I remember, no, Vulcan never had    12:19:48

## 94

```
1   formed?
2        A.   I won't recall exactly.
3        Q.   Okay.  Was there a management team?
4        A.   I won't recall.  I mean, there was
5   classification, as HR does for the employees,
6   management, operations, says yes, that classification
7   was there.
8        Q.   Okay.  What about on the finance team, was
9   there anyone other than you?
10       A.   No.
11       Q.   Okay.  In terms of running the business
12  itself, the day-to-day operations of the company, was
13  the sheikh involved in the day-to-day operations of
14  the company at all?
15       A.   I wouldn't say up to the point when Reno
16  was CEO because I did not have that kind of direct
17  instructions, interaction with him directly, so --
18       Q.   From when the company was formed in May of
19  2012 up until October 2017, are you aware of the
20  sheikh performing any day-to-day operations for the
21  company?
22       A.   Not to my knowledge.
```

## 95

```
1        Q.   Are you aware of a power of attorney
2   between Mr. Alberto and the shareholders?
3        A.   Yes.
4        Q.   And what's your understanding as to the
5   authority that was provided to Mr. Alberto based on
6   that power of attorney?
7        A.   I can't recall the contents exactly, but
8   in general, he was authorized to act on behalf of the
9   board of directors.
10       Q.   Why did the board of directors issue the
11  power of attorney to Mr. Alberto?
12       A.   As far as my experience in UAE, that's a
13  common practice there.  So in the memorandum of the
14  company, normally the owners authorize one person to
15  act on behalf of them certain things.  So that's
16  listed in the board of directors.
17       Q.   Just tell me a little bit about that
18  because, again, I'm just not familiar with UAE
19  business.
20            So in your experience, it's common for
21  CEO's of UAE companies to have a power of attorney?
22       A.   Not power of attorney.  The memorandum of
```

## 96

```
1   the company itself also has that clause which
2   specifically stipulates certain powers given to the
3   managing director.  That's the word used in the legal
4   document of the memorandum.
5        Q.   Okay.
6        A.   So the point of managing director has
7   certain powers on behalf of the board, on the owners,
8   so --
9        Q.   And is that because the owners of the
10  company just are not involved in the day-to-day
11  operations?
12       A.   In general, not necessarily.
13       Q.   Okay.  What about with NorthStar?
14       A.   With NorthStar, that's practically that's
15  what it was.
16       Q.   Okay.
17       A.   Mr. Reno was performing all the day-to-day
18  duties.
19       Q.   Is it your understanding that the
20  shareholders of NorthStar just were not interested in
21  running the day-to-day operations and so they gave
22  Mr. Alberto the power of attorney?
```

## 97

```
1        A.   I won't say that they were interested, not
2   interested.  I will not know that.
3        Q.   Okay.  Is the sheikh the -- the UAE
4   sponsor for NorthStar?
5        A.   Come again.
6        Q.   You're familiar with members of the royal
7   family serving as a sponsor with UAE companies,
8   right?
9        A.   Yeah.  That's -- that's not to the royal
10  families only.  That's any UAE national can sponsor a
11  company.
12       Q.   Okay.  And who was the NorthStar sponsor?
13       A.   In this case, the sponsor was not required
14  legally because the owner was UAE national himself.
15       Q.   I see.  So under UAE law, if you are a
16  member of the UAE royal family, you do not need to be
17  a sponsor of the company, do I have that right?
18       A.   No.  It's not matter of being royal family
19  or not, it's UAE national.  So if you are a UAE
20  national and you are forming a company, you don't
21  need another sponsor.
22       Q.   I see.
```

98

| | | |
|---|---|---|
| 1 | **A. You can do it yourself.** | 13:13:07 |
| 2 | Q. Okay. What was -- to your knowledge, what | 13:13:09 |
| 3 | was the sheikh's involvement, if any, in forming the | 13:13:18 |
| 4 | company? | 13:13:23 |
| 5 | **A. Not to my knowledge.** | 13:13:25 |
| 6 | Q. To your knowledge, did he do anything? | 13:13:26 |
| 7 | **A. No. It's nothing about this I know at** | 13:13:28 |
| 8 | **all.** | 13:13:32 |
| 9 | Q. Let's go back to the power of attorney. | 13:13:37 |
| 10 | Have you seen the power of attorney? | 13:13:40 |
| 11 | **A. Yes.** | 13:13:42 |
| 12 | Q. Okay. Are you aware of any limits to the | 13:13:43 |
| 13 | power of attorney? | 13:13:49 |
| 14 | **A. As far as I can recall, there was one** | 13:13:49 |
| 15 | **limit, for sure.** | 13:13:53 |
| 16 | Q. And what was that limit? | 13:13:55 |
| 17 | **A. That was the company cannot apply for a** | 13:13:56 |
| 18 | **bank loan at any facility which is unsecured.** | 13:14:01 |
| 19 | Q. Okay. | 13:14:01 |
| 20 | **A. So that limit I know for sure.** | 13:14:05 |
| 21 | Q. Other than that limit, are you aware of | 13:14:07 |
| 22 | any other limits? | 13:14:10 |

99

| | | |
|---|---|---|
| 1 | **A. I can't recall any.** | 13:14:11 |
| 2 | Q. Okay. Sitting here today, can you think | 13:14:12 |
| 3 | of any other limits to the power of attorney? | 13:14:14 |
| 4 | **A. I can't recall any.** | 13:14:16 |
| 5 | Q. Pursuant to the power of attorney, is it | 13:14:17 |
| 6 | your understanding that Mr. Alberto could make | 13:14:19 |
| 7 | personnel decisions? | 13:14:21 |
| 8 | **A. That's -- that's what the power of** | 13:14:23 |
| 9 | **attorney basically was all about.** | 13:14:28 |
| 10 | Q. Could he open bank accounts? | 13:14:29 |
| 11 | **A. He could.** | 13:14:31 |
| 12 | Q. Sign contracts? | 13:14:32 |
| 13 | **A. Yes.** | 13:14:33 |
| 14 | Q. Set compensation? | 13:14:34 |
| 15 | **A. Yes.** | 13:14:36 |
| 16 | Q. Issue bonuses? | 13:14:37 |
| 17 | **A. Yes.** | 13:14:38 |
| 18 | Q. Prepare financial statements? | 13:14:39 |
| 19 | **A. He could -- yeah, he was responsible for** | 13:14:41 |
| 20 | **that.** | 13:14:44 |
| 21 | Q. Did Mr. Alberto have to get approval | 13:14:45 |
| 22 | before making any of those decisions? | 13:14:47 |

100

| | | |
|---|---|---|
| 1 | **A. As far as I can recall the contents of the** | 13:14:50 |
| 2 | **power of attorney, there was no such condition.** | 13:14:54 |
| 3 | Q. What about the memorandum of association, | 13:14:56 |
| 4 | are you familiar with that document? | 13:15:01 |
| 5 | **A. Yes.** | 13:15:01 |
| 6 | Q. Does that have similar broad authority as | 13:15:03 |
| 7 | the power of attorney does? | 13:15:09 |
| 8 | **A. Yes, they were almost the similar** | 13:15:11 |
| 9 | **documents. In terms of powers and the contents, they** | 13:15:17 |
| 10 | **were almost the similar documents.** | 13:15:20 |
| 11 | Q. Are you aware of any limits to the | 13:15:22 |
| 12 | memorandum of association? | 13:15:24 |
| 13 | **A. I can't really recall that at this point.** | 13:15:25 |
| 14 | Q. To the best of your knowledge, how long | 13:15:36 |
| 15 | was the power of attorney in effect between | 13:15:36 |
| 16 | Mr. Alberto and the shareholders of NorthStar? | 13:15:39 |
| 17 | **A. It was October 2017. I don't recall the** | 13:15:42 |
| 18 | **exact date.** | 13:15:47 |
| 19 | Q. So it was in effect from the company's | 13:15:50 |
| 20 | inception in 2012, up until October 2017? | 13:15:52 |
| 21 | **A. Yes, that's correct.** | 13:15:56 |
| 22 | Q. Okay. The company eventually landed a | 13:15:57 |

101

| | | |
|---|---|---|
| 1 | contract with the UAE military, right? | 13:16:06 |
| 2 | **A. Correct.** | 13:16:08 |
| 3 | Q. Okay. When was that? | 13:16:08 |
| 4 | **A. I won't recall the exact date, but it was** | 13:16:10 |
| 5 | **2013.** | 13:16:16 |
| 6 | Q. And prior to landing that contract, did | 13:16:19 |
| 7 | the company have any other source of revenue? | 13:16:21 |
| 8 | **A. No.** | 13:16:24 |
| 9 | Q. What funds was the company using prior to | 13:16:25 |
| 10 | landing the UAE contract to pay expenses? | 13:16:31 |
| 11 | **A. The setup cost came from the same amount** | 13:16:36 |
| 12 | **that came from Reflex Responses. That was used as** | 13:16:38 |
| 13 | **setup cost.** | 13:16:42 |
| 14 | Q. Okay. Prior to landing the UAE contract, | 13:16:44 |
| 15 | was it doing any sales of any type? | 13:16:48 |
| 16 | **A. No.** | 13:16:49 |
| 17 | Q. Was it selling any helicopters of any kind | 13:16:50 |
| 18 | that you're aware of? | 13:16:53 |
| 19 | **A. No.** | 13:16:55 |
| 20 | Q. Okay. So the company operated solely on | 13:16:59 |
| 21 | the funds that came over from R2, correct? | 13:16:59 |
| 22 | **A. Yes.** | 13:17:02 |

### 110

1   dollars value of the helicopters, so --

2       Q.   What was the value, approximate value, of

3   the spare parts?

