# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

----------------------------------------

NorthStar Aviation, LLC, et al.,

     Plaintiffs/Counterclaim Defendants

               v.                        Civil Action

Alden Burt Alberto,                        No: 1:18cv191
  a/k/a Reno Alberto,

     Defendant/Counterclaim Plaintiff

----------------------------------------


                  Thursday, November 15, 2018

                  Tysons Corner, Virginia

Videotape depositions of:

        NORTHSTAR AVIATION, USA, LLC

         NORTHSTAR AVIATION, LLC

           (LYLE BECKA)

called for examination by counsel for the

Defendant/Counterclaim Plaintiff,

pursuant to Notice, taken at the law offices of

Berenzweig Leonard, 8300 Greensboro Drive, Suite

1250, McLean, Virginia  22102 beginning at 9:07 a.m.,

before Lu Anne Dawson Kirkland, Notary Public in and

Becka, Lyle

November 15, 2018

---

**2**

1  for the Commonwealth of Virginia, when were present
2  on behalf of the respective parties:
3
4
5  APPEARANCES:
6  ON BEHALF OF PLAINTIFFS/COUNTERCLAIM DEFENDANTS:
7  KEVIN T. STREIT, ESQ.
8  Dunlap Bennett & Ludwig
9  8003 Franklin Farms Drive, Suite 220
10  Richmond, Virginia   23229
11  (804) 823-7776    Direct (804) 620-7262
12  Kstreit@dbllawyers.com
13
14
15
16
17
18
19
20
21
22

---

**4**

C O N T E N T S

1
2  Witness:                              Page:
3  LYLE BECKA
4      Examination by Mr. Johnson        10, 133
5      Examination by Mr. Streit         131
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**3**

1  APPEARANCES (CONTINUED)
2  ON BEHALF OF DEFENDANT/COUNTERCLAIM PLAINTIFF:
3  NICK JOHNSON, ESQ.
4  (703) 462-8603
5  Njohnson@berenzweiglaw.com
6  DECLAN C. LEONARD, ESA.
7  (703) 760-0469
8  Dleonard@berenzweiglaw.com
9  CLYDE FINDLEY, ESQ.
10  (703) 574-9140
11  Cfindley@berenzweiglaw.com
12  SAMANTHA K. COLLINS, ESQ.
13  (703) 663-8185
14  Scollins@berenzweiglaw.com
15  Berenzweig Leonard
16  8300 Greensboro Drive, Suite 1250
17  McLean, Virginia   22102
18  (703) 760-0402
19
20  ALSO PRESENT:  ALDEN "RENO" BURT ALBERTO
21          VIDEOGRAPHER DANIEL COMSTOCK
22

---

**5**

E X H I B I T S

1
2  Marked for identification:                Page:
3  NORTHSTAR DEPOSITION EXHIBIT NOS.
4  Exhibit 1 - NorthStar Aviation LLC Notice of      14
5  Corporate Deposition
6  Exhibit 2 - NorthStar Aviation USA LLC Notice    14
7  of Corporate Deposition
8  Exhibit 3 - Power of Attorney, Bates NSA000402    28
9  through -407
10  Exhibit 4 - Revocation of Power of Attorney
11  33Wells Fargo Business Choice Checking, Bates
12  NSA019102 through -103
13  Exhibit 5 - Letter from Reno Alberto to Dr.      36
14  Al Nahyan 9/25/17, Bates NDA009283
15  Exhibit 6 - Email from Reno Albert to            38
16  Dr. Al Nahyan 11/6/17, Bates NSA015060
17  Exhibit 7 - Written Consent of the Sole Member   40
18  Of NorthStar Aviation USA LLC, Bates re
19  Removal of Alden Alberto, Bates
20  NSA016661
21
22

---

Henderson Legal Services, Inc.

**6**

E X H I B I T S

Marked for identification:                    Page:

NORTHSTAR DEPOSITION EXHIBIT NOS.

Exhibit 8 - Written Consent of the Sole Member          43
of NorthStar Aviation USA LLC, Bates re
Amendment to LLC Agreement, Bates NSA
016664

Exhibit 9 - Letter from Dr. Al Nahyan To Whom          46
It May Concern 10/31/17, Bates NSA013435

Exhibit 10 - Memorandum of Association of          50
NorthStar Aviation LLC, NSA000755
Through -774

Exhibit 11 - Memorandum of Association of          55
NorthStar Aviation LLC, Amendment
No. (2), Bates NSA010763 through -778

Exhibit 12 - NorthStar Aviation LLC Projected          74
Cash Position from July 2017 to
March 2019, Bates NSA000709

**7**

E X H I B I T S

Marked for identification:                    Page:

NORTHSTAR DEPOSITION EXHIBIT NOS.

Exhibit 13 - Letter from Dr. Al Nahyan to          82
Alden Alberto 10/8/17, Bates NSA001643

Exhibit 14 - Deloitte North Star Aviation LLC          107
Report NSA0019557 through -9592

Exhibit 15 - Akin Gump Invoice, Bates          121
NSA0019767 through 9768

Exhibit 16 - Second Amended and Restated          130
Limited Liability Company Agreement of
NorthStar Aviation USA LLC, Bates
NSA0019928 through -9939

**8**

P R O C E E D I N G S

9:15 a.m.

THE VIDEOGRAPHER:  We are going on the
record.  This is video number 1 in the 30(b)(6)
depositions of NorthStar Aviation LLC and NorthStar
USA LLC.  Representing both of those entities is
Mr. Lyle Becka.

The case is taken in the matter of
NorthStar Aviation LLC, et al., Plaintiffs and
Counterclaim Defendants v. Alden Burt Alberto,
Defendant and Counterclaim Plaintiff.  It's pending
before the United States District Court for the
Eastern District of Virginia, Alexandria Division,
Case Number 1:18-CV-00191.

This deposition is being held at the law
offices of Berenzweig Leonard at 8300 Greensboro
Drive, Suite 1250, McLean, Virginia on November 15th,
2018.  The time on the video screen is 9:15 a.m.

My name is Daniel Holmstock, and with me
is Lu Anne Dawson Kirkland.  We are in association
with Henderson Legal Services, located at 1560 Wilson
Boulevard, Suite 750 in Arlington, Virginia.

**9**

For the record now, will counsel please
introduce themselves and whom they represent?

MR. JOHNSON:  Good morning.  Nick
Johnson with the law firm Berenzweig Leonard
representing Mr. Albert.

MR. LEONARD:  I'm Declan Leonard, also
representing Mr. Alberto.

MR. FINDLEY:  And Clyde Findley, also
representing Mr. Alberto.

MR. STREIT:  Kevin Streit with Dunlap
Bennett and Ludwig representing NorthStar Aviation
and NorthStar Aviation USA.

THE VIDEOGRAPHER:  Also present, please
identify?

MR. JOHNSON:  Go ahead.

MR. ALBERTO:  Reno Alberto.

THE VIDEOGRAPHER:  Court Reporter,
please administer the oath.

THE REPORTER:  Would you raise your
right hand, please?

Thereupon,

LYLE BECKA

**18**

1  and a half.
2      Q.   So you sat in on the depositions?
3      A.   I did.
4      Q.   Did you review those transcripts?
5      A.   Yes.
6      Q.   Did you review any other documents with
7  respect to preparing for topics 3 and 4?
8      A.   I have reviewed, just overall, for the
9  basic, I've reviewed several documents.
10     Q.   Do you recall with specificity what
11 documents?
12     A.   I do not.  But I would ask in general,
13 if you are, because there are so many documents, if
14 you are referring to something specific, present me
15 with that specific document, if you can.  This way I
16 know that we're all, the question that you're asking
17 and the answer that I'm giving both relate to the
18 same thing.
19     Q.   Did you review any documents pertaining
20 to the R2 liquidation?
21     A.   I did not.
22     Q.   Did you review any company financial

**19**

1  statements when the company was formed in 2012?
2      MR. STREIT:  Objection to form.
3      THE WITNESS:  I briefly reviewed some
4  just as part of the package that was presented.
5  BY MR. JOHNSON:
6      Q.   Did you talk to anyone with respect to
7  preparing for topics 3 and 4?
8      A.   Primarily what I learned was from the
9  depositions.
10     Q.   Which depositions specifically?
11     A.   Either Ali's deposition, Salem
12 Al-Dhaheri's deposition or Dr. Bin Saif's deposition.
13     Q.   Other than sitting in in those
14 depositions and potentially reviewing those
15 transcripts, did you have a subsequent conversation
16 with Ali about topics 3 and 4?
17     A.   I did not.
18     Q.   Did you have a subsequent conversation
19 with Salem about topics 3 and 4?
20     A.   Yes, I did, briefly.
21     Q.   And what did Salem tell you?
22     MR. STREIT:  Objection.  That is subject

**20**

1  to work product protection.
2      I advise you not to respond to that.
3      THE WITNESS:  Okay.
4  BY MR. JOHNSON:
5      Q.   When did you talk to Salem?
6      A.   Over the course of the last week.
7      Q.   Roughly, was it more than one
8  conversation?
9      A.   One or two conversations, yes.
10     Q.   How long did you talk to him?
11     A.   On those specific subjects, it would not
12 have been very long.
13     Q.   What about the Sheik or Dr. Ahmed; did
14 you talk to him about topics 3 and 4?
15     A.   I did.
16     Q.   When did you talk to him?
17     A.   Over the course of the last week.
18     Q.   When you had those conversations, was
19 counsel present?
20     A.   At times.  At times, no.
21     Q.   Who else was present during those
22 meetings?

**21**

1      A.   It would have just been the three of us
2  or the two of us, as the case may be.
3      Q.   How long did you talk to the Sheik?  And
4  I'm just going to refer to Dr. Ahmed as the Sheik --
5      A.   Sure.
6      Q.   -- throughout the course of the day.
7      How long did you talk to the Sheik?
8      A.   On these specific topics, it wouldn't
9  have been that long.
10     Q.   Did you talk to anyone else about topics
11 3 and 4?
12     A.   I did not.
13     Q.   The Sheik, when you talked to the Sheik,
14 what did he tell you about topics 3 and 4?
15     MR. STREIT:  Objection.  That would be
16 subject to work product protection.
17     I advise you not to answer.
18     THE WITNESS:  Okay.
19 BY MR. JOHNSON:
20     Q.   The Sheik did not contribute any
21 personal funds in initially capitalizing NorthStar,
22 correct?



