# EXHIBIT 16

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

------------------------------------x

NORTHSTAR AVIATION, LLC, et al.,    :

 Plaintiffs/Counterclaim Defendants,: Civil Action

           vs.                      : No. 1:18cv191-

ALDEN BURT ALBERTO,                 : TSE-JFA

 Defendant/Counterclaim Plaintiff.  :

------------------------------------x


VIDEOTAPED DEPOSITION OF LYLE BECKA

McLean, Virginia

Tuesday, November 6, 2018

9:32 a.m.


Reported by:  Elizabeth Mingione, RPR

Job No.:  44471

**Page 2**

Videotaped deposition of LYLE BECKA, held at the offices of Berenzweig Leonard, LLP, 8300 Greensboro Drive, Suite 1250, McLean, Virginia, commencing at 9:32 a.m., Tuesday, November 6, 2018, before Elizabeth Mingione, Registered Professional Reporter and Notary Public for the Commonwealth of Virginia.

**Page 3**

APPEARANCES OF COUNSEL:
ON BEHALF OF PLAINTIFF:
   DUNLAP, BENNETT & LUDWIG
   Kevin T. Streit, Esquire
   8003 Franklin Farms Drive, Suite 220
   Richmond, Virginia  23229
   (804) 620-7262
   Kstreit@dbllawyers.com

ON BEHALF OF THE DEFENDANT:
   BERENZWEIG LEONARD
   Nicholas R. Johnson, Esquire
   Declan C. Leonard, Esquire
   Clyde Findley, Esquire
   David B. Deitch, Esquire
   8300 Greensboro Drive, Suite 1250
   McLean, Virginia  22102
   (703) 760-0402
   Njohnson@berenzweiglaw.com
   Dleonard@berenzweiglaw.com
   Cfindley@berenzweiglaw.com
   Ddeitch@berenzweiglaw.com

**Page 4**

A L S O  P R E S E N T
Nancy Holmstock, Videographer
Alden Burt Alberto

**Page 5**

C O N T E N T S
WITNESS:  LYLE BECKA
EXAMINATION BY:                            PAGE
Mr. Johnson ................................  7

              * * *

       DEPOSITION EXHIBITS
NUMBER       DESCRIPTION                    PAGE
Exhibit 1   Bonus Payments Document NSA014873 ..  70
Exhibit 2   Text Messages .....................  85
Exhibit 3   Employment Agreement ..............  96
Exhibit 4   E-Mail October 26, 2017,
            Alberto_05054 .....................  140
Exhibit 5   E-Mail October 27, 2017, NSA001091 .  145
Exhibit 6   E-Mail November 6, 2017, NSA015060 .  151
Exhibit 7   E-Mail March 12, 2018, NSA011855 ...  167
Exhibit 8   E-Mail, November 21, 2017, NSA011925  180
Exhibit 9   Contracts and Business Projections,
            NSA012940 .........................  185
Exhibit 10  NorthStar Financial Statements ....  199

**6**

PROCEEDINGS

VIDEOGRAPHER: This is video number 1 in the video recorded deposition of Lyle Becka, taken by defendant's counsel in the matter of NorthStar Aviation, LLC, et al., Plaintiffs/counterclaim defendants, versus Alden Burt Alberto, defendant/counterclaim plaintiff, pending before the United States District Court for the Eastern of -- excuse me, for the Eastern District of Virginia, Civil Action Number 1:18cv191.

This deposition is being held at the law office of Bertzwinger -- Berenzweig Leonard located at 8300 Greensboro Drive, McLean, Virginia, on November 6, 2018. The time is 9:32 a.m. My name is Nancy Holmstock, video operator representing the firm of Henderson Legal Services. Court reporter today is Liz Mingione in association with Henderson Legal Services.

For the record, will counsel now please introduce themselves and whom they represent.

MR. JOHNSON: Good morning. Nick Johnson with the law firm of Berenzweig Leonard, representing Mr. Alberto.

**7**

MR. LEONARD: Declan Leonard for the defendant/counterplaintiff Reno Alberto.

MR. FINLEY: And Clyde Findley, also for defendant Alden Burt Alberto.

VIDEOGRAPHER: Will the court reporter please administer the oath.

