**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

NORTHSTAR AVIATION L.L.C., *et al.*,    )
    )
    Plaintiffs/Counterclaim Defendants,  )
    )
    v.    )
    )    C. A. No. 1:18cv191-TSE-JFA
ALDEN BURT ALBERTO,    )
    a/k/a Reno Alberto,    )
    )
    Defendant/Counterclaim Plaintiff.  )
    )

**PLAINTIFFS'/COUNTERCLAIM DEFENDANTS' OPPOSITION TO
DEFENDANT/COUNTERCLAIM PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT</u>[1] [Dkt. 159]**

---

[1]    Defendant/Counterclaim Plaintiff Alden Alberto's ("Alberto") motion for partial summary judgment [Dkt. 159] is referenced herein as the "Motion." Alberto's memorandum in support of the motion [Dkt. 161] is referenced herein as the "Alberto Brief" or "Defendant's Brief," and is cited herein as "Def. Br. at __."

When defendant Alden "Reno" Alberto claims that "the record shows a complete failure of proof with respect to multiple essential elements of the NorthStar claims" (Def. Br. at 13), the only "record" to which Alberto refers consists of select excerpts from his own self-serving deposition testimony, augmented by his equally self-serving affidavit. The bulk of the evidentiary record – including Alberto's deposition testimony – reveals, however, <u>undisputed</u> facts which establish beyond peradventure Alberto's multiple breaches of legal duties. Alberto cannot hide from that record. Thus, for the reasons detailed herein as well as in NorthStar's memorandum of law supporting its summary judgment motion [Dkt. 158], incorporated herein by reference, summary judgment should be entered in NorthStar's favor and against Alberto.

<u>ALBERTO'S MOTION RELIES ON "FACTS" DISPUTED BY NORTHSTAR</u>[2]

It is striking that Alberto's Motion relies on a preliminary statement and recital of "undisputed" material facts which, in reality, are vehemently disputed. As detailed below, Alberto relies almost solely on his <u>own</u> testimony and Affidavit to posit alleged "facts" which often directly contradict other testimony and exhibits generated in discovery, and which Alberto never mentions. Among those putative "facts" is Alberto's contention that he founded NorthStar and, in effect, was its *de facto* owner – an idiosyncratic view of the company's history which has no basis in reality.

1. In 2011, the owners of Reflex Responses Management Consultancy, L.L.C. ("R2") hired Alberto to serve as R2's managing director ("Director" or "CEO"). (See Def. Stmt., ¶¶ 1-2.) While serving in that position, Alberto not only failed to maintain R2 in good standing but, in fact, his poor management precipitated its forced liquidation. (See Exh. 1; *cf*. Def. Stmt., ¶¶ 43-45.) After R2's debts were paid, its remaining funds were transferred to a new company, Vulcan Management

---

[2] This list of "facts" which Alberto erroneously claims are undisputed is cited herein as "Def. Stmt., ¶ __."

Consultancy, LLC,[3] which ultimately funded NorthStar UAE's creation. (Id. See also Exh. 2, Ali Tr. 51:8-10; *cf.* Def. Stmt. ¶ 3.)

2. Contrary to Alberto's claim that <u>he</u> "secured all funding for <u>his</u> next venture [NorthStar UAE]" (Def. Stmt., ¶ 3 (emph. supp'd)), NorthStar UAE's Chairman and owner, Sheik Ahmed Bin Saif Al Nahyan ("Dr. Bin Saif"), used **his** connections as a member of the Abu Dhabi royal family and **his** good reputation within the United Arab Emirates' ("UAE") military (the "UAEAF") to secure funding for NorthStar UAE, and then to obtain NorthStar's cornerstone contract with the UAEAF in 2013. (See Exh. 3, Bin Saif Tr. 76:1-78:22; Exh. 4, Becka Tr. 62:20-22, 63:1-11; Exh. 5, Rog. Nos. 6-7; *cf.* Def. Stmt., ¶¶ 3-10, 21-22.) Dr. Bin Saif – a successful UAE business owner in the UAE, a former pilot in the UAEAF, and Chairman of the UAE Civil Aviation Authority – had the experience, credentials, and connections necessary to ensure that NorthStar UAE received the funding and the UAE-government contract it needed to launch its business. (See Exh. 3, Bin Saif Tr. 25:3-22; 26:1; *cf.* Def. Stmt., ¶¶ 3-10, 20-22.) <u>Alberto has shown no such assets or credentials</u>, and his assertion that NorthStar was "his venture" (Def. Br. at 2, ¶ 3) is fantasy. (See Exh. 5, Rog. No. 6; *cf.* Def. Stmt., ¶¶ 3-10, 20-22.)

3. In fact, while the Defendant's Brief erroneously asserts that "Dr. Bin Saif did not contribute any personal funds to NorthStar UAE upon its founding" (Def. Stmt., ¶ 12), Alberto has testified that Dr. Bin Saif contributed $40,000 to help launch the company. (Exh. 6, Alberto Tr. 53:14-15.)

4. Notably, NorthStar UAE's Memorandum of Association (Exh. 7) states plainly that <u>Alberto was not one of the company's owners</u>. (See Dkt. 161-5, ¶¶ 1-2.) While Alberto claims that under UAE law he "could not be a majority owner" of NorthStar UAE (Def. Br. at 3, ¶ 7), he

---

[3] Alberto also did not own any interest in Vulcan Management Consultancy, LLC – not to be confused with a later company, Vulcan Aviation LLC, which Alberto launched to compete with NorthStar <u>while Alberto remained employed by NorthStar</u>.

posits no legal barrier to becoming a <u>minority</u> owner – thus, if his tale of "founding" NorthStar were true, he could have been named as one of NorthStar's owners. Alberto has admitted, however, that he <u>never held any ownership in the company</u>. (See Exh. 6, Alberto Tr. at 29:3-5, 41:13-15, 52:9-15, & 54:13-16.) Thus, despite claiming ownership of NorthStar and a right to its assets, the evidence is undisputed that **Alberto did not own any part of NorthStar UAE** and he had <u>no</u> right to its assets. (See Exh. 7; *cf*. Def. Stmt. 7, 9, 12; Exh. 6, Alberto Tr. at 29:3-5, 41:13-15, 52:9-15, & 54:13-16.) Alberto contributed <u>no</u> funds to NorthStar UAE, and he did nothing more for the company than what he was paid – handsomely – to do. (See Exh. 5, Rog. No. 6; Exh. 6, Alberto Tr. 62:10-11 & 80:15-19; *cf*. Def. Stmt., ¶¶ 3, 20-22, 26.) The indisputable fact is that Dr. Bin Saif, individually and as Rotana Jet Aviation LLC's sole member, founded and owned NorthStar UAE. (Exh. 7; Exh. 5, Rog. No. 6; *cf*. Def. Stmt., ¶¶ 3-10.)

5. Although Alberto portrays himself as exerting heroic efforts to benefit NorthStar, in reality his efforts amounted to merely doing the job for which he was paid a $1 million salary – and without any real success. (See Def. Stmt., ¶¶ 3-10; *cf*. Pltf. Stmt., ¶¶ 26-27.) Alberto also mischaracterizes his efforts on behalf of NorthStar Aviation USA, LLC ("NorthStar USA"), asserting that "Alberto formed NorthStar [USA]." (Def. Stmt. 15.) Yet, **NorthStar UAE formed NorthStar USA as its wholly owned subsidiary**. (See Exh. 8; Exh. 6, Alberto Tr. 62:10-11 & 80:15-19; *cf*. Def. Stmt. 15.) Again, Alberto confuses performing his duties as an employee with having an ownership interest.

6. Because Alberto served as NorthStar's managing director, NorthStar's owners granted him a Power of Attorney ("POA") to act on NorthStar's behalf. (See Exh. 9; *cf*. Def. Stmt., ¶ 17.) "The Power of Attorney was issued as a matter of standard UAE business practice" to facilitate Alberto's ability to manage the day-to-day affairs of NorthStar. (Exh. 5, Rog. No. 4; *cf*. Def. Stmt., ¶¶ 17-

18.) The POA was executed in conjunction with NorthStar UAE's Agreement to Amend the Memorandum of Association, which expressly limited Alberto's powers by making him "responsible and subject to the control of NorthStar UAE's Board" of Directors. (Exh. 10, § 9.10; *cf.* Def. Stmt., ¶¶ 18-19.) Thus, Alberto's assertion that "no document stated that exercise of [his] authority required any third party's approval" is demonstrably incorrect. (See Def. Stmt., ¶ 19.)

