Exhibit 4

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

-----------------------------------x

NORTHSTAR AVIATION, LLC, et al.,     :

 Plaintiffs/Counterclaim Defendants,: Civil Action

            vs.                      : No. 1:18cv191-

ALDEN BURT ALBERTO,                  : TSE-JFA

  Defendant/Counterclaim Plaintiff. :

-----------------------------------x


VIDEOTAPED DEPOSITION OF LYLE BECKA

McLean, Virginia

Tuesday, November 6, 2018

9:32 a.m.


Reported by:  Elizabeth Mingione, RPR

Job No.:  44471

1      A.    Yes.

2      Q.    Was anyone else involved in that process?

3      A.    **Gary Hodgson, maybe Pablo.**

4      Q.    Did you have decision-making authority with

5 respect to the negotiation of that contract?

6      A.    **I believe so.  Yes.**

7      Q.    Was Terry Key involved in that process?

8      A.    **He probably was at one point.  Yes.**

9      Q.    Did you report to Terry Key?

10     A.    **I did.**

11     Q.    And did you report to Terry Key with

12 respect to the submission of the UAE contract?

13     A.    **I don't remember from a time line**

14 **perspective.  I didn't start off reporting to Terry**

15 **Key, so --**

16     Q.    Okay.  Is it your understanding that the

17 company has properly performed under that UAE

18 contract?

19     A.    **Generally, yes.**

20     Q.    When was final delivery of the final

21 helicopter?

22     A.    **January or February of 2017.**

1    Q.    Are you aware of any outstanding

2    performance obligations with respect to that contract?

3    **A.    Yes.**

4    Q.    What are they?

5    **A.    Some COMSEC modifications.**

6    Q.    Is that part of the spare parts?

7    **A.    No.**

8    Q.    Okay.  Were you involved in the signing of

9    the UAE contract?

10   **A.    I don't remember.  I don't think so.**

11   Q.    Okay.  Are you aware of who signed the UAE

12   contract?

13   **A.    I'm not.**

14   Q.    Okay.

15   **A.    I expect it would have been Reno.**

16   Q.    What's your understanding as to Reno's

17   involvement in the submission and negotiation of the

18   UAE contract?

19   **A.    From the end user and jack perspective, I**

20   **never saw him involved in any of it.**

21   Q.    So let's go back to performance

22   obligations.  You said that there was a -- what did

1          Q.     Have you hired anyone since being

2    reemployed by NorthStar?

3          **A.     No.**

4          Q.     Let's talk about your reemployment.

5          **A.     Okay.**

6          Q.     Walk me through, in as much detail as you

7    can remember, how that came about.

8                 MR. STREIT:  Objection to form.

9          **A.     As I can recollect, again I was -- I was**

10   **laid off.  I was not -- or I was terminated.  I was**

11   **not part of NorthStar.**

12                **Sometime, I want to say it was Sunday the**

13   **22nd, I got call from one of the guys that work in Abu**

14   **Dhabi and said that it didn't -- they were briefed**

15   **that they may not get paid.  My first intent was to**

16   **see if I could find other work for these guys.  They**

17   **were very good guys.  We've known each other for 15**

18   **years.  And even though I was outside of the company,**

19   **I wanted to try to see what I could go to help them,**

20   **if in fact there -- you know, if they weren't going to**

21   **be paid.**

22                **They have their families there.  They need**

1    to be protected.  So I was going to see what I could

2    do to secure them -- find them jobs over in Abu Dhabi.

3    That was how I first got back involved.

4              I believe the following day, Monday, was

5    when Terry Key had a briefing with the U.S. employees

6    regarding them potentially not getting paid.  I knew

7    that nobody knew anything about that prior to that,

8    because I had had a lasagna dinner with all the

9    NorthStar USA employees at my house the Saturday

10   prior, and it obviously would have come up had anyone

11   been privy to the fact that they may not get paid.

