Exhibit 13

COPY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

C.A. No. 1:18cv191-TSE-JFA

NORTHSTAR AVIATION, LLC et al.

Plaintiffs/Counterclaim Defendants,

v.

ALDEN BURT ALBERTO,

a/k/a Reno Alberto

Defendant/Counterclaim Plaintiff.

This is the deposition of Mr. Hani Farag
taken in the above-entitled cause, before
Denise Turcot, No. 264848-2, official court
reporter for the Province of Québec, on October
11, 2018, at the offices of Lapointe Rosenstein
Marchand Melançon LLP, at 1 Place Ville Marie,
Suite 1300, Room Jasmin, in the City of
Montréal, Province of Québec.

FILE NO.: 1810111A

DENISETURCOT S.O./OCR
38-11, Place du Commerce, Suite 614
Montréal (Québec) H3E 1T8
514.362.8600
steno@deniseturcot.com

**50**

1 would come and see me.
2 Q. And you're referring again to what
3 looks like a couple of documents you've brought
4 with you today, is that right?
5 A. Yes, sir.
6 Q. What exactly are the documents you're
7 referring to?
8 A. Organization charts that - they were
9 not asked for.
10 Q. Okay. As you've brought them, I would
11 like to have copies made of those.
12 A. With pleasure.
13 Q. Simon --
14 BY MR. RAINVILLE:
15 Were they in the bundle that we had
16 earlier?
17 BY THE WITNESS:
18 No. No, no, no, because that was not
19 requested in the subpoena.
20 BY MR. RAINVILLE:
21 Okay. I'll be right back.
22 BY THE WITNESS:
23 I brought them because I thought it
24 might help.
25 BY MR. DEITCH:

**51**

1 Very helpful, thank you.
2 OFF-THE-RECORD DISCUSSION
3 BY MR. STREIT:
4 Q. Okay, Mr. Farag, before we went off
5 the record, you had been describing for us the
6 corporate hierarchy at NorthStar Aviation, and
7 you were making reference to a two-page
8 document that you had brought with you. Can
9 you tell us what that document is exactly?
10 A. Sure. The document is NorthStar
11 Aviation's organization chart, and it's a two-
12 pager. The first one basically outlines the
13 corporate headquarters, including what we had
14 in Virginia at the time, Florida.
15 And the second page outlines in very
16 good detail all operations personnel either in
17 Abu Dhabi or in Florida.
18 Q. Okay, let's mark this as Exhibit
19 number 3.
20 Okay, Mr. Farag, who generated Exhibit
21 3?
22 A. Oh, it was honestly one of my - I'm
23 not sure if it was Beckley or the one before
24 her, but it's one of my staff.
25 Q. Okay, Beckley who? Kate Beckley?

**52**

1 A. Kate Beckley.
2 Q. Okay. And when would this have been
3 generated, do you know?
4 A. It still has Laurie Holcombe's name on
5 it, so that would have been before 2016, 2017.
6 But really, there was no change.
7 Q. And was this something you had asked
8 Ms. Beckley to prepare?
9 A. Anywhere I went, we prepared an
10 organization chart, yes.
11 Q. Okay. So that's standard protocol for
12 you?
13 A. Yes, sir.
14 Q. Okay. Prior to your first meeting
15 with Mr. Alberto at R2 Management, had you ever
16 met him before?
17 A. No, sir.
18 Q. Okay. Was there anyone at R2
19 specifically who introduced you to Mr. Alberto?
20 A. No, sir.
21 Q. Okay. Does the chart shown in Exhibit
22 3 accurately describe everyone who reported to
23 you?
24 A. To me?
25 Q. Yes.

**53**

1 A. Absolutely. Now, for example,
2 Ms. Lachner, she's no longer with the company.
3 Mr. Akour, I honestly don't know, because that
4 was basically consulting basis, so I don't know
5 what happened to him. But Mr. Siraj I believe
6 is still there, and Ms. Kate Beckley is still
7 there.
8 Q. And I understand that Exhibit 3 would
9 only reflect the organization as it existed
10 during your time at the company, because
11 obviously you were no longer there?
12 A. Exactly. This is when I was there.
13 Q. Okay. And let's go back to your job
14 responsibilities there at NorthStar; I know we
15 talked a little bit about that earlier.
16 Was one of your responsibilities
17 making recommendations to Mr. Alberto regarding
18 bonus payments for employees?
19 A. Okay, it's a very good question. One
20 of my responsibilities was coordinating the
21 request for bonuses on behalf of all my
22 colleagues. Finance would prepare HR sort of
23 an Excel spreadsheet. So I went to, for
24 example, the finance guy, and said, "Okay, so
25 we've got a 5% pot, let's say, what do you want

**54**

1 to give employee A, B, C." Okay. And then I
2 would do the same - Terry did his own anyway,
3 as soon as he knew how much, he did his whole
4 list on his own.
5     I would be the one coordinating that
6 whole process. I would send it to Mr. Alberto
7 with the recommendations of everybody. He
8 would approve by e-mail, send it back. And
9 then it was handed over to Finance because they
10 were responsible, not only just for preparing
11 the spreadsheet, but for making the payments
12 that he had approved.
13    Q. You mentioned a moment ago the finance
14 guy; would that have been Mr. Ali?
15    A. Sorry, yes.
16    Q. Okay. And I've seen his name
17 represented in some different ways. To your
18 knowledge, what is his full name?
19    A. Nrasib Ali is how he was known in the
20 company. I don't know if he has another name,
21 or two, or three; he could. Usually people of
22 the Muslim faith will always start with
23 Mohammed, but I don't know if his first name is
24 Mohammed, they don't say it, but their first
25 name is always Mohammed.

**55**

1    Q. And was it your understanding he was
2 Muslim? Is that why you mention that?
3    A. Yes, absolutely. Like Mr. Dhaheri,
4 etc., etc. It's a Muslim country.
5    Q. And I'm sure it's probably self-
6 evident, but Nrasib Al is an Arab name, is that
7 right?
8    A. Pakistani. Pakistani passport.
9    Q. Okay, okay. All right. Now, bonus
10 recommendations again, were you responsible for
11 making recommendations for bonuses for people
12 of any specific level within the company
13 hierarchy?
14    A. Junior staff, and never ever to the
15 senior people that reported to Mr. Alberto
16 directly.
17    Q. Did those people - were they paid any
18 bonuses, to your knowledge?
19    A. Yes, sir.
20    Q. Who decided the bonuses for those
21 people?
22    A. Mr. Alberto.
23    Q. Okay. Was that purely within his
24 discretion?
25    A. He was the one that sent back the

**56**

1 approval, and he was the one that would enter -
2 because what Finance did on their spreadsheet
3 is they left, for example, they would put
4 Nrasib Ali's name, and they would leave it
5 blank. Terry Key's name, and they would leave
6 it blank. Hani Farag's name, and they would
7 leave it blank. And he would complete that and
8 send it back with the spreadsheet.
9    Q. Okay. Do you know if there was anyone
10 there who advised him on bonuses for senior
11 employees?
12    A. No, sir.
13    Q. No, you don't know, or no, there was
14 not?
15    A. No, I don't think anybody there
16 advised him on senior bonuses.
17    Q. Okay. Now, did you have any role at
18 all in the payment of bonuses to Mr. Alberto?
19    A. The process?
20    Q. Hmm-hmm?
21    A. Not the payment, but the process, yes.
22    Q. Okay, what was that process?
23    A. Okay. Very simple. Because His
24 Highness is a royal, okay, we could not get
25 access to him. In fact, I met him perhaps

**57**

1 three or four times in my whole life, and it
2 was basically at air shows. He would pass by,
3 spend a few hours with us, and that was it.
4 Okay, I have never met His Highness at the
5 company, ever, okay.
6    So we were basically told that, the
7 way to deal with the royals, which was
8 unbeknownst to me, was it's only the CEO that
9 goes to see him. Okay.
10    Mr. Dhaheri also was working with him.
11 In all fairness, I cannot describe what kind of
12 responsibilities, but he used to travel with
13 him, he used to do all sorts of odd jobs for
14 him, pick this up, get this done, go to that
15 ministry, etc., etc., for any one of his
16 companies. Mr. Dhaheri really was just, you
17 know, his administration assistant, okay, for
18 an awful lot of stuff. And because he knew the
19 infrastructure, and because he had the
20 connections, he was able to facilitate an awful
21 lot of stuff. Not just for NorthStar, but also
22 for His Highness's other companies, at least
23 that's what Mr. Dhaheri was telling us.
24 Because, I repeat, you know, we never discussed
25 it.

58

1     So, when it came time to the bonuses,
2 and I was obviously still a consultant, quite
3 frankly, the CEO in my world, in my book, is
4 authorized to provide the bonuses to all his
5 staff. He's chief executive, okay.
6     For his own was the issue that, you
7 know, we fixed basically. So I drew on my
8 expertise, quite frankly, with something that
9 we had done here in Montreal at my previous
10 employers, and in Switzerland, and basically
11 introduced a form that would list what the
12 executive had presently, and what any changes,
13 or in other words, present and proposed, and
14 that we relied on him to get the signature from
15 His Highness because we had no communication
16 with His Highness.
17     So, the process basically was mine,
18 and the confirmation was always with his
19 signature. So I don't know which --
20     Q.   And you're referring again to some
21 documents that you've brought along with you.
22 Let's do this this way. Start with yours. I
23 have some things here as well, but let's go
24 ahead and mark that document as Exhibit number
25 4.

59

1     A.   May I ask which one, because there's
2 like a lot of them.
3     Q.   Now are these documents we've already
4 copied, or is this --
5     A.   Yes, yes.
6     Q.   Okay.
7     A.   You have all of them. These are the
8 ones that look like this.
9     Q.   Well, you were just - I want to make
10 sure whatever you are making reference to we
11 get marked as an exhibit. What were you making
12 reference to there?
13     A.   Okay, any one of these forms with the
14 title "Present and Proposed."
15     Q.   Okay. Let me just find that.
16     BY MR. DEITCH:
17     Kevin, if I can suggest, there was a
18 packet, because these have been stapled and the
19 copies we have, that you just mark that packet
20 collectively as one exhibit?
21     BY MR. STREIT:
22     That makes good sense. All right.
23     A.   I will staple it, and this will be
24 just one packet.
25     Q.   All right, this will be Exhibit 4

60

1 then.
2     A.   Good idea.
3     Q.   All right, Mr. Farag, you were just
4 referring to a packet of documents that you
5 brought along this morning, and it's been
6 marked as Exhibit number 4. Would you please
7 identify for us what is included in Exhibit
8 number 4?
9     A.   Okay. It's various forms describing
10 changes to the compensation, or any payouts
11 that were requested, and confirmed by
12 Mr. Alberto's signature.
13     Q.   Okay. And you, I believe, testified
14 that these forms are something you've generated
15 based on your previous experience in the human
16 resources realm?
17     A.   Correct.
18     Q.   Okay. Let's see. Did there ever come
19 a time during your work at NorthStar when
20 Mr. Alberto told you that he was not going to
21 continue signing forms such as those shown in
22 Exhibit number 4?
23     A.   Yes, sir.
24     Q.   When was that?
25     A.   It was around October 2016.