4       A.   I won't recall that.

5       Q.   Well, if you said the total value was like

6   280 million and the helicopters was a little north of

7   a hundred fifty million.

8       Is it around a hundred million?

9       A.   Yeah -- shouldn't be more than that, yeah.

10  Could be less than that but no more than that.

11      Q.   And was the spare parts component to the

12  contract, did that have the same period of

13  performance as the helicopters did?

14      A.   As far as the warranties are concerned?

15      Q.   No, just delivery.

16      A.   Delivery.  Yeah.

17      Q.   Okay.

18      A.   Almost the same time.

19      Q.   And when was the last delivery of the

20  helicopter?

21      A.   2017, March some time, I guess.

22      Q.   And when was the last delivery of the

### 111

1   spare parts?

2       A.   I won't recall that.  But it was almost

3   the same period.  And actually I would remember -- if

4   I remember correctly, we get delayed on some of the

5   delivery of the parts, as well, so there are certain

6   things still on the table to conclude for that

7   contract.

8       Q.   To date, sitting here today, October 18th,

9   2018, how much money, how much revenue has NorthStar

10  realized as a result of the UAE armed forces

11  contract?

12      A.   I won't recall the exact number.  But

13  apart from what is still not delivered that's not

14  significant, but other than that everything like I

15  would say for part of two eighty, at least two

16  hundred fifty something has been realized.  Like

17  that's what we have delivered and received.

18      Q.   So you've received 200 -- approximately

19  250 million dollars as a result of this UAE armed

20  forces contract?

21      A.   Correct.

22      Q.   Okay.  Are there any deliveries that are

### 112

1   outstanding under that original contract that was

2   entered into in 2013?

3       A.   There are some.

4       Q.   What are those?

5       A.   I won't recall that exactly.  It -- it's

6   the operation side, the technical part.

7       Q.   Okay.

8       A.   But there are still some things pending.

9       Q.   All the helos, though, have been

10  delivered, though, right?

11      A.   Yes, those are.

12      Q.   So it would be spare parts that are left

13  to be delivered?

14      A.   Yeah.

15      Q.   Okay.  What's the status of those?

16      A.   It's -- it's still pending some

17  deliveries.

18      Q.   Do you have any reason to believe that

19  they're not going to be delivered?

20      A.   No.

21      Q.   Do you have any reason to believe that

22  they're not going to be accepted?

### 113

1       A.   No.

2       Q.   Okay.  Do you have any reason to believe

3   that the company is not going to realize over two

4   hundred and eighty million dollars a result of this

5   contract?

6       A.   No.

7       Q.   This contract was landed while Mr. Alberto

8   was CEO of NorthStar, correct?

9       A.   Correct.

10      Q.   Other than the UAE armed forces contract,

11  what other contracts or -- or business opportunities

12  are you aware of that NorthStar was pursuing while

13  Mr. Alberto was CEO?

14      A.   There were proposals out to different

15  countries.

16      Q.   And can you just please name them?

17      A.   Yeah.  The few I remember, with my

18  discussions to Reno and operations, I know of Iraq,

19  Afghanistan, Saudi Arabia.  Egypt was under

20  discussion for a long time, but that's closed now.

21  These are the few countries that I know.

22      Q.   What about Kuwait?

138

1    document.                                          13:48:36
2        Q.  Okay.  And it's consistent with what Reno  13:48:37
3    told you before, right?                            13:48:39
4        A.  We can see on the document, yes.           13:48:40
5        Q.  Okay.  When Reno talked to you about this  13:48:43
6    agreement that he reached with the sheikh, it was for  13:48:48
7    the entire performance bond, correct?              13:48:50
8        A.  He generally mentioned performance bond,   13:48:55
9    so --                                              13:48:55
10       Q.  Okay.  He never limited it to the first    13:48:56
11   release, right?                                    13:48:57
12           MR. BENNETT:  Objection.                   13:48:57
13           THE WITNESS:  As far as I recall, no.      13:48:59
14   BY MR. JOHNSON:                                    13:49:01
15       Q.  Okay.  So your understanding from          13:49:01
16   discussions with Reno was that the agreement between  13:49:02
17   him and the sheikh with respect to the performance  13:49:05
18   bond was for the entire performance bond, right?   13:49:07
19           MR. BENNETT:  Objection to form.  He has   13:49:09
20   never acknowledged there was an agreement.  He said  13:49:10
21   Reno told him there was an agreement, so you're    13:49:14
22   mischaracterizing testimony.                       13:49:16

139

1            MR. JOHNSON:  I said in discussions with   13:49:17
2    Reno.                                              13:49:18
3            THE WITNESS:  Yeah.  So as I said, Reno    13:49:18
4    mentioned that as the performance bond.  So not half  13:49:20
5    and half, as a performance bond.  That's what he   13:49:25
6    mentioned, so --                                   13:49:28
7    BY MR. JOHNSON:                                    13:49:30
8        Q.  Did the sheikh ultimately receive the 4.5  13:49:30
9    million dollars reflected in Exhibit 6?            13:49:42
10       A.  Yes, he did.                               13:49:44
11       Q.  How was payment made to him?               13:49:45
12       A.  As far as I recall, it was check.          13:49:47
13       Q.  Was the check made payable to him or to    13:49:52
14   Rotana?                                            13:49:55
15       A.  I can't recall exactly.                    13:49:56
16       Q.  Okay.  But you are -- you can confirm that  13:49:59
17   he did receive the check, right?                   13:50:01
18       A.  Yes.                                       13:50:03
19       Q.  Okay.  And did you deliver the check to    13:50:03
20   him?                                               13:50:05
21       A.  No.                                        13:50:06
22       Q.  Who did?                                   13:50:07

140

1        A.  Mr. Salem Al Dhaheri, as I recall it.      13:50:09
2        Q.  Okay.  Why did Salem deliver it?           13:50:14
3        A.  Because he was like -- somehow he was like  13:50:21
4    connected to his highness office.  So any          13:50:24
5    communication, if something got to be delivered, get  13:50:26
6    signed, so we would normally handle -- hand over the  13:50:28
7    documents to him, he would take it there.          13:50:31
8        Q.  Okay.  So if you were to communicate with  13:50:31
9    the sheikh, you would communicate through Salem?   13:50:33
10       A.  Well, there was nothing but communication  13:50:35
11   in this, it was just turning over a check.         13:50:37
12       Q.  I see.  Okay.                               13:50:39
13       A.  So --                                      13:50:43
14       Q.  Does the company have a copy of that       13:50:46
15   check?                                             13:50:46
16       A.  I'm sure, yes.                             13:50:46
17       Q.  Where would that document be?              13:50:47
18       A.  In our finance file, for sure.             13:50:48
19       Q.  Are you aware of that document being       13:50:50
20   turned over as part of this litigation?            13:50:52
21       A.  No, I'm not aware of that.                 13:50:54
22       Q.  Okay.  But to your knowledge, that         13:50:56

141

1    document exists, correct?                          13:50:57
2            MR. BENNETT:  Objection to form.           13:50:59
3            THE WITNESS:  Yes, exactly.  It's part of  13:51:01
4    the accounting records, so it's in the company.    13:51:01
5    BY MR. JOHNSON:                                    13:51:01
6        Q.  If you were to go to the company right now  13:51:06
7    and try and search for that document, where would you  13:51:08
8    go?                                               13:51:09
9        A.  When you say "document," you mean the     13:51:09
10   check?                                             13:51:11
11       Q.  Yes.                                       13:51:11
12       A.  It would be in finance file.              13:51:12
13       Q.  Any particular file?                      13:51:14
14       A.  I can't say.  I don't know what the       13:51:16
15   question really means.                            13:51:19
16       Q.  Okay.  Well, when you say in the file, do  13:51:20
17   you mean electronic file or a hard copy file?     13:51:23
18       A.  Hard copy would be there.                 13:51:26
19       Q.  Okay.  Is there a file cabinet?           13:51:27
20       A.  Of course, yes.                           13:51:31
21       Q.  And is there a particular folder that it  13:51:31
22   would be in?                                      13:51:31

**142**

1    A.   Yeah, the -- all the documents are kept in
2  a, you know, certain order, like month by month files
3  are there.  So it would be in the month when the
4  payment was made, it will be there.
5    Q.   Okay.  And when was payment made?
6    A.   I can't recall exactly.
7    Q.   Well, take a look at Exhibit 6.
8    A.   Yeah.
9    Q.   Does that refresh your memory?
10   A.   It would be on around the document is
11 signed, so --
12   Q.   There were other payments made to the
13 sheikh, correct?
14   A.   That is correct.
15   Q.   Okay.  Approximately how many other
16 payments were made to the sheikh while Reno was CEO?
17   A.   I can't recall exactly, but yes, the
18 payments are made.
19   Q.   What was the total amount of payments made
20 to the sheikh while Reno was CEO?
21   A.   I can't recall like this.
22   Q.   More than six million dollars?