**22**

1    A. He did not.

2    Q. And his solely-owned company, Rotana Jet

3    Aviation, did not contribute any funds in initially

4    funding NorthStar, correct?

5    A. As he indicated in his deposition, they

6    did provide services. Rotana Jet provided services.

7    They provided hangar space. They provided equipment

8    leases, fuel, various services which he may or may

9    not have been immediately reimbursed for.

10    Q. But in terms of contributing money,

11    Rotana Jet did not contribute any money in initially

12    funding NorthStar, correct?

13    A. Correct.

**23**

3    Q. Can you give me a ballpark?

4    A. The various documents I've seen, they

5    don't seem to necessarily always jibe with each

6    other, but it would be somewhere in the neighborhood

7    of, I would expect, $50 to $60 million.

8    Q. I would like to direct your attention

9    and -- strike that.

10    Throughout the course of today, I'm

11    going to be referring back to Exhibits 1 and 2. That

12    will be kind of our general guide for today.

13    A. Okay.

14    Q. I'd like to refer to topic number 7 in

15    both Exhibit 1 and 2. Mr. Becka, you previously

16    testified in your individual deposition that you were

17    not involved in negotiating Mr. Alberto's power of

18    attorney, correct?

19    A. That is correct.

20    Q. I believe your testimony was that during

21    your initial employment with NorthStar, you did not

22    recall ever specifically actually even seeing the

**24**

1    document; is that right?

2    A. If I recall correctly, I believe I

3    remember seeing it or seeing portions of it, but I

4    don't remember going through it in great detail.

5    Q. Since the time of your individual

6    deposition, what have you done to prepare to testify

7    as to topic 7?

8    A. Regarding topic 7, I can tell you the

9    reason for the power of attorney.

10    Q. And we'll get to that.

11    A. Okay.

12    Q. I just want to understand just about

13    your preparation.

14    A. Yes. I know, I know the reasoning for

15    it. I know why it was put in place. I know the

16    tie-in to the Memorandum of Association.

17    Q. Did you review the Power of Attorney in

18    preparing for topic 7?

19    A. I did.

20    Q. Did you review any other documents in

21    preparing for topic 7?

22    A. The MOA.

**25**

1    Q. And did you talk to anyone in preparing

2    for topic 7?

3    A. I did not.

4    Q. You didn't talk to the Sheik about topic

5    7?

6    A. No.

7    Q. Why was this Power of Attorney provided

8    to Mr. Alberto?

9    A. It is part of the standard course of

10    business within the UAE. I'm not sure if you would

11    call it law, but in general, a Memorandum of

12    Association outlines the ownership and the executives

13    within a company.

14    But that also has, if you look at the

15    Memorandum of Association, it also has some, for lack

16    of a better term, more sensitive information about

17    the company.

18    But within the UAE, you are not just

19    assumed to have rights. You have to prove that you

20    have rights to do certain things within the UAE, so

21    therefore, rather than provide a Memorandum of

22    Association, which has some sensitive information in



**26**

1   it, a Power of Attorney is generated for the
2   executive to be able to have the authority to carry
3   out certain functions for the company on behalf of
4   the company and for the benefit of the company.
5         A good example would be a bank account.
6   Within the UAE, you can't just go in without proving
7   that you have the authority to open a bank account
8   under a company name without showing that written
9   authority.
10        Q.   In this case, NorthStar provided
11  Mr. Alberto with a Power of Attorney so that he could
12  run the company, right?
13        A.   That is correct.
14        Q.   And it was provided to Mr. Alberto so
15  that he could run the day-to-day operations of the
16  company; is that correct?
17        A.   That is right.
18        Q.   And it was provided to Mr. Alberto so he
19  could run the company as he saw fit, right?
20        A.   Yes, and for the benefit of the company.
21        Q.   And specifically, the Sheik provided
22  this to Reno so that the Sheik didn't have to run the

**27**

1   day-to-day, right?
2         A.   That is correct.
3         Q.   How long was this Power of Attorney in
4   effect?
5         A.   Until it was revoked.
6         Q.   And when was it revoked?
7         A.   I believe the date is October 19th,
8   2017.
9         Q.   Pursuant to the Power of Attorney, is it
10  NorthStar's understanding that Mr. Alberto had the
11  authority to make personnel decisions?
12        MR. STREIT:  Objection to form.
13        THE WITNESS:  Yes.
14  BY MR. JOHNSON:
15        Q.   Open bank accounts?
16        A.   Yes.
17        Q.   Sign contracts?
18        A.   Yes.
19        Q.   Set compensation?
20        A.   Yes.
21        Q.   Issue bonuses?
22        A.   Yes.

**28**

1         Q.   Authorize the preparation of --
2         A.   I don't know if bonuses are specifically
3   listed in there, but yes.  Between the the,
4   Memorandum of Association outlines the various powers
5   that are authorized of the executive.
6         Q.   The Power of Attorney gave Mr. Alberto
7   the ability to authorize the preparation of financial
8   statements, too, right?
9         A.   Correct.
10        Q.   And I'm talking just about --
11        A.   I don't know if that was in the Power of
12  Attorney or if that was in the Memorandum of
13  Association.  I would have to review the documents.
14        Q.   Let me give you the documents.
15        MR. JOHNSON:  I would like to have this
16  marked as Exhibit 3, please.
17        (Thereupon, NorthStar Deposition Exhibit
18  Number 3 was marked for identification.)
19  BY MR. JOHNSON:
20        Q.   And Mr. Becka, take a moment to review
21  what's been marked as Exhibit 3, but the question
22  that I have is:  Does this appear to be the Power of

**29**

1   Attorney that was in effect while Mr. Alberto was
2   CEO?
3         A.   Yes, it does.
4         Q.   Pursuant to the Power of Attorney,
5   nothing in this document required Mr. Alberto to get
6   approval before making any of those company decisions
7   we just discussed, right?
8         MR. STREIT:  Objection to form.  Legal
9   conclusion.
10        THE WITNESS:  If it was specifically
11  authorized in the Power of Attorney, then yes.
12  BY MR. JOHNSON:
13        Q.   Then yes, he did not need to get
14  approval?
15        A.   Correct.
16        Q.   And Mr. Alberto was empowered to give
17  himself bonuses, right?
18        MR. STREIT:  Same objection.
19        THE WITNESS:  Mr. Alberto was empowered
20  to set compensation and authorize bonuses for the
21  personnel under his guidance or under his control,
22  but for himself he would need to get approval from

Becka, Lyle

November 15, 2018

9 (Pages 30 to 33)

---

**30**

the shareholders.
BY MR. JOHNSON:
    Q.    What's your basis for that?
    **A.    It is the way every company that I'm**
**aware of runs.**
    Q.    So you can't specifically point to
something in this document that says that he needed
to get approval from the shareholders before he
issued bonuses, right?
    **A.    I would have to review the document**
**more, but I would venture to say that it would not be**
**listed in here that he would have to do that for**
**himself.**
    Q.    So just so that your testimony is clear,
the company's understanding of the Power of Attorney
is that it does not require shareholder approval
before Reno paid himself bonuses, correct?
    MR. STREIT:  Same objection.
    THE WITNESS:  I believe if you look at
the MOA, there are some limitations that are listed
in it, within the MOA.
BY MR. JOHNSON:

---

**31**

    Q.    And we'll get to the MOA eventually.
    **A.    Okay.**
    Q.    But we're just talking about the Power
of Attorney.
    **A.    I would have to review the Power of**
**Attorney --**
    Q.    Take your time.
    **A.    -- in detail --**
    Q.    Take your time.
    **A.    (Witness reviewed document.)  Okay.**
    Q.    Nothing in the Power of Attorney
provides that Reno needed board approval before
giving himself a bonus, right?
    **A.    Actually, there's nothing --**
    MR. STREIT:  Same objection.
    THE WITNESS:  Actually, there's nothing
that grants him that authority.  Under --
BY MR. JOHNSON:
    Q.    That's not the question, Mr. Becka.
    **A.    There's nothing that grants him the**
**authority to set his own bonus.  There's nothing that**
**grants him the authority to set his own compensation.**

---

**32**

    Q.    I'm going to ask the question again.
        Nothing in the power of attorney
provides that Reno needed board authority -- strike
that -- board approval before giving himself a bonus,
right?
    MR. STREIT:  Same objection and asked
and answered.
    THE WITNESS:  There's nothing that
specifically states he needs to, but there's nothing
here that states also that he can do this by himself.
    If you look at letter (n), he can engage
and dismiss employees on behalf of the company; he
can fix their salaries and other conditions of
employment; he can determine their job descriptions,
supervise their performance, amend or terminate their
employment and settle their entitlements and
appointment agents to act or -- and representatives
to act on behalf of the Company, granting them the
necessary powers of attorney and to revoke the same,
signing all papers which may be necessary.
        So it specifically relates to what he
can do for the employees.  There's nothing in this

---

**33**

Power of Attorney that states that he can set his own
compensation and that he can set his own bonuses --
    Q.    Reno was an employee, right?
    **A.    -- he has that authority.**
    **What's that?**
    Q.    Reno was an employee, right?
    **A.    He was an employee, yes.  I don't see**
**anywhere in here where it says including himself.**
    Q.    You said that the Power of Attorney was
revoked on October 19th; is that right?
    **A.    I believe it was October 19th.**
    Q.    I'll show you a document just to
confirm.
    MR. JOHNSON:  I'd like to have this
marked as Exhibit 4, please.
        (Thereupon, NorthStar Deposition Exhibit
Number 4 was marked for identification.)
BY MR. JOHNSON:
    Q.    Mr. Becka, is this the document that
revoked Mr. Alberto's power of attorney?
    **A.    Yes, it is.**
    Q.    And if you look at the last page of what

---

Becka, Lyle

November 15, 2018

10 (Pages 34 to 37)

---

**34**

1  has been marked as Exhibit 4, there is a date stamp
2  on the bottom of 10/19/2017; do you see that?
3      A.    Yes.
4      Q.    Is that how you determined the date for
5  these documents?
6      A.    Yes.
7      Q.    And --
8      A.    As well as the information that was
9  provided with it, the --
10     Q.    The email --
11     A.    -- the dates of the emails.
12     Q.    Because there was an email that went
13  along with this.
14     A.    There was.
15     Q.    From the company's perspective, what
16  were the specific reasons as to why Mr. Alberto's
17  Power of Attorney was revoked?
18     A.    During the Board of Directors meeting,
19  as we learned through the depositions, there was
20  information that was requested by Dr. Bin Saif, and
21  per his testimony, Reno offered to provide that
22  information within the next two days.