- - -

Whereupon,

LYLE BECKA,

having been first duly sworn was examined and testified as follows:

- - -

EXAMINATION CONDUCTED
BY MR. JOHNSON:

Q. Good morning, Mr. Becka.
A. Good morning.
Q. Can you please state your name for the record.
A. Lyle Becka.
Q. Mr. Becka, you understand that you are here today to be deposed in the matter of NorthStar Aviation versus Alden Burt Alberto, currently pending

**8**

in the Eastern District of Virginia?
A. I do.
Q. Okay. Mr. Becka, have you ever had your deposition taken before?
A. I have not.
Q. Have you ever testified in a court of law?
A. I have not.
Q. Okay. You sat in for Ali's deposition, so you kind of know the drill, but --
A. I did.
Q. -- the most important thing about today is that you and I understand each other. If I ask a question and you don't understand it, please just say so, and I'm happy to rephrase.
A. Okay.
Q. Everything that you are saying today is being transcribed by a court reporter, so you must respond verbally and audibly. You understand that you are here testifying under oath, and that you must testify truthfully. You understand that, right?
A. I do.
Q. Okay. If at any point throughout the

**9**

course of today's deposition you need to take a break, I'm happy to do so, restroom, water, what have you. My only request is that if there is a question pending, I'd request that you answer the question and then we can take a break. Is that fair?
A. That is fair.
Q. Okay. Throughout the course of today's deposition, NorthStar's counsel may make various objections to preserve the record. But unless you are directed not to respond, you understand that you need to answer my questions?
A. I do.
Q. Okay. Let's just first start with who you talked to in preparation for today's deposition. Other than counsel, who did you talk to about today's deposition?
A. Just counsel.
Q. Okay. Did you talk to Dr. Ahmed about today's deposition?
A. No.
Q. Okay. What about Salem AlDhaheri?
A. I did not.

Page 14

1 performance under that contract?
2     A.  No.
3     Q.  Okay. Is this litigation affecting the
4 staffing of that contract?
5     A.  No.
6     Q.  How is this litigation affecting your
7 performance, if at all, under the UAE contract?
8     A.  It is not.
9     Q.  Okay. What about subcontractors? Have you
10 talked to any of your subcontractors about this
11 litigation?
12     A.  I may have.
13     Q.  Okay.
14     A.  Just to state that --
15     Q.  I'm sorry?
16     A.  Just to state that, you know, we are in
17 litigation.
18     Q.  Okay. Did they ask or did you volunteer
19 this information?
20     A.  They may have asked.
21     Q.  Okay.
22     A.  I can't remember exactly who I spoke to.

Page 15

1     Q.  You don't remember who you talked to?
2     A.  Not in total. No.
3     Q.  Okay. When you were having discussions
4 with General Toumajan, did you talk about Reno
5 specifically?
6     A.  Obviously I would have if he's the
7 defendant in the case.
8     Q.  And what did you say about Reno?
9     A.  I said we have a pending lawsuit against
10 Reno.
11     Q.  And that's it?
12     A.  Hmm.
13     Q.  You didn't say anything about how he was as
14 CEO?
15     A.  Well, he knew he was the CEO.
16     Q.  Okay. Did you say anything about your
17 impressions on Reno as the CEO?
18     A.  No.
19     Q.  How long was the conversation?
20     A.  Probably five minutes.
21     Q.  Did you talk about things other than this
22 litigation?

Page 16

1     A.  Yes.
2     Q.  How much time did you spend talking about
3 this litigation?
4     A.  Not that long, maybe a minute.
5     Q.  Did you indicate to General Toumajan that
6 he could be a witness in this case?
7     A.  No.
8     Q.  What about Bell, have you talked to anyone
9 at Bell about this litigation?
10     A.  I made them aware of it. Yes.
11     Q.  Who did you talk to?
12     A.  Robert Dompka.
13     Q.  And what is his position?
14     A.  He is director of programs, I believe.
15     Q.  And when did you talk to Mr. Tompko?
16     A.  Dompka.
17     Q.  Tompka. When did you talk to Mr. Tompka?
18     A.  It would have been March of 2018.
19     Q.  Okay. So shortly after the lawsuit was
20 filed?
21     A.  Yes.
22     Q.  Okay. And why did you talk to Mr. Dompka