7. Apart from mischaracterizing and misstating NorthStar's origin, Alberto also presents several conclusory assertions as "undisputed facts," without supporting evidence. For example, he states that many of his unlawful actions were taken on advice of counsel but sets forth no supporting evidence apart from his own self-serving testimony – which does not even specify the content or nature of the purported advice. (See Def. Stmt., ¶¶ 24, 53, 56.) In particular, Alberto contends that he executed NorthStar USA's unauthorized Amended LLC Agreement "on the advice of NorthStar's corporate counsel, Bergstrom & Taylor." (Def. Stmt., ¶ 24.) Yet the only evidence for this "undisputed fact" is his own testimony, unsupported by an affidavit from the attorney(s) in question or even a representation as to precisely what advice was offered. (Id.) And Alberto's assertion <u>is</u> disputed. (See Exh. 11, Rog. No. 2; *cf.* Def. Stmt., ¶ 24.)

8. Additionally, while Alberto incorrectly avers that he performed his job duties successfully (Def. Stmt., ¶¶ 26-27), NorthStar has shown that to be very far from the truth. (See Exh. 11, Rog. No. 8;[4] Exh. 12, at 4; *cf.* Def. Stmt., ¶¶ 26-27.) Because of Alberto's (at best) mediocre performance and the poor financial condition to which he allowed NorthStar to lapse, Alberto

---

[4] "Defendant Alberto was not involved in the day to day business of NorthStar USA. Apart from Terry Key and Ali Nrasib, most NorthStar employees rarely interacted with or received guidance from Defendant Alberto…. Defendant Alberto rarely made himself available to meet with NorthStar's sole customer at any level to provide support…. Furthermore, Defendant Alberto failed to secure any additional significant contracts for NorthStar during his time as CEO. Defendant Alberto directed NorthStar to invest hundreds of thousands of dollars in advertising displays at conventions. However, he rarely appeared at these conventions and, even with prodding, never directed any follow-up with potential customers to capitalize on these investments to secure additional contracts." (Exh. 11, Rog. Ans. No. 8.)

should not have taken the alleged "bonus" payments he paid to himself. While Alberto details a "multi-step process" of paying bonuses to employees (Def. Stmt., ¶¶ 30-37), he fails to acknowledge or discuss several material facts:

> ➢ First, Contrary to Alberto's assertion, Dr. Bin Saif was <u>not</u> aware of the payments and total amount of employee bonuses each year, nor could he reasonably have been so aware. (Exh. 3, Bin Saif Tr. 153:9-19; *cf*. Def. Stmt., ¶¶ 28-30.) Though NorthStar's Board of Directors was informed of the <u>total</u> amount of bonuses paid each year, it was <u>not</u> informed that <u>Alberto alone pocketed the great majority of that sum</u>, as yearly reports for the company "nested" the bonus amounts within the total figure of the salaries paid to NorthStar employees. (Exh. 3, Bin Saif Tr. 153:9-19; see also Exh. 5, Rog. No. 3; *cf*. Def. Stmt., ¶¶ 28-30.)

> ➢ Second, Alberto misleadingly states that human-resources director Hani Farag was intimately involved in determining the appropriateness of bonus payments. (See Def. Stmt. 33-35.) But Mr. Farag had <u>no</u> role in recommending or determining the "bonuses" that Alberto ordered for himself. (Exh. 13, Farag Tr. at 55:9-56:16.) And Alberto omits the fact that he laid off Mr. Farag in 2017, allegedly due to the dangerously poor financial state of the company and, conveniently, just before Alberto took $9.54 million from NorthStar for himself as alleged "bonuses." (See Exh. 6, Alberto Tr. 248:15-17, 247:11-20; Exh. 2, Ali Tr. 152:18-22, 153:1-8; *cf*. Def. Stmt., ¶¶ 33-35.)

9. Alberto cites no source other than his own testimony to support his allegation that NorthStar's liquidity informed or supported his "bonus" decisions. (Def. Stmt., ¶ 37.) In fact, <u>no such source exists</u>. And it is undisputed that in 2017, when NorthStar's sales totaled less than $12 million, Alberto gave himself over **$9 million** in "bonuses." (See Exh. 12, at 1-2; *cf*. Def. Stmt., ¶¶ 43-45.) Alberto awarded himself at least **$11,840,000** in alleged "bonuses" over less than two years, including during a period of financial difficulty when the company "had to make some layoffs." (See Exh. 6, Alberto Tr. 247:3-22, 248:1-2; 247:11-20; *cf*. Def. Stmt., ¶¶ 43-45.) <u>At this time, NorthStar had a single contract for a single customer, which was drawing to a close</u>, and no other contracts had been secured. (Exh. 6, Alberto Tr. 248:15-17; Exh. 2, Ali Tr. 152:18-22, 153:1-8; *cf*. Def. Stmt., ¶¶ 43-45.) Alberto neglects to mention that his "compensation" – in the form of his salary and his astonishing "bonuses" – equaled <u>97% of the company's consolidated revenues</u>

during this precarious period. (See Exh. 12, at 1-2; *cf.* Def. Stmt., ¶¶ 43-45.)  In other words, in his final, troubled year at NorthStar **Alberto pocketed 97 cents out of every dollar that the company brought in**.

10. Upon learning of NorthStar's dire condition, Dr. Bin Saif called a Board meeting and a General Assembly of NorthStar UAE for October 17, 2017, and summoned Alberto to attend. (See Exh. 14; Exh. 15, Agha Tr. 183:18-185:3, 198:21-211:9; Exh. 16, Al Dhaheri Tr. 111:13-128:1; *cf.* Def. Stmt., ¶¶ 46-47.)  Due to Alberto's inability or refusal to fully answer questions regarding NorthStar's finances during the Board Meeting, NorthStar UAE revoked Alberto's POA on October 19, 2017. (See Exh. 5, Rog. No. 3; *cf.* Def. Stmt., ¶ 49.) Deprived of his most effective tool for looting NorthStar, Alberto resigned from NorthStar less than a week later. (See Exh. 17.)

11. Alberto attempts to portray his conduct after the revocation of his POA as measured, reasonable, and guided by the advice of counsel.[5]   (Def. Stmt., ¶¶ 50-52, 56-60.)   In reality, however, Alberto's actions in the final weeks of October 2017 stand out as a frantic effort to raid the company's coffers and divert and destroy the company's business.   After resigning from NorthStar on October 25, 2017, Alberto accessed NorthStar USA's bank account on multiple occasions, from October 26, 2017 through October 31, 2017, transferring and withdrawing more than **$683,364.25** from NorthStar USA's accounts and depositing these funds into his personal bank accounts. (Exh. 6, Alberto Tr. 94:8-22-95:1-22; *cf.* Def. Stmt., ¶¶ 50, 52-53.)   Alberto's withdrawals left NorthStar USA's accounts with a negative balance. (See Exh. 18; *cf.* Def. Stmt., ¶ 44.) Alberto has admitted that he never intended to return – and never has returned – any of these sums. (Exh. 6, Alberto Tr. 94:8-22-95:1-22.)

---

[5]     In fact, Alberto's claim that he acted on the advice of NorthStar's counsel raises the obvious question of how NorthStar's attorneys could have rendered him advice when Alberto was – by virtue of the POA's revocation – in an adverse relationship with NorthStar.   In this respect as in so many others, Alberto's story makes no sense.  *See* Va. R. Prof'l Cond. 1:13, Comments [2] & [10].

12. Even before resigning, Alberto schemed to launch a new, competing company, Vulcan Aviation LLC ("Vulcan"), using at least $11,140.00 in funds that Alberto had misappropriated from NorthStar to fund Vulcan's expenses. (Exh. 19, Vulcan Tr. 19:6-19; 62:1-22, 63:1-5, 65:11-16, 66:13-15, 104:2-21, 107:11-22, 108:1-6; *cf.* Def. Stmt., ¶¶ 50, 52-53.) Alberto intended for Vulcan to supplant NorthStar in its particular niche of selling military helicopters. (Exh. 19, Vulcan Tr. 67:6-8; Exh. 6, Alberto Tr. 61:1-7; *cf.* Def. Stmt. 62-64.) To achieve that aim, Alberto attempted – while still employed by NorthStar – to: a) convince key NorthStar employees to come to work for Vulcan; b) divert NorthStar's customers and vendors to Vulcan; and c) transfer ownership of NorthStar's crucial ITAR license to Vulcan. (Exh. 19, Vulcan Tr. 67:17-22, 68:1-22; Exh. 20, Styers Tr. 147:21-25; Exh. 6, Alberto Tr. 59:20-60:12; *cf.* Def. Stmt., ¶¶ 50, 52-53.) Once Alberto learned that it was not possible to transfer NorthStar's ITAR license, he instead adopted "scorched earth" tactics to sabotage NorthStar's business:

➢ Alberto asked the U.S. State Department to <u>rescind</u> NorthStar USA's ITAR licenses, falsely reporting that NorthStar was ceasing business. (See Exh. 21; Exh. 20, Styers Tr. 125:16-126:5; *cf.* Def. Stmt., ¶¶ 54-57.)

➢ Alberto issued a letter to the UAE Armed Forces – NorthStar's sole customer – falsely stating that NorthStar would no longer provide services under its contract with the UAEAF. (See Exh. 22; *cf.* Def. Stmt., ¶¶ 58-59.)