12             So that was my first involvement back into

13   what was going on with NorthStar.  And it was really

14   just to try to assist the -- do what I could to assist

15   the guys in Abu Dhabi.  You know, beyond that, you

16   know, I don't remember all the details, but there were

17   several things that were going on at that particular

18   point in time, you know, as it relates to what Amy was

19   being directed to do, some of the conversations that

20   -- again, I don't remember all the details, but some

21   of the conversations that Terry had with the U.S.

22   employees.

1          And so I reached out to Salem and see if

2    he, you know, just if he needed some assistance with

3    anything later on that week.  And it appeared that

4    Reno was trying to -- from what I gathered from Amy,

5    was trying to revoke the ITAR license.  There was a

6    letter that was drafted to -- sent to the employees

7    that they were to cease and desist any -- performing

8    any defense services, destroy all ITAR equipment and

9    technical data, and send proof of that destruction

10   back over.  Again, a lot going on.

11          I offered assistance in the background, and

12   to my surprise, on Friday I was -- that Friday I was

13   rehired, or I had an offer letter.

14   Q.    Okay.  Let's unpack that a little bit.  the

15   phone call that you had on Sunday, October 22, who was

16   that with?

17   A.    Stefan Orlygsson.

18   Q.    And Stefan, did he work for NorthStar?

19   A.    He does.

20   Q.    Okay.  Did he at the time?

21   A.    Yes.

22   Q.    Okay.  And he was concerned that he wasn't

1    going to get paid?

2         A.    Yes.

3         Q.    Did he say why he wasn't going to get paid?

4         A.    It was based on -- I don't know if it was

5    an e-mail or some communication from Terry Key.

6         Q.    Okay.  So Terry told him something that

7    led --

8         A.    Told that group.  Yes.

9         Q.    Okay.  And who was that group?

10        A.    I would assume that that group included Rob

11   Howard, Greg Huber and Stefan Orlygsson and Rick

12   Liddle.

13        Q.    Okay.

14        A.    Maybe not Rick Liddle, but --

15        Q.    And from what Stefan told you, Terry told

16   them that they may not get paid?

17        A.    Correct.

18        Q.    Did he say why they may not get paid?

19        A.    I don't remember.

20        Q.    Okay.  Did he say that there was a concern

21   that they were going to shut down NorthStar USA?

22        A.    I don't remember.

1      Q.      Okay.

2      **A.      No.  He wouldn't have had anything to say**

3  **about NorthStar USA.  He was in Abu Dhabi.**

4      Q.      Okay.  So he was UAE?

5      **A.      Um-hmm.**

6      Q.      And were all those individuals UAE or USA?

7      **A.      They were in UAE.**

8      Q.      Okay.  And when you say in UAE, does that

9  mean they are employed by NorthStar USA or NorthStar

10  UAE?

11      **A.      Everybody that's a U.S. person is employed**

12  **by NorthStar USA on loan to NorthStar UAE.**

13      Q.      Okay.  What did you tell Stefan you would

14  do after that call on Sunday the 22nd?

15      **A.      Essentially I just told him to let me see**

16  **what I could do.**

17      Q.      Were you considering hiring them?

18      **A.      No.  No.  I --**

19      Q.      Did Dynamic Solutions come up in that

20  conversation?

21      **A.      No.**

22      Q.      But you weren't with NorthStar at the time?

1          A.     Correct.

2          Q.     So what could you do?

3          A.     I could try to reach out to some of the

4     companies that are there, and see if I could, you

5     know, at least get them access to get an interview.

6          Q.     Okay.  So you were kind of doing

7     contingency planning?

8          A.     I was just trying to help in case they

9     found themselves out of a job.

10         Q.     Okay.

11         A.     Because they had their families over there.

12         Q.     Is it fair to say that there was some

13    uncertainty that you picked up on with respect to

14    those people?

15         A.     Yes.

16         Q.     Okay.  And they weren't sure whether or not

17    their company was going to continue operations?