61

1     Q.   And what was the context of that
2 conversation? How did that come up?
3     A.   He called me, and I said, "Do you want
4 me to prepare these year-end bonuses," etc.,
5 etc., which I usually would ask him, because he
6 dictated also the timing of when he wanted to
7 do anything. And he said, "By the way, I've
8 decided that I'm not signing the forms that you
9 asked me to sign anymore." And I said, "Why is
10 that?" And the answer was, "Mr. Ali told me
11 that they were not necessary, and it was just
12 something that you basically requested."
13     I said, "I vehemently apologize, and,
14 you know, sort of push back here, these are not
15 forms that I just requested; these are forms
16 that we've been applying as the process for you
17 to get all your payments done and get the
18 approvals required, etc., etc., for the past
19 three years." Okay.
20     And furthermore, they were discussed
21 with the auditors every year, because the
22 auditors would come in, they would sit down
23 with the Finance department for two, three
24 weeks, whatever, and then Mr. Ali would bring
25 the auditor to my office to describe the

110

1 regarding Hillary Holcombe's qualifications for
2 the job?
3     A.   No.
4     Q.   Where was Hillary Holcombe assigned to
5 work during her time with NorthStar?
6     A.   The US office.
7     Q.   Okay.  And is that the same office
8 where Mr. Alberto worked?
9     A.   Yes, sir.
10     Q.   Did you ever have occasion to visit
11 NorthStar's office in Virginia?
12     A.   Yes, sir.
13     Q.   When did you visit that office?
14     A.   It was not a regular visit.  I went to
15 that office twice when it was on Connecticut
16 Avenue, and three to four times when it was in
17 Tysons Corner.  Before meetings, after
18 meetings, etc., etc.
19     Q.   Okay.  So, in total, you may have
20 visited that office five or six times?
21     A.   Five or six times, in total.
22     Q.   Do you recall any particular dates
23 visiting that office?
24     A.   The only date I distinctly remember is
25 when our medical insurance was coming to be

111

1 renewed, the company's medical insurance, and
2 I met the broker with the AETNA staff at that
3 office.  So I would have - I don't know when
4 the policy was coming for renewal, but that was
5 the only time I saw her at that office.
6     Q.   So, you say you visited the offices,
7 that office, maybe five or six times?
8     A.   Correct.
9     Q.   But you only saw Ms. Holcombe there
10 one time?
11     A.   Yes, sir.
12     Q.   All right.
13     A.   In fairness, the first two times was
14 his previous assistant, okay, who retired.  So,
15 I would say that Tysons Corner office four
16 times, and I would say I saw her there once.
17     Q.   Okay.  Now, on the two occasions you
18 visited Laurie Holcombe was Mr. Alberto's
19 assistant.  Did you see Laurie Holcombe at the
20 office the times you visited?
21     A.   No, sir.  Or the previous assistant by
22 the name of Susan something or other.  It was
23 quite an elderly lady.
24     Q.   Did you get any information on where
25 Hillary Holcombe was on the times you visited

112

1 that office and did not see her?
2     A.   No.  I once asked - Mr. Alberto and I
3 met in the conference room, this was like a
4 shared office in Tysons Corner; I don't know if
5 you're familiar with it.  And I said, "I'm just
6 going to go say hi to Ms. Holcombe," and he
7 said, "no, no, I gave her the day off."  So I
8 said okay.
9     Q.   Do you happen to know where she lived
10 during her employment at NorthStar?
11     A.   Yes, New York, although when she was
12 in Virginia, it's a guess, you know.  The
13 rumour was that she may be staying with her
14 aunt; we're not sure.  I'm not sure.
15     Q.   Was NorthStar giving her any kind of
16 allowance for travel from New York to Virginia?
17     A.   The Finance Department would be better
18 placed to answer that.
19     Q.   But it was NorthStar's understanding
20 that she was going to live in New York but work
21 in the Virginia office, is that what --
22     A.   No, sir, it's not my understanding.
23     Q.   Okay, what was your understanding?
24     A.   My understanding is that you're going
25 to work where - you're going to relocate to

113

1 Virginia.  And in fact, that was one of the
2 questions that I had for her, or I made a
3 comment to her at the Trump Hotel, and she said
4 that "we'll see."  Okay.
5     Q.   Do you know whether she ever relocated
6 to Virginia?
7     A.   No idea.  Remember, this was at the
8 tail end of 2016, right, so it was after the
9 discussion about I'm not signing any more
10 papers, etc., etc., so it became a bit more of
11 a void relationship between Mr. Alberto and I.
12     Q.   Was Ms. Holcombe one of the persons
13 for whom you provided bonus recommendations?
14     A.   No, sir, never.
15     Q.   Did you ever have any input on whether
16 Ms. Holcombe should be paid a bonus?
17     A.   Absolutely not.  He considered the
18 assistant position to be one of those five or
19 six senior positions, regardless of the duties,
20 okay, so he managed that 100%.
21     Q.   "He," again, being Mr. Alberto?
22     A.   That's correct.
23     Q.   To your knowledge, was Ms. Holcombe,
24 Hillary Holcombe, paid a bonus during her time
25 as an independent contractor?

**114**

1      A.   Yes, sir.
2      Q.   In your experience in human resources,
3  is it normal to pay an independent contractor
4  a bonus?
5      BY MR. DEITCH:
6           Objection to form.
7      BY THE WITNESS:
8           In my experience, it's not normal to
9  pay a bonus to someone who has been in the
10 company for two to three months, regardless of
11 level, let alone an administrative assistant.
12     BY MR. STREIT:
13     Q.   Okay.  Over the years, in your work
14 experience with various companies, have you
15 ever had occasion to deal with independent
16 contractors in any fashion?
17     A.   Sure, but at much more senior levels.
18     Q.   At more senior levels.  Did any of
19 those individuals get paid bonuses?
20     A.   I'd be hard-pressed to say yes or no.
21 I honestly cannot answer that because the
22 independent contractors were always managed by
23 a different department that hired them.  The HR
24 function, either in Montreal in Bombardier, or
25 Jet Aviation, ran the full time, the

**115**

1  independent contractors were hired by the
2  department.  Like, the IT, the head of IT would
3  hire his consultant; the head of Finance would
4  hire his consultant; you understand?  And that
5  was managed.
6      Q.   In your experience, you say - well, I
7  believe you testified that you found it unusual
8  for Ms. Holcombe to receive a bonus payment
9  when she had only been at the company for a
10 couple of months?
11     A.   Absolutely.  No question.  And her
12 level.
13     Q.   In your previous experience, do you
14 recall what the shortest tenure was of anyone
15 ever receiving a bonus?
16     A.   In my humble opinion - and it's an
17 opinion - it would not be before a year.
18 Proven performance, outstanding performance,
19 etc.  That's all.
20     Q.   Do you know if NorthStar paid bonuses
21 to any other independent contractors during
22 your time at the company?
23     A.   No, sir.
24     Q.   No, you don't know, or --
25     A.   No, I don't know.

**116**

1      Q.   Okay.  Did you ever mention to
2  Mr. Alberto that you thought it unusual for
3  Ms. Holcombe to be receiving a bonus?
4      A.   I had a discussion with him about the
5  first time when he put the amount of money on
6  paper.
7      Q.   Okay, tell me about that discussion.
8      A.   It was not long.  It was basically
9  that, you know, this is very unusual for that
10 level, etc., etc., and it was his decision.
11     Q.   Was that all he had to say about that?
12     A.   Yes.  Well, that was the gist of it.
13 I honestly don't remember the exact wording,
14 but bottom line was it's not your business.
15     Q.   Okay.  How did the bonus that
16 Ms. Holcombe was paid on or about November 27,
17 2016 compare to bonuses paid to other NorthStar
18 personnel of equivalent rank?
19     A.   Remember, now you're talking November
20 2016, I was basically stepped aside from the
21 whole bonus discussions.  This would be a
22 better question for the Finance people.
23     Q.   Okay.  During the time that you and
24 Ms. Holcombe, Hillary Holcombe, both worked at
25 NorthStar, did you form an opinion regarding

**117**

1  the quality of her work?
2      A.   The departments that dealt with her,
3  whether it was Finance mainly, Operations
4  partly, and my HR coordinator, did not have a
5  very high opinion of her.
6      Q.   They expressed that view to you?
7      A.   It was generally known in the building
8  in Abu Dhabi, in the office.
9      Q.   Did you have occasion to evaluate her
10 work product yourself?
11     A.   Well, I attended the meeting at the
12 Trump Tower that he had invited us, Mr. Alberto
13 had invited Mr. Key, myself, and I think
14 Mr. Becka too, where she presented a potential
15 future, so the marketing campaign.  And I
16 remember at the end of the meeting, I asked a
17 simple question, again, due to my gray hair
18 experienced background, I just said, well, you
19 know, when you're going to put a proposal
20 together, it would be nice if we just saw how
21 much it could cost, because it's nice to dream
22 marketing-wise, but you need to give us just an
23 idea about what it would cost.
24          And Mr. Alberto was pretty direct.  He
25 responded to the question, that this was

## 118

1 preliminary, and they were working on it, da da
2 di da da da, etc., etc.; in other words, I
3 don't want to discuss it.
4          So, I was not very impressed with the
5 presentation, to be honest. Neither was Terry,
6 because Terry and I were at a different hotel,
7 so, you know, when we walked that night,
8 basically, that's all.
9          Aside from that, the Finance
10 department will give you much, much more
11 focused feedback about her abilities or
12 inabilities to prepare very simple expense
13 reports, or whatever. This is not really my -
14 I never had anything to do with her.
15     Q.   Had you ever attended presentations
16 similar to that one before?
17     A.   My whole life, sir. In Bombardier, 20
18 years, and in Jet Aviation, and General
19 Dynamics, three and a half years.
20     Q.   So you were comparing, or tell me --
21     A.   Apples to apples.
22     Q.   Okay, when you sat through that
23 presentation presented by Ms. Holcombe, you
24 were comparing it to similar presentations you
25 had been at?

## 119

1     A.   In my opinion, yes.
2     Q.   And I believe you just mentioned that
3 you, Mr. Key, and possibly Mr. Becka were
4 staying at a different hotel?
5     A.   Yes, sir.
6     Q.   Where were you staying?
7     A.   We always stayed at the - I think it's
8 Marriott, right across from the White House,
9 you walk and then you turn right. It's pretty
10 reasonable.
11     Q.   And where were Mr. Alberto and
12 Ms. Holcombe staying, do you know?
13     A.   Mr. Alberto and Ms. Holcombe were
14 staying at the Trump Hotel right beside the
15 White House. And I'm not certain if her aunt
16 was also staying there. Don't know. Because
17 her aunt lived in DC, so --
18     Q.   Okay. Did anyone at NorthStar ever
19 express to you any concerns regarding the
20 nature of Ms. Holcombe's relationship with
21 Mr. Alberto?
22     A.   We discussed it, Terry and I, on
23 frequent occasions.
24     Q.   And what did those discussions entail?
25     A.   Very simple, in the United States

## 120

1 versus Europe versus the Middle East, the
2 executives' behaviour around any employee is
3 extremely, how can I put it, delicate,
4 basically, so, you know, there are boundaries
5 in the United States, etc.
6          And with my responsibilities in
7 Bombardier, I was responsible for the Lear Jet
8 facility in Wichita; I was responsible for the
9 flagship facility in Dallas; and the flight
10 department in Harper (ph.); so I knew a little
11 bit about, you know, potential, you know,
12 unfortunate, let's say, situations when it came
13 to things like this.
14          Terry was way ahead of me. He was
15 very - not unhappy, that's not the word, but he
16 was very surprised at some of the reactions and
17 some of the relationship, I guess, or the, you
18 know, what we thought would be a public
19 relationship, that's all. There was nothing
20 specific to point to, but the overall
21 appearance was not very good.
22     Q.   So, when you say "overall appearance,"
23 did you have the opinion that there might be an
24 improper relationship of some kind?
25     A.   Maybe, I would say.