**143**

1    A.   In total?  Yes.
2    Q.   More than ten?
3    A.   I wouldn't say that.
4    Q.   Okay.  So somewhere between six million
5  and ten million dollars?
6    A.   I wouldn't say that.  But for six, I'm
7  sure it will be around six, that's for sure.
8    Q.   How about since Reno left in October 2017,
9  has the sheikh received any payments?
10   A.   You mean after?
11   Q.   Yes.
12   A.   After Reno left?  No.
13   Q.   Do you know why not?
14   A.   I don't know what that question means,
15 again.
16   Q.   Are you aware of any reason why he hasn't
17 received a payment?
18   A.   The payment the sheikh would receive as a
19 chairman and the shareholder would only be the
20 dividend.  So there was no dividend to be declared
21 after that period, so --
22   Q.   Is it your understanding that all payments

**144**

1  made to the sheikh were treated as dividends?
2    A.   They were treated as dividends, yes,
3  that's right.
4    Q.   Was this 4.54 million dollars treated as
5  dividends?
6    A.   As dividend, yes.
7    Q.   Okay.  Going back to Exhibit 6, the last
8  page, there's a table and it list as number of
9  employees.  Do you see that?
10   A.   Correct.
11   Q.   My understanding is that regular bonuses
12 were paid on an annual basis and that they were
13 discretionary, yet -- yet this was not a
14 discretionary bonus, is that your understanding?
15   A.   This was a discretionary bonus.
16   Q.   It was a discretionary bonus?
17   A.   (Nods.)
18   Q.   At the discretion of who?
19   A.   Of the CEO.
20   Q.   Was the sheikh aware of these payments?
21   A.   I -- you mean before the payment?
22   Q.   Was the sheikh aware of the fact that

**145**

1  these individuals were receiving money?
2    A.   You mean before the payment?
3    Q.   Yes.
4    A.   I won't know that.
5    Q.   Did you provide that information to Salem?
6    A.   No.  Because that was not part of the
7  authorization process.  So before making a payment,
8  we never turned any documents to sheikh for his
9  approval because only approval required as per the
10 legal documents was Reno's approval.
11   Q.   I see.  So your understanding was the
12 power of attorney did not require Reno to get the
13 sheikh's approval before a payment was made?
14   A.   I wouldn't know that.  It would require
15 Reno to get the approval or not?  I don't know.  But
16 to me, as a finance person and the auditors, we
17 wouldn't see that like Reno would require or any
18 document would require additional signatures on any
19 page for approval.
20       MR. JOHNSON:  Let's go off the record.
21       THE VIDEOGRAPHER:  We are going off the
22 record at 1:55 p.m.

**146**

```
1         (Thereupon, a lunch break was taken at    13:55:18
2     1:55 p.m. until 2:35 p.m., after which the following  13:55:18
3     proceedings were had.)                          13:55:19
4         (Ali deposition Exhibit 7 was              14:32:09
5     marked for identification and attached to the   14:32:09
6     transcript.)                                     14:34:03
7         THE VIDEOGRAPHER:  We are back on the      14:34:03
8     record at 2:35 p.m.  This begins disk number three.  14:34:23
9     BY MR. JOHNSON:                                  14:34:28
10        Q.  Ali, I'd like to hand you a document that  14:34:30
11    we'll have marked as Exhibit 7.  Ali, just take a  14:34:32
12    moment to familiarize yourself with what's been  14:34:43
13    marked as Exhibit 7.                            14:34:44
14        Do you recognize that document?            14:34:59
15        A.  Yes, it's an e-mail.                    14:35:00
16        Q.  This is an e-mail starting, I guess, at  14:35:03
17    the bottom.                                      14:35:06
18        This is an e-mail from you to Reno on July  14:35:07
19    16th, 2017, right?                               14:35:09
20        A.  Right.                                   14:35:11
21        Q.  And it looks like you're attaching a -- a  14:35:11
22    forecast sheet, is that right?                   14:35:14
```

**147**

```
1         A.  Correct.                                14:35:16
2         Q.  Okay.  A forecast sheet for 2017 to 2019?  14:35:16
3         A.  Correct.                                 14:35:20
4         Q.  And then going up, you e-mail Mr. Alberto  14:35:21
5     on July 17th and say "Hi, Reno, FYI, Salem took the  14:35:32
6     forecast sheet to HH as per your direction."    14:35:32
7         "HH" is the sheikh, right?                  14:35:37
8         A.  Right.                                   14:35:37
9         Q.  And did you direct -- did you ask Ali to  14:35:39
10    provide the forecast sheet to the sheikh?        14:35:44
11        I'm sorry.                                   14:35:47
12        Did Reno ask you to provide the forecast    14:35:47
13    sheet to the sheikh?                             14:35:50
14        A.  It looks like.                           14:35:51
15        Q.  Okay.  And do you have any reason to      14:35:52
16    believe that Salem did not provide the forecast sheet  14:35:54
17    to the sheikh?                                   14:35:57
18        A.  No.                                      14:35:58
19        Q.  Okay.  And then scrolling up to the --  the  14:35:59
20    top, the very first e-mail on that page, it says, "Hi  14:36:04
21    Reno, HH was here and I handed him the check."   14:36:07
22        Was that the performance bond check?        14:36:10
```

**148**

```
1         A.  I can't recall, but it could be.        14:36:12
2         Q.  Okay.                                    14:36:14
3         A.  Could be.                                14:36:16
4         Q.  It was July 2017.  Does that refresh your  14:36:16
5     memory?                                          14:36:21
6         A.  Of course that was the last payment.  So  14:36:21
7     around these dates, I cannot recall any other     14:36:28
8     payments.                                        14:36:30
9         Q.  Okay, okay.                              14:36:30
10        So you can't recall any other payments      14:36:31
11    other than the performance bond payment?         14:36:32
12        A.  Around this period, yeah.               14:36:34
13        Q.  Okay, okay.                              14:36:36
14        So does that lead you to believe that the   14:36:36
15    check that was provided to him --                14:36:39
16        A.  It could be.                             14:36:40
17        Q.  Okay.                                    14:36:41
18        A.  I'm not sure, yeah.                      14:36:41
19        Q.  Okay, okay.                              14:36:42
20        So it references a forecast sheet.  What    14:36:43
21    is a forecast sheet?                             14:36:48
22        A.  What a -- I can understand from this, it  14:36:50
```

**149**

```
1     would be a forecast from 2017 to '19, cash flow    14:36:54
2     forecast.  And it says like from 2017, it's July  14:36:57
3     2017.  So our contract period was already ended in  14:37:03
4     July 2017, so that means like for the period of   14:37:07
5     warranties.  So that what the forecast sheet would  14:37:11
6     show.                                            14:37:15
7         Q.  Okay.  And was this forecast sheet, was  14:37:15
8     that something that you prepared regularly?      14:37:17
9         A.  This is a management report based on any  14:37:20
10    request from Reno.                               14:37:25
11        Q.  Okay.                                    14:37:25
12        A.  So --                                    14:37:26
13        Q.  So Reno told you to prepare a forecast  14:37:26
14    sheet.                                           14:37:30
15        A.  That's how it looks like.               14:37:30
16        Q.  Okay.  And he told you to give it to the  14:37:32
17    sheikh?                                          14:37:35
18        A.  That's how it looks like from here.     14:37:35
19        Q.  Did he say why, did he indicate why the  14:37:37
20    sheikh needed to see it?                         14:37:39
21        A.  I will not recall, I think that.        14:37:40
22        MR. JOHNSON:  I'd like to hand you a        14:37:47
```

**150**

1    document that will be marked as Exhibit 8, please.

2         (Ali deposition Exhibit 8 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. JOHNSON:

6         Q.   Do you recognize what has been marked as

7    Exhibit 8?

8         A.   Yeah.

9         Q.   And what is it?

10        A.   It's, again, a cash forecast.

11        Q.   Does this appear to be the cash forecast

12   that's referenced in Exhibit 7?

13        A.   I don't understand.  There's an e-mail

14   dated 22 December 2015 and the forecast is 2017 to

15   19.  I can't recall it, but I do obviously regenerate

16   the document.

17        Q.   Okay.  To your knowledge, did the sheikh

18   receive the cash for -- the cash forecast that's

19   reflected in Exhibit 8?

20        A.   I can't recall that because there would be

21   a lot of cash forecast reports on the same format.

22   So they could be updated every other month or any

**151**

1    other -- any new event, so they need to be updated

2    for something.  So this like the similar cash flow

3    forecast would be for, you know, would be regenerated

4    quite a few times in a year --

5         Q.   Yeah.

6         A.   -- based on, you know, any -- anything

7    changes in the future events, so we could update

8    that.

9         Q.   Okay.

10        A.   So I cannot say like this is exactly the

11   same as you handed over me the first one.

12        Q.   Okay.

13        A.   So I cannot recall that.

14        Q.   When the cash forecasts were updated, were

15   they provided to the sheikh?

16        A.   No.  Providing the reports to sheikh was

17   not like normal practice.  So it would come, it was

18   directed by Reno, if Reno had any discussion with the

19   sheikh, sheikh would request something.  So it would

20   be not a normal practice, so --

21        Q.   Okay.  Every time that Reno told you that

22   the sheikh requested something, was that in fact

**152**

1    provided to the sheikh?

2         A.   As I mentioned earlier, anything which

3    needed to be handed over to sheikh would go through

4    Mr. Salem.  So I would give it to him and I assume

5    like it was delivered.

6         Q.   Right.  But are you aware of a time where

7    the sheikh made a request and that request was

8    never -- was not honored?

9         A.   I would not recall any -- any event like

10   that.

11        Q.   Okay.  Let's look at the cash forecast in

12   Exhibit 8.

13        You prepared this forecast, right?

14        A.   Yes.

15        Q.   And it lays out a number of different

16   scenarios that are reflected in blue, right?

17        A.   Correct.

18        Q.   Why were you laying out different

19   scenarios?

20        A.   As far as I remember correctly, I guess

21   so -- this was when the contract ended and there was

22   no other business with NorthStar.  So the only thing

**153**

1    was going on was business development and proposals

2    out.  So no contracts, no revenue coming in to the

3    company.  So at that time, Reno and I had discussion

4    and quite a few times actually over this thing.  So

5    we needed to reduce our overheads.  So there were

6    different scenarios, so in how much cost-cutting

7    would lead us to 2019 to end up the warranty period.

8    So these numbers are actually based on that.

9         Q.   Okay.  And so what were you contemplating?

10   What costs were you specifically contemplating as

11   part of this cost reduction?