---

**35**

1      He determined that he had left the
2  company and did not provide the information, so
3  therefore, his Power of Attorney was revoked until
4  such time as he provided the information.
5      Q.    So from the company's perspective, the
6  Power of Attorney was revoked because it believes
7  Reno did not provide the Sheik with certain
8  information?
9      A.    Yes.
10     Q.    So the revocation had nothing to do with
11  bonuses, right?
12     MR. STREIT:  Objection to form.
13     THE WITNESS:  No, it did not.
14  BY MR. JOHNSON:
15     Q.    After Mr. Alberto's Power of Attorney
16  was revoked, the Sheik started requiring that all
17  expenditures be approved by him before paying, right?
18     A.    That is correct.
19     Q.    And after Reno's Power of Attorney was
20  revoked, all payments to employees must now first be
21  approved by the Sheik, right?
22     A.    That is correct.

---

**36**

1      Q.    And that includes bonuses, right?
2      A.    That is correct.
3      Q.    And before Reno's Power of Attorney was
4  revoked, such approval was not required, right?
5      A.    That is correct.
6      Q.    Reno did not resign from NorthStar USA
7  until November 6th, right?
8      A.    I believe it was November 6, correct.
9      Q.    So you would agree that he remained
10  employed through NorthStar USA as its CEO until
11  November 6, right?
12     A.    I would not.
13     Q.    Why not?
14     A.    Because NorthStar USA is a subsidiary of
15  NorthStar UAE, and upon his resignation of NorthStar
16  UAE, how can remain as an employee of a subsidiary?
17     MR. JOHNSON:  I would like this to be
18  marked as Exhibit 5, please.
19     (Thereupon, NorthStar Deposition Exhibit
20  Number 5 was marked for identification.)
21  BY MR. JOHNSON:
22     Q.    Do you recognize this document,

---

**37**

1  Mr. Becka?
2      A.    I do.
3      Q.    And this is Mr. Alberto's resignation
4  for NorthStar UAE, correct?
5      A.    Yes.
6      Q.    And it is only addressed to NorthStar
7  UAE, correct?
8      A.    Oh.  It's addressed to Dr. Bin Saif.
9      Q.    I'm sorry.  It's addressed to Dr. Bin
10  Saif, NorthStar UAE and Rotana Jet, correct?
11     A.    That's correct.
12     Q.    And if you look at the second full
13  paragraph, it states, I am submitting my resignation
14  as Chief Executive Officer on behalf of NorthStar
15  UAE; do you see that?
16     A.    I do.
17     Q.    And there's no mention of resigning from
18  NorthStar USA, right?
19     A.    There is not.
20     Q.    And Mr. Alberto's employment agreement
21  was with NorthStar USA, correct?
22     A.    That is correct.

---

Becka, Lyle

---

**38**

1  Q.  I would like to hand you another
2 document that I would like marked as Exhibit 6.
3  (Thereupon, NorthStar Deposition Exhibit
4 Number 6 was marked for identification.)
5 BY MR. JOHNSON:
6  Q.  Mr. Becka, you recognize this document,
7 correct?
8  **A.  I do.**
9  Q.  And this is Mr. Alberto's resignation
10 from NorthStar USA, correct?
11  **A.  That is what he's addressing here in**
12 **this email, yes.**
13  Q.  And it's addressed only to NorthStar
14 USA, correct?
15  **A.  It's actually addressed to Dr. Bin Saif**
16 **with NorthStar Aviation.**
17  Q.  I'm sorry.
18  **A.  And Rotana Jet.**
19  Q.  The subject line states Resignation as
20 CEO of NorthStar USA, correct?
21  **A.  Yes.**
22  Q.  And in the body of the email, it only

---

**39**

1 provides that he is resigning from NorthStar USA,
2 correct?
3  **A.  That is correct.**
4  Q.  To your knowledge, has anyone ever
5 responded to this email?
6  **A.  Not that I'm aware of.**
7  Q.  To the company's knowledge, has anyone
8 ever responded either verbally or in writing and say,
9 We disagree with your resignation?
10  MR. STREIT:  Objection to form.
11  THE WITNESS:  Not that I'm aware of.
12 BY MR. JOHNSON:
13  Q.  Mr. Alberto was the manager of NorthStar
14 USA, correct?
15  A.  That is correct.
16  Q.  Has he ever been removed as the manager
17 of NorthStar USA?
18  **A.  Yes.**
19  Q.  Are you aware of a document that's been
20 executed removing him as the manager?
21  **A.  Yes.**
22  Q.  What document is that?

---

**40**

1  **A.  I don't remember the exact name of it,**
2 **but it is the amended agreement of the operation of**
3 **NorthStar USA.**
4  Q.  I would like to hand you a document that
5 will be marked as Exhibit 7.
6  (Thereupon, NorthStar Deposition Exhibit
7 Number 7 was marked for identification.)
8 BY MR. JOHNSON:
9  Q.  Mr. Becka, do you recognize this
10 document?
11  **A.  Let me take just a minute to review it.**
12 **(Witness reviewed document.)**
13  MR. STREIT:  Nick, I'll note for the
14 record that Exhibit 7 doesn't bear a Bates label.  Is
15 this something that's been produced in discovery; do
16 you know?
17  MR. JOHNSON:  Oh, it does.  The version
18 that I have has a Bates label.
19  MR. LEONARD:  It might have just gotten
20 cut off.
21  MR. JOHNSON:  For the record, it's Bates
22 label NSA016661.

---

**41**

1  MR. STREIT:  Thank you.
2  MR. JOHNSON:  Sorry.  It must have
3 gotten cut off.
4 BY MR. JOHNSON:
5  Q.  Mr. Becka, have you seen this document?
6  **A.  I believe I have, yes.**
7  Q.  Has this document ever been executed?
8  **A.  I would have to look, but I believe it**
9 **has.**
10  Q.  Has that document been produced in this
11 case?
12  **A.  I can't say for sure.**
13  Q.  I will --
14  **A.  Just there's, there's a lot of documents**
15 **that have been produced, so I would have to go back**
16 **and take a look and see if, if this, in fact, was**
17 **executed and if it was executed, if it was**
18 **produced --**
19  MR. JOHNSON:  On the record --
20  THE WITNESS:  -- if it was signed.
21  MR. JOHNSON:  -- I'll note that I do not
22 believe we have an executed copy.

---

Becka, Lyle

November 15, 2018

13 (Pages 46 to 49)

---

46

1   those plans are?
2       A.   He would be the best person to ask.
3           MR. STREIT:  And I would object that I
4   think your questioning is starting to go beyond the
5   parameters of topic 7.
6   BY MR. JOHNSON:
7       Q.   I would like to hand you a document that
8   will be marked as Exhibit 9.
9           (Thereupon, NorthStar Deposition Exhibit
10  Number 9 was marked for identification.)
11  BY MR. JOHNSON:
12      Q.   Do you recognize this document,
13  Mr. Becka?
14      A.   I do.
15      Q.   What is this document?
16      A.   This is a document authorizing me to act
17  as the empowered official on behalf of NorthStar and
18  NorthStar USA.
19      Q.   What is an empowered official?
20      A.   This would have been issued to the State
21  Department for the purposes of the ITAR licensing.
22      Q.   So this letter was prepared specifically

---

47

1   for the ITAR licensing?
2       A.   Empowered official is a specific term as
3   it relates to Department of Defense trade controls
4   and the State Department for purposes of ITAR.
5       Q.   Other than this document and your
6   employment agreement, are you aware of any other
7   document that provides any power or authority to you
8   to run NorthStar?
9           MR. STREIT:  Objection to form.
10          THE WITNESS:  The amended LLC agreement
11  for NorthStar USA authorizes me as the manager of
12  NorthStar USA.
13  BY MR. JOHNSON:
14      Q.   And it's your understanding that that
15  document is executed?
16      A.   Yes.
17      Q.   But you can't recall when it was
18  executed?
19      A.   The specific date, no, I cannot.  I know
20  it was executed sometime in November of 2017.
21      Q.   Sorry.  You said that the amended LLC
22  agreement was executed in November --

---

48

1       A.   The one that I have was -- it was the
2   one that I referred to previously that was executed
3   in November of 2017.
4       Q.   I would like to direct your attention to
5   topic 8 found on both Exhibit 1 and 2.  Mr. Becka,
6   you previously testified in your individual
7   deposition last week that during your initial
8   employment with NorthStar, you were not involved with
9   the preparation of the Memorandum of Association;
10  that was your testimony, correct?
11      A.   That is correct.
12      Q.   And since the time of your testimony,
13  what have you done to prepare to testify as to this
14  topic, topic 8?
15      A.   I have reviewed the MOA and discussed
16  the specifics of why there's an MOA and why there's a
17  power of attorney with Dr. Bin Saif and Salem
18  Al-Dhaheri.
19      Q.   Was anyone else present during those
20  discussions?
21      A.   I don't believe so.
22      Q.   Was counsel present?

---

49

1       A.   They may or may not have been.
2       Q.   During the times that counsel was not
3   present, what did the three of you talk about?
4           MR. STREIT:  Objection to form.
5           THE WITNESS:  The purposes of the,
6   general reason for why you establish an MOA and a
7   power of attorney for a UAE company.
8   BY MR. JOHNSON:
9       Q.   And what were those reasons?
10      A.   The MOA establishes the legality of the
11  company and builds up for your trade license to have
12  a viable company in UAE, and as I mentioned
13  before, you don't want to just take your MOA to the
14  bank, because it has more sensitive information
15  regarding the company itself.
16          So therefore, a power of attorney is
17  generated in order for someone to use that for
18  outside customers, banks, government agencies, those
19  type of functions that you would want to prove that
20  you have the authority to act.
21      Q.   Pursuant to the MOA, the Memorandum of
22  Association, Mr. Alberto was appointed as a member of

---

50

1  the Board of Directors, correct?
2      A.   He was.
3      Q.    And he was a member of the Board of
4  Directors at all times while he was CEO of both
5  NorthStar companies, correct?
6      A.   I believe so.
7      Q.    And in addition to providing that
8  Mr. Alberto was a member of the Board of Directors,
9  the MOA also provided that Mr. Alberto was the
10  Managing Director of NorthStar, correct?
11      A.   That is correct.
12      Q.    I should clarify.  That was NorthStar
13  UAE, correct?
14      A.   Understood.  Yes.
15      Q.    And the authority provided to
16  Mr. Alberto as the Managing Director was similar to
17  the authority provided to him in the power of
18  attorney, correct?
19      A.   Generally, yes.
20      Q.    And let me hand you the document.
21          MR. JOHNSON:  I would like this to be
22  marked as Exhibit 10, please.