Page 17

1 about this litigation?
2     A.  We were in discussions about the path
3 forward between NorthStar and Bell, and I figured they
4 need to be aware of it.
5     Q.  Was that relationship damaged in some way?
6     A.  It was.
7     Q.  And what do you mean by that? Elaborate.
8     A.  It was. They had very much planned to move
9 ahead without NorthStar on several fronts. When I
10 went to Dubai air show, the -- their managing director
11 for Middle East sales, he actually made the comment to
12 me that I made his life more difficult because he had
13 already planned on this course of action of moving
14 ahead without NorthStar. And with me coming back now,
15 he had to think about how Bell was going to react.
16     Q.  What's the current status of the situation
17 with Bell?
18     A.  We have a good relationship with Bell. We
19 are working together in certain areas. In certain
20 areas we are working apart, but we have a good
21 relationship with Bell.
22     Q.  Did you lose any opportunities with Bell?

```
                                              18
 1    A.   It's hard to tell.
 2    Q.   Can you identify one?
 3    A.   Not that -- no, not today I can't.
 4    Q.   Okay.  What are the projects that you are
 5  working with Bell on since Mr. Alberto left the
 6  company?
 7    A.   A project for the UAE Armed Forces and a
 8  project in Iraq.
 9    Q.   Have those contracts been awarded?
10    A.   They have not.
11    Q.   Sorry?
12    A.   They have not.
13    Q.   Okay.  Do they have -- have those
14  governments issued an anticipated award date?
15    A.   For the UAE, it's anticipated to be
16  December.
17    Q.   Okay.  And what's the value of that
18  opportunity with UAE?
19    A.   Approximately 62.7 million.
20    Q.   How do you feel about your chances to win
21  that contract?
22    A.   99 percent.
```

```
                                              19
 1    Q.   What about Iraq?
 2    A.   Iraq, we feel good about it.  With the
 3  changes in government, it's hard to tell but --
 4    Q.   What's the value of that contract?
 5    A.   168 million.
 6    Q.   And so those are the two opportunities that
 7  you are pursuing with Bell, UAE and Iraq?
 8    A.   Yes.
 9    Q.   Any others?
10    A.   Not at this point.
11    Q.   Okay.  Is it fair to say that you have a
12  pretty good relationship with Bell now?
13    A.   We do have a good relationship with Bell
14  now.
15    Q.   Okay.  Have you ever talked to Philip
16  Bardawil?
17    A.   Um-hmm.
18    Q.   Did you talk to Mr. Bardawil about this
19  litigation?
20    A.   I told him it was -- that we had the case
21  pending.  Yes.
22    Q.   Did he volunteer that information or did he
```

```
                                              20
 1  ask about it?
 2    A.   He may have asked about it.  I don't
 3  remember the exact conversation.
 4    Q.   What's your understanding as to how
 5  Mr. Bardawil learned about it?
 6    A.   I think he may have asked what's happening
 7  with Reno.
 8    Q.   And what was your response?
 9    A.   I said, well, we have a -- you know, we are
10  pending litigation with Reno, so --
11    Q.   And that's it?
12    A.   Pretty much.  Yeah.
13    Q.   Have you talked to anyone that used to work
14  at Presidential Airways about this litigation?
15    A.   Richard Pere.
16    Q.   Anyone else?
17    A.   Not that I can think of.  No.
18    Q.   And, I'm sorry, Rich O'Pare, you said?
19    A.   Pere.
20    Q.   Pere.  Okay.  When did you talk to Mr.
21  Pere?
22    A.   Probably in the spring.
```

```
                                              21
 1    Q.   And tell me about the conversation with Mr.
 2  Pere about this litigation.
 3    A.   Primarily that we had litigation moving
 4  forward.
 5    Q.   How have you described the litigation?
 6    A.   In what?
 7    Q.   Well, did you say it's going well?  Did you
 8  say it's going poorly?  How did you describe it?
 9    A.   It was -- it was fairly early on that I had
10  the conversation with him because, you know, we just
11  filed it in -- was it February.  So it would have been
12  fairly early on.  Probably said I feel good about it
13  because we are in the right.
14    Q.   What about Erik Prince?  Have you talked to
15  Erik Prince about this litigation?
16    A.   Yes.
17    Q.   When?
18    A.   Last month.
19    Q.   Tell me about that conversation.
20    A.   I gave him an update of the fact that we
21  are under litigation, and the value of it.  And it was
22  part of an overall conversation I had with him last
```

54

1  of that services agreement?
2      A.   It was a vehicle to get NorthStar started.
3      Q.   What's the status of that services
4  agreement?
5      A.   I would imagine it's no longer valid.
6      Q.   What makes you think that?
7      A.   If R2 is no longer a going concern, then
8  how can it be a valid agreement.
9      Q.   Are you aware of that agreement ever being
10 terminated?
11     A.   I'm not.  No.
12     Q.   When did you first learn about that
13 agreement?
14     A.   I remember parts of it back in 2012.
15     Q.   Were you presented with the agreement?
16     A.   I think mostly because we were trying to
17 figure out what -- what prices we would pay for
18 services and how much we would pay for hangar rent.
19     Q.   And why would you need to reference that
20 agreement then?
21     A.   I'm sorry?
22     Q.   I just don't understand why you would need

55

1  to reference a services agreement for determining
2  rent?
3      A.   It was in there.
4      Q.   Okay.  And so you personally reviewed the
5  agreement?
6      A.   I don't remember seeing all of it at the
7  time.
8      Q.   But it's your understanding that the
9  services agreement provided that one of the parties to
10 that agreement was to provide rent or provide a leased
11 space?
12     A.   Yes.
13     Q.   Okay.  And which company was that?
14     A.   Rotana.
15     Q.   Okay.  Is it your understanding that the
16 parties operated and performed consistent with that
17 services agreement?
18         MR. STREIT:  Objection to form.
19     A.   I don't know.
20     Q.   Are you aware of them not performing under
21 that agreement?
22     A.   I don't know.