➢ Alberto continued withdrawing and transferring funds from NorthStar USA and depositing those sums into his personal bank accounts. (Exh. 19, Vulcan Tr. 19:6-19; 62:1-22, 63:1-5, 65:11-16, 66:13-15, 104:2-21, 107:11-22, 108:1-6; Exh. 6, Alberto Tr. 98:1-107:19.)

13. Alberto attempts to rationalize and defend his actions by claiming that (i) he acted on the advice of counsel,[6] (ii) his letters to the State Department and UAEAF did not contain "any false statement," and (iii) he had a "good-faith" belief that NorthStar intended to cease doing business

---

[6] This assertion is disputed. (*See* Exh. 20, Styers Tr. 89:8-90:1, noting that Ms. Styers did not know whether Alberto followed Akin Gump's advice in forming Vulcan, attempting to cancel NorthStar's licenses, or contacting NorthStar's customers.)

with the UAEAF. (Def. Stmt., ¶¶ 58, 57, 60.)  Yet Alberto has admitted that his reports to NorthStar's customer and to the State Department were based upon uncorroborated statements from third parties, "rumors," and "passing" comments made by Dr. Bin Saif <u>years before Alberto's resignation</u>. (Exh. 19, Vulcan Tr. 53:21-22, 54:1-22, 55:1-2, 71:13-21, 100:5-17; *cf.* Def. Stmt., ¶ 60.)  Nor can Alberto credibly claim that his letters to the State Department did not contain "any false statement":  they expressly stated that NorthStar was winding up its business when, in fact, the company remained in business and intended to continue in business if it could overcome the enormous damage Alberto had inflicted on it. (Exh. 20, Styers Tr. 136:1-3; Exh. 4, Becka Tr. 106:6-111:19, 119:16-138:9, 183:1-184:16; *cf.* Def. Stmt., ¶ 60.)

14. Notably, in his Employment Agreement with NorthStar Alberto had acknowledged that he bore a "fiduciary duty of loyalty, fidelity and allegiance to the Company," and that he was to refrain from any "act that would knowingly injure the business, interests, or reputation of the Company." (See Exh. 23, at ¶ 3.4.)  While Alberto maintains that he honored his legal duty of fidelity to NorthStar, the indisputable facts paint a very different picture:  he violated his fiduciary duties during and after his tenure at NorthStar, and damaged NorthStar very seriously. (Exh. 3, Bin Saif Tr. 42:4-10, noting that NorthStar was unable to compete for a significant contract in Iraq after Alberto depleted the company's funds; see also Exh. 5, Rog. Nos. 18-19*; cf.* Def. Stmt., ¶¶ 62-64.)  Far from warranting a dismissal of NorthStar's claims, the undisputed evidence calls for entry of summary judgment in NorthStar's favor, against Alberto.

<u>LEGAL STANDARD</u>

"[S]ummary judgment is appropriate only when there is no issue of material fact and the movant is entitled to judgment as a matter of law." *Jones v. Target Corp.*, 341 F. Supp.2d 583, 586 (E.D. Va. 2004) (Ellis, J.); *see Marron v. Jabe*, No. 1:12cv468, 2013 WL 394812, *2 (E.D. Va. July 30, 2013) (Ellis, J.).  The "moving party must demonstrate that no genuine issues

of material fact are present for resolution." *Turner v. Godwin*, No. 1:15cv770, 2018 WL 284978, *2 (E.D. Va. Jan. 3, 2018) (Ellis, J.). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Those facts . . . which the moving party bears the burden of proving are facts which are material. . . . [D]isputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Turner*, 2018 WL 284978, *2, citing *Anderson*, 477 U.S. at 248.

"In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party." *Id.*, citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157-59 (1970); *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995).

## ARGUMENT

### I. ALBERTO BREACHED HIS FIDUCIARY DUTY EGREGIOUSLY

Alberto's argument against NorthStar's fiduciary-duty claim is wholly legal in nature, as it takes no issue with most of the relevant, undisputed facts recited in the Opening Brief.[7] (See Def. Br. at 19-21; *cf.* Op. Br. at 2-7.) Instead, Alberto places all his chips on the "business judgment rule," arguing that he committed all his self-interested, self-enriching acts based upon his subjective belief that those acts somehow benefited NorthStar. (See Def. Br. at 18-19.) Under governing Virginia law, his argument fails and summary judgment should be entered in NorthStar's favor on this claim.

---

[7] NorthStar's memorandum supporting its summary judgment motion [Dkt. 158] is referenced herein as the "Opening Brief," and is cited herein as "Op. Br. at __."

"The business judgment rule is a presumption that, when making business decisions, the directors of a corporation act on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of th[e] corporation." *Poth v. Russey*, 281 F. Supp.2d 814, 826 (E.D. Va. 2003), citing *Lake Monticello Owners' Ass'n v. Lake*, 463 S.E.2d 652, 655-56 (Va. 1995) (add'l cits. omit'd). Under that rule, a "court generally will not substitute its judgment for that of the board of directors, unless the plaintiff[ ] show[s] that the directors' decision involved a breach of fiduciary duty, such as <u>fraud</u>, <u>bad faith</u>, or <u>unconscionable conduct</u>." *Id.* *See Morefield v. Bailey*, 959 F. Supp.2d 887, 897 (E.D. Va. 2013) (emphs. supp'd).

Under the Virginia Limited Liability Company Act, a "manager, like a corporate director, is required to discharge his duties in accordance with his 'good faith business judgment of the best interests of the limited liability company.'" *Flippo v. CSC Assocs. III, L.L.C.*, 547 S.E.2d 216, 221 (Va. 2001). *See* Va. Code Ann. § 13.1-1024.1(A). But the Act "afford[s] managers… protection from liability in the exercise of that good faith judgment [only] under certain circumstances." *Flippo*, 547 S.E.2d at 221, citing *Simmons v. Miller*, 544 S.E.2d 666 (Va. 2001) (emph. supp'd). *See Penn v. Pemberton & Penn, Inc.*, 53 S.E.2d 823, 829 (Va. 1949). "The unbending rule is that the [manager] must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his [company]. . . . One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself."[8] *Rowland v. Kable*, 6 S.E.2d 633, 642 (Va. 1940) (cits. omit'd).

---

[8]     The fiduciary-duty "rule is wide of application. . . . It rests upon the principle that as long as the confidential relation lasts the . . . fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties. . . . The rule applies alike to agents . . . and managing officers of corporations. . . ." *Rowland v. Kable*, 6 S.E.2d 633, 642 (Va. 1940). Simply put, the "duty of fidelity forbids the director from 'placing himself in a position where his individual interest clashes with his duty to his'" company. *DCG & T ex rel. Battaglia/Ira v. Knight*, 68 F. Supp.3d 579, 587 (E.D. Va. 2014), quoting *Rowland*, 6 S.E.2d at 642.

Importantly, the "<u>burden of proof lies upon the person[ ] who fill[s] the position of trust and confidence to show that the transaction has been fair</u>." *Giannotti v. Hamway*, 387 S.E.2d 725, 731 (Va. 1990) (emph. supp'd), citing *Waddy v. Grimes*, 153 S.E.2d 807, 817 (Va. 1930). "<u>This burden-of-proof principle is an exception to the business judgment rule which limits the power of courts in reviewing the internal management of corporate affairs</u>." *Id.*, citing *Gottlieb v. Economy Stores*, 102 S.E.2d 345, 352 (Va. 1958) (emph. supp'd).

To "come within the protection of [the business-judgment rule], [any] legal advice which [the manager] received and acted upon must have been advice sought in good faith for the benefit of the company." *Flippo*, 547 S.E.2d at 222. But the statutory good-faith advice provision "is expressly not applicable to instances of 'willful misconduct,'" and "<u>fraud</u>, <u>embezzlement</u> and <u>willful and malicious acts</u>" by a manager "constitute 'willful misconduct'." *In re McKnew*, 270 B.R. 593, 645 (Bankr. E.D. Va. 2001) (emphs. supp'd); *see* Va. Code Ann. § 13.1-1025.B. In fact, a fiduciary's "act constitutes 'willful misconduct' if the actor commits an intentional act or omission that is wrongful, regardless of whether injury was intended." *DCG & T ex rel. Battaglia/Ira v. Knight*, 68 F. Supp.3d 579, 588 (E.D. Va. 2014). *See Quinn v. Knight*, No. 3:16cv610, 2016 WL 6471462, *4 (E.D. Va. Nov. 1, 2016).