18         A.     Correct.  Based on the communications from

19    Terry Key.

20         Q.     Okay.  You said you had a lasagna dinner.

21         A.     Um-hmm.

22         Q.     Was that prior to the conversation with

1      **A.     If somebody's been told that they may not**
2  **be paid, each one of these people has bills to pay.**

3      Q.     Do you allow employees currently to
4  disclose sensitive information?

5      **A.     I'm not sure that was considered sensitive**
6  **information if it affected them personally.**

7      Q.     Well, it's company financial information,
8  right?

9             MR. STREIT:  Objection to form.

10     **A.     It was presented as to whether that these**
11 **people may or may not get paid.**

12     Q.     Has anyone brought to those employees'
13 attention that they are arguably in violation of their
14 confidentiality obligations?

15     **A.     I don't believe so.**

16     Q.     Who did you speak to on the 23rd?

17     **A.     I don't remember.**

18     Q.     Was it Stefan?

19     **A.     I spoke to him on the 22nd.**

20     Q.     Right.  So did you talk to him on the 23rd?

21     **A.     I may have.**

22     Q.     What about Virginia?

1      A.     I expect I would have spoken to her at some
2  point that week.  I don't remember what day.
3      Q.     Okay.  So you may have talked to Stefan on
4  the 23rd.  You likely talked to Virginia sometime that
5  week.
6      A.     Sometime that week.
7      Q.     What about Amy?
8      A.     I did speak with Amy.
9      Q.     Okay.  That week?
10     A.     Yes.
11     Q.     What about Tom?
12     A.     No.
13     Q.     What's --
14     A.     I don't believe so.
15     Q.     What's Tom's last name?
16     A.     Graziano.
17     Q.     What about Rob?
18     A.     I don't believe so.
19     Q.     What's Rob's last name?
20     A.     Tahmassebi.
21     Q.     Okay.  So starting on the 21st, you have a
22  meeting with five NorthStar employees, right?

1       **A.      A social gathering.**

2       Q.      You have a social gathering of five

3  NorthStar employees?

4       **A.      Yes.**

5       Q.      Then on Sunday the 22nd, you have a phone

6  call with Stefan, right?

7       **A.      Yes.**

8       Q.      And then on the 23rd, you may have had

9  another phone call with Stefan, right?

10      **A.      Correct.**

11      Q.      And then that week, you had conversations

12  with Virginia and Amy, right?

13      **A.      Yes.**

14      Q.      And during all of those discussion, those

15  individuals are sharing information about NorthStar to

16  you, right?

17      **A.      Correct.**

18      Q.      And then once you took that information,

19  what did you do with it?

20      **A.      I reached out to Salem AlDaheri.**

21      Q.      And when did you talk commit to Salem?

22      **A.      Probably 24th.**

1      Q.    And did you talk to him by phone?

2      **A.    Yes.**

3      Q.    Did you call him or did he call you?

4      **A.    I believe I called him.**

5      Q.    Does he speak English?

6      **A.    He does.**

7      Q.    Did you have an interpreter when you were

8   talking to him?

9      **A.    No.**

10     Q.    Have you ever had an interpreter when you

11  are talking to Salem?

12     **A.    Not per se an interpreter, but the -- his**

13  **-- he sometimes gets assistance with his English.**

14     Q.    By whom?

15     **A.    One of the other employees that's in**

16  **NorthStar.**

17     Q.    What's that person's name?

18     **A.    Khalid Ali.**

19     Q.    And how does Khalid assist Salem?

20     **A.    Just to help break out some of the**

21  **differences between Arabic and English.**

22     Q.    Does he use Khalid to this day?

1       A.      I mean, from time to time, yeah, he's

2    there.  Yeah.  He's working in the same office.

3       Q.      What about the sheikh?  Does he speak

4    English?

5       A.      He does.

6       Q.      Have you ever used an interpreter when

7    communicating with the sheikh?

8       A.      No.

9       Q.      Are you aware of him ever needing an

10   interpreter?

11      A.      I wouldn't know.

12      Q.      That doesn't answer the question.  Are you

13   aware?  Are you personally aware of him ever needing

14   an interpreter?

15      A.      Personally I am not aware of him needing

16   one.

17      Q.      Okay.  And so it's your understanding that

18   he speaks and understands English?