## 121

1     Q.   Okay. And was there anything specific
2 that caused you to have that impression?
3     A.   Specific, it was just a series of
4 things. One, the level of competence, or
5 incompetence that I kept hearing from the other
6 departments that deal with her.
7          Two, the fact that Mr. Alberto
8 travelled with her everywhere.
9          Three, the fact that the Operations
10 personnel, for example, that went to the
11 Australian air show, indicated that they had
12 come to the show, Mr. Alberto and Ms. Holcombe,
13 for about a day and a half, less than two days,
14 which is fine, there's nothing wrong with that.
15 It's a five-day or seven-day show, I have never
16 been.
17          But then I heard from the Finance
18 department that the expenses submitted were
19 like three times the time, okay?
20          So, it was just a series of things,
21 but nothing that I can say specific.
22     Q.   And did you ever hear of any specific
23 observations from anyone else within the
24 company?
25     A.   Like I said, Mr. Key and I, he was

122

1 number two in the company, and I was number
2 three; we discussed it at length. It was a bit
3 of a joke in the corporate office, to be
4 honest. Okay, it was a bit of a joke, that if
5 you were not, excuse me, but blonde and pretty,
6 you know, you couldn't get a decent bonus, etc.
7 But I never really listened to any of that. I
8 was more concerned about the potential
9 litigation.
10     Q.   How old was Hillary Holcombe at this
11 time, do you know?
12     A.   My guess, low 30s, high 20s, I really
13 don't know.
14     Q.   Okay. About how old was Mr. Alberto
15 at this time, do you know?
16     A.   I think he's about five years younger
17 than I am, maybe - yes, I think he's five years
18 younger than I am. So I would guess 58, 57
19 right now.
20     Q.   Okay. Did you ever discuss these
21 concerns you had regarding the relationship
22 with Mr. Alberto?
23     A.   Terry opened the subject with him when
24 we were walking back from the restaurant in
25 Washington, either the same day of the

123

1 presentation or the day after, and he basically
2 just, you know, listened and didn't say
3 anything.
4     Q.   So you made no comment at all?
5     A.   No, I made no comment, but I took
6 action.
7     Q.   Next one.
8     A.   Thanks.
9     Q.   What are we up to, 9? All right,
10 Mr. Farag, I'm showing you a document that's
11 been marked for identification as Exhibit
12 number 9.
13     A.   Yes, sir.
14     Q.   Have you ever seen Exhibit 9?
15     A.   Yes, sir.
16     Q.   What do you recognize Exhibit 9 to be?
17     A.   It's a policy, an insurance policy
18 that I purchased called the Employment
19 Practices Liability Policy.
20     Q.   Okay. And you say you purchased; do
21 you mean --
22     A.   The company purchased. Sorry.
23     Q.   But I take it from your answer that
24 this was your idea?
25     A.   Yes, sir.

124

1     Q.   Okay. And was purchasing a policy of
2 this kind something within your responsibility
3 and authority at NorthStar?
4     A.   Yes, sir. All non-aviation directly
5 related policies were mine. Okay, so, the
6 building policy, the fire policy, the whatever,
7 okay, the medical policy, etc., etc. Anything
8 that had to do with the aircraft, the
9 warranties, the parts, etc., etc., were all
10 Terry. But we dealt with the same broker.
11     Q.   Who was the broker?
12     A.   Mr. Mike Hanuschak.
13     Q.   Why did you decide to purchase the
14 insurance policy shown in Exhibit 9?
15     A.   Because of a potential liability that
16 the company would be facing.
17     Q.   What kind of potential liability?
18     A.   Well, she could file a suit, if there
19 was something going on, she could file a case
20 against the company.
21     Q.   "She" being?
22     A.   She being Holcombe.
23     Q.   Hillary Holcombe?
24     A.   Yes. Or Alexa, whatever. And it
25 could cost the company hundreds of thousands of

125

1 dollars.
2     Q.   Did you have any particular reason to
3 think that that might be a real possibility?
4 BY MR. DEITCH:
5     Objection to form.
6 BY THE WITNESS:
7     Not A rticular reason. As I said, it
8 was the total of everything we were seeing.
9 First of all, the competence of the individual,
10 her very high salary for the position, okay, to
11 travel everywhere, everywhere together, etc.,
12 etc., I just would not take a chance.
13     And the cost of the policy was minimum
14 compared to mitigating the potential risk. It
15 was $5,000. So, Terry and I discussed and I
16 actually told him, you know, that's the only
17 thing we can do, quite frankly, and he thought
18 it was a good idea.
19 BY MR. STREIT:
20     Q.   Did you tell Mr. Alberto that you were
21 going to have this policy taken out?
22     A.   No, sir. In fairness, sorry, this
23 also covered any other potential in the United
24 States. It was not specific. I mean, that was
25 what drove me to do it, but if I had a case in

126

1 Florida, it would be the same. Same policy
2 would cover it.
3    Q.  Got it. Did you ever have any
4 discussions with Ms. Holcombe regarding your
5 concerns?
6    A.  Absolutely not.
7    Q.  Did you ever talk to Ms. Holcombe at
8 all after your initial introduction with her?
9    A.  She came to the Abu Dhabi office with
10 him a couple of times. Hello, hello. That's
11 about it.
12    Q.  Okay. How often did you she visit the
13 Abu Dhabi office?
14    A.  Whenever he visited, she was with him.
15    Q.  How often was that?
16    A.  I couldn't tell you exactly, but my -
17 two to three times a year, perhaps.
18    Q.  Okay. And whenever she came to visit
19 the Abu Dhabi office with Mr. Alberto, do you
20 happen to know what her hotel arrangements
21 were, where she stayed?
22    A.  No, they switched hotels because he's
23 very picky about his hotels, Mr. Alberto, and
24 they stayed at the Ritz one time, they stayed
25 at another hotel that was owned in part by His

127

1 Highness another time, etc. It didn't really
2 make a difference because Abu Dhabi is small
3 enough, and the driver that was basically
4 dedicated to them would just pick them up from
5 anywhere and bring them to office. It didn't
6 matter.
7    Q.  Who was that driver?
8    A.  A gentleman by the name of Nasir; I
9 don't know his last name. An Indian national,
10 I think.
11    Q.  Okay. And do you know if Mr. Alberto
12 and Ms. Holcombe generally stayed at the same
13 hotel?
14    A.  Yes, they did, absolutely. And when
15 her aunt was also his assistant, they stayed at
16 the same hotel.
17    Q.  So, if Laurie came to Abu Dhabi with
18 Mr. Alberto, then she --
19    A.  Exactly.
20    Q.  Got it. Okay.
21    A.  Which is normal.
22    Q.  Are you aware of any occasions when
23 Ms. Holcombe travelled to Abu Dhabi with
24 Mr. Alberto where they did not spend time
25 actually working at the office there in Abu

128

1 Dhabi?
2    A.  When they came to the office, the way
3 it would work is Mr. Alberto would have
4 meetings with Mr. Ali, Mr. Key, would pass by
5 and see me, okay? In the meantime, she would
6 be upstairs saying hello to the junior staff,
7 etc., etc., and that was the end of it.
8    Mr. Alberto did not have meetings with
9 the whole staff. He relied on me to do that.
10 So I kept the headquarters staff informed of
11 what our initiatives were, where we were, etc.,
12 etc., because these people depended on that job
13 for their own livelihood, to be honest.
14    So, the communication, Mr. Alberto was
15 very good at communicating one to one, but he
16 was - talking to the team was not his modus
17 operandi.
18    While he was doing that, she would be
19 running around, you know, dealing with paper
20 work, etc., with Finance; I have no idea. All
21 I know is when she was in the corporate office,
22 it was rare, when they came anyway. And even
23 when he went to a meeting, she would accompany
24 him most of the time. That's all.
25    Q.  And what was her function on those

129

1 occasions? Did she take notes?
2    A.  Very good question; I have no answer
3 for that, sir. Don't know.
4    Q.  So you're unaware of any work function
5 she filled?
6    A.  No, sir. Doesn't mean she wasn't
7 doing it, okay, but I have not even seen her
8 take minutes when we were having meetings.
9    Q.  Okay. And normally in your role as
10 the head of Human Resources, would you know
11 what an employee's functions was at a meeting
12 like that?
13    BY MR. DEITCH:
14    Objection to form.
15    BY THE WITNESS:
16    The assistant, including her aunt,
17 would take all the minutes of the meeting. But
18 I repeat, her aunt was a very, very experienced
19 executive assistant. This young lady had, in
20 my opinion, you know, very little experience in
21 administrative assistant. That's all.
22    BY MR. STREIT:
23    Q.  Did Mr. Alberto allow her any time off
24 when they were in the United Arab Emirates,
25 just to, you know, sightsee, shop, anything

130

1 like that?
2 A. As the drivers, I'm not sure how
3 relevant, but anyway, as the drivers were under
4 my responsibility, through the supervisor of
5 support services, you know, the next morning,
6 I would say I was going somewhere, or one of
7 the other senior guys was going somewhere, and
8 we needed a driver, because parking over there
9 is just a nightmare.
10     So they drive you, they wait for you,
11 and they bring you back. And she said, "Nasir
12 is still in Dubai." And my answer was,
13 "Christ, what the hell is he doing in Dubai?"
14 And she said, "Well, Reno and his assistant
15 flew in to Dubai instead of flying into Abu
16 Dhabi." That could very well happen, depending
17 on flight times, availability, etc.
18     When Nasir came back, I said, "What
19 the heck took you to two days to drive them to
20 Dubai to fly out?" He says, "Well, I wasn't
21 doing that, I was driving them around from a
22 couple of shopping places to a couple of
23 shopping places," and to my surprise, he said,
24 "and her mom came to visit Dubai at the same
25 time." I said okay, fair enough.

131

1     I mean, the poor guy was - this is a
2 very low-level employee, so I did not involve
3 him into anything obviously. You're talking
4 about 3000 dirhams a month, which is about 700
5 bucks. And I just said, "That's interesting."
6 That's it.
7 Q. You said "she," you were referring to
8 Hillary Holcombe's mother?
9 A. That's right. Apparently travelled to
10 Dubai, and he took them around for shopping,
11 which is, you know, maybe she was going
12 somewhere, maybe, you know, she was in transit,
13 maybe, maybe, maybe, I have no idea.
14 Q. Do you know if she paid for her own
15 travel?
16 A. Who "she," the mother?
17 Q. Now it's my turn; yes, the mother.
18 A. The mother, I would assume so. I
19 would assume so. I don't think the company
20 ever paid for family member travel. No way.
21 Q. And do you recall about when that was,
22 this shopping trip in Dubai?
23 A. It would be after her employment,
24 obviously, sometime late summer, but I couldn't
25 tell you, honestly, the specific month.

132

1 Q. Late summer 2017?
2 A. Well, she was hired in 2017, right,
3 full time, so it would be late summer of 2017.
4 Q. Okay.
5 A. Something like that. Wait a minute.
6 It would be earlier than that because I was
7 still employed, and I left in May 2017, so it
8 had to be earlier than that. Sorry.
9 Q. And actually that's an excellent
10 segue. Did there come a time when NorthStar
11 began laying off personnel?
12 A. Yes, sir.
13 Q. When was that?
14 A. Well, when the Egyptian initiative
15 fell through, he basically directed us to start
16 laying off staff.
17 Q. Mr. Alberto did?
18 A. Yes, which was quite frankly the right
19 thing to do, you know, we had to shed some of
20 the expenses, and so we started doing that
21 process, and we were still continuing to push
22 through other channels the Egyptian initiative.
23     Once we could not get access anymore
24 to the military because we were no longer
25 getting invitations to show up, that was it, he

133

1 basically informed me, on the phone, "By the
2 way, I will not be able to you keep you." That
3 was my termination speech.
4     And I said, "Interesting. I'm going
5 to be in the office in DC in a couple of days,
6 maybe we should discuss it." Okay.
7     And again, to be crystal clear, late
8 the year before, I had already told him that my
9 wife and I were going to come back to Montreal
10 around mid to end of 2017. So he basically
11 superceded all that.
12 Q. And when was that conversation with
13 him?
14 A. I believe March 2017, around there.
15 January, February, you know. First quarter, I
16 would say.
17 Q. Okay. Now, other than yourself, do
18 you know of any other individuals of the
19 company who were let go?
20 A. Yes, sir.
21 Q. Who else?
22 A. Some of the staff - I did the
23 terminations myself. Some of the staff in
24 Operations were let go. That was mainly the
25 department impacted, but that was the bulk of