12        A.   Yeah, as the scenarios changes, it's

13   different.  So current, when you go in the right

14   number, it shows like we'll be cash negative in a

15   certain period, and that's all the different

16   scenarios are.  So if we go with 50 percent cost

17   reduction, it's different 60 and 65.

18        Q.   Okay.  And as part of this cost reduction,

19   were you contemplating laying off employees?

20        A.   Yeah, letting go employees was one of the

21   things.

22        Q.   Okay.  What were some of the other things

---

**154**

1  were you contemplating?

2    A.  There were a lot of things:  Cutting cost

3  on traveling, re -- relocating our office somewhere

4  where we would pay not that much of rent, and quite a

5  few things on that list.

6    Q.  And just so I understand, these -- these

7  cost cuts were all designed so that the company could

8  maintain a profitability?

9    A.  Company could maintain its liquidity.

10    Q.  Its liquidity, okay.

11    A.  Until 2019 March, where we would get

12  another performance bond released, so that liquidity

13  issue would not be there anymore.

14    Q.  Okay.

15    A.  So that was the goal.

16    Q.  Okay.  And this -- this projection

17  presumed that the company would not land any more

18  contracts beyond the UAE AF contract, right?

19    A.  Yes.  This is the more conservative

20  approach in this report.

21    Q.  Okay.  If you look at the

22  Notes/Assumptions, I see number two, it says "No

---

**155**

1  shareholders payment assumed to be made from February

2  2017 to March 2019."

3    Q.  Okay.

4    Q.  Was the sheikh made aware of that?

5    A.  I wouldn't recall anything like that

6  because as far as I remember, this report was

7  prepared for Reno and for our discussion, so which

8  scenario we can go with.

9    Q.  Was the sheikh aware that the company

10  needed to cut costs in order to maintain a liquid

11  position?

12    A.  I heard that from Reno.

13    Q.  Okay.  And is it your understanding that

14  Reno shared that information with the sheikh?

15    A.  I heard the discussion -- from Reno, I

16  heard that he had this discussion with the sheikh --

17    Q.  Okay.

18    A.  -- regarding cost cutting and all that.

19    Q.  Okay.  And was it your understanding that

20  Reno had that conversation directly with the sheikh

21  or was it through someone else?

22    A.  No, directly.  Because any conversation

---

**156**

1  with Reno mentioned to me ever with sheikh, that was

2  directly.

3    Q.  Okay.  And what's your understanding as to

4  how the sheikh received that news?

5    A.  As far as I remember, what I heard from

6  Reno, it was just a discussion and Reno made sheikh

7  aware of the changes we are making and the cost

8  cutting, you know, to make it as to 2019, so --

9    Q.  Did the sheikh voice any objection over

10  having to cut costs, potentially laying off people?

11    A.  I didn't hear that from Reno.

12    Q.  Okay.  And so looking at the notes number

13  four, it says "Bonus payment is part of Q4 2017 and

14  2018 as per the actual bonus paid in 2015."

15    A.  Correct.

16    Q.  What does that mean?

17    A.  That means which were normal bonuses were

18  paid in 2015, yearly bonuses.  So the same is assumed

19  to be paid in 2017 and '18.

20    Q.  Gotcha.

21    So even though the company did not have

22  any contracts, you were presuming that they were

---

**157**

1  still gonna pay bonuses?

2    A.  Yeah, this is -- I remember clearly, this

3  is part of our discussion and Reno was quite clear on

4  that.  And so we were in agreement like if obviously

5  you are letting go a lot of people and you are

6  keeping some and there is no revenue to the company,

7  so of course the employees feel insecure.  So Reno

8  was under the impression, which was correct to that,

9  so --

10    To the industry, like the professional

11  people we keep right now, if we let them go, it is

12  not easy to add them back.  So we need to take care

13  of the employees as they were taken care in the

14  previous year.  So based on that assumption, those

15  bonuses are there.

16    Q.  I see.  So because there were gonna be

17  some layoffs, you wanted to make sure that the people

18  that remained employed were taken care of by way of

19  bonuses.

20    A.  Yeah.  They feel secure, like company is

21  not going anywhere, so --

22    Q.  And that was something that Reno

---

**158**

1    recommended?
2        A.   Yeah.
3        Q.   Did you agree with that?
4        A.   Yeah.  The argument, definitely I agreed
5    with that, yeah.
6        Q.   Was the sheikh aware of that?
7        A.   I'm not aware of that.
8        Q.   The company eventually made a number of
9    layoffs, right?
10       A.   Yes, we did.
11       Q.   And approximately how much cost was
12   reduced as a result of those layoffs?
13       A.   I won't exactly remember the number or the
14   percentage.
15       Q.   Okay.  But in this document, there's --
16   there's a scenario where there's a 50-percent cost
17   reduction, a 60-percent cost reduction and a
18   65-percent cost reduction.
19       A.   Yeah.  But I do remember it was almost
20   impossible to go for the 60 percent and Reno said
21   we'll try to go for the 50 percent.  But actually it
22   was not 50 when we let people go, but it was

**159**

1    significant, so --
2        Q.   Okay.  Who made the decision to lay people
3    off?
4        A.   Reno.
5        Q.   And what went into that decision?
6        A.   Can you please rephrase?
7        Q.   Sure.
8             When Reno was deciding who to keep and who
9    to lay off, what were the deciding factors?
10       A.   Generally it was in every department based
11   on the requirements of that department, how many
12   people need to be kept and who needs to be -- minimum
13   needs to be there.  So what's the minimum requirement
14   of this department.
15       Q.   Was there anything that you found
16   inappropriate about the layoffs?
17       A.   No.
18       Q.   While Mr. Alberto was CEO, the company
19   made bonus payments, right?
20       A.   Right.
21       Q.   Okay.  And traditionally those bonuses
22   were paid on an annual basis, right?

**160**

1        A.   Right.
2        Q.   Okay.  And was there a procedure that the
3    company would follow as to determining bonuses?
4        A.   Well, the annual bonuses, it was different
5    for discretionary, it was different.  So for the
6    annual bonuses, it was Reno would get input from the
7    department heads for their teams and then we would
8    send him previous year's report, a list of all the
9    bonuses paid.  And then he would compare it, and it
10   was until 2016, as I remember, it was going through
11   HR to Reno and, after his approval, getting back to
12   HR, and then they would hand over to me for the
13   processing.  So obviously I would have been in touch
14   with Reno like when to process or not.
15       Q.   Okay.
16       A.   But that would -- process would go through
17   HR.
18       Q.   Okay.
19       A.   And once the HR head, Hani Faragh, was let
20   go, after that in 2017, I was doing the same
21   practice.
22       Q.   I see.  Okay.

**161**

1             And so just so I understand, so the first
2    step in this bonus process was the managers or the
3    supervisors, they would make a recommendation, is
4    that right?
5        A.   That's what HR would do.  They would --
6    and in some instances, Reno would directly get that
7    input from the department heads.
8        Q.   Okay.
9        A.   So like for the key people of a department
10   head, of the upper department, Reno would get direct
11   input.  And but for the rest of the team, it will be
12   general, generally going through HR and coming to
13   Reno.
14       Q.   Okay, okay.
15             And that was up until 2017, right, when
16   Hani was let go?
17       A.   2016, yeah.
18       Q.   Okay.  And then would -- after the
19   department heads or the managers would make a
20   recommendation, that would then go to Hani, who was
21   HR.  And would Hani then approve the recommendation
22   and then pass it up the line?

162

| | | |
|---|---|---|
| 1 | A. No. What I recall, Hani would be | 14:50:43 |
| 2 | coordinating this thing with the head of | 14:50:50 |
| 3 | departments -- | 14:50:52 |
| 4 | Q. Okay. | 14:50:52 |
| 5 | A. -- for their teams. | 14:50:53 |
| 6 | Q. Okay. | 14:50:53 |
| 7 | A. Except certain people, as I said, where | 14:50:56 |
| 8 | Reno would directly ask the head of the | 14:50:57 |
| 9 | departments -- | 14:50:59 |
| 10 | Q. Okay. | 14:50:59 |
| 11 | A. -- for certain people. | 14:50:59 |
| 12 | Q. Were you involved in that process, in the | 14:50:59 |
| 13 | coordination between HR and the department heads? | 14:51:01 |
| 14 | A. No. | 14:51:04 |
| 15 | Q. Okay. You got involved after HR approved | 14:51:05 |
| 16 | it? | 14:51:06 |
| 17 | A. Yeah, once the bonus is approved, then | 14:51:07 |
| 18 | that sheet would come to me for -- | 14:51:10 |
| 19 | Q. Okay. So -- | 14:51:10 |
| 20 | A. -- for the processing. | 14:51:11 |
| 21 | Q. So Hani would come to you and say, Hey, | 14:51:12 |
| 22 | here are the recommended bonuses for X year, right? | 14:51:15 |

163

| | | |
|---|---|---|
| 1 | A. Yes, that's correct. | 14:51:17 |
| 2 | Q. Okay. And you would review the bonuses, | 14:51:18 |
| 3 | right? | 14:51:19 |
| 4 | A. No. He would not come to me with that | 14:51:20 |
| 5 | recommended bonuses, he would come to me the finally | 14:51:25 |
| 6 | approved bonuses. So before that, before the final | 14:51:28 |
| 7 | approval, whatever the conversation that was going on | 14:51:31 |
| 8 | between Reno and Hani, that would -- I would not be | 14:51:34 |
| 9 | involved in that. | 14:51:37 |
| 10 | Q. Okay. | 14:51:38 |
| 11 | A. So he would come to me with the final | 14:51:38 |
| 12 | list, once it's approved. | 14:51:40 |
| 13 | Q. Okay. And why would he come to you? | 14:51:42 |
| 14 | Would he come to you for your approval? | 14:51:45 |
| 15 | A. No. It's the execution and all the | 14:51:47 |
| 16 | payment part of it. | 14:51:49 |
| 17 | Q. Okay. | 14:51:51 |
| 18 | A. So as a finance, we had to execute the | 14:51:51 |
| 19 | payments now. | 14:51:54 |
| 20 | Q. And was that to ensure that the company | 14:51:54 |
| 21 | had the money to pay the bonuses? | 14:51:56 |
| 22 | A. It would be before that. Like Reno would | 14:51:58 |