51

1          (Thereupon, NorthStar Deposition Exhibit
2  Number 10 was marked for identification.)
3  BY MR. JOHNSON:
4      Q.    Mr. Becka, this is the MOA that was in
5  effect while Mr. Alberto was running the company,
6  correct?
7      A.   That is correct.
8      Q.    I would like to direct your attention to
9  Section 9.8 --
10      A.   Okay.
11      Q.    -- on Bates number NSA000761, and
12  actually on the top of the next page is where I want
13  to direct your attention.  Pursuant to Section 9.8,
14  Mr. Alberto could only be removed as a managing
15  director by way of a written statement from the
16  board, correct?
17          MR. STREIT:  Objection to form.
18          THE WITNESS:  Let me read it.  (Witness
19  reviewed document.)  That is what it states, yes.
20  BY MR. JOHNSON:
21      Q.    Moving along, I would like to direct
22  your attention to Section 9.11.

52

1      A.   Okay.
2      Q.    Once you get there, just take a moment
3  to review that section.
4      A.   (Witness reviewed document.)  Okay.
5      Q.    Section 9.11, that's an indemnification
6  clause, right?
7          MR. STREIT:  Objection to form.
8          THE WITNESS:  It appears to be.
9  BY MR. JOHNSON:
10      Q.    And if Reno wins this case, that
11  indemnification provision is triggered, right?
12          MR. STREIT:  Objection to form.
13          THE WITNESS:  I would have to consult
14  with legal counsel on the specifics.
15  BY MR. JOHNSON:
16      Q.    Well, what's your understanding of it?
17      A.   As far as indemnification goes, again,
18  for matters like this, I would consult with an
19  attorney.
20      Q.    And if Reno wins this case, you're aware
21  that the company may have to pay his legal fees,
22  right?

53

1          MR. STREIT:  Objection to form.
2          THE WITNESS:  I would have to refer to
3  an attorney.
4  BY MR. JOHNSON:
5      Q.    Have you talked to the Sheik about that
6  provision?
7      A.   I have not.
8      Q.    What's the current status of
9  Mr. Alberto's role as the managing director of
10  NorthStar UAE?
11      A.   He is not.
12      Q.    When was that changed?
13      A.   2017.
14      Q.    When --
15      A.   Either per this, on October 30th, or
16  whatever date it was executed or November of 2017.
17      Q.    The document you're referring to is
18  referring to NorthStar USA, though, right?
19      A.   It -- these particular documents refer
20  to NorthStar USA, that is correct.
21      Q.    So what document are you aware of that
22  removed him as managing director of NorthStar UAE?

58

1    Q.    This document wasn't signed until May
2    23rd, 2018, correct?
3         A.    I do not know what date it is signed.
4         Q.    I direct your attention to Bates number
5    NSA010778.  Do you see the stamp at the bottom?
6         A.    I do.
7         Q.    And the stamp provides May 23rd, 2018,
8    correct?
9         A.    That's what it appears, yes.
10        Q.    And so this document was signed May
11   23rd, 2018, correct?
12             MR. STREIT:  Objection to form.
13             THE WITNESS:  Or filed with the judicial
14   department on that date.
15   BY MR. JOHNSON:
16        Q.    Does the company have any knowledge of
17   this document being signed any time prior to that
18   date?
19        A.    I would have to refer to the signatory.
20        Q.    So sitting here today, the company has
21   no knowledge of this document being signed prior to
22   May 23rd, 2018, correct?

59

1         A.    Well, it doesn't say that it's signed on
2    May 23rd, 2018.  It said that it was filed with the
3    justice department and a judicial department on 2018.
4         Q.    When does the company believe this
5    document was signed?
6              MR. STREIT:  I'm going to object to
7    questioning regarding Exhibit 11, Nick, because I
8    don't believe it's encompassed within any of the
9    topics shown in Exhibits 1 or 2.  You can continue.
10   BY MR. JOHNSON:
11        Q.    When does the company believe this
12   document was signed?
13        A.    I would have to confirm.
14        Q.    So sitting here today, the company does
15   not know when this document was signed?
16        A.    It would rely on the one person that was
17   the signatory of it.
18        Q.    And the only evidence that the company
19   has as of today is the date stamp on the bottom of
20   Exhibit 11, correct?
21        A.    With the judicial department, yes.
22        Q.    So as we sit here today, the company

60

1    cannot point to any date prior to May 23rd, 2018 as
2    to when this document was signed, correct?
3         A.    Sitting here right now, correct.
4         Q.    This addendum made certain changes to
5    company operations as it relates to approval from the
6    board, correct?
7              MR. STREIT:  Objection to form.
8              THE WITNESS:  I believe the document
9    would stand on its own.  Then you would compare it to
10   what the previous document was.
11   BY MR. JOHNSON:
12        Q.    I'm going to direct your attention to
13   Section 9-13, Board Reserved Matters.  And 9-13 lists
14   a number of acts that require approval from the board
15   prior to taking those acts, correct?
16        A.    (Witness reviewed document.)  I would
17   agree with that, yes.
18        Q.    And one of the changes was that you must
19   now get board approval before issuing a bonus,
20   correct?
21        A.    If that's what it says in here, yes.
22        Q.    Do you have any reason to believe that

61

1    it doesn't say that?
2         A.    (Witness reviewed document.)  I do not
3    see where it does say that.
4         Q.    So the word bonus may not be
5    specifically mentioned in 9-13, yet does the company
6    interpret this to mean that you must now get board
7    approval before issuing a bonus?
8              MR. STREIT:  Objection to form.
9              THE WITNESS:  Yes.  It does not state in
10   here that you have to get board approval for a bonus.
11   But as discussed before, Dr. Bin Saif, being the
12   owner and chairman and shareholder, authorizes
13   expenditures.
14   BY MR. JOHNSON:
15        Q.    I'm going to direct your attention to
16   section 14.9 of Exhibit 11.  It's Bates number
17   NSA010777, and specifically, I'm going to direct your
18   attention to 14.9, section a).  And you see that the
19   board now has a specific responsibility of approving
20   and writing any bonuses, correct?
21        A.    Yes.  I do see that.
22        Q.    And that is a change that was brought

**62**

1   about as a result of this addendum, correct?
2       A.   (Witness reviewed document.)  Yes.  That
3   was a lesson learned.
4       Q.   This provision was not in effect when
5   Mr. Alberto was running the company, correct?
6            MR. STREIT:  Objection to form.
7            THE WITNESS:  I do not see that this
8   specific paragraph was addressed in this, but I would
9   have to compare it.
10  BY MR. JOHNSON:
11      Q.   So sitting here today, the company's
12  testimony is that this specific provision was not
13  provided in the MOA that was in effect while
14  Mr. Alberto was running the company?
15      A.   It does not appear to be, no.
16      Q.   I would like to direct your attention to
17  topic 6, topic 6 of Exhibits 1 and 2.  Topic 6
18  generally refers to the UAE contract.
19      A.   Okay.
20      Q.   From the company's perspective, what was
21  the Sheik's role in obtaining the UAE contract?
22      A.   Dr. Bin Saif, as a member of the Royal

**63**

1   Family, was able to meet with the personnel within
2   the general headquarters of the UAE armed forces and
3   discuss the contract with them.  He did give them the
4   confidence and faith that under his ownership, that
5   the contract would be executed effectively and that
6   the UAE government, having made the investment into
7   the unauthorized or unsigned contract up to that
8   point, that their money would be safe, they would get
9   the products that they asked for and they would
10  achieve that capability within the UAE that they had
11  desired.
12      Q.   How many meetings did he have?
13      A.   Sitting here, I can't say how many.
14      Q.   Did he have more than one meeting?
15      A.   It would be a speculation, but I would
16  say yes.
17      Q.   Well, ballpark, how many meetings?
18      A.   I would venture to say at least two to
19  three.
20      Q.   So he had two to three meetings with
21  members of the UAE military?
22      A.   Yes.

**64**

1       Q.   Who did he meet with?
2       A.   As he set forth last week, due to the
3   confidentiality agreement, he can't list names of
4   personnel that he met with.
5       Q.   Who do they work for?
6       A.   They work for the UAE armed forces.
7       Q.   And he had two to three meetings with
8   people that the company cannot identify, correct?
9            MR. STREIT:  Objection to form.
10           THE WITNESS:  Per the confidentiality
11  agreement in the actual contract itself that not only
12  deals with -- we're, we're very restricted in what we
13  can share, which you have a copy of the company, as
14  well.
15  BY MR. JOHNSON:
16      Q.   Does the company know the identity of
17  those people?
18      A.   The person that met with them does.
19      Q.   Does the company know the identity of
20  the people that the Sheik met with?
21      A.   He would know that.
22      Q.   Does the company know the identity?

**65**

1       A.   The company does not.
2       Q.   So sitting here today, NorthStar cannot
3   identify the individuals that the Sheik met with in
4   preparation of this UAE contract?
5       A.   That is correct.
6       Q.   Other than a couple meetings, what else
7   did the Sheik do to help the company obtain the UAE
8   contract?
9       A.   He provided facilities.
10      Q.   What does that mean?
11      A.   The hangar space.  And he offered his
12  influence.  The Sheik is, again, as a member of the
13  Royal Family, he was a general within the UAE air
14  force, having retired from the UAE air force.  He has
15  influence, he has relationships and provided
16  credibility to NorthStar to the UAE armed forces and
17  the UAE government.
18      Q.   Did the Sheik ever work on the proposal?
19      A.   He did not.  To add to that, I don't
20  believe that Alberto ever worked on the proposal.
21      Q.   Other than the UAE contract, the main
22  helicopter contract, what other contracts or business

**70**

1    Q.   What about follow-on work with the UAE
2  armed forces?
3        A.   The company had officially submitted a
4  proposal last summer for follow-on work with the UAE
5  armed forces, although the company approach to
6  addressing that work pretty much guaranteed that the
7  work would not be awarded to NorthStar.
8        Q.   The company has since landed that work,
9  right?
10       A.   Not officially, no.
11       Q.   You anticipate winning that work, right?
12       A.   We anticipate it.
13       Q.   And that was a proposal that was
14 submitted while Reno was CEO, correct?
15       A.   Yes, it was.  But the proposal in its
16 form while Reno was CEO guaranteed that we would not
17 be awarded the contract.
18       Q.   But the company was pursuing that work
19 while Reno was CEO, right?
20       A.   Tepidly, yes.
21       Q.   Is that the block upgrade program?
22       A.   Yes.