56

1      Q.   Have you ever talked to the sheikh about
2  the services agreement?
3      A.   No.
4      Q.   Have you ever talked to Salem about the
5  services agreement?
6      A.   No.
7      Q.   Have you ever talked to Magda about the
8  services agreement?
9      A.   No.
10     Q.   Does magda still work for the company?
11     A.   I don't know.  Which company?
12     Q.   NorthStar.
13     A.   She never worked for NorthStar.
14     Q.   Okay.  Who does she work for?
15     A.   I assume Rotana Jet.  I don't know.
16     Q.   Okay.  How long were you employed by
17 NorthStar?
18     A.   Until -- whenever it started, until
19 September 2017.
20     Q.   And you subsequently obviously have been
21 reemployed by NorthStar, right?
22     A.   Yes.

57

1      Q.   I'll just refer to that time frame from
2  when the company was formed, until September 2017,
3  just as your initial employment.
4      A.   Okay.
5      Q.   With NorthStar.  During your initial
6  employment with NorthStar, was Dr. Ahmed, or the
7  sheikh, was he involved in running the company?
8      A.   Not that I know of.
9      Q.   Okay.  Are you aware of him performing any
10 services for the company?
11     A.   I wouldn't know.
12     Q.   Okay.  Sitting here today, can you think
13 of --
14     A.   You are talking initial employment.
15     Q.   Yes.  Yes.
16     A.   No.
17     Q.   Okay.  So sitting here today, you can't
18 think of a single thing that he did?
19     A.   I would expect that he -- given his
20 connections, I would expect that he was involved in
21 securing the contract and forming NorthStar and
22 providing some weight to the NorthStar organization.

138

1  Q. Okay. But you communicated with the State
2  Department in response to Mr. Alberto's letter to the
3  State Department, right?
4  A. We sent the letter. We sent our letter
5  changing the management representative and the change
6  of office location.
7  Q. Okay. And that was accepted, right?
8     MR. STREIT: Object to the form.
9  A. I believe so.
10 Q. That change was approved by the State
11 Department?
12 A. I believe so. Yes.
13 Q. Okay. Okay. And you didn't lose any
14 business as a result of the letter that Mr. Alberto
15 sent?
16 A. Not that I know of.
17 Q. Okay. And what about the letter to the UAE
18 AF? You didn't lose any business as a result of that
19 letter either, right?
20 A. I wouldn't know.
21 Q. Well sitting here today, can you identify
22 any specific business that you lost as a result of the

139

1  letter that Mr. Alberto sent to the UAE AF?
2  A. I can't identify any business that we lost.
3  Was there a potential business that we could have had
4  otherwise, I don't know.
5  Q. Okay. But you can't identify any business
6  or potential business, right?
7  A. Not that I know of.
8  Q. Okay. When you were -- well, strike that.
9     What was your start date when you were
10 rehired -- when you were rehired?
11 A. October 27th.
12 Q. And what was your position when you were
13 rehired?
14 A. Vice President Operations, I believe.
15 Q. Okay. Is that equivalent to CEO?
16 A. No.
17 Q. Okay. Is there a CEO of NorthStar?
18 A. No.
19 Q. Okay. Who do you report to?
20 A. Dr. Bin Saif.
21 Q. Do you anticipate hiring a CEO?
22 A. I don't know yet. That will be up to him.

140

1  Q. Up to Dr. Said?
2  A. Yes.
3  Q. Okay. Since being reemployed, how would
4  you characterize or how would you describe Dr. Saif's
5  involvement in the company?
6  A. He is interested and engaged. He has
7  communicated with the UAE government. He also
8  approves every expenditure.
9  Q. Okay. And were there any other changes to
10 company operations that took place after you were
11 reemployed?
12 A. Could you explain in a little more detail?
13 Q. Sure. You know what, let me hand you a
14 document, actually. I would like this to be marked as
15 Exhibit 4.
16         - - -
17    (A document was marked as Deposition
18 Exhibit 4.)
19         - - -
20    BY MR. JOHNSON:
21 Q. Mr. Becka, do you recognize this document?
22 A. It appears to be an e-mail from Kate