Furthermore, "an act which is otherwise legal may, nevertheless, breach [a manager's] fiduciary duty." *Flippo*, 547 S.E.2d at 222. When the "advice relied and acted upon [by a manager] was given solely for the purpose of" advancing the manager's interest, "the action was neither sought nor taken with the intent of benefiting" the company. *Id.* Even if the attorney advising the manager arguably had a conflict of interest subjecting him to discipline by the Bar, "such conflict [does] not affect [the manager's] motivation for seeking the advice, the advice given, and the decision to follow that advice." *Id.*

Alberto has utterly failed to meet his probative burden to show that his undisputed actions were fair to NorthStar. *See Giannotti*, 387 S.E.2d at 731; *Waddy*, 153 S.E.2d at 817. As detailed in the Opening Brief, Alberto violated his fiduciary duty in at least five respects: (1) he paid himself and a select coterie of enablers excessive "bonuses" from the fall of 2016 through the fall of 2017 totaling **$11,840,000**, which threatened the company's ability to continue in business beyond the end of the UAE Contract (Pltf. Stmt.,[9] ¶¶ 23, 26, 27); (2) in the fall of 2017, he pocketed funds in NorthStar USA's bank account totaling $5 million which had been ear-marked for pursuing new contracts with other customers, and he converted them for his own use (Pltf. Stmt., ¶ 25); (3) while still employed as NorthStar's managing director, he launched a new company, Vulcan, to take over NorthStar's existing business, and he attempted to lure NorthStar's personnel, vendors, and prospective customers away from NorthStar to Vulcan (Pltf. Stmt., ¶¶ 29, 31); (4) he falsely informed the U.S. State Department and the UAEAF that NorthStar was unable to continue its business, that it would cease all work under the UAE Contract, and that its ITAR license was being surrendered (Pltf. Stmt., ¶ 30); and (5) from October 26, 2017 through October 31, 2017, he converted funds in NorthStar USA's bank account, and he improperly charged sums for his competing company, Vulcan, to NorthStar's credit card.[10] (Pltf. Stmt., ¶ 31.) In each of these respects, Alberto unquestionably betrayed the "total fidelity" he owed to NorthStar and "engage[d] in self-dealing which may [and did] have an[ ] adverse effect on [NorthStar's] interests." *State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 97 (Va. 1988). *See McKnew*, 270 B.R. at 645 (the Virginia LLC Act's good-faith advice provision "is expressly not applicable to instances of

---

[9]    The Statement of Undisputed Facts provided in NorthStar's Opening Brief [Dkt. 158] is cited herein as "Pltf. Stmt., ¶ __," and like the rest of the Opening Brief it is incorporated herein, by reference.

[10]    A "claim for breach of fiduciary duty requires proof of (1) the existence of a fiduciary relationship, (2) breach of a duty arising from [the] relationship, and (3) damages." *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 397 (W.D. Va. 2017), citing *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 666 (Va. 1994).

'willful misconduct,'" and "fraud, embezzlement and willful and malicious acts" by a manager "constitute 'willful misconduct'").

Furthermore, under Article 13 of the MOA, profits and losses were to be allocated in the following manner:  "The Company shall allocate a minimum of ten percent (10%) of its net profits each year to create a statutory reserve. . . . The net profits of [NorthStar UAE] shall be distributed between the Shareholders in the following proportion: Name of Shareholder: ROTANA JET AVIATION LLC – Abu Dhabi Branch 1: 99%. Name of Shareholder: SHEIKH AHMED BIN SAIF BIN MOHAMED AL NAHYAN: 1%."  the MOA's Article 9 established a Board composed of three directors, Dr. Bin Saif, Alberto, and NorthStar's former vice president, Hani Farag.  The same Article provided that "[n]o resolution shall be passed at a meeting of the Board, unless a majority of directors vote in favour [*sic*] of such resolution."  (Exh. 24, at ¶¶ 18-20)

Despite this clear requirement under the MOA, Alberto never allocated the net profits of the company in the manner specified in Article 13.  Instead, on June 29, 2017, Alberto awarded himself $4.54 million dollars in funds derived from the net profits of NorthStar, and did so as a "bonus" payment pursuant to a purported Board resolution which only Alberto signed.  This resolution was not approved by a majority of NorthStar's Board and, indeed, Alberto had not called a Board meeting.  (Exh. 24, at ¶¶ 21-23; Exh. 6, Alberto Tr. 50:6-7, 166:16-19, 213:19-21, 234:20 – 235:3.)

Given the strength and force of this evidence, Alberto clearly bears the "burden of proof . . . to show that the transaction[s]" detailed by NorthStar were "fair."  *Giannotti*, 387 S.E.2d at 731. With only his own, self-serving testimony to counter that evidence (see Def. Br. at 20-21), he falls back upon the argument that he had the legal authority to issue discretionary "bonuses" to NorthStar employees – including himself (see Def. Br. at 19-20) – and that the "bonuses" he issued in 2016 and 2017 served to "retain[ ] . . . key people vital to NorthStar's success."  (Id. at 20-21.)

Of course, Alberto numbers himself among the "key people" he claims NorthStar had to reward. (Id. at 21.) Yet Alberto cites <u>no</u> evidence as to why his most highly rewarded confederates were such "key people." For example, when Hillary "Alexa" Holcombe, as an independent contractor, had worked as Alberto's administrative assistant for no more than <u>two months</u> in the fall of 2016, Alberto authorized a "bonus" to her of $100,000. (Pltf. Stmt., ¶ 22; Exh. 13, Farag Tr. 113:23 – 114:11.) Then, over the course of 2017, he authorized additional "bonuses" to Holcombe totaling $120,000. (Pltf. Stmt., ¶ 25.) <u>Nowhere does Alberto try to explain how or why Holcombe merited such largesse.</u>[11] While Alberto had the legal authority to issue discretionary bonuses – including to his assistant, Holcombe – he does not attempt to explain why she was a "key" employee whom NorthStar needed to retain, to the tune of $220,000 in "bonuses" for less than a year of employment,[12] <u>all while Alberto was terminating other high-ranking NorthStar personnel purportedly to reduce the company's expenditures</u>. (Exh. 13, Farag Tr. 132:10-135:24; Exh. 15, Agha Tr. 128:9-132:7;

Even "an act which is otherwise legal may, nevertheless, breach [a manager's] fiduciary duty." *Flippo*, 547 S.E.2d at 222. Alberto thus cannot hide behind his general bonus-issuing authority to avoid a finding that he breached his fiduciary duty – especially as <u>he bears the probative burden to</u>

---

[11]   Notably, the <u>only</u> evidence generated in discovery relating to the quality of Ms. Holcombe's work indicates that she was incompetent at her job. (Exh. 15, Agha Tr. 75:1 – 123:22; Exh. 13, Farag Tr. 116:23-119:1, 120:22-121:6, 123:10-125:12.)

[12]   As the Court is aware, NorthStar has attempted for months to conduct an oral examination of Ms. Holcombe and to obtain document discovery from her. (See Dkt. 152.) Based on Ms. Holcombe's failure to comply with subpoenas issued to her on NorthStar's behalf and related court orders, this Court extended NorthStar's time to complete such discovery until at least January 4, 2019. (See id.) The Southern District of New York has since issued a show-cause Order directing Ms. Holcombe to appear before that court on January 4, 2019, to explain her failure to comply with NorthStar's deposition subpoena. (See Exh. 25.) Ms. Holcombe failed to appear, and the Southern District of New York has ordered her to appear for deposition on January 11, 2019. NorthStar has noticed Ms. Holcombe's deposition for that day in New York, New York. (See Exh. 26.) NorthStar therefore asks this Court to allow NorthStar an opportunity to supplement this Opposition with any and all relevant evidence which it might obtain from Ms. Holcombe, pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(d)(1)-(3).

show that he acted fairly to NorthStar, and in good faith. *See Giannotti*, 387 S.E.2d at 731; *Waddy*, 153 S.E.2d at 817. Alberto has come nowhere near meeting his burden with respect to the lavish sums he granted to supposedly "key people," such as Ms. Holcombe.[13]

Alberto's failure is even more pronounced vis-à-vis the nearly $12 million in "bonuses" he directed NorthStar to pay to him in his final year with the company. In defense of those payments, he asserts only that he "was principal among the[ ] ['key'] employees and crucial to NorthStar's operations, being the [self-proclaimed] founder of the company and the person who secured and oversaw its business development work, well-performing team, and primary contract." (Def. Br. at 21). Even if one assumes that those representations were accurate (and some certainly are not) (Def. Stmt., ¶¶ 2-4), Alberto fails to demonstrate that he acted in NorthStar's best interest, and in good faith, by funneling nearly $12 million of NorthStar's money – **97 cents out of every dollar generated by the company** in his final year at the helm – into his own pocket. (Pltf. Stmt., ¶ 27.) Much less does Alberto show how setting up a competing company – Vulcan Aviation – **using NorthStar's credit card,** while he remained NorthStar's managing director, either served NorthStar's best interest or could be said to have been a good-faith use of his authority as NorthStar's manager. (Pltf. Stmt., ¶ 31.) And he prudently offers no explanation as to how emptying NorthStar's American bank accounts and taking those funds for himself conceivably could be deemed consonant with his fiduciary duty. Alberto's stated defense to NorthStar's