19      A.      He does.

20      Q.      Okay.

21      A.      To what level, I'm not aware.

22      Q.      Okay.

124

1      A.      But it is his second language, as it's

2   Salem's second language.

3      Q.      So you called Salem on the 24th, right?

4      A.      On or about the 24th.  Yes.

5      Q.      And what did you say to him?

6      A.      I don't remember the exact words, but the

7   gist of it was that it sounds like there's things

8   going on within NorthStar.  If you need my assistance,

9   I'm available to you.

10      Q.      What did Salem say?

11      A.      He acknowledged and he thanked me for

12   offering.

13      Q.      Did Salem want Reno fired?

14      A.      Not that I know of.

15      Q.      Are you aware if Salem wanted to be CEO?

16      A.      No, not at all.

17      Q.      How did you leave it with Salem after that

18   call on the 24th?

19      A.      Again he just -- if I remember right, he

20   just thanked me and said okay.

21      Q.      Did he say, Hey, we are looking to bring

22   you back on board?

1    **A.    No.**

2    Q.    Did he say I'll bring this information to

3    the sheikh?

4    **A.    I don't remember.**

5    Q.    How long was the phone call?

6    **A.    Probably about 10 minutes.**

7    Q.    Okay.  So kind of a long phone call?

8    **A.    Yeah.**

9    Q.    So what else did you talk about?

10   **A.    All primarily what was going on in my -- my**

11   **desire to assist the team.**

12   Q.    And so you were trying to become reemployed

13   with NorthStar?

14   **A.    I was not.**

15   Q.    Okay.

16   **A.    It was not my intent.**

17   Q.    And when you say your primary intent was to

18   assist the team?

19   **A.    Yes.**

20   Q.    How did you envision assisting the team?

21   **A.    The majority of these people that worked**

22   **for NorthStar, I hired.  I've known them for 10 to 15**

1    years.  We've worked together in previous -- in

2    previous companies.  And they were the best of the

3    best from previous companies.

4              So, yes, there's a personal stake.  There's

5    a family aspect of it.  They are a team.  And it is

6    always going to be my desire to take care of those

7    people, best I can.

8         Q.    And this was on October 23, right?

9         A.    Yes.

10        Q.    Reno was still employed, right, by

11   NorthStar?

12        A.    I -- I don't know.  I just knew that -- I

13   heard that there was a lot going on.  So I offered

14   Salem, if he needed assistance, let me know.

15        Q.    What did you hear specifically about Reno?

16        A.    Originally I did not hear anything

17   specifically about Reno.  It was about the employees,

18   that they were not going to get paid.  Then later I

19   heard from Amy that she was being directed to generate

20   these letters, and she was very upset about it.

21        Q.    And the letters you are referring to are

22   the letters to the State Department?

1       A.      Yes.

2       Q.      And the letter to the UAE Armed Forces?

3       A.      I don't know as if she was involved in that

4  one.

5       Q.      Okay.  But she was upset about having to

6  prepare a letter to the State Department?

7       A.      Yes.

8       Q.      Okay.  And that's the letter that forms the

9  basis for your defamation claim?

10          MR. STREIT:  Objection to form.

11      A.      I don't have an answer to that right now.

12      Q.      Well, you are aware that you're suing Mr.

13  Alberto for defamation, right?

14      A.      Yes.

15      Q.      Okay.  What's your understanding as to the

16  basis of that claim?

17      A.      There was -- there was also information

18  that went to the GHQ, UAE Armed Forces, and to General

19  Toumajan.  I don't know if Amy was involved in

20  crafting those letters.  She was directed to craft the

21  letters to the State Department to revoke the ITAR

22  licenses.

1      Q.     Okay.  And what's Amy's title?

2      **A.     I can't remember the exact title.  It's**

3   **compliance officer or manager of export compliance.**

4      Q.     And so --

5      **A.     I would have to look it up what her actual**

6   **title is.**

7      Q.     She's familiar with the ITAR regulations,

8   right?

9      **A.     She is.**

10     Q.     Okay.  And if there's an ITAR question, you

11  go to Amy, right?