134

1 the staff, to be fair.
2    Q.  Do you know any of those persons by
3 name?
4    A.  I couldn't tell you, honestly.  George
5 was one of them.  If I see the names, I might
6 recognize, if you don't mind.  One second.
7    Q.  Sure.  Are you looking to refer to
8 something already marked?
9    A.  Yes, because they don't work for me.
10 Yes, Exhibit 3.  I sat through some of those
11 terminations.  George Soter was one of them.
12 There was three or four of them anyway.  Rick
13 Morris had resigned.  They were not my
14 employees, I really don't remember, but I did
15 sit through because the HR coordinator, who was
16 going to basically be the only HR person left,
17 had no idea about how to handle any of this.
18 So I said, "You come with me, and you will see
19 the first two or three, there's a process here,
20 etc.," and that was it.
21    Q.  So the individuals who were let go, to
22 the best of your recollection, are they all
23 shown on the chart in Exhibit number 3?
24    A.  Well, that chart is two years old,
25 right.  The more senior ones that were let go

135

1 was Mr. Becka.
2    Q.  Lyle Becka?
3    A.  Lyle Becka.  And Mr. Adam Gunn.  Okay.
4 There was - I think Mr. Jett resigned.  I was
5 terminated, which was - that's it.  There was
6 no change to the Finance department.  In fact,
7 initially they told Mr. Agha that he was
8 leaving.  And then when I came back from the
9 hangar, things had changed.  He was then told
10 he was going to stay, and I said, "Good for
11 you, you want to stick around, you stick
12 around."  I mean, I've known him for 40 years,
13 right?
14       And then two months later, they
15 changed their mind again, and got rid of him.
16 But I repeat, you know, the terminations of
17 some staff had to be done due to cost control.
18 You can argue with the selection of staff, you
19 can argue with the level of staff, you can
20 argue with the timing of the terminations, but,
21 you know, do I agree as an executive and a
22 business person that, you know, where there are
23 no contracts, we've got to reduce staff,
24 absolutely.
25    Q.  Were you anticipating receiving a

136

1 bonus in 2017?
2    A.  Yes, I was anticipating being part of
3 the senior management that would have received
4 something once the first part of the
5 performance bond was paid.
6    Q.  And did you in fact receive that
7 bonus?
8    A.  No, sir.
9    Q.  Do you know why you did not?
10    A.  It's impossible to answer that
11 question straightforward.  I can tell you that
12 I asked him about it.  When I went to
13 Washington two days later, we met and I said,
14 "One, this is no way to tell an executive
15 that's been working with you for any length of
16 time that his employment's coming to an end."
17 I said, "Two, I had dinner with Terry last
18 night, he was aware of it before I was aware of
19 it.  That's not acceptable."  He apologized,
20 and I accepted his apology.  Okay.  Call it
21 inexperience, whatever.  I said, "That's fine,
22 just don't do that again.  This is just not
23 right.  You talk to the employee, and then
24 after that, you can inform his colleagues.  You
25 do not tell his colleagues, and then I'm having

137

1 dinner with Terry, and something comes up that
2 evening before, and all of a sudden I realize
3 that he's fully aware of my situation.  Crap."
4 Okay, that's all.
5       So he apologized, and I said fine.
6 Then I asked him, I said, "Listen, I was
7 planning to leave at the end of the summer
8 anyway, after the performance bond; the first
9 part of the performance bond is coming.  You
10 know that and I know that."  And he said, "No,
11 you know, there's not going to be anything for
12 you when the performance bond," and I said
13 that's fine.  I did not even argue.
14       You know, honestly, by that time, I
15 was just aching to go.  That would have been
16 May, it was my last day, so that would have
17 been, again, two, three months earlier.
18    Q.  And again, just to clear up the
19 pronouns, when you say "he apologized," you're
20 referring to Mr. Alberto?
21    A.  Mr. Alberto, he did, in his office, to
22 be fair.
23    Q.  Okay.  So when was your last day
24 working at NorthStar?
25    A.  Officially July, but because the

218

1    Q.   Okay.  Were you aware that
2  Ms. Holcombe was responsible for work relating
3  to the company's website?
4    A.   Yes.
5    Q.   And were you aware that she was
6  responsible for issues, other issues relating
7  to media?
8    A.   No.  No.  And by the way, I called
9  Mr. Alberto to question the title of Chief
10 Marketing Officer, because, again, in my
11 industry experience, if you're going to have
12 somebody called that, it's 25 years of
13 experience and more.  And he had already
14 promised the title, and there was nothing we
15 could do, to Ms. Holcombe.
16   Q.   So, when you say "there's nothing we
17 can do," did you communicate to the sheik any
18 of these complaints?
19   A.   Absolutely not.  I repeat, we were not
20 authorized to talk to the sheik about anything.
21 The only two people, I'll go back through it
22 again if you want, on the org chart that
23 communicated with His Highness were Mr. Alberto
24 and Mr. Dhaheri, okay.  Mr. Key, Mr. Ali, and
25 Mr. Farag - I mean, I can't comment for Ali

219

1  because of the finance side, but Mr. Key and I
2  would probably only see the sheik, I certainly
3  only saw the sheik at the air shows.
4    Q.   If I understand your testimony
5  correctly, there was a point in time when you
6  developed a concern that the company would be
7  exposed to liability because of what you
8  believed was a relationship between Mr. Alberto
9  and Ms. Holcombe?
10   A.   A potential relationship, first of
11 all.  And second of all, it wasn't just myself.
12 It was Terry Key and myself.
13   Q.   And when you say "a potential
14 relationship," is that because, do I understand
15 correctly, you never observed any conduct that
16 led you to conclude conclusively that there was
17 such a relationship?
18   A.   Well, the key word in what you just
19 said, with respect, is conclusively.  Okay?
20 For example, we're in Cairo, okay, and I know
21 very well that my boss at the time does not
22 like to leave the hotel because of security
23 matters, etc., etc., and she decides, the young
24 lady decides she was going to go shopping;
25 Mr. Alberto decided to join us.  Okay?  I'm

220

1  just giving you that as an example.  When we
2  were in Cairo and we walk into the suite,
3  right, and they're having lunch in the same
4  plate, literally, and sharing their meal, sure,
5  it could be very innocent, very, you know,
6  etc., etc.  It just didn't look right.  That's
7  all.
8          I'm not familiar, but you will see it
9  in the Affidavit, I'm not familiar with the
10 cartoon Tinkerbell, but that's the nickname
11 that Terry gave her, whatever that means.  It
12 didn't sound very complimentary, let me put it
13 to you that way.
14   Q.   And when was the first time you heard
15 Mr. Key speak about Ms. Holcombe using that
16 nickname?
17   A.   My god, it wasn't - using the
18 nickname, it would have been about three, four
19 months after she arrived.  But his first
20 complaint about her was literally a couple of
21 weeks after she arrived.
22   Q.   And what was that complaint?
23   A.   He got very upset because he wrote to
24 her and he needed some stuff, and there was
25 zero response.  So he called Mr. Alberto, and

221

1  basically told him that, you know, as a Vice-
2  president of this company, when I write to your
3  assistant, I expect her to respond.  And
4  Mr. Key can testify to that if you care to ask
5  him.  That's all.
6    Q.   Okay, if you look at paragraph 24 of
7  the Affidavit, which I believe is Exhibit 15.
8  Okay, so in paragraph 24, you've listed some
9  observations about what you refer to as the
10 working relationship between Alberto and
11 Holcombe.
12   A.   Yes.
13   Q.   Okay, if you look at C, do you see
14 that in - you say:
15        "In November 2016, Terry
16        Key, Alberto, Holcombe and
17        I travelled to Washington,
18        DC to attend a corporate
19        meeting."
20   A.   Hmm-hmm.
21   Q.   Yes, you see that?
22   A.   Yes.
23   Q.   Okay, you made a sound rather than a
24 word, that's why I was correcting you.
25   A.   Yes.  Yes.  Sorry.

### 222

1    Q.   That's not accurate, correct?  That
2  should have been October 2016?
3    A.   Whatever.  I mean, when was AUSA?  It
4  was a day or two before, and I said that to
5  Mr. Streit.  So we would have to go back and
6  check when the show was.  We only went to
7  Washington because of the show.  If the show
8  was in October, it would have been a day or two
9  before.  If the show was in November, it would
10 have been a day or two before.  So, yep, I
11 could stand corrected here, instead of
12 November, it could be October.
13   Q.   Okay, earlier in your testimony, you
14 said that you in October 2016, you went to the
15 AUSA show?
16   A.   It depends when the AUSA was.  I'm not
17 an encyclopaedia, Mr. David, okay.  If AUSA was
18 in October, it would have been a couple of days
19 before.  If AUSA was in November, it would have
20 been a couple of days before.  If you want to
21 check the internet, we can find out when AUSA
22 was in Washington, DC in 2016 in a minute.
23   Q.   Was it not important to you to be
24 accurate when you signed this Affidavit?
25   A.   I mean, no, it was, but the difference

### 223

1  between an October and a November 2016, it
2  would have been probably better to just put in
3  the bottom three months of 2016, or in the
4  bottom quarter.  That would be more accurate.
5    Q.   Do you know where the information came
6  from that appears in this Affidavit that this
7  travel was in November 2016?
8    A.   No, it's just myself.
9    Q.   Okay, and then in paragraph 24 d.,
10 that refers to the meeting in Australia that
11 you testified about earlier, correct?
12   A.   Yes, correct.
13   Q.   Who was the Operations staff?  You say
14 you were advised by the Operations staff about
15 certain information.  What Operations staff
16 gave you that information?
17   A.   Minimum would be James Jett, and Dave
18 Williams.  Minimum.  I don't recall if Lyle had
19 gone with them or not, to be honest, but
20 certainly James Jett and David Williams.
21   Q.   And when and how did they inform you
22 of this information?
23   A.   Oh, could have been a couple of weeks
24 after, two, three weeks after, I honestly don't
25 recall.

### 224

1    Q.   What did they say to you?
2    A.   They basically said that, you know,
3  and Alexa, as she calls herself, had come to
4  the show for about a day and a half over two
5  days, that's it, and then left, and they never
6  saw them again.
7    Q.   The AUSA show is very large, isn't it?
8    A.   No, no, this is not AUSA, this is
9  Australia.
10   Q.   Oh, excuse me.  Was this a large
11 convention?
12   A.   I've never been.  I couldn't answer.
13   Q.   Okay.  So do you know whether
14 Mr. Alberto and Ms. Holcombe could have been
15 there and those Operations staff simply did not
16 know whether they were there?
17   A.   I seriously doubt that, but the answer
18 is no, okay.  The answer is no, I don't know,
19 but I seriously doubt that.  Because usually
20 when you go to an air show, I don't know if
21 you've ever been, you have a tendency - you
22 have to stay in your booth because clients, or
23 potential clients, are passing by and - so you
24 don't go walk around unless you're backed up,
25 etc., etc.

### 225

1    Q.   Well, who was manning the booth at the
2  convention?
3    A.   I would assume it's James Jett and
4  David Williams, and potentially Lyle if he was
5  there, I don't know.
6    Q.   Okay, so Mr. Alberto and Ms. Holcombe
7  would not have been staffing the booth?
8    A.   Yeah, but he was always at the booth
9  when we were at AUSA, for example, he either
10 sat upstairs in the conference room, etc., and
11 whenever people came, suppliers and clients, or
12 potential clients, he met with them.
13   Q.   Do you know what day Mr. Alberto left
14 the convention?
15   A.   No.
16   Q.   And do you know who he travelled with?
17   A.   Herself.
18   Q.   Excuse me?
19   A.   Ms. Holcombe.
20   Q.   Do you know if he left on the same day
21 as any of the other people who travelled there?
22   A.   No idea.  You'll get a better feel for
23 that probably from the Finance department
24 because they saw his expense report when it
25 came in.