164

| | | |
|---|---|---|
| 1 | always ask me, What is our liquid position, can we | 14:52:01 |
| 2 | pay the bonuses? So -- | 14:52:03 |
| 3 | Q. So before any bonus was made, Reno came to | 14:52:05 |
| 4 | you and said, What's the liquid position of the | 14:52:07 |
| 5 | company? | 14:52:10 |
| 6 | A. Yeah, liquid position, he would ask. | 14:52:10 |
| 7 | Q. Okay. And would there be some sort of | 14:52:12 |
| 8 | like a bonus pool that he would work off of? | 14:52:14 |
| 9 | A. No. | 14:52:17 |
| 10 | Q. Okay. | 14:52:18 |
| 11 | A. There was no such pool. | 14:52:19 |
| 12 | Q. Was there like a set amount of money each | 14:52:21 |
| 13 | year that the company had to work with in terms of | 14:52:23 |
| 14 | bonuses? | 14:52:25 |
| 15 | A. No. | 14:52:26 |
| 16 | Q. Okay. Was there ever a time where Reno | 14:52:27 |
| 17 | came to you and he showed you the proposed bonuses | 14:52:30 |
| 18 | and you said, That's too much, we can't afford that? | 14:52:35 |
| 19 | A. I can't recall. But as I said, before | 14:52:37 |
| 20 | going into the bonus process, Reno would always ask | 14:52:40 |
| 21 | for the liquidity position. | 14:52:44 |
| 22 | Q. Okay. | 14:52:44 |

165

| | | |
|---|---|---|
| 1 | A. So he would know what he can go for. | 14:52:46 |
| 2 | Q. In your opinion, was every bonus that was | 14:52:48 |
| 3 | ever made consistent with maintaining the liquid | 14:52:51 |
| 4 | position of the company? | 14:52:53 |
| 5 | A. Yeah, without that -- as I said, before | 14:52:53 |
| 6 | going into the bonus discussion, that discussion | 14:52:57 |
| 7 | would happen between me and Reno. | 14:53:01 |
| 8 | Q. And what does "liquid position" mean? | 14:53:04 |
| 9 | A. Liquid position mean once we pay a certain | 14:53:07 |
| 10 | amount of bonus, after that until the next payments | 14:53:10 |
| 11 | are coming in, receipts are coming in from the | 14:53:15 |
| 12 | customers, how much cash we have left so we can | 14:53:16 |
| 13 | easily pay our supplies and the payroll and | 14:53:18 |
| 14 | everything, so -- | 14:53:22 |
| 15 | Q. Was there ever a time where Reno came to | 14:53:22 |
| 16 | you and the bonuses were -- were too high that you | 14:53:26 |
| 17 | would not be in a liquid position? | 14:53:30 |
| 18 | A. I can't recall that. | 14:53:34 |
| 19 | Q. Okay. If that ever happened, what would | 14:53:36 |
| 20 | you have said? | 14:53:41 |
| 21 | A. It happened only one time, that was last | 14:53:42 |
| 22 | bonus which was paid in September or October. So | 14:53:47 |

**166**

1 that was only time I can recall we will -- we had

2 that discussion, like if we don't get the --

3 anticipated money, then we will be liquid, you know,

4 liquidity will be like in trouble and we'll have

5 liquid issues.

6     Q.  Okay.  So --

7     A.  -- that liquid.

8     Q.  So prior to October 2017, was there ever a

9 time where Reno came to you with approved bonuses

10 that you disagreed with?

11     A.  I would not agree or disagree on the

12 amount of the bonus because that's not -- that was

13 not my part, I could not approve that part.  So I

14 could only give my opinion on the liquid position,

15 like are we comfortable liquidity-wise after paying

16 this bonus or not?  So that would be my opinion to

17 any bonus.

18     Q.  Okay.

19     A.  Not more than that --

20     Q.  Okay.

21     A.  -- approval like.

22     Q.  Was there ever a time where you were not

**167**

1 comfortable from a liquidity standpoint prior to

2 October 2017?

3     A.  No, I don't recall that.

4     Q.  Okay.  Reno paid himself bonuses, too,

5 correct?

6     A.  Correct.

7     Q.  Prior to October 2017, did you ever think

8 any of Reno's bonuses were inappropriate?

9     A.  I wasn't in that position to judge Reno's

10 bonuses.

11     Q.  Well, as it relates to the liquidity of

12 the company, did you --

13     A.  Liquidity, no.  As I said, I never felt

14 uncomfortable as far as the liquidity of the company

15 was concerned.

16     Q.  And you may have said this earlier and I

17 apologize if I did ask it earlier and I apologize for

18 asking it again, but since Reno left the company in

19 October 2017, have you personally received a bonus?

20     A.  No.  No one received a bonus after that.

21     Q.  Are you expecting a bonus at the end of

22 this year?

**168**

1     A.  No.

2     Q.  When the performance bond is released in

3 2019, are you expecting a bonus?

4     A.  No.  There is no expectation.  As every

5 employee's letter and -- and offer letter says, I

6 mean, bonus is discretion.  So it is solely based on

7 the performance of the company, so it's not based on,

8 you know, what has been paid in the previous year.

9 So -- so based on that, I won't think like I would

10 expect a bonus.

11     Q.  The -- the warranty reserve, the eight

12 million warranty reserve, when does that expire?

13     A.  That period expires in March 2019.

14     Q.  Okay.  What's your understanding as to

15 what the company is planning on doing with those

16 funds once it expires?

17     A.  No, that needs a clarification because

18 those funds are not sitting in the bank somewhere.

19 The eight million when we talked about in the

20 previous document, that is the document which is

21 dated some time in 2015 at some time.  So at that

22 time, that eight million was set aside.  So after

**169**

1 that and gradually when the warranty period is

2 expiring, so every like -- every month, the portion

3 of that warranty period would expire, the same

4 proportion of those funds will be released from the

5 provision of the warranty.  So that's not exactly

6 eight million per million right now in our books.

7     Q.  Okay.

8     A.  So right now, just to explain more, it's

9 2018 October now, so it's only a few months from, you

10 know, the warranty period expires.  So the only

11 portion left in the provision of the warranty would

12 be for that many months, not for years, and that's

13 not eight million.  So that would be like a fraction

14 of that.

15     Q.  How much are we talking about?

16     A.  I can't exactly recall.  But that will be

17 like a fraction of that, it's only a few months,

18 so --

19     Q.  Okay.  Since the company -- since the

20 company's inception, the company had auditors,

21 correct?

22     A.  Correct.

**178**

1    A.    Correct.

2    Q.    Okay.  And they did one for every year,

3    correct?

4    A.    Correct.

5    Q.    Was the sheikh provided with copies of

6    those financial statements?

7    A.    Yes.

8    Q.    Every year?

9    A.    Every year.

10    Q.    How were those financial statements

11    provided to him?

12    A.    They would be handed over to Salem and he

13    would take it to his highness.

14    Q.    And Salem would hand them to the sheikh

15    personally?

16    A.    I guess so.

17    Q.    Okay.  Do you have any reason to believe

18    that Salem did not deliver the financial statements

19    to the sheikh?

20    A.    No.

21    Q.    And in those financial statements, is it

22    possible to discern the amount of bonuses that were

**179**

1    paid?

2    A.    The amount of bonuses was -- it was not

3    like a requirement to put as a separate note.  So

4    it's -- but if management requires the auditors to

5    put that as a separate note, they would do that.  But

6    we never asked to us do that because that's a general

7    practice, so it was not separately -- like the total

8    compensation of the employees would be there as

9    expense of the company, but not like --

10    Q.    So it wasn't a separate line item?

11    A.    No.

12    Q.    Okay.  And it's -- and you just said, I

13    think you said that it's common practice to not

14    include bonuses --

15    A.    That's -- yes.

16    Q.    -- as defined.

17    A.    That's generally the authorities.

18    Q.    Okay.  How were bonuses captured in the

19    financial statements?  What do they show up?

20    A.    Yeah, it's not only the bonuses, including

21    the payroll.  So how it's captured in the financial

22    statement when it comes to the audit report, it's

**180**

1    employees' compensation.  And then they have a

2    separate like item which is called key management

3    generation.  So under the key management generation,

4    all the bonuses and the payroll of the management

5    would be shown, so --

6    Q.    And that would be reflected in every

7    annual financial statement, right?

8    A.    Yeah, that's correct.

9    Q.    When the sheikh would receive those

10    financial statements on an annual basis, are you

11    aware of him ever voicing any objection to the

12    company's finances?

13    A.    Once, I can recall.  Not the objection,

14    but once, he had questions.

15    Q.    And when was that?

16    A.    I can't recall exactly which year was

17    this, but it was first of the year, I guess, 2013, it

18    guess, I would say.

19    Q.    Okay.  So in 2013, the sheikh may have

20    voiced a concern about --

21    A.    No.  On the audit report of 2013.

22    Q.    Okay, okay.

**181**

1    So that would be 2014?

2    A.    Yeah.

3    Q.    Okay.  And what do you recall he said?

4    A.    I can't really recall what was discussed

5    in the meeting, but I was called there to discuss.  I

6    don't remember now how I was called, but I remember

7    going there and discussing the sheikh's concerns.