**71**

1        MR. JOHNSON:  Let's take a break.
2        THE VIDEOGRAPHER:  The time is 10:28
3  a.m., and we're going off the record.
4        (Recess at 10:28 a.m., resuming at 10:44
5  a.m.)
6        THE VIDEOGRAPHER:  The time is 10:44
7  a.m., and we're back on the record.
8  BY MR. JOHNSON:
9        Q.   Mr. Becka, I would like to refer back to
10 Exhibits 1 and 2, and the next line of questioning
11 will surround topics 10 and 11 on both documents.
12 Mr. Becka, you previously testified in your
13 individual deposition last week that because you were
14 terminated in 2017, you were not involved in the
15 October 2017 board meeting, right?
16       A.   That is correct.
17       Q.   And you were not involved in the event
18 that ultimately led up to the board meeting, right?
19       A.   That is correct.
20       Q.   And you were not involved in the
21 decision to revoke Mr. Alberto's power of attorney,
22 right?

**72**

1        A.   That is correct.
2        Q.   Since the time of your testimony, what
3  have you done to prepare to testify as to these
4  topics?
5        A.   I have learned more about these topics,
6  primarily through the depositions of Ali, Dr. Bin
7  Saif and Salem Al-Dhaheri but mostly Ali and Dr. Bin
8  Saif.
9        Q.   Other than sitting in those depositions,
10 did you review any documents as you prepared for
11 topics 10 and 11?
12       A.   Just the email trail between -- it
13 started with Magda Talkan and Ali and the various
14 email trails.
15       Q.   Did you have a conversation with the
16 Sheik and Salem about the board meeting?
17       A.   Briefly.
18       Q.   Was counsel present for that?
19       A.   I believe so.
20       Q.   How long was that conversation?
21       A.   Again, briefly.  Probably five minutes
22 or less.

**73**

1        Q.   What prompted the Sheik to get more
2  involved in NorthStar in 2017?
3        MR. STREIT:  Objection to form.
4  BY MR. JOHNSON:
5        Q.   Well, let me strike that.  It was a bad
6  question.
7        The Sheik started getting more involved
8  in the day-to-day operations of NorthStar in 2017,
9  right?
10       A.   He did.
11       Q.   And what prompted that?
12       A.   His primary, his primary concern, as I
13 understand it, was that he, some of the information
14 that he was given regarding the financials focused on
15 keeping the company solvent until the spring of 2019,
16 which obviously, he had some concerns regarding that
17 and there were concerns about expenditures.
18       There were concerns about the fact that
19 the intent was potentially not to have the company as
20 a long-term, viable organization.
21       So those that came together led him to
22 start asking some questions regarding the financial

Becka, Lyle

November 15, 2018

21 (Pages 78 to 81)

---

78

1  reason as to why the Sheik was so upset?
2      A.   Again, you would have to discuss that
3  with him.  He had concerns.
4      Q.   I'll direct your attention to note
5  number 2; do you see that?
6      A.   Yes.
7      Q.   It says, No shareholders payout is
8  assumed until end of warranty period of March 2019;
9  do you see that?
10      A.   I see that.
11      Q.   So that means that the Sheik wasn't
12  going to get paid until March 2019, right?
13      A.   That's what that states, yes.
14      Q.   He was pretty upset about that, right?
15      A.   You would have to speak with him about
16  that.
17      Q.   Let's talk about the board meeting
18  itself.  When was the board meeting?
19      A.   October 17th, 2017.
20      Q.   And who was present for the board
21  meeting?
22      A.   Dr. Bin Saif; Alden Alberto; Nrasib Ali;

---

79

1  Hani Farag, not the NorthStar Hani Farag but the
2  representative of Dr. Bin Saif Hani Farag, and -- is
3  it Mohammed Jallad or Jallad Mohammed?
4      Q.   And Jallad Mohammed --
5      A.   From Deloitte.
6      Q.   -- from Deloitte, and Deloitte was the
7  company's external auditor, right?
8      A.   That is correct.
9      Q.   And it's your understanding that
10  Mohammed Jallad was there on behalf of Deloitte, the
11  external auditor of NorthStar?
12      A.   Yes.  His presence or the auditor's
13  presence was specifically requested by Dr. Bin Saif.
14      Q.   And where was the board meeting held?
15      A.   As I understand it, the board meeting
16  was held at the, at the -- Dr. Bin Saif's corporate
17  offices at the Oryx Hotel.
18      Q.   So Dr. Bin Saif maintains a corporate
19  office at the Oryx Hotel?
20      A.   Yes.
21      Q.   And that's the company's understanding
22  as to where the board meeting was?

---

80

1      A.   Yes.
2      Q.   Prior to October 2017, has NorthStar
3  ever previously called a board meeting?
4      A.   No.
5      Q.   Did the company direct that the auditors
6  prepare anything for this board meeting?
7      MR. STREIT:  Objection to form.
8      THE WITNESS:  The specific topics of the
9  board meeting were put out by Dr. Bin Saif and
10  disseminated by Magda.
11  BY MR. JOHNSON:
12      Q.   There was an agenda, right?
13      A.   There was an agenda, yes.
14      Q.   And I guess my question is, did the
15  company direct Deloitte to prepare anything for that
16  board meeting?
17      A.   That would have all been done
18  specifically by Alden Alberto.
19      Q.   Well, but he was acting on behalf of the
20  company at that time, right?
21      A.   He was a member of the company, yes.
22      Q.   So sitting here today, is the company

---

81

1  aware of NorthStar directing Deloitte to prepare
2  anything for the October board meeting?
3      A.   I have not interviewed Alden Alberto
4  regarding that.  He would have been the only person
5  that would have been privy to that information, so
6  the company position is whatever he was directed or
7  whatever he directed Deloitte to prepare for that
8  board meeting.
9      Q.   And the company's testimony is that the
10  board meeting was at the Oryx Hotel?
11      A.   That's what I believe, yes.
12      Q.   It wasn't at NorthStar's corporate
13  offices?
14      A.   I don't believe so.
15      Q.   Who told you it was at the Oryx Hotel?
16      A.   I believe it came out in, I believe it
17  came out in Ali's deposition.
18      Q.   Would it surprise you to know that the
19  meeting was, in fact, at NorthStar's corporate
20  offices?
21      A.   It wouldn't surprise me.
22      Q.   So is it the company's testimony --

---

---

82

1       **A.   I, I, I didn't go into where, the**
2 **location of it.  It, I wasn't there personally.  You**
3 **know, as far as the preparation for this, the**
4 **location of it wasn't really of --**
5       Q.    Is it -- and this may clarify it -- is
6 it the company's position that whatever Ali said at
7 his deposition is likely where the board meeting was
8 held?
9       **A.   Yes.**
10       Q.    You said there was an agenda prepared,
11 correct?
12       **A.   There was an agenda prepared.**
13       MR. JOHNSON:  I would like this marked
14 as Exhibit 13, please.
15       (Thereupon, NorthStar Deposition Exhibit
16 Number 13 was marked for identification.)
17 BY MR. JOHNSON:
18       Q.    Mr. Becka, does this appear to be the
19 agenda that was prepared for the October 2017 board
20 meeting?
21       **A.   Yes, it does.**
22       Q.    And there are a number of items listed,

---

83

1 1 through 7, on the agenda; do you see that?
2       **A.   I do.**
3       Q.    The first one is Audited financial
4 statements for the year 2016 and before; do you see
5 that?
6       **A.   I do.**
7       Q.    Those were provided to the Sheik,
8 correct?
9       **A.   I believe they were, yes.**
10       Q.    And he had access to them, correct?
11       **A.   I believe so.**
12       Q.    The next one says Decisions taken not in
13 accordance with the company's articles of
14 association; do you see that?
15       **A.   I do.**
16       Q.    Sitting here today on behalf of the
17 company, are you aware of any decision by Reno taken
18 not in accordance with the articles of association?
19       **A.   Those were items that were, again, as**
20 has been determined, there was nobody there to take
21 meetings of the minute -- or minutes of the meeting,
22 so the discussions that took place regarding these

---

84

1 agenda items would have been limited to those people
2 who were there, two of which were deposed over the
3 last month, Ali and Dr. Bin Saif.
4       So the information that was discussed
5 specifically at the board meeting from the NorthStar
6 perspective can only go back to what those two people
7 said about the meeting.
8       Q.    And maybe I'm asking a different
9 question.  I'm not asking what was specifically
10 discussed about this topic at the board meeting.  I'm
11 just asking more generally, as you sit here today on
12 behalf of the company, can you identify any action
13 taken by Mr. Alberto not in accordance with the
14 company's articles of association?
15       **A.   These were concerns that the chairman**
16 **himself had that he wanted to discuss at the company**
17 **board meeting, so those specific, you would --**
18       Q.    Got you.  So the --
19       **A.   -- you would want to ask him.**
20       Q.    So the concerns were specific to the
21 Sheik; do I have that right?
22       **A.   Yes.**

---

85

1       Q.    And so NorthStar didn't have any
2 concerns, right?
3       **A.   The concerns were specific to the**
4 **shareholder and chairman of the company, yes.**
5       Q.    And so NorthStar did not have any
6 specific concerns about decisions not taken in
7 accordance with the articles of association; is that
8 right?
9       **A.   This was a concern of the Sheik,**
10 **correct.**
11       Q.    And it was not a concern of the company,
12 right?
13       **A.   This specific was a concern of the**
14 **Sheik.**
15       Q.    Are you here today --
16       **A.   A concern of the chair, the chairman.**
17       Q.    I understand that, and he's testified
18 before.
19       **A.   Correct.**
20       Q.    And my question is, on behalf of
21 NorthStar, the company, the company --
22       **A.   Not that I'm aware.**