141

1  Beckley to NorthStar staff.
2  Q. And you received this e-mail, right?
3  A. I don't believe did.
4  Q. If you look at the "To" line on the second
5  line in between Chad Krueger and Robert T, that's your
6  name, right?
7  A. It is my name there, but at the time,
8  October 26, I don't think I had access to NorthStar
9  e-mail.
10 Q. Okay. So when did you regain access to
11 NorthStar e-mail?
12 A. It would have been likely the 27th or the
13 Sunday.
14 Q. Okay. And when you regained access did you
15 then have access to the e-mails that were sent to you
16 prior to that date?
17 A. Probably.
18 Q. Okay. So, I mean, if you were --
19 A. I don't know. It may have -- my e-mail
20 mailbox may have been shut off so it wouldn't accept.
21 I don't know.
22 Q. Okay. Okay. Well, the e-mail itself, if

### 194

1  under that opportunity with Bell?
2  **A. Could be anyone.**
3  Q.  Okay.  UAE?
4  **A. No.**
5  Q.  Okay.  Would this be with the Middle East
6  or where?
7  **A. If you read this, this is -- this is**
8  **originally limited, the scope is originally limited in**
9  **the teaming agreement to the MENA region, but it could**
10 **have been opened up to other areas.**
11 Q.  Okay.
12 **A. It's crawl, walk, run.**
13 Q.  Okay.  The next full paragraph talks about
14 an opportunity with the government of Kuwait.  What's
15 the status of that?
16 **A. That is stalled at this point in time.**
17 Q.  What's your understanding as to why it's
18 stalled?
19 **A. Because I haven't done anything with it.**
20 Q.  Is that the same Kuwait opportunity that's
21 referenced in the complaint in this litigation?
22 **A. Yes.**

### 195

1  Q.  Are you aware of any -- strike that.
2      What specifically are you aware of Mr.
3  Alberto doing to interfere with that opportunity with
4  Kuwait?
5  **A. I would have to go back and recheck, but I**
6  **believe it was primarily limited to a request to stop**
7  **any and all work with Kuwait with the representative**
8  **at the time.**
9  Q.  Mr. Alberto said that?
10 **A. I don't remember if it was Mr. Alberto or**
11 **Mr. Key.**
12 Q.  Okay.  So the evidence that you have of Mr.
13 Alberto interfering with an opportunity with Kuwait is
14 an e-mail from either him or Mr. Key alleging to stop
15 work?
16 **A. I would have to go back and look.  I don't**
17 **remember off the top of my head what is there.**
18 Q.  And is it your understanding that that
19 e-mail was sent to someone who was a representative of
20 the government of Kuwait?
21 **A. I believe he was a representative of or**
22 **ties with the government of Kuwait.  I don't remember**

### 196

1  the exact.
2  Q.  Okay.  So --
3  **A. Yeah.**
4  Q.  The person that -- and, I'm sorry, so was
5  it Terry or Reno that sent the e-mail?
6  **A. I don't know.**
7  Q.  Okay.
8  **A. I don't remember.  I've seen it, but I've**
9  **seen a lot of things, so I'd have to go back and --**
10 Q.  But sitting here today, you can't recall
11 who it was?
12 **A. I can't remember who it was.**
13 Q.  Okay.
14 **A. I've looked at too many documents.**
15 ==Q.  As you sit here today, can you identify any==
16 ==contracts that NorthStar has lost as a result of Mr.==
17 ==Alberto's conduct?==
18 ==**A. Physical contracts, no.**==
19 ==Q.  As you sit here today, can you identify any==
20 ==contracts that NorthStar has lost as a result of==
21 ==Vulcan's alleged conduct?==
22 ==**A. No.**==

### 197

1  Q.  Prior to you being reemployed by NorthStar,
2  you were previously not involved in preparation of the
3  company's financial statements, right?
4  **A. That is correct.**
5  Q.  Once you were reemployed, were you then
6  involved in the preparation of the company's financial
7  statements?
8  **A. Somewhat.**
9  Q.  Okay.  Were you involved in preparing the
10 company's 2017 financial statement?
11 **A. Extremely limited.**
12 Q.  What was your involvement?
13 **A. Generally providing this and providing any**
14 **documentation that they had asked for.**
15 Q.  Did you personally interface with -- well,
16 let me go back.  Deloitte prepared the company's
17 financial statements, right?
18 **A. That's correct.**
19 Q.  Did you personally interface with
20 representatives of Deloitte?
21 **A. I did.**
22 Q.  Okay.  And who did you interface with?