---

[13]    Both Hani Farag and Marwan Agha have testified that, based on their observations, Alberto was engaged in a romantic relationship or liaison with Ms. Holcombe during his final year with the company. (Exh. 15, Agha Tr. 135:24-137:13; 138:7-140:9; 229:5-231:16; Exh. 13, Farag Tr. 113:23-115:19, 119:18-125:18; 126:12-127:18; 129:23-131:20; 219:4-228:19; Exh. 27.) In fact, NorthStar's vice president, Mr. Farag, was so concerned about Alberto's relations with Ms. Holcombe that, on Mr. Farag's own authority, he procured an insurance policy to insure NorthStar against sexual harassment claims. (Exh. 13, Farag Tr. 123:9-125:18 & Exh. 9.) And as detailed in footnote 12 above, Ms. Holcombe has actively avoided complying with NorthStar's efforts at obtaining discovery from her. On the question of Ms. Holcombe's involvement with Alberto, and other questions, NorthStar asks this Court to allow NorthStar an opportunity to supplement this Opposition with any and all relevant evidence which it might obtain from Ms. Holcombe, pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(d)(1)-(3).

fiduciary-duty claim – *viz.*, that he cannot be found to have breached that duty because he had legal authority to issue "bonuses" – is, therefore, farcical:  it ignores all his acts of malfeasance other than the issuance of such "bonuses," and it even fails to support those "bonus" payments under Alberto's rationale of rewarding "key people."  Alberto's soft-shoe routine only emphasizes why, as detailed in the Opening Brief, summary judgment should be entered for NorthStar on its fiduciary-duty claim.

Moreover, Alberto did <u>not</u> have the authority to bestow bonuses on himself, even if he had such authority with respect to other NorthStar employees.  Alberto's 2014 employment agreement provided that NorthStar "may in its absolute discretion pay [Alberto] a bonus of such amount, at such intervals, and subject to such conditions as [NorthStar] may in its absolute discretion determine from time to time."  (Dkt. 158-9, § 5.2(a).)  Although the POA that NorthStar granted to Alberto empowered him to "fix [employees'] salaries and other conditions of employment" (Dkt. 30-3, ¶ (n)), the POA did not purport to alter the terms of Alberto's employment agreement – and that agreement placed the discretionary authority to issue bonuses to Alberto <u>solely</u> in NorthStar's hands, not Alberto's.  <u>Alberto was not NorthStar</u>,[14] nor did the POA purport to equate him with the company.  As Alberto has acknowledged that during his tenure as NorthStar's managing director he never called a single board meeting (Exh. 6, Alberto Tr. 50:6-7, 166:16-19, 213:19-21, 234:20 – 235:3), it was impossible for NorthStar to have exercised its discretionary authority to issue bonuses to him – and it never did.  (Exh. 11, Rog. No. 8.)  Even though up until October 2016, Alberto repeatedly told NorthStar's vice president for human resources, Hani Farag,

---

[14]   Alberto's deposition testimony and, indeed, his summary judgment motion reflect his refusal to distinguish between himself and NorthStar, despite his admission that he has never held an ownership interest in the company. (Exh. 6, Alberto Tr. 29:3-5, 41:13-15, 52:9-15, 54:13-16.)  While Alberto views himself as indistinguishable from NorthStar – along the lines of Louis XIV's quip, "*l'état c'est moi*" – it is indisputable that he was not NorthStar's living embodiment; he was an employee, nothing more.

that Alberto had obtained all necessary approvals for the "bonuses" that Alberto ordered to be made to himself (Exh. 13, Farag Tr. 60:3-17; Exh. 4), those statements were false:  Alberto <u>never</u> obtained approval from NorthStar for the "bonuses" he pocketed during his tenure at the company, including the enormous sums he siphoned in 2016 and 2017.  (Exh. 11, Rog. No. 8.)  For this reason, too, summary judgment should be entered in NorthStar's favor on its fiduciary-duty claim, and against Alberto.

## II. NORTHSTAR DID NOT RATIFY ALBERTO'S ACTS OF CONVERSION

As with his argument relating to NorthStar's fiduciary-duty claim, Alberto offers no excuse for accessing NorthStar's bank accounts in late October 2017 and converting the funds in those accounts – close to three quarters of a million dollars – to his own use.  With no legitimate explanation for that specific theft, Alberto confines his argument to the "bonuses" he lavished on himself in the final year of his employment and asserts, in essence, that NorthStar constructively knew what he was doing but just accepted it.  That argument fails on the law and on the facts.

A company "has no way of acquiring knowledge other than through its officers and agents." *Fitch v. Roberson Elec. Co., Inc.*, No. 91-0054-C, 1992 WL 88177, *2 (W.D. Va. Apr. 3, 1992), citing *Atlantic Trust Co. v. Union Trust Co.*, 69 S.E. 975, 977 (Va. 1911).  Thus, a company can only ratify an officer's payment of "bonuses" to himself or to others based upon the <u>actual</u> knowledge of its agents.  *See id.*  "What constitutes a waiver or ratification depends upon the particular facts of each case."  *Kewanee Private Utilities Co. v. Norfolk So. R. Co.*, 88 S.E. 95, 99 (Va. 1916).  No Virginia authority holds that a company "has constructive knowledge of all facts which its officers could have discovered."  *Fitch*, 1992 WL 88177, *3.  In fact, when an officer falsely tells another officer or employee that he is authorized to have "bonus" payments issued to himself, such a representation does not place the company on constructive knowledge of the

culprit's acts.[15] *See id.*, *4. Even Alberto concedes that "the use of deception may negate [the] imputation of . . . institutional knowledge to a corporate plaintiff and undermine a ratification defense." (Def. Br. at 15.)

Yet Alberto asks the Court to disregard these binding legal principles, and to ignore the record of his deceptive acts: he avers that his "payments" – his euphemism for the unauthorized "bonuses" – "appeared plainly upon [NorthStar's] books, and no person with the authority to review those books was ever denied the right to do so." (Def. Br. at 16.) He declines to mention that each year until October 2016, he signed a statement proffered to him by human resources director Hani Farag certifying (falsely) that Alberto had received the appropriate approval for taking a bonus. (Exh. 13, Farag Tr. 60:3-25.) Alberto also omits the fact that during 2017 there were no financial statements or records available for review which might have alerted NorthStar's Chairman to what Alberto was doing. (Exh. 24, at ¶¶ 11-17.) Alberto fails, as well, to mention that when NorthStar's Chairman called a board meeting in October 2017 to demand an explanation for the large sums of money which the Chairman had, by then, learned Alberto had been taking from the company, Alberto had no answers. (Exh. 3, Bin Saif Tr. 180:9 – 181:10.) These facts illustrate Alberto's use of deception to disguise the fact that his "bonuses" were unauthorized and excessive: he deliberately misled NorthStar's top human-resources executive into believing that Alberto had obtained the necessary "bonus" authorization, and he kept NorthStar's Board in the dark regarding the purported bases for his "bonuses" by never calling a single Board meeting during his tenure as managing director and Board member. As Alberto acknowledges that "the

---

[15] While this Court has relied upon a Ninth Circuit decision to hold that "[i]mplied consent is a well-recognized bar to conversion claims," *Devil's Advoc., LLC v. Zurich Am. Ins. Co.*, No. 1:13cv1246, 2014 WL 5161197, *8 (E.D. Va. Oct. 10, 2014), citing *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902 (9th Cir. 2008) (applying California law), federal courts in California have declined to extend *Fremont General*'s holding. *See, e.g., Bailey v. Cty. of San Joaquin*, 671 F. Supp.2d 1167, 1178-79 (E.D. Cal. 2009). Alberto's reliance on *Devil's Advocate* is, thus, misplaced (*cf.* Def. Br. at 15-16), and he cites no other authorities from within the Fourth Circuit or from Virginia's courts that have followed *Fremont General*.

use of deception may negate [the] imputation of . . . institutional knowledge to a corporate plaintiff and undermine a ratification defense" (Def. Br. at 15), the undisputed facts defeat his argument.

III. THE UNDISPUTED FACTS PROVE ALBERTO'S UNJUST ENRICHMENT

Alberto attempts to avoid NorthStar's unjust-enrichment claim by asserting three separate arguments: (1) an unjust-enrichment theory is unavailable to NorthStar because of Alberto's written employment agreement (see Def. Br. at 21-22); (2) NorthStar paid the "bonuses" Alberto pocketed "voluntarily" (id. at 22); and (3) Alberto's "compensation" was "justified and paid in consideration of value provided . . . to the company." (Id.) These arguments, too, fail under the law and the undisputed facts.