12     **A.     Generally, yes.**

13     Q.     Okay.  And so Amy came to you in person or

14  by phone?

15     **A.     By phone.**

16     Q.     Okay.  And so Amy called you and said Reno

17  is directing me to prepare these letters?

18     **A.     Yes.**

19     Q.     What else did he say?

20     **A.     She didn't know what to do.  She was upset,**

21  **so --**

22     Q.     Did she ever tell you that she told Reno

1  that she thought that that was inappropriate?

2       A.    She did not tell me that.

3       Q.    Okay.

4       A.    That I remember.

5       Q.    Are you aware of Amy ever voicing any

6  concern or objection over the preparation of those

7  letters?

8       A.    I  wouldn't know.

9       Q.    Okay.  What other information did you learn

10 about Reno or what Reno was doing prior to having that

11 call with Salem?

12      A.    I don't remember having much recollection

13 or much knowledge at all.  So it just sounded like

14 things were going sideways, and I was just there to

15 offer my assistance.

16      Q.    Were you aware that his power of attorney

17 had been revoked?

18            MR. STREIT:  Objection to form.

19      A.    I don't believe I was.

20      Q.    Okay.  Did Amy ever say anything about

21 Reno's power of attorney being revoked?

22      A.    I don't know that -- I don't remember her

1    saying anything about it.  I don't know if she would

2    have known.

3         Q.    Prior to your call with Salem, were you

4    aware of the October board meeting?

5         A.    I knew that there was a board meeting going

6    to take place, because Reno briefed me about it at the

7    Trump Hotel in earlier October.

8         Q.    And this was at AUSA, right?

9         A.    At AUSA.

10        Q.    Or in connection with AUSA?

11        A.    Yes.

12        Q.    And what was -- what did Reno say to you

13   about this October board meeting when you were at the

14   Trump Hotel?

15        A.    I remember he was preparing for it.  He

16   expressed some frustration, if I remember correctly,

17   something to the effect of it won't be exactly the

18   same, but something to the effect of, you know, I'm

19   kind of getting sick of dealing with him anyway,

20   something to that effect.

21        Q.    Him being the sheikh?

22        A.    The sheikh.  Yes.

1       Q.      Was he taking -- did Reno tell you that he

2   was taking on an increased role in the company or

3   something?

4       **A.      He did not.**

5       Q.      Okay.

6       **A.      He did not.**

7       Q.      Okay, so after your call with Salem on the

8   24th, what happened next?

9       **A.      Then I believe Salem reached out to me to**

10  **tell me that the -- that Reno did resign.  And at that**

11  **point, it was a matter of working with Salem to try to**

12  **protect whatever was remaining, for instance, the --**

13  **you know, Amy being directed to write the letters,**

14  **because I told her, I said just go ahead and do it,**

15  **Amy.  You know, don't go sideways if, you know, I said**

16  **you don't have to do it fast, but go ahead and do it.**

17  **And that can be taken care of afterwards by Salem.**

18           **And I reached out to Salem and I told him**

19  **what was going on.  And I told him that she was being**

20  **forced to do this, and even though she didn't agree**

21  **with it, and but here's how you can counteract it.**

22  **You can write another letter to State Department and**

1    **inform them of the situation, so --**

2         Q.    So you knew about the letter before it went

3    out?

4         **A.    Yes.**

5         Q.    And not only did you tell Amy not to send

6    it, you said actually go forward with it?

7         **A.    Yes.**

8         Q.    Okay.  Because it was easily fixable?

9         **A.    Yes.**

10        Q.    Okay.

11              MR. STREIT:  Object to the form.

12        Q.    When did you have that follow-up

13   conversation with Salem?

14        **A.    It would have been later that week.  I**

15   **don't remember the exact date.**

16        Q.    So the 24th was a Tuesday.

17        **A.    It was a Tuesday.**

18        Q.    First time you talked to him.  So you

19   talked to him sometime later, maybe Thursday --

20        **A.    25th, 26th, yes.**

21        Q.    Okay.  Let's go back to Exhibit 2.  Turn to

22   page 33, please.