226

1    Q.   Okay.  So did the Finance department
2 reject his expense report?
3    A.   No idea.  When a CEO tells you that
4 he's gone here for business meetings, etc.,
5 etc., it's pretty hard for a lower level, you
6 know, controller to question.  And I can assure
7 you that the financial controller questioned on
8 a few occasions.  He went to his boss and he
9 asked him to either approve, or sign, or get
10 clarification because he wasn't going to do it.
11    Q.   And what's the basis for what you just
12 described about the financial controller, which
13 I assume is referring to Mr. Agha?
14    A.   That's right.
15    Q.   So what's your basis for, you just
16 said that he did go and he did say --
17    A.   There were some expenses, and by the
18 way, not just his, anybody's expenses, that
19 Mr. Agha would question.
20         And the rule of thumb was very simple,
21 right, you go to your boss, and when it came to
22 the CEO, he actually talked with Alberto a
23 couple of times, you can re-validate all of
24 that tomorrow, and was told by his boss,
25 Mr. Ali, that Alberto had called and said that

227

1 he no longer wants to get any calls from
2 anybody else about his stuff, except from Ali.
3 And that's it.  And you'll get that tomorrow
4 under oath.
5    Q.   How long have you known Mr. Agha?
6    A.   Oh, 40 years.  We went to university
7 together.
8    Q.   Okay.  And have you kept in touch with
9 him throughout that whole period of time?
10    A.   Absolutely.
11    Q.   Do you consider him a close friend?
12    A.   Absolutely.
13    Q.   Okay.  Have you spoken to him since
14 you left NorthStar?
15    A.   Absolutely.  And we spoke to
16 Mr. Streit together on the phone.
17    Q.   So you and Mr. Agha were on the
18 telephone at the same time with Mr. Streit?
19    A.   Hmm-hmm.
20    Q.   And this is the conversation in which
21 he interviewed you about the information that
22 later appeared in your Affidavit?
23    A.   Well, we each have separate
24 Affidavits, I don't know what's in his
25 Affidavit, but basically I have my own separate

228

1 Affidavit.  But the first call, yes, we were
2 both there.
3    Q.   So, when you provided information on
4 that call to Mr. Streit, Mr. Agha was able to
5 hear what you said, right?
6    A.   Absolutely.
7    Q.   And when Mr. Agha provided
8 information, you were able to hear what he
9 said?
10    A.   Yes, sir.
11    Q.   In paragraph 24 d., when you say:
12         "I was then surprised when
13         advised by NorthStar's
14         Finance department that the
15         expenses submitted
16         indicated they remained for
17         more than one week."
18    A.   That's right.  That's the Australian
19 trip.
20    Q.   You had no responsibility for expense
21 reports, correct?
22    A.   No, sir.
23    Q.   So why were you advised by the Finance
24 department about Mr. Alberto's expense report?
25    A.   Why was I advised by Operations that

229

1 they had only showed up for a day and a half?
2 Because people were pretty frustrated, and one
3 of my jobs was to calm them down.
4    Q.   So how was it that you calmed them
5 down?
6    A.   Basically just listened, and I
7 basically guided that this is not your concern,
8 and, hey, he may have other business in the
9 location, etc., etc., etc.  That's all.
10    Q.   Because it's possible that that in
11 fact was what happened?
12    A.   Absolutely possible.  No question
13 about it.
14    Q.   So when, in paragraph 24 d., when you
15 cite that as an observation that's intended to
16 suggest impropriety on the part of Mr. Alberto,
17 it's possible there was no impropriety in this,
18 isn't it?
19    A.   It's possible that there was no
20 impropriety, and it's possible that it was an
21 exaggerated trip based on the number of days he
22 was at the business location.
23    Q.   And you have no idea which one?
24    A.   No, I cannot confirm either/or, but I
25 know that, at the booth, he wasn't there.

270

1  show, if you want, I'm happy to re-read the
2  whole thing again.
3      Q.   And take your time.
4      A.   Absolutely.  Two very minor
5  adjustments.  One, Terry Key, typo, is not
6  Director of Operations, it's Vice-president, or
7  Senior Vice-president.  That's on page 3,
8  middle of the page, item 15.  And of course
9  what Mr. David highlighted is that the show was
10 in October, not November 2016.
11     Q.   Okay.
12     A.   That's all.
13     Q.   Everything else, as far as you can
14 recall sitting here today, is absolutely
15 correct?
16     A.   Everything else, as far as I can
17 recall sitting here today, is absolutely
18 correct.
19     Q.   Okay.  That's all I have.
20     A.   All right.  Thank you.
21     BY MR. DEITCH:
22         Thank you.
23 AND FURTHER DEPONENT SAYETH NAUGHT.
24 * * * * * * * * *
25

271

1          I, DENISE TURCOT, bilingual Official Court
2  Reporter number 264848-2 duly sworn as such, do
3  hereby certify that the foregoing is a true and
4  accurate transcription of the evidence herein,
5  the whole in accordance with the law.
6
7  And I have signed,
8
9                      Signature numérique de
10                     Denise Turcot
11 _____        DN : cn=Denise Turcot
12                     Date : 2018.10.16 21:47:46
13                     -04'00'
14 DENISE TURCOT
15 Bilingual Official Court Reporter
16
17
18
19
20
21
22
23
24
25

**DENISE TURCOT S.O./OCR**

MAXIN



## NorthStar
AVIATION

**Name:** Reno Alberto                                                                 December 9, 2012

| | PRESENT | PROPOSED |
|---|---|---|
| **Title** | CEO | CEO |
| **Effective date** | | January 2013 |
| **Company** | | NSA USA LLC. |
| **Level** | Senior Executive | Senior Executive |
| **Basic Salary / month** | US$62.5k | Same |
| **Basic Salary & Deferred Compensation** | US$750.0k + US$250.0k | Same |
| **Performance Bonus** | Discretionary | Same |
| **BENEFITS** | | |
| **Health insurance** | Yes | Same |
| **Transportation allowance** | US$40.0k | Same |
| **Housing allowance/year** | US$125.0k | Same |
| **Travel** | 10% of basic salary | Same |
| **Tax Equalization 2012 only** | | US$550.0k  $550.0k US (PA) |
| **Tax Equalization 2013 forward** | | US$450.0k per annum payable monthly and reviewed annually depending on US income tax rates |
| | | |
| | | |
| | | |
| | | |
| **Rationale / Justification** | | As the basis for compensating the Executive has changed strictly due to business requirements, the Company will grant him Tax equalization assistance |

---------------------------                              ---------------------------------------------------

**VP HR**                                                       I confirm having obtained approval for these payments
                                                                            **Reno Alberto**





# NorthStar
## AVIATION

February 3, 2013

**Memorandum:**

To: H. Farag, VP HR

    N. Ali, Dir. Finance


From: Chief Executive Officer


**Subject: Personal Income Taxes 2012**


This is to confirm that I have received the Company's contribution to my personal income tax bill for calendar year 2012 and have personally remitted the required payments.

Thank you,

Reno Alberto



## NorthStar
AVIATION

|  | PRESENT | PROPOSED |
|---|---|---|
| Title | CEO | CEO |
| Effective date |  | January 2013 |
| Company | NSA LLC | NSA USA LLC. |
| Basic Salary | US$750.0k | US$1,000.0k |
| Basic Salary / month | US$62.5k | US$83.3k |
| Differed Compensation | US$250.0k | Nil |
| Performance Bonus | Discretionary | Same |
| BENEFITS |  |  |
| Health insurance | Yes | Same |
| Transportation allowance | US$40.0k | Same |
| Housing allowance/year | US$125.0k | Same |
| Travel | 10% of base, US$75.0k | 10% of base, US$100.0k |
| Tax Equalization 2012 ONLY |  | US$550.0k (payable before January 15, 2013) |
| Tax Equalization 2013 (at 42%*) & beyond (TBD) |  | US$873.0k per annum payable monthly & reviewed annually. Amount is dependent on US income tax rates |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| *Rationale / Justification* |  | *As the basis for compensating the Executive has changed strictly due to business requirements, the Company will grant him Tax protection assistance for his annual compensation excluding bonuses* |

*Tax rate provided by CEO after consultation with PWC

Prepared by:
**VP HR**

I confirm that I obtained all required approvals for these payments
**Reno Alberto**



**Name:** Reno Alberto

|  | PRESENT | PROPOSED |
| --- | --- | --- |
| Title | CEO | CEO |
| Effective date | | March 2013 |
| Company | | North Star USA |
| Level | | |
| Basic Salary / month | | |
| Basic Salary / year | | |
| Performance Bonus | | |
| BENEFITS | | |
| Health insurance | | |
| Transportation allowance | | |
| Housing allowance/year | | |
| Travel | | |
| TOTAL CASH / year | | |
| % change | | |
| OTHER CONDITIONS | | |
| FINAL Income tax payment for 2012 | | One time gross payment of US$ 106,224 (net US$ 62,330) based on a 42% tax rate |
| Rationale / Justification | | *Final income tax payment for 2012 as per PWC's email dated March 11, 2013 which is based on the "actual" filing & remittance and response for income tax year 2012.* |
| | | |
| | | |
| | | |

I confirm that I received all required approvals for this payment

----------------

**prepared by**
**VP HR**

----------------------------------------

Reno Alberto
**CEO**

|  | PRESENT | PROPOSED |
|---|---|---|
| Title | CEO | CEO |
| Effective date |  | January 27, 2014 |
| Company | North Star Aviation | North Star Aviation |
|  |  |  |
| Basic Salary / month |  | Same |
| Basic Salary / year |  | Same |
| Discretionary Bonus |  | US$1,200,000.00 |
| BENEFITS |  |  |
| Health Coverage |  | Same |
| Transportation /year |  | Same |
| Housing allowance/year |  | Same |
| Travel/year |  | Same |
|  |  |  |
| TOTAL CASH / year |  | Same |
| % Change |  | n/a |
| OTHER CONDITIONS |  |  |
| Schooling Fees |  | n/a |
|  |  |  |
| Life Insurance |  | Same |
|  |  |  |
|  |  |  |
|  |  |  |
| Rationale / Justification |  | Payout for 2013 performance |

I confirm that I received ALL necessary authorized approvals for this bonus payout.

----------------------
Prepared: H.Farag

------------------------------------------------------------
Confirmed
**Reno Alberto, CEO**



**NorthStar**
A V I A T I O N

**Name:** Reno Alberto

| | PRESENT | PROPOSED |
|---|---|---|
| Title | CEO | Same |
| Effective date | | April 1, 2014 |
| Company | NSA USA | Same |
| Basic Salary / year | $1,000,000 | Same |
| Tax Assistance | $874,000 (2014) adjusted annually | Same |
| | | |
| Performance Bonus | Discretionary | Same |
| BENEFITS | | |
| Car allowance | $39,996 / year | Same |
| Housing allowance | $125,688 / year (AED 460.0k) | Nil |
| Travel allowance | $100,000 / year (10% of base salary) | Nil |
| Cost of living allowance | Nil | $225,688 / year |
| TOTAL CASH / year | Gross $2,139,684 / year | Gross $2,139,684 / year |
| % change | | No change |
| OTHER CONDITIONS | | |
| Health insurance | Yes | Same |
| Severance | Yes | Same |
| Life insurance | Yes | Same |
| Probation | Not applicable | Same |
| Rationale / Justification | | As CEO position had to be relocated to Washingtn DC for business development purposes, Housing & Travel allowances were eliminated and New Cost of Living allowance was applied |

I confirm that I received all
necessary approvals to implement
this compensation plan

-------------------------        ------------------------- 23 MAR '14

**Prepared, date**                                  **Reno Alberto, date**
**VP Corporate**                                      **CEO**



**NorthStar**
AVIATION

**Name: Reno Alberto**

|  | PRESENT | PROPOSED |
|---|---|---|
| Title | CEO | same |
| Effective date |  | April 14, 2014 |
| Company | NSA USA | same |
|  |  |  |
|  |  |  |
| **BENEFITS** |  |  |
| Additional Tax payment for 2013 |  | GROSS: US$155,049 (Net: US$90,006) |
|  |  |  |
|  |  |  |
|  |  |  |
| **OTHER CONDITIONS** |  |  |
| Rationale / Justification |  | Final income tax payment for calendar year 2013 as per PWC calculations (email dated April 13 & 17, 2014) |
|  |  |  |
|  |  |  |
|  |  |  |