8    It's not the concerns, he had a few questions to ask,

9    I remember that but not the details.

10    Q.    Who was in the meeting?

11    A.    It was Sheikh Ahmed, myself.  I can't

12    really recall if Salem was there.  Perhaps he was,

13    I'm not sure.  But I remember I went to sheikh's

14    office with him, so probably he was there.  And

15    sheikh's CFO for Rotana Aviation.  His name's Hany

16    Farag.  He was there.

17    Q.    And the sheikh had a couple questions?

18    A.    Yeah, the questions were regarding the

19    bonus payment.  Yeah, something like that.

20    Q.    Were those questions answered?

21    A.    Yeah, absolutely.  Explanation I had, I

22    give explanations.  And then I can't recall if he

### 182

1  talked to Reno about that.  For sure, I think he did,
2  but I can't recall that.
3      Q.   As best you can recall, was everything
4  that the sheikh asked for or requested provided to
5  him during that meeting?
6      A.   Yeah.  He didn't ask anything to be
7  provided on the details later.  He just wanted to
8  discuss a few things on the financials, that's all.
9      Q.   Okay.  And so that was with respect to the
10 2013 audited financial statements?
11     A.   That's what I think, correct.
12     Q.   Let's just kind of go year by year.
13          With respect to the 2014 audited financial
14 statement, did the sheikh ever voice any objection to
15 that financial statement?
16     A.   No.  Not to my knowledge.
17     Q.   With respect to the 2015 audited financial
18 statement, did the sheikh --
19     A.   Not to my knowledge.
20     Q.   -- ever voice any objection -- sorry.
21          Did the sheikh ever voice any objection to
22 the 2015 --

### 183

1      A.   Not to my knowledge.
2      Q.   -- audited financial statement?
3      A.   Not to my knowledge.
4      Q.   Okay.  Sorry, let me just get the question
5  out.  I understand your answer, but just so we have a
6  record.
7          With respect to the 2015 audited financial
8  statement, did the sheikh ever voice any objection to
9  that statement?
10     A.   Not to my knowledge.
11     Q.   With respect to the 2016 audited financial
12 statement, did the sheikh ever invoice any objection
13 to that financial statement?
14     A.   Not to my knowledge.
15     Q.   With respect to the 2017 financial
16 statement, did the sheikh ever voice any objection to
17 that financial statement?
18     A.   2016?
19     Q.   '17.
20     A.   '17.  Yeah, '17 is -- the '17 audit was
21 after Reno left.  So that was kind of ordered when I
22 was reporting directly with Sheikh Ahmed, so -- it

### 184

1  wasn't -- it wasn't the same as the previous years
2  were.  Previous years, he would receive the audit
3  report after the audit.  '17 was different, he was
4  there.
5      Q.   Okay.
6      A.   So --
7      Q.   So '17, he did voice some concerns about
8  the '17 financial statement?
9      A.   '17, he had concerns before the audit.
10     Q.   Okay.
11     A.   Actually he requested on behalf of the
12 board a special audit, so he requested that.  So '17,
13 as I said, '17 was different, so it's not comparable
14 to the previous years.
15     Q.   But for 2014, '15 and '16, he never voiced
16 an objection to those financial statements?
17     A.   That's what I recall.  I don't remember
18 anything happen.
19     Q.   In addition to the annual audited
20 financial statements, was there any other information
21 that the sheikh would receive, financial information
22 that the sheikh would receive, on an annual basis?

### 185

1      A.   Not on annual basis.  But if there was any
2  specific request, like these cash forecast, I
3  suppose, we would provide that.
4      Q.   So if he requested something, you would
5  always give it to him?
6      A.   Yeah.  I cannot --
7      Q.   Was there ever a time where he requested
8  something and you did not give it to him?
9      A.   I cannot think of any instance like that.
10     Q.   Okay.  While Reno was CEO, were there
11 people that wanted him fired?
12     A.   Can you rephrase?
13     Q.   Sure.
14     A.   People in the company, like --
15     Q.   Sure.  Good point.
16          While Reno was CEO, were there people that
17 were working for NorthStar, NorthStar employees, that
18 wanted Reno fired?
19     A.   I heard that.
20     Q.   Okay.  And who specifically?
21     A.   It wasn't like they wanted him to fire, I
22 heard like -- like I came across some information

## 210

1    A.   Overall, it's looking for more detailed
2  information.
3    Q.   It seemed like there's a number of things.
4  Let's just go in order.  So there's six things.
5         What's the first thing that the -- the
6  sheikh is looking for?
7    A.   Yeah, the first thing, it's just as far as
8  my memory goes back, we had in 2015 and '16 books, we
9  had the payments we made to shareholder to sheikh,
10  they were recorded as advance against the future
11  payments.  That's how they were recorded in the
12  books.  So they wanted to like not look at that
13  advances against the future share dividends, they
14  wanted to see as dividends to the shareholders, not
15  an advance.  Advance could be asked to be repaid, so
16  that was the one concern.  So that was presentation
17  of the dividends, actually.  So they wanted to have
18  the presentation other way around.
19    Q.   Okay.
20    A.   So that was just a presentation issue on
21  the financial statements.
22    Q.   I don't mean to stop, but was that change

## 211

1  made?
2    A.   That change was made in 2017 because 2016
3  books were already audited at that point.
4    Q.   Okay.  So for the 2017 statement, it will
5  show that it's a dividend, not an advance of future
6  dividend.
7    A.   Yeah.
8    Q.   Okay.  Sorry I interrupted.
9    A.   Yeah, so that's what the first one was.
10    Q.   The second one was asking about key
11  management compensation, is that right?
12    A.   Yeah.
13    Q.   And did you in fact provide that
14  information?
15    A.   Yeah, I guess so.
16    Q.   If you look at what's Bates numbered NSA
17  001660, it looks like you have a response to Magda.
18         Did you provide the sheikh with the
19  request -- with the second request for key management
20  compensation?
21    A.   Yeah, that's what it shows on the e-mail.
22    Q.   Do you have any reason to question the

## 212

1  accuracy of those numbers?
2    A.   No.
3    Q.   Okay.  And actually while we're on that
4  page, looking up, in response to number one, the
5  italicized portion, that's your response, right?
6    A.   Yeah.
7    Q.   Okay.  And in the paragraph that starts
8  off with "The CEO's directives," the last sentence of
9  that paragraph reads, "The auditors have no concerns
10  with regards to the liquid strength of the company."
11         Do you have any reason to question the
12  accuracy of that statement, sitting here today?
13    A.   No.
14    Q.   And then moving along in that document,
15  turning to the next page, NSA 001659, there's an
16  e-mail from Magda to you, cc'ing Reno and what
17  appears to be someone from Deloitte.
18         Who is that person from Deloitte?
19    A.   Yeah.  That Jallad, Mohammed Jallad.
20    Q.   Was he the external auditor?
21    A.   He was the partner of the company.
22    Q.   Okay.

## 213

1    A.   The partner on the audit.
2    Q.   And it appears that Magda has a number of
3  comments on the bottom of that page, and the second
4  comments says, "Furthermore, the bonuses should be
5  stated and separately noted in the audited financial
6  statements, and should specify the names or
7  positions."
8         In your opinion, is that request
9  consistent with international accounting standards?
10    A.   Yeah.  As I said, the shareholders can
11  make certain requests to the auditors to give details
12  of any of the line items they want to -- they want to
13  see in the financials.  So it's not uncommon.  But
14  it's -- it could -- it's normally a specific request.
15  That's not a common practice for the auditors.
16    Q.   Did you take Magda's e-mails to mean that
17  the sheikh was requesting changes to the financial
18  statements?
19    A.   No.
20    Q.   Did you disregard these suggestions?
21    A.   I took it as like they had some concerns.
22  They wanted more clarity on that.

### 218

1    not more than that.

2        Q.    In your experience, have you ever seen

3    someone's bonus treated as a receivable?

4        A.    I haven't seen anything as -- in my career

5    as that.

6        Q.    Is it your understanding that that amount

7    of money that is now treated as a receivable, is that

8    just Mr. Alberto's bonuses?

9        A.    Yes.

10        Q.    Are Terry Key's bonuses treated as a

11    receivable?

12        A.    No.

13        Q.    Are Hillary Holcombe's bonuses treated as

14    a receivable?

15        A.    No.

16        Q.    Are your bonuses treated as a receivable?

17        A.    No.

18        Q.    Has anyone asked you that your bonuses be

19    treated as a receivable?

20        A.    No.

21        Q.    Why is the company singling out Reno?

22        A.    As I said, I'm not in that position to

### 219

1    comment on because it's coming from the board of

2    directors, so --

3        Q.    Did you participate in any way in that

4    decision to treat it as a receivable?

5        A.    Not apart from changing the accounting

6    entries, making the new ones, the adjustments to the

7    financial statements. Nothing more.

8        Q.    What was Deloitte's response to changing

9    it to a receivable?

10        A.    In that specific matter, I was not

11    directly engaged fully with Deloitte, with the

12    treatment of that specific bonus.

13        Q.    Have you ever talked to Deloitte or Jallad

14    Mohammet about this issue?

15        A.    Not to Jallad, but one of the supervisor

16    of their firm. Another one, not Jallad.

17        Q.    Tell me about that conversation.

18        A.    Yeah, it's like he would -- maybe two or

19    three times we had that conversation, and he would

20    ask like, How do you want to treat it and what kind

21    of documentation you can produce and the supporting

22    documents, you know. So that like typical finance

### 220

1    conversation.

2        Q.    Did the representative from Deloitte say

3    that this was unusual?