---

Becka, Lyle

---

**86**

1    Q.   Well, let me just get the question out.
2         The company did not have any specific
3    concerns about decisions taken not in accordance with
4    the company's articles of association, right?
5    A.   Correct.
6    Q.   The next item is Bonus given to company
7    executives.
8    A.   Yes.
9    Q.   The Sheik was aware of those bonuses,
10   correct?
11   A.   He was aware of the accumulated amounts
12   of bonuses that were given for specific years.
13   Q.   So he knew the total amount of bonuses,
14   right?
15   A.   He did.
16   Q.   And he never objected to them, right?
17   A.   As I understand it, his objection in
18   a -- this went back and forth with the emails from
19   Magda to Ali.  It was requested several times that
20   the bonus structure be broken out, and as we
21   understood, that never, that never took place in
22   advance of the board of directors meeting, and as we

---

**87**

1    learned through the deposition of the company
2    personnel, that that was still never shared at the
3    board of directors meeting.
4    Q.   So --
5    A.   But the request was made several times
6    to break out the bonuses, who got paid what in these,
7    at what times for these particular bonus budgets.
8    Q.   And I understand the point that you
9    make, and I guess my question is a little different.
10        The Sheik knew about the total amount of
11   bonuses for each and every year that the company was
12   in operation, correct?
13   A.   He was.
14   Q.   And at no time did the Sheik ever object
15   to the total amount of bonuses being paid, right?
16   A.   I can't speak for him specifically.  I
17   don't know if he objected concerns directly to the
18   CEO, but as a -- outside of the conversations that
19   would have taken place between the chairman and the
20   CEO, I'm not aware.
21   Q.   And the company never objected to the
22   amount of bonuses being paid, right?

---

**88**

1    A.   The company would have no -- with
2    Alberto as the CEO, who else within the company would
3    object?
4    Q.   Well, you're here testifying on behalf
5    of the company, so I'm just asking --
6    A.   That's fine.
7    Q.   -- the company never objected, correct?
8    A.   Correct.
9    Q.   The next item is Amounts paid to the
10   Chairman.  How much was paid to the chairman since
11   NorthStar's inception?
12   A.   That, I believe, was -- I won't go into
13   the specific amounts, because I think it was well
14   documented and presented within discovery.
15   Q.   It was over $10 million, right?
16   A.   I believe so, yes.
17   Q.   And he did not make any -- strike that.
18        The next one is Company financial
19   position, number 5?
20   A.   Uh-huh.
21   Q.   Do you see that?
22   A.   I do.

---

**89**

1    Q.   How would you describe the company
2    financial position as of the date of October 2017?
3    A.   Well, I'm not a, a financial expert, but
4    the -- it would depend on what date you're speaking
5    about.
6    Q.   October 2017.
7    A.   But that's -- there's 31 days in there.
8    Q.   Let's go with October 8th, 2017, the
9    date of the agenda.
10   A.   Okay.  Okay.  I would have to actually
11   review the document to see.
12   Q.   Sitting here today, can you identify any
13   financial concerns as of October 8th, 2017?
14   A.   I -- yes, the financial concerns were,
15   there was a release of the performance bond, half of
16   the performance bond.  Where did it go?
17   Q.   That's the company's concern, is where
18   the money went?
19   A.   That would be the chairman's concern.
20   Q.   Well, he received $4.54 million, right?
21   A.   He did.
22   Q.   So he knew where about half of it went,

---

**94**

1 board meeting?
2    **A.   Unless it's, unless it's listed in his**
3 **deposition, no.  Again, from the company standpoint,**
4 **because there were no minutes taken of the meeting,**
5 **it's relying upon those personnel that were there to**
6 **highlight what actually took place within the**
7 **meeting.**
8    Q.   And Jallad Mohammed from Deloitte was at
9 the meeting, right?
10    **A.   That is what I understand, yes.**
11    Q.   And he was active in the meeting,
12 correct?
13       MR. STREIT:  Objection to form.
14       THE WITNESS:  I don't know.
15 BY MR. JOHNSON:
16    Q.   Well, he participated in the meeting,
17 correct?
18    **A.   Yes.**
19    Q.   And does the company have any reason to
20 question the accuracy of Ali's testimony as it
21 relates to Jallad's involvement in the board meeting?
22    **A.   I don't believe so, no.**

**95**

1    Q.   I would like to direct your attention
2 back to Exhibits 1 and 2.
3    **A.   Okay.**
4    Q.   And specifically, I'd like to now focus
5 on topic 15.  That's the bonuses.
6    **A.   Okay.**
7    Q.   Mr. Becka, you testified last week that
8 while Reno was CEO, you were not personally involved
9 in the decision to terminate bonuses while you were
10 employed, right?
11    **A.   That is correct.**
12    Q.   And since the time of your testimony,
13 what have you done to prepare to testify as to this
14 topic?
15    **A.   This topic specifically, I reviewed the**
16 **depositions of Dr. Bin Saif, Salem and Hani Farag.**
17    Q.   Did you --
18    **A.   The other Hani Farag.**
19    Q.   What about Ali?
20    **A.   I did not.**
21    Q.   You were --
22    **A.   I reviewed his deposition.**

**96**

1    Q.   In Ali's deposition, he talked at length
2 about the bonus process; do you agree?
3       MR. STREIT:  Objection to form.
4       THE WITNESS:  He referred to it, I
5 believe.
6 BY MR. JOHNSON:
7    Q.   Does the company have any reason to
8 question the accuracy of the testimony that Ali
9 provided with respect to the bonus process?
10    **A.   I do not believe so.**
11    Q.   While Mr. Alberto was CEO of NorthStar,
12 the company paid bonuses, right?
13    **A.   Yes.**
14    Q.   And what's the company's understanding
15 as to the bonus process?
16    **A.   Depending on which department, there's a**
17 **period of time that the vice president human**
18 **resources would make recommendations for bonuses.  He**
19 **has since left, and in the upper-level staff, it was**
20 **all at the discretion of the CEO.**
21    Q.   And so HR would make a recommendation as
22 to a bonus?

**97**

1    **A.   For support personnel, yes.**
2    Q.   And managers would make recommendations,
3 as well, right?
4    **A.   I'm not aware of the managers making**
5 **recommendations.**
6    Q.   Or --
7    **A.   But they may have at least conferred**
8 **with HR, the manager may have.  HR may have wanted to**
9 **confer with the manager to get their opinion.**
10    Q.   So HR would confer with the manager and
11 they would come up with a recommendation, correct?
12    **A.   Yes.**
13    Q.   And that recommendation would take into
14 account past bonuses, right?
15    **A.   Generally.**
16    Q.   And that recommendation would also take
17 into account individual performance, right?
18    **A.   Generally, yes.**
19    Q.   And that recommendation would take into
20 account the company's financial position, correct?
21    **A.   I would believe so.**
22    Q.   And then HR would take those

Becka, Lyle

November 15, 2018

26 (Pages 98 to 101)

98

1   recommendations to Ali, correct?
2   **A.  I believe they would take them to Ali**
3 **and the CEO, because --**
4   Q.  Okay.  And --
5   **A.  -- Ali wouldn't have the authority to.**
6   Q.  And the CEO, who at the time was Reno,
7 correct?
8   **A.  Uh-huh.**
9   **Q.  Reno and Ali would then have a**
10 **discussion about the amount of bonuses to be paid,**
11 **correct?**
12   **A.  It was, well, it was Reno's decision.**
13   **Q.  Right.**
14   **A.  For the employees.**
15   **Q.  And every time a bonus was paid, Reno**
16 **would always ask what was the liquid position of the**
17 **company before making a bonus, correct?**
18   MR. STREIT:  Objection to form.
19   THE WITNESS:  I believe you would have
20 to ask him that.
21 BY MR. JOHNSON:
22   Q.  But you sat in the testimony, and that's

99

1 your understanding as to the bonus process, right?
2   **A.  Yes.**
3   **Q.  For all bonuses that were issued while**
4 **Reno was CEO, the company always maintained a liquid**
5 **position after those bonuses were paid, correct?**
6   **A.  Yes.**
7   **Q.  It was always able to meet its**
8 **short-term liabilities?**
9   **A.  Yes.**
10   **Q.  Always able to make payroll?**
11   **A.  Yes.**
12   **Q.  Never became insolvent?**
13   **A.  Yes.**
14   **Q.  I'm sorry?  It never became insolvent?**
15   **A.  Correct.**
16   Q.  And it never went into bankruptcy,
17 right?
18   **A.  Correct.**
19   Q.  Has anyone in the company received a
20 bonus since October 2017?
21   A.  No.
22   Q.  What about the Sheik?

100

1   A.  No.
2   Q.  What about Rotana?  Has Rotana received
3 a payment since October of 2017?
4   A.  No.
5   Q.  Has the Sheik received a payment of any
6 kind, bonus, distribution, any type of payment, since
7 October 2017?
8   A.  I --
9   MR. STREIT:  Objection to the form.
10   THE WITNESS:  I don't believe so.
11 BY MR. JOHNSON:
12   Q.  Has Rotana received a payment of any
13 kind since October 2017?
14   **A.  I don't believe so.**
15   Q.  Is the company aware of any discussions
16 with the Sheik about making payments at the
17 conclusion of this lawsuit?
18   A.  No.
19   Q.  Is the company aware of any discussions
20 about making a payment to Rotana at the conclusion of
21 this lawsuit?
22   A.  No.