A. Alberto's Employment Agreement does not Embrace the Funds he Stole

Generally, an "action for unjust enrichment is unavailable . . . when an express contract exists that governs payment for the services rendered." *Lion Assocs., LLC v. Swiftships Shipbuilders, LLC*, 475 Fed. Appx. 496, 503 (4th Cir. 2012) (unpub'd). That is because "when such an express contract exists, there is no need to imply one [as] the parties have already negotiated an agreement." *Id.*, citing *Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) (int'l punct. omit'd). "But this 'rule, according to its terms, applies only when there is an express, enforceable contract between the parties covering the services for which [equitable] recovery is claimed.'" *Id.*, quoting *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009). "If an express contract exists but does not cover the services rendered, a cause of action for unjust enrichment remains available." *Id.*

Offering no defense for his taking of funds from NorthStar's bank accounts in late October 2017, Alberto instead confines his argument to the so-called "bonuses" he ordered for himself from November 2016 through October 2017. (Def. Br. at 23 n.4.) He maintains that because his employment agreement allowed for the payment of bonuses (at NorthStar's sole discretion), NorthStar cannot maintain an unjust-enrichment claim for those unauthorized payments. (Def. Br.

at 23.)  Alberto fails to recognize, however, that "this rule, according to its terms, applies only when there is an express, enforceable contract . . . <u>covering the services for which [equitable] recovery is claimed</u>."  *Lion Assocs.*, 475 Fed. Appx. at 503 (int'l punct. omit'd) (emph. supp'd); *see Mongold*, 677 S.E.2d at 292.  "If an express contract exists <u>but does not cover the services rendered, a cause of action for unjust enrichment remains available</u>."  475 Fed. Appx. at 503 (emph. supp'd).  <u>NorthStar's allegations of unjust enrichment are not predicated upon any "services rendered" by Alberto pursuant to his employment agreement</u>; rather, they are based upon his outrageous misuse of the authority and trust reposed in him by NorthStar, to use his position as managing director to enrich himself at NorthStar's expense and to the point of nearly ruining the company.  As detailed in section I above, under his employment agreement Alberto had no authority to issue himself bonuses; rather, that authority lay solely within <u>NorthStar</u>'s discretion. (Dkt. 158-9, § 5.2(a).)  Nor did the POA issued to Alberto authorize him to circumvent or change the terms of his employment agreement (see Dkt. 30-3, ¶ (n)) – <u>particularly as the POA predated the employment agreement in effect in 2016 and 2017, which expressly superseded all previous agreements and understandings between Alberto and NorthStar</u>.  (See Def. Br. at 5, ¶ 15; id. at 23; Dkt. 158-9 at 2; Dkt. 158-9, § 15.9.)  Alberto's contention that the unjust-enrichment claim fails because it relates to his contractually-determined "compensation" is thus specious.

B.  <u>NorthStar did not Pay Alberto's "Bonuses" Voluntarily</u>

Even more startling is Alberto's assertion that NorthStar paid his "bonuses" voluntarily. Despite making that conclusory argument (Def. Br. at 22), tellingly Alberto cites no evidence in support of it.  (See id. at 21-24.)  In fact, the <u>only</u> relevant evidence before the Court shows that NorthStar did <u>not</u> voluntarily pay the sums in question:  Alberto misled NorthStar's officers and ownership regarding whether he had been duly authorized to receive such payments, and whether the payments were merited by the company's performance.  (Exh. 13, Farag Tr. 60:3-25; Exh. 11,

Rog. No. 8.)  Because Alberto lied to NorthStar's human resources director about his authorization

for such payments and never provided an accurate report to NorthStar's ownership regarding the

company's performance in Alberto's final two years as managing director, NorthStar could not

assent to Alberto's "bonuses."  *See Fitch*, 1992 WL 88177, *2; *Atlantic Trust*, 69 S.E. at 977.

Alberto therefore cannot show that NorthStar "voluntarily" paid the improper "bonuses" to

Alberto, and which Alberto – abusing his position as managing director – ordered to be paid.

C.  Alberto's "Bonuses" were neither Justified nor Paid in Consideration of Value

Finally, Alberto fails to show that the "bonuses" he ordered for himself were "justified and

paid in consideration of value provided . . . to the company."  (Def. Br. at 22.)  The only evidence

to which Alberto points to support this contention is his own, self-serving testimony (see id. at 7-

8, ¶¶ 31-37) – but even that only stands for the fact that Alberto consulted with human resources

director Hani Farag and finance director Nrasib Ali in determining bonuses to be paid for personnel

below the senior management level.  (Exh. 13, Farag Tr. 53:17-54:12; 55:9-56:16.)  There was no

review process in place for the unauthorized "bonuses" which Alberto paid himself out of the

company's coffers.  (Id. at 53:17-54:12, 55:9-56:16, 60:3-25; Exh. 2, Ali Tr. 167:4-10.)  Alberto

points to no evidence supporting his one-sided view that the fabulous sums of money he pocketed,

at his own direction, were "earned."

In reality, the huge sums that Alberto directed into his own pocket in his final year with the

company were manifestly unmerited, based upon his failure to procure any new business for

NorthStar after the UAE Contract was executed in 2013 (see Def. Br. at 5, ¶ 21) and the fact that

in his final year with the company – with no new business on the horizon[16] – Alberto pocketed 97

---

[16]    Alberto misleadingly insists that NorthStar's liquidity in 2016 and 2017 supported the jaw-dropping
"bonuses" he ordered for himself.  (See Def. Br. at 7-8, ¶¶ 32, 37.)  Alberto's own expert in this litigation, Bruce
Benesh, has defined "liquidity" as "the cash that you would have on the balance sheet or other short-term instruments

cents out of every dollar of gross revenue that NorthStar brought in. (Pltf. Stmt., ¶ 27; Dkt. 158-36 at 1-2.) Having failed resoundingly to procure new business for NorthStar despite five years of effort (Pltf. Stmt., ¶ 27; Exh. 6, Alberto Tr. 248:15-17; Exh. 2, Ali Tr. 152:18-22, 153:1-8), Alberto scarcely deserved to continue drawing his million-dollar annual salary, much less the colossal "bonuses" with which he rewarded himself for his failure. In fact, during his tenure at NorthStar Alberto was <u>overcompensated</u> by a figure of **$23,520,056.00** relative to managing officers for peer-group companies. (Exh. 29, at 5.) Alberto's contention that the near-twelve million dollars in "bonuses" he ordered for himself in his final year at NorthStar was "justified and paid in consideration of value provided… to the company" (Def. Br. at 22) is, thus, risible in the extreme.

IV. <u>THE UNDISPUTED FACTS PROVE ALBERTO DEFAMED NORTHSTAR *PER SE*</u>

Finally, Alberto erroneously contends that the evidence does not establish his defamation *per se* of NorthStar because, he claims, his defamatory statements: (1) were not actionable; (2) purportedly were true when he made them; (3) were made on the advice of counsel; and (4) were subject to a qualified privilege. (Def. Br. at 26-29.) As elsewhere in the Opposition, Alberto misreads both the law and the facts.

A. <u>Alberto's Statements were Actionable</u>

Alberto begins by confusing the law governing statements defaming individuals *per se* with the law governing statements which defame corporations and other companies *per se*. "The elements of defamation are (1) publication of (2) an actionable statement with (3) the requisite intent. To be actionable, the statement must be both false and defamatory." *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (cit. omit'd). "As to intent, the requisite standard varies based on

---

that can be turned into . . . cash, and the . . . undrawn amounts in your . . . debt instrument or your revolvers." (Exh. 28, Benesh Tr. at 75, 11.1-4) (emph. supp'd). In other words, liquidity is a measure of <u>immediate cash availability</u> – it is not a forward-looking indicator of a company's financial health or the health of its business. And as NorthStar's expert, Leslie Robson, C.P.A., has opined, NorthStar's financial condition in the final two years of Alberto's tenure at the company was poor. (See Dkt. 158-36 at 1-4; Exh. 29, at 4-5.)

the status of the plaintiff as a public or private figure." *Taylor v. CNA Corp.*, 782 F. Supp.2d 182, 201 (E.D. Va. 2010).

"[D]efamatory words that prejudice a person in his or her profession or trade are actionable as defamation *per se*." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003) (punct. & cit. omit'd). A "corporation may be defamed *per se* by statements 'which cast aspersion on its . . . credit, efficiency or its prestige or standing in its field of business.'" *Swengler v. ITT Corp.*, 993 F.2d 1063, 1071 (4th Cir. 1993) (punct. & cit. omit'd). *See Dangerfield v. WAVY Broadcasting, LLC*, 228 F. Supp.3d 696, 704 (E.D. Va. 2017). If "a plaintiff establishes a claim for defamation *per se*, Virginia law presumes that the plaintiff suffered actual damage to its reputation and, therefore, does not have to present proof of such damages." 993 F.2d at 1071, citing *Fleming v. Moore*, 275 S.E.2d 632, 636 (Va. 1981). *See Dangerfield*, 228 F. Supp.3d at 704; *JTH Tax, Inc. v. Grabert*, 8 F. Supp.3d 731, 741 (E.D. Va. 2014). "A defamatory statement may be made by inference, implication or insinuation." *Fuste*, 575 S.E.2d at 861. Thus, a "court 'should consider not only the words themselves but also the inferences fairly attributable to them.'" *Nexus Servs., Inc. v. Vance*, No. 5:17cv72, 2018 WL 542977, *5 (W.D. Va. Jan. 24, 2018), quoting *Shaheen v. WellPoint Companies, Inc.*, 490 Fed. Appx. 552, 555 (4th Cir. 2012) (unpub'd).