1          Did you call Pete around this time?

2     And, sorry, did you call Pete around the time that you

3     had that call with Salem later the week of the 23rd?

4          **A.    I believe I spoke to him later on that**

5     **week.  Yes.**

6          Q.    Why were you reaching out to Pete?

7          **A.    First off, it -- it was a change in the**

8     **domain name of the website from USANSTAR to NSTARUSA.**

9     **I had noticed it a couple months earlier, but I didn't**

10    **pay much attention to it.**

11         Q.    This was as of October 26?

12         **A.    I had noticed it back in June or July when**

13    **there was some work being done on their new website.**

14    **And I didn't pay much attention to it at the time of**

15    **the NSTARUSA.  But later on that week, there was --**

16    **there was concern that NSTARUSA wasn't under the**

17    **control of NorthStar.  NSTARUSA domain name was**

18    **developed by Hillary Holcombe.**

19         **So I was trying to find out from Pete was**

20    **he involved in NSTARUSA so that I could pass that**

21    **information to Shadhi, who's the IT person within**

22    **NorthStar, because it appeared that there was a**

1    **website domain that lists NorthStar but is not under**

2    **the control of NorthStar.**

3             **And with everything that was going on that**

4    **week, they needed to control everything that they had.**

5        Q.    And you had a phone call with Pete about

6    that?

7        **A.    I did.**

8        Q.    Okay.  And what did you tell Pete about the

9    circumstances surrounding why you became reemployed by

10   NorthStar?

11       **A.    I was not reemployed at the time.**

12       Q.    Okay.  So as of October 26, you were not

13   reemployed?

14       **A.    I was not reemployed.**

15       Q.    Okay.  Did you have a NorthStar e-mail

16   account?

17       **A.    Did not.**

18       Q.    As of October 26?

19       **A.    As far as I know, I did not.**

20       Q.    Okay.  When was your effective --

21       **A.    They may not have ever -- they may not have**

22   **ever taken my e-mail down, but I didn't have a way to**

1    retrieve NorthStar e-mails on the 26th, if I remember

2    right.

3         Q.    Okay.

4         A.    Because I would have had no NorthStar

5    account.

6         Q.    When were you offered the position?

7         A.    Friday, October 27th.

8         Q.    Okay.  And who offered you?

9         A.    It came as an e-mail from Kate Beckley.

10        Q.    Okay.  Did you have a conversation with

11   Salem before that?

12        A.    No.  It was actually a surprise.

13        Q.    When you talked to Salem after your

14   conversation with him on the 24th, maybe sometime on

15   the 26th, did he talk about you rejoining NorthStar?

16        A.    I don't -- I don't believe so.  He may

17   have, but I don't believe so.  Again, I -- the -- I

18   woke up the morning of the 27th, and it was actually a

19   bit of a surprise that I had had the offer letter in

20   my inbox.

21        Q.    You weren't employed at that time, right?

22        A.    I was not.

1    Q.    You weren't bringing in any money?

2    **A.    I'm sorry.**

3    Q.    You weren't bringing in any money?

4    **A.    No.**

5    Q.    And you were getting information from

6    NorthStar employees, right?

7    **A.    Yes.**

8    Q.    And then you took that information and you

9    shared it with Salem, right?

10   **A.    Another NorthStar employee, yes.**

11   Q.    And that sharing of information resulted in

12   your becoming reemployed, right?

13          MR. STREIT:   Objection to form.

14   **A.    May have had something to do with it.   I**

15   **don't know.**

16          MR. JOHNSON:   Let's go off the record.

17          VIDEOGRAPHER:   The time is now 12:30.

18   Going off the record.

19                     -   -   -

20          (Recessed for lunch at 12:04 p.m.)

21            (Reconvened at 1:00 p.m.)

22                     -   -   -

1          VIDEOGRAPHER:  We are on the record.  The

2    time is 12:59.

3          BY MR. JOHNSON:

4     Q.    Mr. Becka, shortly after you were

5    reemployed with NorthStar, one of the things that you

6    did was correspond with the State Department, correct?