**I confirm that I received all necessary approvals for this payment.**

----------------------------

**Prepared**

-------------------------------

Reno Alberto
**CEO**



**Name: Reno Alberto**

|  | PRESENT | PROPOSED |
|---|---|---|
| Title | | CEO |
| Effective date | | August 10, 2014 |
| Company | | NSA |
| | | |
| | | |
| Virginia state tax payment on Performance Bonuses paid in 2014 | | US$149,500 |
| Incme tax implication Federal+State+FICA | | US$136,351 |
| | | |
| | | |
| | | |
| | | |
| | | |
| TOTAL | | US$285,351 |
| | | |
| | | |
| Rationale / Justification | | Additional tax payment"on an exception basis" due to change in residence from Washington state to Virginia state on bonus payments made in 2014 until the end of July |

*I confirm having received all the necessary approvals for this special payment*

--------------------------                        -----------------------
**Prepared**                                        Reno Alberto
                                                    **CEO**



NorthStar

**Name: Reno Alberto**

| | PRESENT | PROPOSED |
|---|---|---|
| **Title** | | CEO |
| **Effective date** | | December 2015 |
| **Company** | | NSA |
| | | |
| | | |
| | | |
| **Discretionary Bonus** | | US$1,500,000.00 (Gross) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Note** | | Less applicable taxes |
| | | |
| | | |
| | | |

I confirm having received all the necessary approvals for this special payment

----------------------------------

Reno Alberto, CEO

Date:

# LIBERTY INTERNATIONAL UNDERWRITERS



EXHIBIT

FARAG 9

# EMPLOYMENT PRACTICES LIABILITY POLICY

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey



Liberty
Surplus Insurance
Corporation℠

1    1

NSA000281

**Liberty**
**Surplus Insurance**
**Corporation**

# LIBERTY SURPLUS INSURANCE CORPORATION
**(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")**
175 Berkeley Street, Boston, MA 02116
Toll-free number: 1-800-677-9163

## EMPLOYMENT PRACTICES LIABILITY POLICY
## DECLARATIONS

THIS POLICY PROVIDES CLAIMS MADE AND REPORTED COVERAGE. THE COVERAGE IS PROVIDED ON A DEFENSE WITHIN THE LIMITS BASIS. COSTS INCURRED BY THE INSURER IN DEFENDING CLAIMS WILL REDUCE THE LIMITS OF LIABILITY. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.

Policy No: EPL5NYABFY1X001
Renewal Of: N / A

Item I. **PARENT ORGANIZATION:** Northstar Aviation USA LLC

ADDRESS: 1750 Tyson Blvd. Suite 1500
McLean, VA 22103

Item II. **POLICY PERIOD:** INCEPTION DATE: March 7, 2017
EXPIRATION DATE: March 7, 2018
12:01 A.M., local time at the address of
the **Parent Organization** as stated above.

Item III. LIMIT OF LIABILITY: $2,000,000
Maximum aggregate Limit of Liability for all **Claims** made per **Policy Period** and the Extended Reporting Period, if applicable under all Section 1. Insuring Agreements, including Defense Costs

Item IV. RETENTION:
Each **Claim:** $10,000 (Retention is inclusive of Defense Costs)

Item V. THIRD PARTY COVERAGE ELECTED
**Third Party Claim** Coverage Elected:
Sublimit of Liability: $2,000,000
Retention: $10,000

Item VI. EXTENDED REPORTING PERIOD:
Extended Reporting Period (If Purchased)

A. Additional Premium: 75%
B. Duration: One Year

1   2



**Employment Practices Liability Policy**

| | | | |
|---|---|---|---|
| Item VII. | COINSURANCE PERCENT: | | 0% |

Item VIII.    PENDING OR PRIOR DATE:

      A.   Section I. Insuring Agreement A.:    March 7, 2017
      B.   Section I. Insuring Agreement B.:    March 7, 2017 (If elected)

Item IX.    CONTINUITY DATE:          March 7, 2017

Item X.    Notice and reporting:

Notice of **Claims** and Potential **Claims:**    All other notices to be sent to:

Attn: Specialty Casualty Claims        Attn: Employment Practices Liability Dept.
Liberty International Underwriters     Liberty International Underwriters
55 Water Street, 23rd floor          55 Water Street, 23rd floor
New York, NY 10041            New York, NY 10041
Facsimile: 212-208-4290
Email: DandONotice@libertyiu.com

Item XI.    ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:    1-5

| | | | |
|---|---|---|---|
| Item XII. | PREMIUM: | $6,500 | |
| | TRIA PREMIUM: | N / A | |
| Item XIII. | SURCHARGES: | N/A | |

This Declarations page, together with the **Application**, the attached Employment Practices Liability Policy Form, and all endorsements thereto, shall constitute the contract between the **Insurer** and the **Parent Organization**. This Policy is valid only if signed below by a duly authorized representative of the **Insurer**.

PRESIDENT
Christopher L. Peirce

VICE PRESIDENT and SECRETARY
Mark C. Touhey

2   2

NSA000283



# LIBERTY SURPLUS INSURANCE CORPORATION
### (A New Hampshire Stock Insurance Company, hereinafter the "Insurer")
175 Berkeley Street, Boston, MA 02116
Toll-free number: 1-800-677-9163

## EMPLOYMENT PRACTICES LIABILITY POLICY

(NOTICE: Words and phrases in **bold**, other than the headings, have a specific meaning and are defined in Section III below.)

THIS POLICY PROVIDES CLAIMS MADE AND REPORTED COVERAGE. THE COVERAGE IS PROVIDED ON A DEFENSE WITHIN LIMITS BASIS. COSTS INCURRED BY THE INSURER IN DEFENDING CLAIMS WILL REDUCE THE LIMITS OF LIABILITY. VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.

> This policy may be subject to surplus lines taxes, stamping fees, surcharges, and certain surplus lines reporting requirements mandated by state regulations. The Surplus Lines Broker is responsible for the disclosure of all related taxes, surcharges, and fees. The Surplus Lines Broker is also responsible for the applicable surplus lines reporting requirements including but not limited to the submission of diligent search forms

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, which is attached and made a part of this Policy, and in consideration of, and subject to, the payment of premium when due, the **Parent Organization** agreeing to pay the Retention specified in Item IV. of the Declarations or Item V., if applicable and subject to the terms, conditions, and exclusions of this Policy, the **Insurer** and the **Insureds** agree as follows:

## I. INSURING AGREEMENTS

A. The **Insurer** will pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made against an **Insured** for a **Wrongful Act** taking place before or during the **Policy Period**, and reported to the **Insurer** during the **Policy Period**, or **Extended Reporting Period** (if applicable), pursuant to Section VI. of this Policy

B. Third Party Liability (Elective)

If Third Party Liability coverage is elected and is indicated in Item V. of the Declarations, the **Insurer** will pay on behalf of the **Insureds** all **Loss** that the **Insureds** shall become legally obligated to pay as a result of a **Third Party Claim** first made against the **Insured** for a **Third Party Wrongful Act** taking place before or during the **Policy Period**, and reported to the **Insurer** during the **Policy Period** or **Extended Reporting Period**, (if applicable) pursuant to Section VI. of this Policy.

## II. COVERAGE EXTENSIONS

A. Spousal/Domestic Partner Liability

Under this subsection, the term "spouse" shall include any person recognized by any applicable federal, state, local or foreign law as having the same rights as a lawful spouse.



If a **Claim** against an **Insured Person** includes a claim against the **Insured Person's** lawful spouse solely because of:

1.  such spouse's status as spouse of the **Insured Person**; or

2.  such spouse's ownership interest in property that the claimant seeks as recovery for alleged **Wrongful Acts** or, if Third Party Liability coverage is purchased, **Third Party Wrongful Acts** of the **Insured Person**;

then all **Loss** that such spouse becomes legally obligated to pay on account of such **Claim** shall be treated as **Loss** that the **Insured Person** becomes legally obligated to pay on account of the **Claim** made against the **Insured Person**, only if and to the extent such **Loss** would be covered if incurred by the **Insured Person**. This coverage extension does not apply to any **Claim** alleging a **Wrongful Act** or omission by the **Insured Person's** spouse.

B.  Estates and Legal Representatives

In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** or, if Third Party Liability coverage is elected, **Third Party Wrongful Acts** by such **Insured Person**, shall be deemed to be a **Claim** against such **Insured Person**.

C.  Extended Reporting Period

If the **Insurer** or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy for the duration of time set forth in Item VI.B. of the Declarations following the effective date of such cancellation or non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** and, if Third Party Liability coverage is elected, **Third Party Wrongful Acts** taking place before the effective date of such cancellation or non-renewal and otherwise subject to coverage under this Policy. A written request for this extension, together with payment of the Extended Reporting Period Premium set forth in Item VI.A. of the Declarations, must be made within 30 days after the effective date of cancellation or non-renewal of the Policy. Such Extended Reporting Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the **Insurer** for failure to pay any premium when due.

The extension of coverage for the Extended Reporting Period shall not in any way increase the Limit of Liability set forth in Item III. of the Declarations.

D.  **Punitive Damages** Coverage

**Loss** shall include **Punitive Damages** to the extent such damages are insurable under the laws of any state or jurisdiction which has a substantial relationship to the **Insured(s)**, the **Insurer**, this Policy or the **Claim**, provided that such jurisdiction is:

1.  where the **Punitive Damages** were awarded or imposed;

2.  where the **Wrongful Act**, or if Third Party Liability coverage is elected, **Third Party Wrongful Act** underlying the **Claim** took place;

3.  where either the **Insurer** or any **Insured** is incorporated, has its principal place of business or resides; or

4.  where this Policy was issued or became effective.

NSA000285


Liberty
Surplus Insurance
Corporation.

If the **Insured** determines in good faith that **Punitive Damages** in a **Claim** are insurable, the **Insurer** shall not challenge such determination unless required to do so as a matter of public policy.

## III. DEFINITIONS

A. **"Application"** means the written application for this Policy and all attachments and materials submitted in connection with or incorporated in the written application. The **Application** shall be deemed attached and incorporated into this Policy.

B. **"Claim"** means:

    1. a written demand against an **Insured** for monetary or non-monetary relief (including any request to toll or waive any statute of limitations);

    2. a civil proceeding against an **Insured** for monetary or non-monetary relief which is commenced by the service of a complaint, or similar pleading;

    3. an arbitration or other alternative dispute resolution proceeding commenced by the **Insured's** receipt of a written request or demand for such proceeding;

    4. a formal administrative or regulatory proceeding, including without limitation any proceeding by or before the Office of Federal Contract Compliance Program, the Equal Employment Opportunity Commission, commenced by the **Insured's** receipt of a notice of charges, or any other similar federal, state or local governmental authority located anywhere in the world;

    against any **Insured** for **Wrongful Acts** or, if Third Party Liability coverage is elected, **Third Party Wrongful Acts**, including any appeal from there.

    **Claim** shall not mean any labor or grievance proceeding or arbitration that is subject to a collective bargaining agreement.