4        A.    No, I won't recall any discussion like

5    that.

6        Q.    Did he voice any concerns changing, making

7    this change?

8        A.    No.

9        Q.    Deloitte prepared drafts of the 2017

10    audited financial statement, correct?

11        A.    As of 31st December?

12        Q.    No, prior to finalizing the October 24th

13    one.

14        A.    Yes.

15        Q.    In those initial drafts, were the bonuses

16    treated as a receivable?

17        A.    No.

18        Q.    So in -- strike that.

19              Eventually there was a board of director's

20    meeting called in October 2017, correct?

21        A.    Correct.

22        Q.    What's your understanding as to why that

### 221

1    meeting was called?

2        A.    To my understanding, it was same, what we

3    just had in Exhibit 12, all the e-mails going back

4    and forth. So it was all the same concerns, that's

5    why, so --

6        Q.    So there were specific concerns that the

7    shareholders wanted to address?

8        A.    My understanding was all the concerns

9    which were raised in the e-mail, the same concerns,

10    they wanted to discuss in front of auditors and face

11    to face.

12              MR. JOHNSON:  I'd like to hand you a

13    document that will be marked as Exhibit 13, please.

14              (Ali deposition Exhibit 13 was

15    marked for identification and attached to the

16    transcript.)

17    BY MR. JOHNSON:

18        Q.    Do you recognize this document?

19        A.    Yes.

20        Q.    What is this document?

21        A.    As I said, the board of directors' meeting

22    called, and this document states the agenda of the

**222**

1    meeting.

2       Q.   And turning to NSA 001641, at the very

3    bottom, an e-mail from Magda to you and Reno.  She

4    says, "Dear Reno and Ali, Please note" -- and in all

5    caps, "auditors must attend [sic], as well."

6            What's your understanding as to why the

7    auditors had to attend?

8       A.   As far as I can recall, at that time, they

9    wanted to have auditors in the meeting, so --

10      Q.   Why?

11      A.   Perhaps there were some questions they

12   wanted to ask auditors regarding the financials.

13      Q.   Did Magda or the sheikh request that the

14   auditors prepare anything for this meeting?

15      A.   I don't recall that.

16      Q.   Moving along that same page, she sends an

17   e-mail to you and Reno again, asking for your

18   feedback.  She sent that e-mail on October 4th.  She

19   then sends another e-mail on October 5th, asking for

20   an update.

21           Did you get a sense that Magda, acting on

22   behalf of the sheikh, was anxious to set up this

**223**

1    meeting?

2       A.   I can recall that they wanted the meeting

3    to be, happen as soon as Reno is available because

4    Reno was in U.S.  But I could not see any urgency

5    other than that.  They wanted to have that meeting as

6    soon as possible, that's all.

7       Q.   And you don't know why they wanted to have

8    it so soon?

9       A.   No, I don't have any more.

10      Q.   And on that same page, you respond, "Dear

11   Magda, I spoke to Reno yesterday and he will only be

12   able to confirm the date after AUSA next week."

13           What's AUSA?

14      A.   It's an aviation exhibition here.

15      Q.   What was Reno doing there?

16      A.   This was like Reno used the attend the

17   exhibitions, and this was one of them, for NorthStar.

18      Q.   Is that for business development?

19      A.   Yeah.

20      Q.   And then moving along on the next page,

21   NSA 001640, Magda provides an agenda, right?

22      A.   Correct.

**224**

1       Q.   And there are what appear to be seven

2    items listed on the agenda, right?

3       A.   Correct.

4       Q.   Okay.  The first one is "Audited financial

5    statements for the year 2016 and before."

6            Do you see that?

7       A.   Correct.

8       Q.   Those were provided to the sheikh, right?

9       A.   Correct.

10      Q.   And he had access to them, correct?

11      A.   Correct.

12      Q.   Okay.  The next one, "Decisions taken not

13   in accordance with the company articles of

14   association."

15           Sitting here today, are you aware of any

16   decision by Reno taken not in accordance with the

17   company's articles of association?

18      A.   Generally I would say no.  But what they

19   specifically mentioning in this and it came up in the

20   meeting, so then it came to what exactly they are

21   mentioning, it was the financial reports need to be

22   approved by the shareholders and general assembly

**225**

1    meeting needs to be held every year and that's not

2    happening.  So that's what they were mentioning it's

3    not being as per the article of association.

4       Q.   Where was that provided, that there needed

5    to -- that the shareholders needed to sign the

6    financial statements?

7       A.   I can't exactly -- I don't have the

8    article association in front of me, I can't exactly

9    point that out.

10      Q.   But it's your understanding that that was

11   provided in the articles of association?

12      A.   There was something like that.  The

13   signing of shareholders isn't there, but there is

14   something where the CEO would present the financials

15   to the shareholders and the general assembly meeting

16   were held.

17      Q.   Moving along to the third item, "Bonuses

18   given to company executives."

19           The sheikh was aware of these, of the

20   bonuses, provided over the years, right?

21      A.   The financial statements were provided to

22   him every year.

**226**

1     Q.  And he never objected to them, right?   16:15:03

2     A.  No.   16:15:05

3     Q.  All right. Moving --   16:15:05

4     A.  Except the one key I already told you.   16:15:07

5     Q.  That was 2013, right?   16:15:09

6     A.  2013 financials.   16:15:10

7     Q.  "Amounts paid to the Chairman," the next   16:15:13

8 item.   16:15:14

9     The sheikh received over five million   16:15:16

10 dollars, correct?   16:15:19

11     A.  Yeah.   16:15:21

12     Q.  Did you get the sense that he wasn't   16:15:22

13 satisfied with that amount?   16:15:24

14     A.  I won't say that.   16:15:26

15     Q.  What did you take this to mean, this item   16:15:29

16 "Amounts paid to the Chairman"?   16:15:35

17     A.  I wouldn't know really.   16:15:37

18     Q.  Okay.   16:15:37

19     A.  All it seems, they wanted to see the   16:15:40

20 number of payments and the total amount, so --   16:15:42

21     Q.  The next one is number five, "Company   16:15:47

22 financial position, P&L and balance sheet up to   16:15:50

**227**

1 9-30-2017."   16:15:55

2     As of the date of this e-mail, how would   16:15:58

3 you describe the company's financial position?   16:16:00

4     A.  Yeah, it was comfortable as of 30-9, yeah.   16:16:03

5     Q.  When you say "comfortable," what do you   16:16:17

6 mean by that?   16:16:18

7     A.  Comfortable means the liquid position   16:16:19

8 is -- there is nothing to worry.   16:16:22

9     Q.  Next one is "Company strategy for coming   16:16:23

10 years."   16:16:26

11     What's your understanding as to what the   16:16:27

12 company's strategy was as of October 2017?   16:16:30

13     A.  It was sourcing the new business and   16:16:33

14 keeping the cost low.   16:16:38

15     Q.  Okay.   16:16:39

16     A.  Yeah.   16:16:39

17     Q.  And --   16:16:39

18     A.  So those were the two key points.   16:16:41

19     Q.  And at that time, Reno was actively trying   16:16:44

20 to land new business, correct?   16:16:46

21     A.  Correct.   16:16:48

22     Q.  And he made a number of layoffs to cut   16:16:49

**228**

1 costs, correct?   16:16:52

2     A.  Correct.   16:16:53

3     Q.  The next one is "Any risen matters."   16:16:55

4     What does that mean?   16:16:57

5     A.  Any matters, I -- I think at that time,   16:16:59

6 they had like anything other than this agenda, they   16:17:02

7 wanted to talk, so --   16:17:06

8     Q.  In conversations leading up to the board   16:17:09

9 meeting, did you ever get a sense as to what these   16:17:12

10 other risen matters were?   16:17:15

11     A.  No.   16:17:16

12     Q.  I'd like to direct your attention to the   16:17:18

13 last page of that document, it's Bates numbered NSA   16:17:22

14 001643.   16:17:26

15     Do you recognize this document?   16:17:30

16     A.  43, right?   16:17:33

17     Q.  Yes.   16:17:36

18     A.  Yeah.   16:17:37

19     Q.  And is this in fact the actual Notice of   16:17:37

20 Meeting?   16:17:40

21     A.  Yeah.   16:17:40

22     Q.  Okay. And does the agenda provided in the   16:17:41

**229**

1 actual notice match up with the agenda provided in   16:17:44

2 Magda's e-mail?   16:17:50

3     A.  Yeah, it seems like.   16:17:50

4     Q.  Okay. And the first line of that notice   16:17:52

5 says, "Considering the current circumstances and the   16:17:58

6 company losses" --   16:18:01

7     What did you take that to mean?   16:18:03

8     A.  The company losses? Yes, the commitment   16:18:06

9 of the company losses were there on the financial   16:18:11

10 statements as of this date because a part of that, a   16:18:14

11 big part of that came from the setup cost, which was   16:18:18

12 initial setup cost of the company when the company   16:18:21

13 did not have any revenue. So that that cost for one   16:18:25

14 and a half year almost was there, so it was getting   16:18:30

15 old.   16:18:35

16     So when you see these coming from the   16:18:37

17 board of directors, that means they had certain   16:18:44

18 issues that they want to talk about in the financial   16:18:45

19 statements, but they want to start it from taking it   16:18:50

20 as company's not in a good financial health. So --   16:18:53

21     Q.  Prior to the meeting, did you ever follow   16:18:56

22 up with Magda or the sheikh and say, I saw your   16:18:59

250

1   meeting about the line item?

2        A.   No.  I don't recall that.

3        Q.   Looking at number three on Exhibit 16, the

4   very end, it says, "it is very clear that there is a

5   material conflict of interest."

6        Do you have any idea what that's in

7   reference to?