101

1   Q.  Other than Reno Alberto, Terry Key and
2 Hillary Holcombe, has the company asked any other
3 NorthStar employee to return bonuses that were paid
4 to them?
5   A.  No.
6   MR. STREIT:  Objection to the form.
7 BY MR. JOHNSON:
8   Q.  No?
9   Let's go year-by-year.  Let's start with
10 2013.
11   **A.  Okay.**
12   **Q.  The company knew that bonuses were paid**
13 **to employees, including the CEO, in 2013, correct?**
14   **A.  Yes.**
15   **Q.  And the total amount of bonuses were**
16 **included in the company's audited financial**
17 **statements in 2013, correct?**
18   **A.  I believe so, yes.**
19   **Q.  And the board of directors had access to**
20 **the 2013 financial statements, right?**
21   **A.  I believe so, yes.**
22   **Q.  And the 2013 financial statements were,**

102

1    in fact, provided to the board, correct?
2        A.   I believe so, yes.
3        Q.   And the board never objected to the
4    bonuses that were paid in 2013, correct?
5        A.   I don't believe they did.
6        Q.   And --
7        A.   But that would be for the board.
8        Q.   The company is not aware of any
9    objection to the amount of bonuses paid in --
10       A.   The company is not aware of any
11   objection.
12       Q.   And the company was liquid in 2013,
13   correct?
14       A.   That is correct.
15       Q.   And it was liquid even after bonuses
16   were paid, correct?
17       A.   Yes.
18       Q.   Let's move on to 2014.  The company knew
19   that bonuses were paid to employees, including the
20   CEO, in 2014, correct?
21       A.   That is correct.
22       Q.   And the total amount of bonuses were

103

1    included in the company's audited financial
2    statements in 2014, correct?
3        A.   I believe so, yes.
4        Q.   And the board of directors had access to
5    the 2014 financial statements, correct?
6        A.   I believe so, yes.
7        Q.   And the 2014 financial statements were,
8    in fact, provided to the board, correct?
9        A.   I believe so, yes.
10       Q.   And the board never objected to the
11   bonuses that were paid in 2014, correct?
12       A.   I don't believe they were.
13       Q.   And the company was profitable that
14   year, right?
15       A.   2014?  I believe, yes.
16       Q.   And there were no concerns with the
17   company's liquidity in 2014 after bonuses were paid,
18   right?
19       A.   I do not believe so.
20       Q.   Let's go on to 2015.  The company knew
21   that bonuses were paid to employees, including the
22   CEO, in 2015, correct?

104

1        A.   That's correct.
2        Q.   And the total amount of bonuses were
3    included in the company's audited financial
4    statements in 2015, correct?
5        A.   I believe so, yes.
6        Q.   And the board of directors had access to
7    the 2015 financial statements, correct?
8        A.   I believe so, yes.
9        Q.   And the board of directors were, in
10   fact, provided with the 2015 financial statements,
11   correct?
12       A.   I believe so, yes.
13       Q.   And the board of directors never once
14   objected to the amount of bonuses that were provided
15   in 2015, correct?
16       A.   Not that I'm aware.
17       Q.   And the company was profitable in 2015
18   after bonuses, correct?
19       A.   Yes.
20       Q.   And there were no concerns regarding the
21   company's liquidity in 2015 after bonuses were paid,
22   correct?

105

1        A.   Not that I'm aware.
2        Q.   Let's go on to 2016.  The company knew
3    that bonuses were paid to employees, including the
4    CEO, in 2016?
5        A.   Yes.
6        Q.   And the total amount of bonuses were
7    included in the company's audited financial
8    statements in 2016, correct?
9        A.   I believe so, yes.
10       Q.   And the board of directors had access to
11   the 2016 audited financial statements, correct?
12       A.   I believe so, yes.
13       Q.   And the board of directors were, in
14   fact, provided with the 2016 audited financial
15   statements, correct?
16       A.   I believe so, yes.
17       Q.   And the board never objected to the
18   bonuses that were paid in 2016, correct?
19       A.   Not that the company is aware of.
20       Q.   And the company was profitable in 2016,
21   correct?
22       A.   Should have been, yes.

---

**106**

1    Q.    And it was profitable even after bonuses
2    were paid, right?
3    A.    I believe so.
4    Q.    And there were no concerns regarding the
5    company's liquidity in 2016, right?
6    A.    Not that I'm aware of.
7    Q.    Let's move on to 2017.  The company knew
8    that bonuses were paid to employees in 2017, right?
9    A.    Yes.
10    Q.    And the total amount of bonuses were
11    included in the 2017 financial statements, right?
12    A.    That were completed this year, yes.
13    Q.    And the board of directors had access to
14    the 2017 financial statements, correct?
15    A.    That were completed this year, yes.
16    Q.    And while Mr. Alberto was CEO, the Sheik
17    received a copy of the 2017 audited financial
18    statement, correct?
19    A.    I don't believe so.
20    Q.    Well, there was a special audit, right?
21    A.    Well, it was still 2017, so you wouldn't
22    have completed a financial, audited financials of

---

**107**

1    2017 in 2017.  So the last that was made available
2    was in 2016, and it mentions it in Exhibit 13, item 1
3    for 2016 and before.
4         MR. JOHNSON:  I would like to hand you a
5    document that I would like marked as Exhibit 14.
6         (Thereupon, NorthStar Deposition Exhibit
7    Number 14 was marked for identification.)
8    BY MR. JOHNSON:
9    Q.    Mr. Becka, you've just been handed
10    Exhibit 14.  Do you recognize this document?
11    A.    I do.
12    Q.    And this is NorthStar's financial
13    statements for the period ending October 24th, 2017,
14    correct?
15    A.    That is correct.
16    Q.    And this document generally describes
17    the company's financial conditions as of October 24,
18    2017, correct?
19    A.    Yes.
20    Q.    The company was liquid as of this date,
21    correct?
22    A.    I would have to refer to all of the

---

**108**

1    information that's provided within here.  And again,
2    I'm not a financial expert.
3    Q.    Do you have any reason to doubt that the
4    company was liquid as of this date?
5    A.    If you -- (witness reviewed document.)
6    I will state that this audit report should stand on
7    its own as far as what it, the interpretation of it
8    and the numbers that are provided within the audit
9    report.
10    Q.    In 2017, the company was able to meet
11    all of its short-term liabilities, correct?
12    A.    Yes.
13    Q.    And always made payroll?
14    A.    Yes.
15    Q.    And it never once became insolvent,
16    correct?
17    A.    That is correct.
18    Q.    And never went into bankruptcy, correct?
19    A.    That is correct.
20    Q.    If you look at Bates number NSA0019562,
21    it's page number 4.
22    A.    Okay.

---

**109**

1    Q.    Do you see a line item total assets; do
2    you see that?
3    A.    Uh-huh.  I do.
4    Q.    And it's the --
5    A.    Sorry.
6    Q.    -- 147 million figure?
7    A.    Yes.
8    Q.    And you see the total liabilities
9    towards the bottom; do you see that?
10    A.    Yes, I do.
11    Q.    And assets exceeded liabilities,
12    correct?
13    A.    According to this, yes.
14    Q.    And assets exceeded liabilities by at
15    least 3 to 1, correct?
16    A.    Yes.
17    Q.    And that's what Jallad from Deloitte
18    said at the board meeting, right?
19    A.    I wasn't there.
20    Q.    Well, from the company's perspective,
21    that's what Jallad said, correct?
22    A.    If that's what was reported in one of

---

114

1  actions hurt the organization.  I believe that they
2  play a very significant role in the teaming agreement
3  with Bell Helicopter.
4       Q.   Sitting here today, other than the
5  amount of bonuses that Reno paid to himself, can you
6  specifically identify any other damages that the
7  company is claiming to have suffered as a result of
8  Mr. Alberto's conduct?
9       MR. STREIT:  I would note an objection
10  that our ad damnum speaks for itself in the amended
11  complaint.
12  BY MR. JOHNSON:
13      Q.   I'm asking you on behalf of the company.
14      A.   There was damage to the reputation of
15  the company through the correspondence from
16  Mr. Alberto to the UAE armed forces, JAC Commander
17  and General Headquarters.  We can't quantify at this
18  particular time how much, in fact, that did damage
19  the organization, but we are also working to rectify
20  it.
21      Q.   You haven't lost any business as a
22  result of that letter, correct?

115

1       A.   It's hard for us to tell.
2       Q.   Well, sitting here today, you can't
3  identify any business that you lost as a result of
4  that letter, correct?
5       A.   I can't identify any specific business
6  that we have lost.
7       Q.   And in fact, you have gotten follow-on
8  work with the UAE military?
9       A.   Not yet.
10      Q.   Well, you're anticipating getting the
11  block upgrade contract, right?
12      A.   Yeah.
13      Q.   So you're anticipating getting follow-on
14  work with the UAE government, correct?
15      A.   That is correct.
16      Q.   So other than --
17      A.   And that is actually due to the change
18  within the management structure of the organization.
19      Prior to my return, it was expressed
20  that NorthStar would not have received that block
21  upgrade contract.  It was not until after my return
22  to NorthStar and their confidence within myself and

116

1  the team that we actually were able to put ourselves
2  in a good place for that.
3       That is a contract that I believe at the
4  time of October of 2017 would have gone to Bell
5  Helicopter.  They were actively pursuing it as a
6  competitor, and we were able to turn that around.
7       Q.   So other than the bonuses Reno paid to
8  himself and the claimed damage to NorthStar's
9  reputation as a result of the letter to the UAE AF,
10  there are no other damages that the company is
11  seeking, correct?
12      MR. STREIT:  Renew the objection.
13      THE WITNESS:  In general.  When
14  NorthStar was formed back in 2012, I believe it was
15  2012, what we did, i.e., taking a commercial
16  aircraft, commercial helicopter, and weaponizing it
17  and providing it to a foreign military, we were one
18  of the few, if not the only, people doing that.
19  Throughout that period of time we essentially had a
20  lock.  That was a niche market that we had a lock in.
21      Through inactions, fast forward another
22  five years and there are many more competitors that

117

1  are in the same space.  You know, I think that there
2  was a, a loss of that competitive advantage over that
3  period of time.  There was not an effort to put
4  professional sales staff to capture programs
5  throughout that period of time.
6       And so again, from a -- what was the
7  loss or damage to the organization, that is hard to
8  qualify also, as well, during those, from those lost
9  opportunities and in the niche and the competitive
10  advantage that we had beginning in 2012, 2013 to
11  where NorthStar is as an organization today.
12      Q.   You haven't quantified those damages,
13  right?
14      A.   They're hard to quantify.
15      Q.   So no?
16      A.   Correct.
17      Q.   Other than the amount of bonuses that
18  Reno paid to himself and other than the damage to,
19  the claimed damage to your reputation, NorthStar is
20  not seeking any other damages, correct?
21      MR. STREIT:  Same objection.
22      THE WITNESS:  I believe it all falls