Alberto acknowledges that his defamatory statements in question were published in two letters that he wrote and sent: "(1) [his] statement to the State Department that NorthStar USA 'will no longer be in the business of manufacturing, exporting or brokering defense articles or defense services,' and (2) his statement to the UAEAF that NorthStar USA['s] 'activities associated with [the UAE Contract] will cease effective October 25, 2017.'" (Def. Br. at 26.) While he avers that these statements are not actionable because they did not "involve attacks on [NorthStar's] character or conduct" (id. at 28), that is not the standard for a corporate plaintiff; instead, statements are

defamatory *per se* when they "cast aspersion on [the company's] . . . credit, efficiency or its prestige or standing in its field of business." *Swengler*, 993 F.2d at 1071 (emphs. supp'd). There is no question that Alberto's false statement to the U.S. Statement Department that NorthStar USA was ceasing business, as well as his false statement to the UAEAF that NorthStar was ceasing all work under the UAE Contract, "cast aspersion on [NorthStar's] . . . credit, efficiency or its prestige or standing in its field of business," *id.*: Alberto falsely reported that NorthStar was ceasing to conduct its business of selling military helicopters, and that it was breaching its one and only customer contract. Such false statements could only "cast aspersion" on NorthStar's credit, efficiency, and prestige in its field, and thus are quintessentially defamatory *per se*.

B. Alberto's Statements were False

Consistent with Alberto's "I-am-NorthStar" view of reality, he avers that his defamatory statements were true when he made them because "he was the only senior official responsible for controlling [NorthStar's] operations and could direct the cessation of ITAR-related activity due to the revocation of his" POA. (Def. Br. at 26.) In other words, he claims that because he was resigning from NorthStar it would cease business and, therefore, his statements "were true at the time he made them" (id.) – even though NorthStar's present and continued existence, and on-going business, alone prove him wrong.[17]

More importantly, Alberto cites no legal or factual support for his theory that NorthStar UAE's termination of his POA meant that he could no longer function as managing director of NorthStar USA, and that he therefore had to "direct the cessation of ITAR-related activity." (Id.) Indeed, Alberto maintains that NorthStar UAE only formed its U.S. subsidiary, NorthStar USA, in order

---

[17] In fact, if Alberto's theory were correct then his resignation alone served as tortious interference with the UAE Contract. While that claim was previously dismissed in this action, Alberto's tacit admission in this respect is yet a further demonstration of his flagrant violation of his fiduciary duty to NorthStar and, indeed, his actual malice in making the statements in question: by resigning in a snit because NorthStar cancelled his POA, Alberto put his own interest ahead of the company's and attempted to torpedo its business by misrepresenting NorthStar's condition.

to satisfy State Department requirements for the export of military materiel.  (See id. at 4, ¶¶ 13-16.)  He is clear in asserting that he "acted as CEO of both NorthStar UAE and NorthStar USA." (Id., ¶ 16.)  He is equally clear in stating that "<u>NorthStar UAE</u> executed a [POA] in favor of . . . Alberto that gave him broad authority to control the day-to-day functions of <u>NorthStar UAE</u>." (Id. at 5, ¶ 17) (emphs. supp'd).  <u>Alberto never explains why the POA was necessary, nor does he (nor can he) show why **NorthStar USA's** "ITAR-related activity" might be affected by the termination of his POA **for NorthStar UAE**</u>.  (*Cf.* id. at 10, ¶ 50.)  In short, Alberto's POA-related argument is nothing more than a pretext to cover the groundlessness – and malice – of his statements.

## C.  Alberto Fails to Prove his Advice-of-Counsel Defense

Alberto also raises an advice-of-counsel defense to NorthStar's defamation claim.  (Def. Br. at 25-27.)  This argument fails as well, however, as Alberto does not meet his burden of proof on any of that defense's elements.  "Generally, the defendant who pleads an affirmative defense has the burden of proof."  *Bengston v. Gibbs*, 884 F.2d 1387 (4th Cir. 1989) (unpub'd).  "Where . . . the movant seeks summary judgment on an affirmative defense, it must <u>conclusively</u> establish all essential elements of that defense."  *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (emph. supp'd).  In "the case of any tort, such as libel, proof of which requires the plaintiff to show malice on the part of the defendant, Virginia recognizes the principle of law that acting on advice of counsel is an affirmative defense."  *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 76 (Bankr. E.D. Va. 1982).

"To establish the [advice-of-counsel] defense, [a defendant] must prove (1) that he sought the advice of reputable counsel[18] because he wished to be informed of the law; (2) that he fully,

---

[18]  Alberto erroneously asserts that the first element of the advice-of-counsel defense is "full disclosure of all pertinent facts <u>to an expert</u>."  (Def. Br. at 25) (emph. supp'd), quoting *U.S. ex rel. DeCesare v. Americare In Home Nurs'g*, 757 F. Supp.2d 573, 586 (E.D. Va. 2010), citing *United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000).

correctly, and honestly disclosed all material facts which he knew . . . or should have known upon a reasonably careful investigation . . . ; and (3) that in good faith he followed his counsel's advice" in publishing the defamatory statements. *Chipouras v. A J & L Corp.*, 290 S.E.2d 859, 861 (Va. 1982). "The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney-client communication." *Shaheen*, 490 Fed. Appx. at 557. Alberto fails to prove these elements at all, much less "conclusively." *See Ray Commons.*, 673 F.3d at 299.

The first flaw in Alberto's advice-of-counsel argument is that he does not show that he consulted with his own legal counsel for any advice at all. Rather, he avers that sometime in October 2017 he "and Amy Styers, NorthStar's compliance officer, consulted with . . . NorthStar's corporate counsel, regarding NorthStar's responsibilities" vis-à-vis NorthStar USA's ITAR license. (Def. Br. at 10, ¶ 52) (emph. supp'd). He also asserts that on the date of his resignation – October 25, 2017 – he and Terry Key "participated in further phone calls with [NorthStar's] attorneys to discuss NorthStar's ITAR responsibilities. . . ." (Id. at 11, ¶ 53.) It is therefore undisputed that on the occasions in question, Alberto sought legal advice (purportedly) on behalf of NorthStar from NorthStar's counsel.[19] He thus cannot satisfy the first element of the advice-of-counsel defense, which requires that "the client assert[ ] a claim or defense, and attempt[ ] to prove that claim or defense by disclosing or describing an attorney-client communication." *Shaheen*,

_____

The decisions cited by Alberto applied D.C. law and Maryland law, respectively, not Virginia law. Whatever the elements of an advice-of-counsel defense might be in those jurisdictions, Virginia requires consultation with an attorney, not an "expert." To the extent Alberto purports to rely on any advice he claims to have received from NorthStar's compliance officer, Amy Styers, such advice is immaterial to an advice-of-counsel defense.

[19]   *See* Va. R. Prof'l Cond. 1:13, Comment [2] ("When one of the constituents of an organizational client communicates with the organization's lawyer in that person's organizational capacity, the communication is protected [as an attorney-client communication]. . . . This does not mean, however, that constituents of an organizational client are the clients of the lawyer") (emph. supp'd). *See also id.*, Comment [10] ("Care must be taken to assure that the individual [organizational constituent] understands that, when there is . . . [an] adversity of interest [between him and the organization], the lawyer for the organization cannot provide legal representation for that constituent individual").

490 Fed. Appx. at 557 (emph. supp'd); *see Chipouras*, 290 S.E.2d at 861 ("To establish the [advice-of-counsel] defense, [a defendant] must prove . . . that <u>he</u> sought the advice of reputable counsel because <u>he</u> wished to be informed of the law . . . and . . . that in good faith he followed <u>his</u> counsel's advice") (emphs. supp'd). <u>Alberto was not the client</u>. He has only shown that <u>NorthStar</u>'s attorneys provided legal advice to <u>NorthStar</u>, not to him, regarding NorthStar's ITAR obligations, and Alberto therefore cannot base an advice-of-counsel defense <u>adverse to NorthStar</u> on those communications.

Second, Alberto has not shown that "he fully, correctly, and honestly disclosed all material facts which he knew . . . or should have known upon a reasonably careful investigation." *Chipouras*, 290 S.E.2d at 861. In fact, <u>Alberto does not reveal what he told NorthStar's counsel</u>. (See Def. Br. at 11, ¶ 53.) His conclusory assertion that he "provided [them with] all of the facts and details about the situation and sought legal advice on how to proceed" is therefore entitled to no weight whatsoever, as he shows no evidence of what he told NorthStar's attorneys. (Id.)