7     **A.    Yes.**

8     Q.    Okay.  And you submitted a letter to the

9    State Department, correct?

10     **A.    Yes.**

11     Q.    And Amy Styers prepared that letter?

12     **A.    Correct.**

13     Q.    And that letter was submitted because there

14    was a change in the senior official of the company,

15    right?

16     **A.    Correct.**

17     Q.    And it was also in response to the letter

18    that Reno sent, correct?

19     **A.    I don't believe that -- I don't believe**

20    **that that was -- I think the letter was just submitted**

21    **as a change of the management representative and a**

22    **change of the office address.**

1      Q.     Okay.  But you communicated with the State

2   Department in response to Mr. Alberto's letter to the

3   State Department, right?

4      **A.     We sent the letter.  We sent our letter**

5   **changing the management representative and the change**

6   **of office location.**

7      Q.     Okay.  And that was accepted, right?

8             MR. STREIT:  Object to the form.

9      **A.     I believe so.**

10     Q.     That change was approved by the State

11  Department?

12     **A.     I believe so.  Yes.**

13     Q.     Okay.  Okay.  And you didn't lose any

14  business as a result of the letter that Mr. Alberto

15  sent?

16     **A.     Not that I know of.**

17     Q.     Okay.  And what about the letter to the UAE

18  AF?  You didn't lose any business as a result of that

19  letter either, right?

20     **A.     I wouldn't know.**

21     Q.     Well sitting here today, can you identify

22  any specific business that you lost as a result of the

1       Q.    Okay.  The company is still doing work with

2    the UAE AF, right?

3       **A.    Yes.**

4       Q.    What are the current contracts that it has

5    in place with the UAE AF?

6       **A.    Follow-on support contract.**

7       Q.    Just one?

8       **A.    Yes.**

9       Q.    And tell me about the follow-on support

10   contract?  What type of work are you doing?

11      **A.    It's supplying parts, repair of parts,**

12   **labor, and potentially training.  It's I guess the**

13   **closest thing in the U.S. government would be an IDIQ**

14   **type.  It's an account and -- that has so much value**

15   **to it, and then they are able to issue purchase orders**

16   **instead.**

17      Q.    They come to you whenever they need

18   something?

19      **A.    Exactly.**

20      Q.    Okay.  Is there a value associated with

21   that contract?

22      **A.    Current value I believe is 40 million**

1  dirham.

2      Q.    Okay.  And what's the period of

3  performance?

4      **A.    I think the period of performance is left**

5  **open.**

6      Q.    Okay.  And you were able to secure that

7  contract in part as a result of the performance you

8  did under the delivery of the helicopters to the UAE

9  military?

10     **A.    As a follow-on support to that.  Yes.**

11     Q.    Okay.  What about --

12     **A.    We were the logical people to support the**

13  **aircraft that we delivered.**

14     Q.    Okay.  Other than that follow-on support

15  contract, any other contracts with the UAE military?

16     **A.    Not that I'm aware of.**

17     Q.    Okay.  What about -- that was -- this is

18  currently.  What about when you took over, were there

19  any other contracts with the military that you were

20  ware of?

21     **A.    Not that I'm aware of.**

22     Q.    Okay.

217

```
 1              C E R T I F I C A T E

 2   UNITED STATES OF AMERICA   )

 3                              ss:

 4   COMMONWEALTH OF VIRGINIA   )

 5           I, ELIZABETH MINGIONE, Notary Public within

 6   and for the Commonwealth of Virginia do hereby

 7   certify:

 8           That the witness whose deposition is

 9   hereinbefore set forth was duly sworn, and that the

10   within transcript is a true record of the testimony

11   given by such witness.

12           I further certify that I am not related to

13   any of the parties to this action by blood or marriage

14   and that I am in no way interested in the outcome of

15   this matter.

16           IN WITNESS WHEREOF, I have hereunto set my

17   hand this _____day of _____, 20_____.

18

19                         _____

20   Notary Registration No. 104119

21   My Commission Expires:

22   May 31, 2019
```