C. **"Defense Costs"** means such reasonable and necessary, charges, fees, (including but not limited to attorneys' fees and experts' fees) and expenses incurred in defending or investigating a **Claim**, including the costs of mediation, arbitration, or other alternative dispute resolution, and the premium for an appeal, attachment or similar bonds. **Defense Costs** are included within, and are not in addition to, the applicable Limit of Liability set forth at Item III. of the Declarations. The salary or other compensation of any **Insured, Employee** or **Executive Officer** are not **Defense Costs.**

D. **"Employee"** means any past, present, or future employee whose labor or service is directed and controlled by the **Insured Organization** in the ordinary course of business, including part-time, seasonal, volunteer, interns, prospective and temporary employees as well as individuals employed in a supervisory or managerial position. An individual who is leased to the **Insured Organization** shall be an **Employee**, but only while acting within the scope of their employment for the **Insured Organization**. **Employee** also means any independent contractor who is alleging status as an employee of the **Insured Organization**. Independent contractor organizations are not **Employees**. Employees of Independent contractors are also not **Employees**, except for temporary or leased personnel retained by an **Insured**, or persons claiming to be **Employees**, or persons determined to be joint Employees retained by an **Insured.**

E. **"Executive Officer"** means the Chairperson, President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Director of Human Resources, Director of Risk Management, or in house General Counsel of the **Insured Organization**, or the **Insured Organization's** functional equivalent for any such title.

 12

NSA000286



F.  **"Insurer"** means the insurer shown in the Declarations.

G.  **"Insured(s)"** means the **Insured Organization** and **Insured Persons**.

H.  **"Insured Person(s)"** means a natural persons who has been, now is, or shall become:

1.  Duly elected or appointed directors or officers of the **Insured Organization** or with respect to a **Subsidiary** incorporated outside the United States, its functional equivalent;
2.  An **Employee** of the **Insured Organization**.

I.  **"Insured Organization"** means collectively, the **Parent Organization** and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

J.  **"Interrelated Wrongful Acts"** means **Wrongful Acts** that are the same, related or continuous, or **Wrongful Acts** that arise out of, a common nexus of any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

K.  **"Loss"** means the total amount which the **Insureds** become legally obligated to pay on account of each **Claim**, for damages (including front pay and back pay), judgments, settlements, pre- and post-judgment interest and **Defense Costs** for which an **Insured** becomes legally obligated to pay on account of any **Claim** for a **Wrongful Act**, or if Third Party Liability coverage is elected, **Third Party Wrongful Acts**, subject to where coverage applies. **Loss** also includes liquidated damages awarded under the Age Discrimination in Employment Act (ADEA), Equal Pay Act (EPA), Family Medical Leave Act (FMLA), and **Punitive Damages** pursuant to subsection II.D.

**Loss** shall not include:

1.  Civil or criminal fines or penalties imposed by law;

2.  Taxes;

3.  Any amount for which the **Insureds** are not financially liable or legally obligated to pay;

4.  Employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation;

5.  Any amount which is based upon, arising from, or in consequence of employment reinstatement of the claimant by the **Insureds** or the continued employment of the claimant;

6.  Any amount which constitutes front pay, future damages or other future economic relief or equivalent thereof, if the **Insureds** has the option pursuant to a judgment or other final adjudication but fails to reinstate the claimant as an **Employee**;

7.  Amounts uninsurable under the law pursuant to which this Policy is construed; or

8.  Any amount which constitutes severance payments or which is payable pursuant to any severance, benefit agreement, practice, or employment related policy.

L.  **"Parent Organization"** means the company designated in Item I. of the Declarations.



12

NSA000287



M. **"Policy Period"** means the period from the inception date set forth in Item II. of the Declarations to the expiration date set forth in Item II. of the Declarations, or its earlier termination pursuant to Section VII.H.

N. **"Punitive Damages"** means punitive or exemplary damages or the multiple portions of multiplied damages.

O. **"Retaliation"** means any retaliatory treatment by an **Insured** relating to or alleged to be in response to any of the following actual, threatened or attempted activities:

    1. The disclosure by an **Employee** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder;

    2. The exercise by an **Employee** of any right that such **Employee** has under law; or

    3. The filing by an **Employee** of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistle-blower" law.

P. **"Subsidiary"** means any entity in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for election of directors or equivalent positions are owned, in any combination, by one or more **Insured Organizations**.

Q. **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of the **Insured Organization**. Third Party shall not include any **Employee**.

R. **"Third Party Claim"** means any **Claim** by or on behalf of a **Third Party** that alleges a **Third Party Wrongful Act**.

S. **"Third Party Wrongful Act"** means:

    1. Discrimination or harassment against a **Third Party**, based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation or preference, gender identity or expression, genetic make up testing, pregnancy, HIV or other health status, disability, or other protected status under federal, state or local law.

T. **"Wrongful Act"** means one or more of the following by an **Insured** in their capacity as such:

    1. **Wrongful Termination** of an **Employee**;

    2. **Retaliation** by an **Insured(s)** against an **Employee**;

    3. Employment related misrepresentation against an **Employee** or an applicant for employment with an **Insured Organization**;

    4. Employment related libel, slander, false arrest, humiliation, negligent infliction of emotional distress, defamation or invasion of privacy against an **Employee**;

    5. Wrongful failure to employ or promote, wrongful discipline, wrongful deprivation of career opportunity, wrongful demotion or adverse change in terms, conditions or status of employment; wrongful failure to grant tenure, negligent hiring or supervision, negligent training, negligent evaluation or retention, wrongful reference, wrongful failure to provide or enforce corporate policies and procedures related to employment;

 12



6. Employment related sexual or other workplace harassment, including quid pro quo, and hostile work environment;

7. Employment discrimination, including discrimination based upon age, gender, race, color, national origin, religion, creed, marital status, sexual orientation, or preference, gender identity or expression, genetic makeup, or refusal to submit to genetic testing, pregnancy, disability, HIV or other health status, Vietnam Era Veteran or other military status, or other protected status established under federal, state or local law;

8. Violation of the Family Medical Leave Act (FMLA);

9. Violation of an individual's civil rights relating to any of the above.

U. **"Wrongful Termination"** means termination (either actual or constructive) of an employment relationship in a manner which is wrongful or against the law, including breach of an implied agreement.

## IV. EXCLUSIONS

A. The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** against an **Insured**:

1. for bodily injury, sickness, disease, death of any person, or for damage to, destruction of, or loss of use of any tangible property; however, this exclusion shall not apply to emotional distress, mental anguish, or humiliation;

2. based upon, arising from, or in any way related to any fact, circumstance, or situation which has been the subject of any written notice under any insurance policy of which this Policy is a renewal or replacement or under any other policy.

3. based upon, arising from, or attributable to any demand, suit, or other proceeding pending against any **Insured** on or prior to the applicable Prior Litigation Date set forth in Item VIII. of the Declarations, or any fact, circumstance or situation underlying or alleged therein;

4. based upon, arising from, or attributable to any alleged violation of the responsibilities, obligations, or duties imposed by law;

   a) any state, federal or local law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law; the Employee Retirement Income Security Act of 1974 (except Section 510 thereof); the Occupational Safety and Health Act; the Federal False Claims Act; the Fair Labor Standards Act (except the Equal Pay Act) any other similar state or local law concerning wage and hour practices, including but not limited to any **Claim** for overtime, off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to timely pay wages, conversion, unjust enrichment or unfair business practices; provided, however, that this shall not apply to a **Claim** by an **Employee** for **Retaliation** based upon the actual or alleged exercise by an **Employee** of any rights by reason of the foregoing statues, rules or regulations.

   b) the Consolidated Omnibus Budget Reconciliation Act of 1985; the Racketeer Influenced and Corrupt Organization Act; the National Labor Relations Acts, Labor Management Relations Act, or any similar state or local law that pertains to the rights of employees with respect to Union, unionizing, or collective activities in the workplace or any obligations of employers with respect to such employee activities: however, this exclusion will not apply to any **Claim** for **Retaliation** with respect to the foregoing.

6 | 12

NSA000289



5.  based upon, arising from, or in any way related to any actual or alleged obligation of any **Insured** under any express written contract or agreement; this exclusion shall not apply if and to the extent such obligation would have existed in the absence of the written contract or agreement;

6.  for **Loss** attributable to or arising out of a criminal investigation or criminal proceeding brought against any **Insured** in any jurisdiction.

For purposes of determining the applicability of any exclusions, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

B.  The **Insurer** shall not be liable for that part of **Loss**, other than **Defense Costs** in connection with any **Claim** against an **Insured**:

1.  the cost associated with providing reasonable accommodations required by the Americans with Disabilities Act of 1990, or any amendment thereto, or any similar federal, state or local law;

2.  the costs associated with costs of training, re-education, sensitivity or minority development programs or other corporate programs, policy or seminars;

3.  based upon, arising from, or attributable to any actual or alleged violation of responsibilities, obligations or duties for the Worker Adjustment and Retraining Notification Act.

## V. LIMITS OF LIABILITY, RETENTIONS AND COINSURANCE

A.  Limit of Liability

1.  The maximum amount payable by the Insurer for all **Loss** under this Policy shall be the amount set forth in Item III. of the Declarations. **Defense Costs** paid by the **Insurer** are included in and shall reduce the Limit of Liability.

2.  All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period** or Extended Reporting Period, if applicable.

3.  **Claims** subject to Insuring Agreement I.B. are subject to the Third Party Liability coverage Sublimit of Liability and Retention specified in Item V. of the Declarations. The sublimit is the maximum aggregate amount that the Insurer will pay for all **Loss** from all **Third Party Claims**, and is subject to, part of, and not in addition to, the Limit of Liability in Item III. of the Declarations.

B.  Retention

The **Insurer** shall be liable for only that part of **Loss** arising from a **Claim** which is excess of the Retention amount only set forth in Item IV. of the Declarations or Item V., if applicable. The Retention shall be uninsured and shall be paid only by an **Insured,** regardless of the number of claimants, **Claims** made, or **Insureds** against whom a **Claim** is made.

In the event the **Insured Organization** is unable to indemnify or advance costs on behalf of an **Insured Person** due to its financial insolvency, no Retention will apply to such **Claim**

C.  Coinsurance Percent



NSA000290


The **Insurer** shall be liable for that portion of **Loss** for each **Claim**, excess of the Retention, specified as the applicable Coinsurance Percent in Item VII. of the Declarations. The **Insurers** liability for **Loss** for each **Claim** shall apply only to that portion of **Loss** in excess of the applicable Coinsurance Percent specified in Item VII. of the Declarations. The **Insurer** shall have no obligation for such Coinsurance Percent.

## VI. DEFENSE COSTS , SETTLEMENT, REPORTING AND NOTICE

A. Defense Costs and Settlements

1. The **Insurer** shall have the right and duty to defend any **Claim** against the **Insureds** to which this Policy applies, even if the allegations in the **Claim** are groundless, false or fraudulent. The **Insurer's** right and duty to defend includes, without limitation, the right and duty to appoint defense counsel. Amounts the **Insurer** pays for **Defense Costs** reduce the Limit of Liability.

2. The **Insurer's** right and duty to defend any **Claim** or to pay any **Loss** shall terminate upon the **Insurer's** payment of the Limit of Liability stated in Item III. of the Declarations. If the **Insurer's** right and duty to defend any **Claim** terminates by reason of payment of the Limit of Liability, the **Insurer** has the right to withdraw from any further defense of any **Claim** by tendering control of said defense to the **Insureds** against whom the **Claim** is made.

3. The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the **Insurer's** prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, the **Insurer's** consent shall not be required with respect to any **Claim** if the total **Loss** (inclusive of **Defense Costs**) arising from such **Claim** is less than sixty percent (60%) of the applicable Retention set forth in Item IV. of the Declarations or Item V., if applicable. The **Insurer** shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

4. If with respect to any settlement offer or demand made in writing for a **Claim** for which the **Insurer** requests that the **Insureds** consent and an **Insured** should withhold such consent then if the total **Loss** incurred on account of such **Claim** is more than what would have been incurred had the **Insureds** consented to such settlement offer or demand, then the Coinsurance Percent applicable to such excess **Loss** shall be increased by adding ten (10) to the percent number shown in Item VII. of the Declarations.

5. If the **Insurer** or the **Insureds** recommend a settlement of a **Claim** which is consented to by the **Insurer** and the **Insureds**, the Retention Amount shall be retroactively reduced by ten percent (10%) if such settlement was agreed to by the **Insureds** within thirty (30) days of the claimants initial monetary demand.