8        A.   Yeah, I cannot explain it to myself very

9   much because it's really a vague statement, so it

10  doesn't have clear meaning.  And I can recall, when I

11  saw this letter, I could not even get that at that

12  time, what the conflict of interest means in this, in

13  this subject particularly.

14       Q.   Did the notion of a conflict of interest

15  with Deloitte come up at the board meeting?

16       A.   No.

17       Q.   Shortly after the board meeting,

18  Mr. Alberto's power of attorney was revoked, correct?

19       A.   Yes, after the -- two days, I guess.

20       Q.   When do you -- when was that revoked?

21       A.   It was 19th October, if I'm not mistaken.

22       Q.   How did you learn that the power of

251

1   attorney had been revoked?

2        A.   I was -- yeah, I was called by Magda.

3        Q.   And what did Magda say?

4        A.   She told me that the power of attorney is

5   revoked and she told me that she would be sending me

6   the cancellation of power of attorney document, which

7   needs to be sent to the banks.

8        Q.   Did she say why the power of attorney was

9   revoked?

10       A.   I don't.

11       Q.   How long was the phone call?

12       A.   A few minutes.

13       Q.   And she never once said why it was being

14  revoked?

15       A.   No.

16       Q.   Did she say it had anything to do with the

17  October board meeting?

18       A.   No.  She was -- actually she -- she is

19  just a messenger, so she won't say anything like that

20  and she wouldn't know anything like that.

21       Q.   Did you ever talk to the sheikh directly

22  about why the power of attorney was revoked?

252

1        A.   Yes.  I did not talk to him but he

2   mentioned that, why he revoked the power of attorney.

3        Q.   What did he say?

4        A.   His concerns were misuse of power of

5   attorney, in general.

6        Q.   Did he provide any details beyond that?

7        A.   No.

8        Q.   Did this notion of a misuse of a power of

9   attorney come up during the October board meeting?

10       A.   No.

11       Q.   Did the word "power of attorney" even come

12  up at the October board meeting?

13       A.   No.

14       Q.   Did you ever talk to Salem about the

15  revocation of Reno's power of attorney?

16       A.   No.

17       Q.   Do you get along with Salem?

18       A.   Not anymore.

19       Q.   Why not?

20       A.   The -- the presentation which I found on

21  my -- on Marwan's computer, I forward it to Reno.

22  After that, we never got along.  We work together,

253

1   that's it.

2        Q.   Is that because you thought Reno was a

3   good CEO?

4        A.   It's not what I thought, it's -- I don't

5   know what he thinks, so --

6        Q.   Well, Salem obviously wanted Reno out,

7   right?

8        A.   I won't say that.  I don't know.

9        Q.   After the power of attorney was revoked,

10  the -- the sheikh started looking even more into the

11  company's finances, right?

12       A.   Right.

13       Q.   Was he doing that through Magda?

14       A.   As I recall, he was himself coming to

15  office more frequently obviously, much more

16  frequently, as it compared to previous, obviously.

17  Now he was the authorized person to sign anything,

18  so -- and but yes, through Magda, as well.  A lot of

19  things were coming through Magda, as well.

20       Q.   Any understanding as to why he started to

21  become more active around this time?

22       A.   After Reno left, it was obvious, because

294

1  we were expecting, 40 percent or 50 percent.  So that
2  could be the case with we're not in a position to
3  perform under that contract.
4      Q.   Because the company would have been
5  insolvent?
6      A.   Yeah, because -- not insolvent but because
7  we would not have that much of cash to take that
8  contract on, on board.
9      Q.   You wouldn't have had any cash flow to pay
10 for any expenses?
11     A.   No, that's not -- I'm not talking about
12 the payroll and all that expenses.
13     Q.   Okay.
14     A.   I'm talking about the supplies to payment
15 with regards to the new contract.
16     Q.   You wouldn't have had any operating money,
17 any money to operate, if the bank accounts were
18 depleted by paying that last bonus in September, is
19 that what you're saying?
20     A.   No.  Let me explain it again.
21          That concern what I raised for -- was for
22 the advance payments, which you need to make to the

295

1  suppliers once you get the contract signed, that.  So
2  it's not for the routine payments, the daily
3  payments, like the payroll, the rent, so it's not
4  that.  So the concern was if the contract gets signed
5  and we don't receive that much of mobilization
6  advance from the customer, then we will not be able
7  to take up that contract, we will not be able to
8  perform that contract.
9      Q.   Okay.  I think I understand what you're
10 saying.  Because the bank accounts at that point were
11 down to about three million in the UAE account and
12 about 300 and something thousand in the USA account.
13     A.   Yeah.  So that cannot make like a 50
14 million U.S. payments to the suppliers.
15     Q.   Right.  You couldn't buy the -- the -- you
16 couldn't pay the big expenses in order to perform the
17 Iraq contract, had you got it.
18     A.   That's correct.  That's correct.
19     Q.   I understand.  Thanks for clarifying.
20          Is it fair to say that throughout the
21 course of the time Reno was the CEO that -- I think
22 you started off with about 100 million in the bank

296

1  accounts and it went down to, when at the end, which
2  I mean September 2017, it was down to about three
3  million, right?
4      A.   It's not just about the three million.
5  There are also assets on the balance sheets, so --
6  which I'm not hundred percent sure how much is there
7  right now.  But it's a big amount of assets sitting
8  on the balance sheet.
9      Q.   Like helicopters?
10     A.   Yeah, the delivery helicopters, the
11 receivables.  We have cash in performance bond
12 sitting in the bank.  So there is a part that is
13 sitting as assets in other forms.  Not in cash,
14 liquid cash, but in other forms.
15     Q.   But the liquid cash had gone down from
16 about a hundred million at the beginning of the
17 company down to about three million as of September
18 2017?
19     A.   No.  Again, I would say it's not hundred
20 and three, if -- I don't have the figures right now
21 in front of me.  But if our balance sheet had, let's
22 say, forty million in assets on the balance sheet, so

297

1  that hundred million, part of that hundred million is
2  converted to other form of assets, which is 40
3  million.  So we're talking about 60 million.
4      Q.   And I'm just talking about cash assets.
5      Q.   Your cash was down to three million, at
6  one point, it had been a hundred million when the
7  company started, is that right?
8      A.   That's right.
9          MR. BENNETT:  Okay.  I don't have any
10 further questions for you.  Thank you for your time
11 today.
12          MR. JOHNSON:  Just briefly.
13          FURTHER EXAMINATION BY COUNSEL FOR DEFENDANTS
14          BY MR. JOHNSON:
15     Q.   Going back to Exhibit 12.  As of December
16 31st, 2016, was the company insolvent?
17     A.   No.
18     Q.   Are you aware of the company ever being
19 insolvent?
20     A.   No.
21     Q.   The losses referred to in Exhibit 12 at

### 298

1  Bates number NSA 00160 -- 1660, those are in dirham's

2  AED's, right?

3  **A. Yeah. All these figures are in dirhams.**

4  MR. BENNETT: Are you finished, Nick? I'm

5  sorry.

6  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS

7  BY MR. BENNETT:

8  Q. I wanted to clarify something. I think

9  you mentioned your salary earlier, and I just think

10 you may have misspoken or there may have been a

11 misunderstanding.

12 I think it's 84,000 dirhams per month, not

13 per year.

14 **A. That's correct.**

15 Q. Okay.

16 **A. I clearly mentioned that.**

17 Q. I just want to make sure, I may not have

18 heard it.

19 MR. JOHNSON: I think you're right, I

20 think I heard the same. Okay. So did you hear --

21 THE WITNESS: No, she cleared it for me.

22 MR. BENNETT: I think the court reporter

### 299

1  asked him off the record and I said --

2  THE WITNESS: Yeah.

3  MR. BENNETT: But I just wanted to put it

4  on the record --

5  THE WITNESS: Okay.

6  MR. BENNETT: -- that it's 84,000 per

7  month, rather than per year.

8  MR. JOHNSON: No further questions.

9  MR. BENNETT: Thank you.

10 MR. LEONARD: Thank you.

11 THE VIDEOGRAPHER: We are going off the

12 record at 6:01 p.m. and completing the deposition.

13 (Thereupon, the deposition was concluded

14 at 6:01 p.m., October 18, 2018.)

### 300

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2  I, Donna A. Peterson, the officer before

3  whom the foregoing proceedings were taken, do hereby

4  certify that the foregoing transcript is a true and

5  correct record of the proceedings; that said

6  proceedings were taken by me stenographically and

7  therefore reduced to typewriting under my

8  supervision; and that I am neither counsel for,

9  related to nor employed by any of the parties to this

10 case and have no interest, financial or otherwise, in

11 its outcome.

12 IN WITNESS WHEREOF, I have hereunto set my

13 hand and affixed my notarial seal this _____ day of

14 _____, ____.

15

16 My commission expires: June 30, 2020

17 Reg. #7231839

18

19 _____

20 NOTARY PUBLIC IN AND FOR THE

21 COMMONWEALTH OF VIRGINIA

22

### 301

1  ACKNOWLEDGMENT OF DEPONENT

2

3  I, _____, do hereby

4  acknowledge that I have read and examined the

5  foregoing testimony, and the same is a true, correct

6  and complete transcription of the testimony given by

7  me, and any corrections appear on the attached Errata

8  Sheet signed by me.

9

10 _____  _____

11 (DATE) (SIGNATURE)

12

13 NOTARIZATION (If Required)

14 State of _____

15 County of _____

16 Subscribed and sworn to (or affirmed) before me on

17 this _____ day of _____, 20____, by

18 _____, proved to me on the

19 basis of satisfactory evidence to be the person who

20 appeared before me.

21 Signature: _____

22 (Seal)