**118**

1  into the part of the total complaint.
2  BY MR. JOHNSON:
3      Q.   Is that a yes?
4      A.   **As part of the total complaint, I would**
5  **say it all falls into it, but the amount specifically**
6  **listed for damages, I can't point to a specific.**
7      Q.   I'm asking you on behalf of the company.
8      A.   **Correct.**
9      Q.   Is it the company's position that the
10  only damages that they're seeking are the bonuses
11  Reno paid to himself and the claimed damage to their
12  reputation?
13          MR. STREIT:  Same objection.
14          THE WITNESS:  I believe if you refer to
15  that, to the complaint, that that is true.
16  BY MR. JOHNSON:
17      Q.   One of the claims made by NorthStar in
18  this lawsuit is that it believes Reno conspired with
19  Terry Key to transfer NorthStar equipment to Vulcan
20  Aviation, right?
21          MR. STREIT:  I'm going to object that
22  that's an allegation relating to a claim that has

**119**

1  been dismissed by the court in this case.
2          MR. JOHNSON:  So just so we're clear,
3  because I won't ask this question, is it NorthStar's
4  position that that claim is no longer part of this
5  case?
6          MR. STREIT:  That's the law of the case
7  at this point.  That is NorthStar's position.
8          MR. JOHNSON:  Okay.  Then we're good
9  there.
10  BY MR. JOHNSON:
11      Q.   One of the claims made by NorthStar in
12  this lawsuit is that it believes that the letters
13  submitted to the State Department and to the UAE AF
14  were defamatory; you're aware of that claim, right?
15      A.   **I am.**
16      Q.   And that is still an active claim?
17      A.   **Yes.**
18          THE VIDEOGRAPHER:  Mr. Becka, if you
19  could move over.
20          THE WITNESS:  I'm sorry.
21          I'm trying to give you space.
22  BY MR. JOHNSON:

**120**

1      Q.   The company is aware -- strike that.
2          And those are, those letters are what
3  form the defamation claim, correct?
4      A.   **Yes.**
5      Q.   And the company is aware of the fact
6  that Reno consulted with counsel in preparing those
7  letters, correct?
8          MR. STREIT:  Objection to form.
9          THE WITNESS:  I believe we were made
10  aware of that, yes.
11  BY MR. JOHNSON:
12      Q.   So the company knew that Reno
13  consulted --
14      A.   **Through the interrogatories, yes.**
15      Q.   And the company is aware that Reno
16  consulted with Akin Gump in preparation of those
17  letters, right?
18      A.   **I do believe so, yes.**
19      Q.   And Akin Gump, in fact, provided advice
20  to Mr. Alberto about those letters, right?
21      A.   **I believe so, based on the information,**
22  **they were provided by Mr. Alberto.**

**121**

1      Q.   Well, there's an invoice, too, right?
2      A.   **There is.**
3      Q.   Let me hand you the invoice.
4          MR. JOHNSON:  I'd like this marked as
5  Exhibit 15, please.
6          (Thereupon, NorthStar Deposition Exhibit
7  Number 15 was marked for identification.)
8  BY MR. JOHNSON:
9      Q.   Mr. Becka, you recognize this invoice,
10  correct?
11      A.   **I do.**
12      Q.   And this is an invoice from Akin Gump,
13  right?
14      A.   **It is.**
15      Q.   And they're a law firm that was
16  representing NorthStar during the period of time that
17  Mr. Alberto was CEO, correct?
18      A.   **That is correct.**
19      Q.   And the company paid this invoice,
20  correct?
21      A.   **I believe so.**
22      Q.   If you look at one of the entries,

Case 1:18-cv-00191-TSE-JFA   Document 161-6   Filed 12/18/18   Page 25 of 26 PageID# 2520

Becka, Lyle

November 15, 2018

32 (Pages 122 to 125)

## 122

there's entries on October 25th, 2017, October 26th
and October 27th; do you see those?

A.  Yes.

Q.   I'd like to direct your attention to the
entry for October 25th.  And I recognize that part of
it has been redacted by NorthStar's counsel, but
there is reference to a discussion with Mr. Alberto,
Terry Key and Amy Styers; right?

A.  Yes.

Q.   And that discussion is around the same
time the letters were sent to the State Department
and the UAE AF, right?

A.  That is correct.

Q.   And Amy Styers was the compliance
director of NorthStar, correct?

A.  Yes.

Q.   And she was the one that prepared the
letters to the State Department and the UAE AF
regarding ITAR, right?

MR. STREIT:  Objection to form.

THE WITNESS:  I believe she did, yes.

BY MR. JOHNSON:

## 123

Q.   And Ms. Styers regularly consulted with
counsel on ITAR issues, right?

A.  When necessary.

Q.  And the company is aware of the fact
that in addition to consulting with counsel in
preparation of those letters, Mr. Alberto also
consulted with NorthStar's compliance officer, right?

A.  Yes.

Q.   And at no time did anyone from the
company ever voice a concern or objection to sending
the letters to the State Department, correct?

A.   I have not reviewed Ms. Styers'
testimony in her deposition.  I do know that she did
it under duress.

Q.   Did she ever voice a concern about
sending that letter?

A.  She did to me.

Q.   That was --

A.   I don't know what she did to others, but
I know to me she did voice a concern.

Q.   And that was after the letters were
sent, right?

## 124

A.   I believe it was while she was asked to
be -- prepare them.

Q.   But when you say --

A.   It was, this was during this week of
October twenty -- which began Monday, October 23rd.
So October 25th would have been Wednesday, and as I
testified previously, I had spoken to her at some
point through that week, whether it was that, that
Tuesday, the Monday, Tuesday or Wednesday regarding
what she was being asked to do with crafting the
letters for State Department.

Q.   And you were not employed with NorthStar
at that time, right?

A.   I was not employed.

Q.   Okay.  So at the time the letters were
prepared and submitted, the company is not aware of
anyone voicing any concern or objection to sending
the letters, right?

A.   The letters were prepared.  Ms. Styers
did not submit them.  They were prepared and they
were sent to Mr. Alberto for him to submit them.

Q.   So if I understand, Amy Styers prepared

## 125

the letters, right?

A.   She did prepare the letters at the
direction of Mr. Alberto.

Q.   And she prepared them and then sent them
to Reno, right?

A.   That is correct.

Q.   And it's the company's understanding
that Reno signed the letters and then submitted them
to the State Department and to the UAE AF, right?

A.   Well, we're talking about two different,
two different things.

Q.   I'll --

A.   The letters to the State Department were
the letters to the State Department.

Q.   I'll break it down.
Ms. Styers prepared the letter to the
State Department, right?

A.   Yes.  Well, she, she prepared a letter
to State Department.  As far as I know, nobody has
yet seen the actual letter that was submitted to the
State Department.

Q.   Is the company aware of Reno ever making

Becka, Lyle

November 15, 2018

33 (Pages 126 to 129)

---

126

1   any changes to the letter that Amy prepared?
2        **A.   The company is not aware of it.  The**
3   **company does not know what the final form of the**
4   **letter was.**
5        Q.    So sitting here today, the company
6   cannot identify any changes to the letter made by
7   Mr. Alberto, correct?
8        **A.   Right.**
9        Q.    And Mr. Alberto ultimately signed that
10  letter, right?
11       **A.   That's the company's understanding.**
12       Q.    And is it the company's understanding
13  that that letter was sent to the State Department?
14       **A.   Yes.**
15       Q.    And so my question is, from the time the
16  letter was prepared to the time that the letter was
17  submitted, is the company aware of anyone from the
18  company voicing any objection to the letter?
19       **A.   Amy Styers.**
20       Q.    And did she voice an objection to you?
21       **A.   She voiced an objection to me.  I don't**
22  **know who else she voiced an objection to.**

---

127

1        Q.    Are you aware of her voicing any
2   objection to anyone in the company?
3        **A.   I believe that she voiced her objection**
4   **to Virginia Roberts.**
5        Q.    What did she say to Virginia Roberts?
6        **A.   You would have to ask her or Virginia**
7   **Roberts, but I know that she was upset about having**
8   **to do it.  The specifics of the conversation between**
9   **her and Virginia Roberts, I don't know if that was in**
10  **Ms. Styers' testimony or not.**
11       Q.    The company doesn't know which version
12  of the letter actually went to the State Department,
13  right?
14       **A.   Not at this time, no.**
15       Q.    What about the letter to the UAE AF;
16  does the company know which version of that went to
17  the UAE AF?
18       **A.   Yes.**
19       Q.    Ms. Styers prepared that letter, right?
20       **A.   I do not know.**
21       Q.    Is the company aware of who prepared
22  that letter?

---

128

1        **A.   No.**
2        Q.    So sitting here today, the company has
3   no idea who drafted that letter?
4        **A.   No.  We can inquire, but actually who**
5   **drafted the letter, I know that Ms. Styers would be**
6   **responsible for drafting the letters to the State**
7   **Department, because that was within her area of**
8   **duties.**
9        Q.    Nothing --
10       **A.   I'm not sure why she would draft a**
11  **letter to the UAE armed forces, but she may have.**
12       Q.    Nothing ever happened to the company's
13  ITAR licenses, right?
14       **A.   No.**
15       Q.    They remained active the whole time,
16  right?
17       **A.   They did.**
18       Q.    And NorthStar has not lost any business
19  as a result of the letters to the State Department,
20  right?
21       MR. STREIT:  Objection to form.
22       THE WITNESS:  Not that we're aware of.

---

129

1   BY MR. JOHNSON:
2        Q.    And NorthStar has not lost any business
3   as a result of the letter to the UAE AF, right?
4        MR. STREIT:  Same objection.
5        THE WITNESS:  As discussed before, we
6   don't know 100 percent if we have lost business as a
7   result of the damage to the reputation, but we
8   cannot, as you mentioned before, we cannot
9   specifically state an instance where we have lost a
10  contract with UAE armed forces.
11       MR. JOHNSON:  Let's go off the record.
12       THE VIDEOGRAPHER:  The time is 11:53
13  a.m.  We're going off the record.
14       (Recess at 11:53 a.m., resuming at 1:10
15  p.m.)
16       THE VIDEOGRAPHER:  The time is 1:00
17  p.m., and we're back on the record.
18  BY MR. JOHNSON:
19       Q.    Mr. Becka, I'd like to hand you a
20  document that will be marked as Exhibit 16, please.
21       (Thereupon, NorthStar Deposition Exhibit
22  Number 16 was marked for identification.)

---