Third, Alberto has failed to show that he "in good faith . . . followed <u>his</u> counsel's advice" in publishing the defamatory statements, *Chipouras*, 290 S.E.2d at 861 (emph. supp'd), as he has not shown (a) what advice he claims to have received, (b) that he consulted with his own counsel (rather than NorthStar's), or (c) that he acted in good faith. <u>Alberto does not identify the advice he claims to have received from NorthStar's attorneys</u>. While it seems preposterous that NorthStar's counsel would have advised Alberto to falsely report to the State Department and to the UAEAF that NorthStar was ceasing business and that it was repudiating future performance under its only business contract, that is what Alberto now asks the Court to infer, <u>without evidence</u>. This groundless argument should be rejected.

Furthermore, as detailed above, Alberto has not shown (and cannot show) that he ever consulted with an attorney of his own. Absent such evidence, Alberto fails to show that he "followed his counsel's advice" in making defamatory statements about NorthStar – much less that he did so in good faith. *See Chipouras*, 290 S.E.2d at 861. Moreover, nothing about the evidence before the Court suggests that Alberto acted in good faith when he made false statements to the State Department and the UAEAF defaming NorthStar's credit, efficiency, and ability to conduct business. "A thing is deemed to be done in good faith . . . where it is in fact done honestly, whether it is done negligently or not." *Moore v. Potomac Savs. Bank of Wash., D.C.*, 169 S.E.2d 922, 925 (Va. 1933) (int'l punct. & cit. omit'd). *See City of Riverdale v. Diercks*, 806 N.W.2d 643, 656 (Iowa 2011) (defining "good faith" as "that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking . . . being faithful to one's duty or obligation"); *Nizzardo v. Capone*, No. 136020104S, 2016 WL 8259422, *3 (Conn. Super. Ct. Dec. 28, 2016) (defining "good faith," as an element of the advice-of-counsel defense, identically with *Diercks*' definition).

The undisputed facts show that Alberto acted in <u>bad faith</u> when he made his false and defamatory statements about NorthStar: he could have had no "honesty of purpose, freedom from intention to defraud . . . [or] faithful[ness] to [his] duty" to NorthStar when he led the State Department and the UAEAF to believe that NorthStar was ceasing its business and would breach its contract with the UAEAF, all <u>while Alberto was launching his own, competing venture –</u> <u>Vulcan – and attempting to lure NorthStar's customers, vendors, and personnel to Vulcan, as well</u> <u>as trying to transfer NorthStar's ITAR license to Vulcan</u>. *Diercks*, 806 N.W.2d at 656; *accord Moore*, 169 S.E.2d at 925. (See Pltf. Stmt., ¶¶ 29-31.) Alberto's contention that he acted in good faith evinces plenty of audacity, but nothing whatsoever of fidelity.

D. <u>Alberto Fails to Support his Qualified Privilege Argument</u>

Finally, Alberto asserts the affirmative defense of qualified privilege, claiming that his "sole purpose in sending the [defamatory] letters was to ensure compliance with ITAR and other applicable law, both for his own good and for the good of NorthStar." (Def. Br. at 27.) While NorthStar agrees that Alberto acted "for his own good," the factual record makes clear that his acts were anything but good for NorthStar. In reality, Alberto not only defamed NorthStar, but he did so maliciously. Summary judgment, therefore, should be entered in NorthStar's favor on this claim, and both actual and punitive damages should be awarded against Alberto.

"[U]nder Virginia law . . . communications between persons on a subject in which the persons have an interest or duty are occasions of privilege. . . ." *Taylor*, 782 F. Supp.2d at 201, citing *Larimore v. Blaylock*, 528 S.E.2d 119, 121 (Va. 2000). But it is "settled that [such] privilege is qualified and is lost 'if a plaintiff proves by clear and convincing evidence that the defamatory words were spoken with common-law malice.'" *Id.*, quoting *Southeastern Tidewater Opp. Project, Inc. v. Bade*, 435 S.E.2d 131, 132 (Va. 1993). "Common-law malice, in turn, is 'behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made.'" *Id.*, quoting 435 S.E.2d at 132; *see McCray v. Infused Soluts., LLC*, No. 4:14cv158, 2018 WL 2392507, *8 (E.D. Va. May 25, 2018). *See also JTH*, 8 F. Supp.3d at 741 ("'Actual malice' is defined under Virginia law to include 'a statement made with knowledge that it was false or with reckless disregard of whether . . . it was false'"); *Newspaper Pub'g Corp. v. Burke*, 224 S.E.2d 132, 136 (Va. 1976).

"In other words, to avoid the qualified privilege [a] plaintiff must show that the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." *Taylor*, 782 F. Supp.2d at 202. A "plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence

concerning motive or care never bears any relation to the actual malice inquiry." *JTH*, 8 F. Supp.3d at 741, citing *Harte-Hanks Communs., Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).

NorthStar does not dispute that the State Department and the UAEAF had an interest in the subject matter of Alberto's communications: the former oversees ITAR licenses, and the latter was NorthStar's customer. The problem, however, is that not only were Alberto's statements false and defamatory, but there is no question that he made them <u>maliciously</u>. In view of Alberto's clear effort (while he remained employed as NorthStar's managing director) to launch a competing company, Vulcan, and to divert NorthStar's personnel and resources to Vulcan – <u>including NorthStar's ITAR license</u> – the common-law malice behind Alberto's statements is simply unquestionable.[20]  *See Taylor*, 782 F. Supp.2d at 202. Circumstantial though it may be, the evidence is not just clear and convincing, but overwhelming and compelling: on these facts, no reasonable jury could conclude that Alberto <u>lacked</u> malice in making his false reports to the State Department and the UAEAF. An award of summary judgment for NorthStar is thus appropriate.

NorthStar respectfully asks that the Court deny Alberto's Motion and, instead, enter summary judgment in NorthStar's favor on all claims. The undisputed evidence in this matter demonstrates that under controlling law Alberto breached his fiduciary duty to NorthStar, converted NorthStar's funds, unjustly enriched himself at NorthStar's expense, and defamed NorthStar *per se*. No reasonable jury could find otherwise, and summary judgment is therefore appropriate, reserving for trial only the question of the quantum of NorthStar's damages.

Respectfully submitted,

NORTHSTAR AVIATION, L.L.C. &
NORTHSTAR AVIATION USA LLC

---

[20] That malice not only overcomes the qualified privilege which Alberto asserts, but it also calls for a punitive-damages award. *See JTH Tax, Inc. v. Grabert*, 8 F. Supp.3d 731, 741 (E.D. Va. 2014) ("To recover punitive damages, a plaintiff must demonstrate through clear and convincing proof that the defendant made the statements with 'actual malice'").

By: DUNLAP BENNETT & LUDWIG PLLC

<u>/s/ Kevin T. Streit</u>
Of Counsel

Thomas M. Dunlap  (VSB No. 44016)
Ellis L. Bennett  (VSB No. 71685)
Ben S. Barlow  (VSB No. 67933)
Eric L. Olavson  (VSB No. 87872)
DUNLAP BENNETT & LUDWIG PLLC
211 Church Street SE
Leesburg, Virginia 20175
(703) 777-7319
(703) 777-3656 (facsimile)
tdunlap@dbllawyers.com
ebennett@dbllawyers.com
bbarlow@dbllawyers.com
eolavson@dbllawyers.com

Noah Fontanez, Esquire, *Pro Hac Vice*
DUNLAP BENNETT & LUDWIG PLLC
616 South Boston Avenue, Suite 60
Tulsa, Oklahoma 74119
(918) 505-7851
(918) 505-7851 (facsimile)
nfontanez@dbllawyers.com

*Counsel for the Plaintiffs/Counterclaim Defendants*

Kevin T. Streit  (VSB No. 45024)
Kyle C. Harrison  (VSB No. 44141)
DUNLAP BENNETT & LUDWIG PLLC
8003 Franklin Farms Drive, Suite 220
Richmond, Virginia 23229
(804) 823-7776
(804) 977-2680 (facsimile)
kstreit@dbllawyers.com
kharrison@dbllawyers.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 7th day of January, 2019, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to the following:

Declan Leonard, Esq.
Clyde E. Findley, Esq.
Nicholas R. Johnson, Esq.
David Deitch, Esq.
Ryen Rasmus, Esq.
Samantha Collins, Esq.
Berenzweig Leonard LLP
8300 Greensboro Drive, Suite 1250
McLean, Virginia 22102
dleonard@berenzweiglaw.com
cfindley@berenzweiglaw.com
njohnson@berenzweiglaw.com
ddeitch@berenzweiglaw.com
scollins@berenzweiglaw.com
*Counsel for defendant/counterclaim plaintiff Alden Burt Alberto*

      /s/ Kevin T. Streit
Kevin T. Streit  (VSB No. 45024)
Dunlap Bennett & Ludwig, PLLC
8003 Franklin Farms Drive, Suite 220
Richmond, Virginia 20175
(804) 823-7776
(804) 977-2680 (facsimile)
kstreit@dbllawyers.com
*Counsel for Plaintiffs/Counterclaim Defendants*