6. The **Insured** shall give to the **Insurer** all information, assistance, and cooperation, including providing all such documents and testimony, as the **Insurer** reasonably may require and, in the event of a **Claim**, and an **Insured** shall do nothing that may prejudice the **Insurer's** position or its potential or actual rights of recovery.

B. Reporting and Notice

1. A **Claim** shall be deemed to have first been made when received by an **Insured**.

2. As a condition precedent to any rights under this Policy, the **Insureds** shall give to the **Insurer** as soon as practicable written notice of any **Claim** or **Third Party Claim**, if applicable, first made against any **Insured** during the **Policy Period** or the **Extended Reporting Period** but in no event later than:

   a) ninety (90) days after the expiration of the **Policy Period**; or





b) the expiration of the **Extended Reporting Period** (if purchased).

3. If during the **Policy Period** an **Insured** should become aware of any fact, circumstance or **Wrongful Act** that reasonably may be expected to give rise to a **Claim**, and if such circumstance or **Wrongful Act** is reported to the **Insurer** during the **Policy Period** in writing with particulars as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured**, including that of any natural person, involved in such circumstance or **Wrongful Act**, and the manner in which the **Insured** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period**.

4. Notice of any **Claim**, circumstance, **Wrongful Act** or **Third Party Wrongful Act**, if applicable, first made during the **Policy Period** shall be in writing and given by prepaid express courier, certified mail, email or facsimile to the address show in Item X. of the Declarations.

5. All other notices under any provision of this Policy shall be sent in writing by prepaid express courier, certified mail or facsimile and shall be effective upon receipt thereof by the addressee. Notice to the **Insureds** shall be given to the **Parent Organization** at the address shown in Item I. of the Declarations. Notice to the **Insurer** shall be given to the appropriate party at the address set forth in Item X. of the Declarations.

## VII. GENERAL CONDITIONS

A. Representations and Severability respect to Application

1. The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the **Insurer** under this Policy. This Policy is issued in reliance upon the truth of such statements and representations.

2. The **Insureds** agree that if the **Application** contains any material statements or representations that are untrue, this Policy shall be void as to:

a) any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**;

b) the **Insured Organization**, if any **Executive Officer** knew the facts that were not truthfully disclosed; whether or not such **Insured Person** or **Executive Officer** knew of such untruthful disclosure in the **Application**.

B. Other Insurance

Unless expressly written to be excess over other applicable insurance, this Policy is intended to provide primary insurance; provided that if any **Loss** arising from any **Claim** made against any **Insured** is also insured under another valid and collectible policy(ies), then this Policy shall share such **Loss** with such other policy(ies) pro rata based on the respective Limits of Liability set forth in the Declarations for this Policy and such other policy(ies).



12



C.  Changes in Exposure

   1.  Acquisition of **Parent Organization**

       If during the **Policy Period:**

       a)  the **Parent Organization** merges into or consolidates with another entity such that the **Parent Organization** is not the surviving entity; or

       b)  another entity, organization, or person or group of entities and/or persons acting in concert acquires stock or voting rights that result in ownership or voting control by the other entity(ies) or person(s) of more than fifty (50%) of the outstanding stock  representing the present right to vote for the election of directors of the **Parent Organization,** then coverage shall continue until the later of:

           i.   termination of the **Policy Period,** or
           ii.  any subsequent date the to which the **Insurer** may agree by endorsement,

       but only with respect for **Claims** arising out of **Wrongful Acts** or, if Third Party Liability coverage is elected, **Third Party Wrongful Acts** taking place prior to such merger, consolidation or acquisition. As a condition precedent to any coverage extension pursuant to this subsection, the **Parent Organization** shall give written notice of such merger, consolidation or acquisition to the **Insurer** as soon as practicable, together with such information as the **Insurer** may reasonably require.  Any **Claim** made and reported during such coverage extensions shall be deemed to have been made during the **Policy Period** in which such merger, consolidation or acquisition occurred.

   2.  Acquisition or Creation of Another Organization

       If during the **Policy Period** the **Parent Organization:**

       a)  Acquires securities or voting rights in another entity or creates another entity that, as a result of such acquisition or creation, becomes a **Subsidiary,** or

       b)  Acquires any entity by merger into or consolidation with the **Insured Organization,**

       Then such entity and its **Insured Persons** shall be **Insureds** under this Policy but only with respect to **Wrongful Acts,** or it Third Party Liability coverage is elected, **Third Party Wrongful Acts** taking place after such acquisition or creation unless the **Insurer** agrees after presentation of all appropriate information, to provide coverage by endorsement for **Wrongful Acts** or **Third Party Wrongful Acts** by such **Insureds** taking place prior to such acquisition or creation.

       If the total number of existing employees of the newly created or acquired **Subsidiary** is greater than twenty percent (20%) of the total number of **Employees of the Insured Organizations,** then the **Parent Organization** as a condition precedent to coverage with respect to such new **Insureds,** the **Parent Organization** shall give written notice of such acquisition or creation to the **Insurer** at the address indicated in Item X. of the Declarations as soon as practicable, but no later than ninety (90) days after the effective date of such acquisition or creation, together with such information the **Insurer** may require and shall pay any additional premium required by the **Insurer.**

D.  Subrogation

 12

NSA000293



If the Insurer pays any **Loss** under this Policy, the **Insurer** shall be subrogated to the extent of such payment to all rights of recovery thereof, including without limitation, against an **Insured**. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.

E.   Authorization Clause

The **Insureds** agree that the **Parent Organization** in Item I. of the Declarations shall act on their behalf with respect to coverage issues under this Policy, including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

F.   Amendment, Assignment and Headings

1.   Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the **Insurer**.

2.   The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

G.   Territory and Valuation

All premiums, Limits of Liability, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than the United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due respectively.

To the extent legally allowed, coverage under this Policy shall extend to **Claims** made and **Wrongful Acts** and, if Third Party Liability coverage is elected, **Third Party Wrongful Acts** occurring anywhere in the world.

H.   Termination

This Policy shall terminate at the earliest of the following:

1.   upon expiration of the **Policy Period** as set forth in Item II. of the Declarations;
2.   twenty (20) days after receipt by the **Parent Organization** of a written notice of termination from the **Insurer** for failure to pay premium when due; or
3.   at such other time when the **Parent Organization** cancels this Policy.

The **Insurer** shall refund the unearned premium computed at customary short rates if this Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata.

I.   No Action Against Insurer

 12

NSA000294

## Employment Practices Liability Policy



No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

No person or organization shall have the right under this Policy to join the **Insurer** as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

_____
PRESIDENT
Christopher L. Peirce

_____
VICE PRESIDENT AND SECRETARY
Mark C. Touhey

12 | 12

NSA000295

Employment Practices Liability Policy



# LIBERTY SURPLUS INSURANCE CORPORATION
### (A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 1

| | |
|---|---|
| Effective Date: | March 7, 2017 |
| Policy Number: | EPL5NYABFY1X001 |
| Issued To: | Northstar Aviation USA LLC |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### U.S. ECONOMIC AND TRADE SANCTIONS ENDORSEMENT

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

 1

OFAC 08/09

NSA000296



**Liberty**
Surplus Insurance
Corporation℠

# LIBERTY SURPLUS INSURANCE CORPORATION

(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 2

| | |
|---|---|
| Effective Date: | March 7, 2017 |
| Policy Number: | EPL5NYABFY1X001 |
| Issued To: | Northstar Aviation USA LLC |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FLSA ENDORSEMENT

It is hereby understood and agreed that Section IV. Exclusions, A.4 of the Policy, is deleted and replaced with the following:

## IV. EXCLUSIONS

A.    The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** against an **Insured**:

4.   based upon, arising from, or in any way related or attributable to any alleged violation of the responsibilities, obligations, or duties imposed by:

a)   any state, federal, or local law governing workers' compensation, unemployment insurance, social security, disability benefits, or wage and hour practices; including but not limited to the Fair Labor Standards Act (except the Equal Pay Act) and state and local statutory laws and schemes concerning wage and hour practices, including, for example, overtime pay, off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to timely pay wages (including upon termination), failure to itemize wage statements and failure to provide seating;

b)   the Employee Retirement Income Security Act of 1974 (except Section 510 thereof), the Occupational Safety and Health Act; the Federal False Claims Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Racketeer Influenced and Corrupt Organization Act, and state and local statutory laws and schemes which are similar to these Federal Acts;

c)   the National Labor Relations Acts, Labor Management Relations Act, and any state or local statutory laws and schemes that pertain to the rights of employees with respect to Union, unionizing, or collective activities in the workplace or any obligations of employers with respect to such employee activities;

and any other causes of action based upon alleged violations of these responsibilities, obligations, and duties, including but not limited to private attorneys general act statutes, conversion, unjust enrichment and unfair business practices; however, this exclusion shall not apply to **Loss** arising from an **Employee's** assertion of **Retaliation** based upon the actual or alleged exercise by an **Employee** of any rights by reason of the foregoing statutes, rules or regulations;

All other terms, conditions and exclusions of the Policy remain unchanged.

 1

EPL-MAN-01-ED.0317

NSA000297



## LIBERTY SURPLUS INSURANCE CORPORATION
(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 3

| | |
|---|---|
| Effective Date: | March 7, 2017 |
| Policy Number: | EPL5NYABFYIX001 |
| Issued To: | Northstar Aviation USA LLC |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### LP CREDIT ENDORSEMENT

It is understood and agreed that Section II is amended by addition of the following:

E.  Loss Prevention Services Credit Against Retention

If during the **Policy Period** the **Insured** with the prior consent of the **Insurer** incurs fees or costs in the form of **Loss Preventions Services** from a provider approved by the **Insurer** and a **Claim** is subsequently made or deemed made during the **Policy Period**, the amounts paid by the **Insured** for such **Loss Prevention Services** shall be credited against the retention amount applicable to such **Claim** up to a maximum of 10 % of the retention amount. This credit shall only apply to the first **Claim** made after the **Loss Prevention Services** were provided.

For the purposes of this endorsement, **Loss Prevention Services** means:

1.  legal compliance audits of the **Insured's** human resources practices and policies, including development or review of employee handbooks, employment application, harassment policies, affirmative action plans and policies regarding hiring, retention, promotion, discipline and discharge of **Employees**;

2.  training programs on employment issues;

3.  advice and counseling on matters which have the potential to give rise to a **Claim**.

All other terms, conditions and exclusions of the Policy remain unchanged.

 1

EPL-MAN-02-ED.0317

NSA000298



**LIBERTY SURPLUS INSURANCE CORPORATION**

(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

ENDORSEMENT NO. 4

| | |
|---|---|
| Effective Date: | March 7, 2017 |
| Policy Number: | EPL5NYABFY1X001 |
| Issued To: | Northstar Aviation USA LLC |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**BANKRUPTCY ENDORSEMENT**

It is agreed that:

The Insured's bankruptcy shall not relieve the Insurer of any of its obligation under the Policy.

All other terms, conditions and exclusions of the Policy remain unchanged.

1

EPL-MAN-03-ED.0317

NSA000299



# LIBERTY SURPLUS INSURANCE CORPORATION
(A New Hampshire Stock Insurance Company, hereinafter the "Insurer")

## ENDORSEMENT NO. 5

| | |
|---|---|
| Effective Date: | March 7, 2017 |
| Policy Number: | EPL5NYABFY1X001 |
| Issued To: | Northstar Aviation USA LLC |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXTENDED REPORTING PERIOD ENDORSEMENT

It is hereby agreed and understood that Item VI. of the Declarations is deleted in its entirety and replaced with the following:

Item VI.  EXTENDED REPORTING PERIOD COVEAGE
Extended Reporting Period (If Purchased)

| | |
|---|---|
| One Year: | 75% |
| Two Years: | 100% |
| Three Years: | 125% |

All other terms, conditions and exclusions of the Policy remain unchanged.

 1

EPL-MAN-04-ED.0317

NSA000300