Exhibit 15

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

C.A. No. 1:18cv191-TSE-JFA

NORTHSTAR AVIATION, LLC et al.

Plaintiffs/Counterclaim Defendants,

v.

ALDEN BURT ALBERTO,

a/k/a Reno Alberto

Defendant/Counterclaim Plaintiff.

This is the deposition of Mr. Marwan Agha
taken in the above-entitled cause, before
Denise Turcot, No. 264848-2, official court
reporter for the Province of Québec, on October
12, 2018, at the offices of Lapointe Rosenstein
Marchand Melançon LLP, at 1 Place Ville Marie,
Suite 1300, Room Jasmin, in the City of
Montréal, Province of Québec.

FILE NO.: 1810121A

DENISETURCOT S.O./OCR
38-11, Place du Commerce, Suite 614
Montréal (Québec) H3E 1T8
514.362.8600
steno@deniseturcot.com

**74**

1      A.   Well, what he said is once the
2  performance bond comes, he wants to - he had an
3  agreement with His Highness to split 50-50.  I
4  don't know what he meant by 50-50, is it 50 for
5  NorthStar and 50 for His Highness, or 50 for
6  Alberto and 50 for His Highness, I don't know.
7  All I understood is 50-50, that's all.
8      Q.   Okay.  And I believe you testified you
9  heard Mr. Ali mention this more than once?
10      A.   More than once, and Hani more than
11  once as well, yes.
12      Q.   Okay.  Do you know where Hani Farag
13  got that information?
14      A.   No idea.
15      Q.   Okay.
16      A.   I believe that discussion with a
17  senior - with Reno Alberto that came up.  I did
18  not hear it from Reno, I heard it from other
19  guys, yes.
20      Q.   Okay.  Did Mr. Ali ever say he had
21  seen a document that reflected that agreement?
22      A.   No.
23      Q.   How about Hani, did he ever say
24  anything like that?
25      A.   No, I don't think so.

**75**

1      Q.   Okay.  And you've testified already
2  about an individual named Hillary Holcombe,
3  correct?
4      A.   Yes.
5      Q.   Do you know if she ever went by the
6  name Alexa?
7      A.   Yes.
8      Q.   Okay.  Do you recall when she first
9  began working as Mr. Alberto's assistant?
10      A.   Okay, I will go back.  She started
11  when her aunt started working with us, because
12  her aunt needed an assistant, and she was
13  coming and working part time at that time to
14  helping her aunt.  And she was making about $14
15  an hour, okay.
16          Subsequently, when her aunt decided
17  that she's going to get married at the end of
18  the year, they sort of like - I think
19  September, October of 2016 - they hired her so
20  she could take over from her aunt and her
21  salary was increased - I think, if I'm not
22  mistaken, she was making $7,500 per month,
23  okay, as a contractor, not as a full - a
24  NorthStar USA employee.  And she was given a
25  contract in January 2017 to be a full-time

**76**

1  employee at the salary - an annual salary of
2  $120,000 per month.  Per year, sorry.
3      Q.   Okay.  And were you responsible for
4  processing her salary payments?
5      A.   Yes.
6      Q.   Okay.  Do you know where she worked
7  physically when she was employed by NorthStar?
8      A.   Myself, no, but every time I needed
9  something, she would say: I don't have the
10  computer, or: When I get the computer, I'll
11  send you the information.  I don't know if she
12  was working from home or from the office, I
13  don't know, okay.
14      Q.   Okay.  Do you know where NorthStar
15  USA's office was located?
16      A.   It was located in McLean, Virginia,
17  okay?
18      Q.   Okay.  Do you know where Ms. Holcombe
19  was living?
20      A.   She was working in - she was living in
21  New York, I believe.
22      Q.   Okay.  And where did you get that
23  information?
24      A.   I know that she worked - she lived in
25  New York, I know that, because she was

**77**

1  submitting a train ticket with her expenses,
2  going to New York, coming back.  So, on a
3  weekly basis, I could see that, there was train
4  tickets.  But, you know, I mean, it's a good
5  indication that she was living in New York.
6      Q.   Okay.  And you say "train", would that
7  be Amtrak?
8      A.   Amtrak, exactly.
9      Q.   Okay.  And did you say she would do
10  this on a weekly basis?
11      A.   Yes.
12      Q.   So, was she being compensated by
13  NorthStar for these travel expenses between New
14  York and Virginia?
15      A.   We are paying, yes, signed by Reno,
16  approved by Reno, okay?
17      Q.   Okay.  Was she submitting any expenses
18  for an apartment or anything in Virginia?
19      A.   No.
20      Q.   Okay.
21      A.   No.
22      Q.   So, do you have any information on -
23  well, strike that.
24          What was your understanding about how
25  she was commuting?  Was she spending a week at

**78**

1 a time in Virginia and then going back to New
2 York?
3     A.  No idea.
4     Q.  Okay.
5     A.  I have no idea, but I'll tell you that
6 very often, not very often, it happened once or
7 twice, that Mr. Farag went to the office and
8 never saw her there, okay?
9     Q.  The Virginia office?
10    A.  Virginia office, yes.
11    Q.  Okay.
12    A.  I never travelled to the Virginia
13 office, never travelled to the U.S. on a
14 business trip, but I know from my discussion
15 with Hani that this is what happened.  He went
16 a few times to the office, but she was never
17 there.
18    Q.  And was Mr. Alberto typically working
19 in the Virginia office?
20    A.  Yes.
21    Q.  Okay.  During the time that you and
22 Ms. Holcombe, Alexa Holcombe, both worked for
23 NorthStar, did you form any opinion of the
24 quality of her work?
25    BY MR. DEITCH:

**79**

1       Objection to form.
2    BY THE WITNESS:
3       From the first day.  Not first day,
4 from the first time that she sent me the first
5 report.
6    BY MR. STREIT:
7    Q.  What was your opinion of her work?
8    A.  First of all, I don't think she had
9 the experience.  I talked at that time to Reno
10 because they came to Abu Dhabi, so, I could go
11 through the process with her, and I showed her
12 everything.  And she took a note and supposed
13 to follow these notes in order for future
14 reporting and, you know, submission of the
15 expenses.
16       And at that time, Reno told me: She's
17 just new, okay, bear with her.  I says: No, I
18 have no issue, I will, you know, teach her,
19 I've done all that all my life.
20       But after that, she came and she took
21 all the information, but I found that she is -
22 she cannot - I don't think she ever done, in my
23 opinion, office work, okay, because she didn't
24 know how to do it.  Even simple things she
25 would not do it.

**80**

1    Q.  Okay.  Did anyone else at NorthStar
2 ever express an opinion to you about the
3 quality of her work?
4    A.  Well, I know certain people that would
5 write her e-mails, she would not respond.  And
6 she's very hard to reach, okay.  I heard - I
7 did not speak to Mr. Terry Key, he expressed
8 his opinion that she is not responding to his
9 e-mail, okay?
10       But I am the guy that dealt with her
11 more because - more than anybody else because
12 of the nature of the things that I had to deal
13 with her, because invoices, using credit cards,
14 use debit cards, the petty cash, and all the
15 other information that I had to, you know, show
16 her how.
17    Q.  Okay.  Let's see.  We'll mark this as
18 2.
19       All right, Mr. Agha, I'm showing you
20 now a document that's been marked for
21 identification as Exhibit number 2.  Just take
22 a second and look at Exhibit 2 and I'll ask you
23 a few questions about it.
24    A.  Yes.
25    Q.  Have you ever seen Exhibit 2 before?

**81**

1    A.  Yes.
2    Q.  What do you recognize Exhibit 2 to be?
3    A.  Well, this is just that I requested a
4 few information from her and again, you know,
5 she comes up with that excuse there.
6    Q.  Okay, well, I'll represent that
7 Exhibit 2 appears to be a string of e-mails
8 between you and --
9    A.  Yes.
10    Q.  -- Alexa Holcombe; do you agree with
11 that?
12    A.  Yes.
13    Q.  And dated - looks like each of these -
14 well, the earliest at the bottom - you know,
15 with e-mail chains you have to look at the
16 bottom --
17    A.  Yes, yes, yes.
18    Q.  -- and then work your way up.  Looks
19 like the earliest e-mail is from you to her
20 dated January 9, 2017.
21    A.  Right, yes.
22    Q.  And you're saying:
23       "Good morning, Alexa.
24       Please find attached
25       Terry's expense report for

---

**82**

1 Reno's approval."
2    A. Yes.
3    Q. Okay. And then you move on up, then
4 there's an e-mail from you to her dated January
5 24th, 2017.
6    A. Yes.
7    Q. You say again:
8      « Sent to you on January
9      9th, still did not get the
10      signed expense back. »
11 Do you see that?
12    A. Yes, absolutely.
13    Q. Okay. And then, up at the top, she e-
14 mails you on January 24th, says:
15      « Hi, Marwan. Reno and I
16      are meeting today to ensure
17      we get everything you've
18      requested. »
19 Okay. So, explain the context of this e-mail,
20 if you can, what was going on?
21    A. Well, it is just simple. Usually
22 whenever senior management submits expense
23 report, I take the liberty of sending it to
24 Reno to get approved, because anybody submits
25 expense. The superior of that individual has

**83**

1 to approve it.
2      So, Terry submitted an expense report
3 and I sent it to her, okay? And then, all that
4 she has to do, print it, give it to her boss,
5 Reno, Reno signs it and she faxes it back. And
6 that, as you could see, from the 9th to the 24th
7 I didn't receive it.
8      This shows you the - and this is not,
9 I mean, this is not - this is one thing only.
10 And my time became, since she started, is just
11 really writing e-mails to her, you know, on the
12 debit card, the credit card, this, that, how
13 come you didn't send this, you know. And this
14 is simple things, just print it.
15      And that shows you that she wasn't in
16 the office. If she was in the office, she
17 would have print it and give it to Reno and
18 he'll send it back, okay? But it shows that
19 she did not - she wasn't in the office at that
20 time. Whether she was in New York, or God
21 knows where, but it shows that she wasn't in
22 Virginia office.
23    Q. Okay. How did you normally
24 communicate with Alexa Holcombe, was it by e-
25 mail?

**84**

1    A. All the time in writing, all the time,
2 never on the telephone, I think, all the time
3 in e-mails.
4    Q. Okay. All right, Mr. Agha, I'm
5 showing you now some documents that have been
6 marked for identification as Exhibit number 3.
7 If you'll take a moment and glance at these,
8 I'll ask you a few questions about them as
9 well.
10    A. Yes.
11    Q. Have you ever seen Exhibit 3 before?
12    A. Yes, sir.
13    Q. What do you recognize Exhibit 3 to be?
14    A. Well, it's some communication between
15 Alexa regarding statements and invoices that I
16 requested.
17    Q. Okay, so, another e-mail chain between
18 you and Ms. Holcombe, is that right?
19    A. Yes. Yes.
20    Q. Okay. And I'll represent that at
21 least one of these e-mails appears to reference
22 an attachment that is not included in Exhibit
23 3 and there's no reason for that other than I
24 don't think we were able to link, up to our own
25 satisfaction, what that attachment might have

**85**

1 been.
2      But if you could explain to me the
3 context of this e-mail chain between you and
4 Ms. Holcombe, what were you talking about here?
5    A. Okay. Usually she gets the - we talk
6 about the statement, the bank statement - she
7 gets the copy statement and then she sends it
8 to me.
9      And I knew she wasn't able to make a
10 reconciliation. I had a spreadsheet, okay,
11 done for her. And I take the statement, I
12 write the supplier name, nature of expenses,
13 and I put them, travel, meal, entertainment,
14 whatever expenses, okay, what's the category of
15 expenses, and I'll send it to her.
16      All that she has to do, to attach copy
17 of the invoices, get it approved by Reno, and
18 send it to me. Everything is done for her.
19      Yet, it would take longer time than -
20 all what I need from her is just to attach copy
21 of the invoices and send it back to me, and it
22 would take forever.
23    Q. When you say "forever", can you can
24 give me an idea of how long we're talking
25 about?

86

1    A.   I mean, from the first - if you look
2  at the first e-mail, I put from January 9 to
3  January 24, okay.  And, so, you know, sometimes
4  I request it in one of the e-mails as well a
5  copy of the invoice from Carr, because they get
6  the copy of - Carr is a company that we lease
7  the office from in Virginia.  If I don't get
8  the invoice, I cannot pay it, because it's not
9  a fixed amount, they're all, you know, variable
10 amounts in the invoice.
11          And then, if I don't receive a copy
12 and if I don't pay it, then they charge it, you
13 know.  And then, they went to Reno.  I told
14 him: How can they get paid?  So, he came back
15 to me and says: How come you didn't pay this?
16 I says: I didn't get the invoice.  Okay?
17          And I requested that they should send
18 it direct to me and I'll, you know, I'll get a
19 process, send the payment, but it never done,
20 anyway, so - but this is Alexa, okay?
21          I did not really have the - I didn't
22 know - I could not convince her or at least
23 teach her how she should respond to me or how
24 to put her things.  She wasn't up to the job,
25 she wasn't really competent enough to do the

87

1  job.
2    Q.   Did you have a similar problem with
3  any of Mr. Alberto's previous assistants?
4    A.   No.
5    Q.   Okay.
6    A.   No.  I'm just wondering where you're
7  getting these e-mails from.
8    Q.   It's magic.  All right, Mr. Agha,
9  we're going you now a document that's been
10 marked for identification as Exhibit number 4.
11 Please take a moment to look at Exhibit 4 and
12 then I'll ask you a few questions about it.
13   A.   You're reminding me of a good time.
14 Yes, okay.
15   Q.   Okay.  Have you ever seen Exhibit 4
16 before?
17   A.   Yes, I did.
18   Q.   What do you recognize Exhibit 4 to be?
19   A.   Again, so many things I requested from
20 her - and from her apology and delay and delay
21 and delay, you know.
22   Q.   Right.
23   A.   Requesting for statements, requesting
24 for, you know, copy of the reports, debit and
25 credit card reports, and - and as I said, I

88

1  prepared everything for her, all that she needs
2  to do these simple things, but again,
3  unfortunately, she wasn't up to the job.
4    Q.   Let's just start with the basics.  Is
5  it fair to say that Exhibit 4 is another e-mail
6  chain between you and Alexa Holcombe?
7    A.   Yes, sir.
8    Q.   I will represent that some of the e-
9  mails shown in Exhibit 4 appear to be also
10 between you and Mr. Ali, at least --
11   A.   Yes.
12   Q.   -- and/or between Ms. Holcombe and
13 Mr. Ali.
14   A.   Yes.
15   Q.   Do you agree with that?
16   A.   Yes.
17   Q.   Okay.  And can you give me the context
18 of the communications shown in Exhibit 4?
19   A.   This is again, you know, because I've
20 requested a few things from her, and as usual,
21 she comes back and she says: When I have the
22 time.  Okay, request for an invoice, for
23 example, from Carr Workplace, and she sent me
24 the wrong one.  I told her: I want this one.
25 But then, you know, just again, it's just

89

1  excuses and apologies and - she did not
2  understand what we're going through, okay, and
3  we spent lots of time on that.
4          I mean, this is only part of what you
5  see here, but there are many things that we had
6  to deal with.  Unfortunately, the boss liked
7  her and he kept her, you know, and then - we
8  couldn't do anything.  We couldn't do anything
9  from our side.
10   Q.   Did you ever express to Mr. Alberto
11 your view that she was not up to the job?
12   A.   At the beginning yes, but he says:
13 Bear with her, she is new.  But very often,
14 when even asked questions, he would defend her,
15 okay?  At one point in time he said, "We're not
16 going to send you these petty expenses, okay?
17 You don't need any support for the petty
18 expenses."  Small things like to him is
19 negligent, okay, but to me it's important.  For
20 me, to do my job, I have to follow the policy
21 and the process of the company.  If I'm not
22 doing that, then I'm not doing my job.  And
23 that's why I raised the question.
24          For example, one thing, and I tell you
25 this is about Ali, I had - they submitted once

90

1 an invoice, a gift for a baby shower, okay?
2 And I said, "This is not a business expense. "
3 And I told Ali, "Come on, do something." He
4 says, "Well, he's the boss, we're not going to
5 ask him." I says, "It doesn't matter." And I
6 went and I sent him an e-mail to Reno, I told
7 him, "This constitutes a personal expense, not
8 a business expense. You want to give somebody
9 a gift, you want to give somebody a gift, you
10 give it from your pocket." And he says, "Okay,
11 deduct it from my expense report." I deduct
12 the amount. But if I didn't ask - if I
13 listened to Ali, that amount would be buried in
14 the expenses.
15        That's the support I'm getting from my
16 boss, this is what I'm trying to tell you.
17     Q.   Okay. In your previous work
18 experience, had a chief executive officer ever
19 told you before just, you know: Don't worry
20 about support for an expense.
21     A.   No way.
22 BY MR. DEITCH:
23        Objection to form.
24 BY THE WITNESS:
25     A.   No way. No, not in the professional

91

1 world, no way.
2 BY MR. STREIT:
3     Q.   Okay, so, in other words, that had
4 never happened to you before?
5     A.   Never happened before.
6     Q.   Okay. All right. Okay, Mr. Agha, I'm
7 showing you now a document that's been marked
8 for identification as Exhibit number 5. Please
9 take a moment and look at Exhibit 5 and then
10 I'll ask you a few questions.
11     A.   Okay.
12     Q.   Have you ever seen Exhibit 5 before?
13     A.   I did.
14     Q.   What do you recognize Exhibit 5 to be?
15     A.   Again, it's going back and forth
16 between me and Alexa concerning certain items.
17 It could be one of the rent, or it could be
18 expenses, it could be re statements. Yes.
19     Q.   Okay, so, another chain of e-
20 mails between you and Ms. Holcombe?
21     A.   Exactly, chain of e-mails, exactly,
22 yes.
23     Q.   Okay. And can you give me the
24 particular context of your communications with
25 Ms. Holcombe here?

92

1     A.   Well, I haven't read the whole thing,
2 but I could tell you there's certain things I
3 sent her by FedEx, but she claimed she never
4 received it. And certain things that I have
5 asked for something and she's asking - okay,
6 again, here, debit card, petty cash and credit
7 card. That is the same thing. It's the same
8 story always going back and forth, the same
9 issue, month after month, month after month.
10     Q.   Next one. Okay, Mr. Agha, I'm showing
11 you now a document that's been marked for
12 identification as Exhibit number 6.
13     A.   Yes.
14     Q.   And I think you know the process by
15 now. Please take a moment and look at that and
16 I'll ask you a couple of questions.
17     A.   Yes.
18     Q.   Have you ever seen Exhibit 6 before?
19     A.   Yes, I did, I did.
20     Q.   What do you recognize Exhibit 6 to be?
21     A.   Well, here, I'm explaining to her
22 what's her requirement really that she has to do on
23 a monthly basis for the Finance department.
24     Q.   Okay, so, in other words, another
25 string of e-mails between you and Ms. Holcombe?

93

1     A.   Yes.
2     Q.   Okay.
3     A.   And, sorry, if you look at the bottom
4 here, I have populated the report for December.
5 So, what I'm trying to say here is: I filled up
6 the spreadsheet for you. All what you need is
7 to attach the invoices and get it signed and
8 send it back, that's all. So, she doesn't need
9 to do any work, okay?
10     Q.   Okay. And sitting here today, do you
11 recall if she did that?
12     A.   Not really.
13     Q.   Okay.
14     A.   Not really. Now, I should be fair, I
15 mean, she did to a certain extent. After
16 requesting once and twice and three times,
17 sometimes I got - and very often missing
18 invoices.
19     Q.   I'm now showing you a document that's
20 been marked for identification as Exhibit
21 number 7. If you would have a look at that.
22     A.   Okay.
23     Q.   Have you ever seen Exhibit 7 before?
24     A.   Yes.
25     Q.   What do you recognize Exhibit 7 to be?

**94**

1    A.   Here I'm requesting again some
2 information from her, and again an excuse that
3 she just came back from Egypt and she will send
4 it to me tomorrow or the day after.
5    Q.   Okay.  Do you have any recollection
6 about this trip to Egypt that she mentions?
7    A.   Yes.
8    Q.   Was that for work?
9    A.   Yes.
10    Q.   Do you know what was going on in
11 Egypt?
12    A.   Yes, they were trying to negotiate a
13 deal with the Egyptian government for the
14 purchase of aircraft from NorthStar Aviation.
15    Q.   Okay.  And do you know why she was
16 there, was she there with Mr. Alberto?
17    A.   Well, she was his assistant and he
18 takes her, I think she - her title wasn't
19 assistant, but she - he took her with her on
20 any trip that, you know - he gave her the title
21 maybe to justify the salary, but she was his
22 assistant really.
23    Q.   Okay.  Okay.  All right, Mr. Agha, I'm
24 showing you a document that's been marked for
25 identification as Exhibit number 8.

**95**

1    A.   Yes.
2    Q.   Have you - or take a moment and look
3 at Exhibit 8.
4    A.   Yes.
5    Q.   And have you ever seen Exhibit 8
6 before?
7    A.   I think so, I think I did, yes.
8    Q.   And what do you recognize Exhibit 8 to
9 be?
10    A.   That would be a credit card statement
11 from Wells Fargo.
12    Q.   Okay.  And looking today at Exhibit 8
13 - I'll have you look back for a moment at
14 Exhibit 7, simply because - if you have Exhibit
15 7 there --
16    A.   Yes.
17    Q.   -- your February 14, 2017 e-mail to
18 Ms. Holcombe showed in Exhibit 7 --
19    A.   Yes.
20    Q.   -- references a Wells Fargo bank
21 statement that says for the month of January.
22    A.   Yes.
23    Q.   Do you know if Exhibit 8 is the
24 statement you were talking about there?
25    A.   Yes.  Yes.

**96**

1    Q.   Okay.  All right, so, this is the
2 statement that you were requesting a purchasing
3 report on --
4    A.   Yes.
5    Q.   -- in Exhibit 7.  All right.  Thank
6 you.
7    A.   There are two here.
8    Q.   Oh! great, I was wondering if I had --
9        Okay, just take a moment and look at
10 Exhibit number 9 in front of you.  Have you
11 ever seen Exhibit 9 before?
12    A.   I think I did.
13    Q.   What do you recognize Exhibit 9 to be?
14    A.   Okay, I think she submitted a report
15 for month of December here, what she says $200
16 Orlando to New York, 200 before taxes, with no
17 support, nothing.  And I requested some backup
18 for that.
19    Q.   Okay, so, this is yet another string
20 of e-mails --
21    A.   Yes.  Yes.
22    Q.   -- between you and Ms. Holcombe
23 talking about expense reports generally?
24    A.   Yes.
25    Q.   Okay.  In the e-mail at the top, on

**97**

1 the first page of Exhibit 9, February 19, 2017
2 from Ms. Holcombe to you, do you see that?  She
3 says:
4        « Hi, Marwan.  I will be in
5        Abu Dhabi March 6th to 9th
6        and would love to schedule
7        some time with you. »
8 Do you see that?
9    A.   Yes, yes.
10    Q.   Do you recall whether she visited Abu
11 Dhabi?
12    A.   Yes, she did, she did, and I sat down
13 with her and we went through the process again.
14    Q.   Okay.
15    A.   Yes.
16    Q.   And did she take any notes or
17 anything --
18    A.   She did.
19    Q.   Okay.
20    A.   Yes.  But again, went back and same
21 thing, as you could see from the e-mails going
22 back and forth.
23    Q.   Okay, but you did in fact have that
24 meeting with her?
25    A.   Yes.

98

1    Q.   Okay.
2    A.   This is the sheet that I would say I
3 would populate, this --
4    Q.   Oh! okay, we'll - let's get --
5    A.   Okay, okay, sorry, okay.
6    Q.   All right.  Okay, we've marked another
7 exhibit, this one is marked for identification
8 as Exhibit number 10.  And have you seen
9 Exhibit 10 before?
10   A.   Yes.
11   Q.   What do you recognize Exhibit 10 to
12 be?
13   A.   Well, this is debit card transaction
14 for the month of December.  I think December,
15 January, February, all the other months.  And
16 what I'll do is I'll just populate that sheet -
17 -
18   Q.   Okay, let's break this up so that
19 everything is clear.
20   A.   Yes, sure.
21   Q.   All right, so, Exhibit 10 is a printed
22 copy of what exactly?
23   A.   In this case, this is the debit card,
24 the first sheet, for the month of December,
25 okay?

99

1    Q.   Okay.
2    A.   This is the transactions, all the
3 purchases they made on debit card for the month
4 of December for that particular sheet.
5    Q.   Okay, the NorthStar USA debit card?
6    A.   Yes.  Yes.
7    Q.   Okay.  And then, as you flip through
8 Exhibit number 10, you go from a couple of
9 pages that are, you know, they're laid out
10 horizontally --
11   A.   Yes.
12   Q.   -- and then you get to a page that
13 begins like that, which is more of a vertical
14 orientation?
15   A.   Yes.
16   Q.   Do you see that?
17   A.   Yes.
18   Q.   Is there any difference in terms of
19 what is represented between these horizontal
20 tables --
21   A.   No.
22   Q.   -- and to the vertical?
23   A.   They're all the same thing, except
24 it's the printing that was done that way,
25 that's all.

100

1    Q.   Okay, great.  And do you know who
2 generated these --
3    A.   I used to do that for her.
4    Q.   So, you generated what's shown in
5 Exhibit 10?
6    A.   Yes, exactly.
7    Q.   Okay.  And what was the purpose of
8 these tables that you generated?
9    A.   Because I know if I send - if I ask
10 her to do that from her - from the copy of the
11 debit card statement, she will not be able.
12 So, I'm making her life easy by populating that
13 form and sending it to her.
14   Q.   Okay.  When you say she would not be
15 able to do it, what do you mean?
16   A.   Because usually she doesn't know how
17 to do formulas, the formula is not matching and
18 so on, and, you know.  By doing that for her,
19 all that I am doing is really just - it would
20 take me maybe 10 minutes to do, it will take
21 her maybe hours to do.  I'm making her life
22 easy so it could be - makes my life easier as
23 well.
24   Q.   What, if anything, did you use to
25 generate Exhibit 10, was it Microsoft Excel?

101

1    A.   Excel, yes.  Excel.
2    Q.   Excel?
3    A.   Yes.  Very simple.
4    Q.   Okay.
5    A.   Yes.
6    Q.   All right, I'm showing you now a
7 document which is marked for identification as
8 Exhibit number 11.
9    A.   Yes.
10   Q.   Have you ever seen Exhibit 11 before?
11   A.   Yes.
12   Q.   What do you recognize Exhibit 11 to
13 be?
14   A.   This is the credit card statement for
15 the month of March.
16   Q.   Okay.  If you glance back at Exhibit
17 number 9, which you should still have in front
18 of you?  Exhibit 9.
19   A.   Okay.
20   Q.   And on the first page of Exhibit 9, if
21 you look down, there's what appears to be an e-
22 mail from you to Ms. Holcombe dated February
23 19, 2017.
24   A.   Yes.
25   Q.   Subject says "Re: bank statement".

**102**

1    A.   Yes.
2    Q.   And then, in the body of that e-mail
3 there's reference to - oh! I'm sorry, I don't
4 see that now - but the subject line is headed
5 "Bank statement". Do you know whether Exhibit
6 11 is the bank statement referenced in Exhibit
7 9?
8    A.   This is - no, this is - actually it's
9 a credit card statement.
10    Q.   Okay.
11    A.   Credit card statement.
12    Q.   Okay, so, Exhibit 11 is a credit card
13 statement?
14    A.   Yes.
15    Q.   All right. But it is also from Wells
16 Fargo?
17    A.   Yes, it is from Wells Fargo.
18    Q.   Okay. And this would be the NorthStar
19 USA credit card account, correct?
20    A.   Yes.
21    Q.   Okay. All right.
22    A.   And as you could see, very often we
23 don't get it on time, okay? What will happen,
24 there is penalty imposed.
25    Q.   I'm sorry?

**103**

1    A.   There will be interest imposed if you
2 don't receive it and pay it on time.
3    Q.   Got it.
4    A.   Okay?
5    Q.   All right. I'm now showing you a
6 document that's marked for identification as
7 Exhibit number 12.
8    A.   Yes.
9    Q.   Have you ever seen Exhibit 12?
10    A.   Yes.
11    Q.   What do you recognize Exhibit 12 to
12 be?
13    A.   That would be again a business card -
14 Visa business card. Credit card statement.
15    Q.   Okay, a statement on the NorthStar
16 credit card account, is that right?
17    A.   That's the same thing as the one we
18 had before.
19    Q.   Are they identical?
20    A.   Yes, identical.
21    Q.   I apologize, they are identical. That
22 is my mistake.
23    A.   Do you want this back?
24    Q.   No, you keep those in front of you.
25    A.   Okay, it was processed.

**104**

1    BY MR. DEITCH:
2       Can we go off the record for just a
3 sec?
4       OFF-THE-RECORD DISCUSSION
5    BY MR. STREIT:
6    Q.   Okay, we're showing you now a document
7 marked for identification as Exhibit number 13.
8    A.   Yes.
9    Q.   If you would take a moment and look at
10 that. Have you ever seen Exhibit 13?
11    A.   Yes.
12    Q.   What do you recognize Exhibit 13 to
13 be?
14    A.   It's a credit card statement from
15 Wells Fargo.
16    Q.   So, this is another statement for
17 NorthStar USA's credit card account?
18    A.   Yes.
19    Q.   Okay. And this one I believe is
20 actually the March 24 to February - or rather
21 April 26, is that right?
22    A.   Yes.
23    Q.   Okay. And did you typically receive
24 copies of these credit card statements each
25 month?

**105**

1    A.   Yes, after usually the month end,
2 they're supposed to send me a copy, okay? And
3 what we will do is we will pay the balance by
4 cheque, okay? But if we don't get it on time,
5 then there is finance charges imposed on the -
6 okay, in this case, as you see, there's $197
7 finance charges.
8    Q.   Okay.
9    A.   And that tells you who we're dealing
10 with again, you know. And that's where I base
11 my statement that she's very, you know, she's
12 not up to the job.
13    Q.   Okay. So, if I understand your
14 testimony, NorthStar USA was incurring finance
15 charges whenever there was delay getting copies
16 of these bank card statements to you?
17    A.   To us, exactly.
18    Q.   Okay. Let me check something first.
19 Okay. All right, we're now showing you a
20 document that's been marked for identification
21 as Exhibit number 14.
22    A.   Yes.
23    Q.   If you would take a moment and look at
24 that.
25    A.   Yes.

106

1    Q.   Have you ever seen Exhibit 14 before?
2    A.   Yes.
3    Q.   What do you recognize Exhibit 14 to
4 be?
5    A.   They're debit and credit card
6 statements that attaches here that I have
7 populated myself after when I received the
8 statement from them and send it back to her,
9 putting some notice, some comments here telling
10 her what's missing, okay?
11   Q.   Okay.
12   A.   Because usually sometimes when she
13 send me the statement she'll send some
14 invoices, okay?  But in this case, and that,
15 for example, here says: No invoices, all the
16 statement, okay?
17   Q.   Let me just slow you down and break
18 your answer up a little bit, if I may.  A
19 couple of times you've used the phrase "you've
20 "populated something".
21   A.   Yes.
22   Q.   What do you mean when you say you've
23 populated a table or something like that?
24   A.   So, that means I get the copy of the
25 credit or debit card statement and I put the

107

1 expenses on that spreadsheet, and I will show
2 her the, you know, I'll put the supplier name,
3 the date of the expense, the supplier name, the
4 nature of the expenses, and what category of
5 expense, and I, you know, and I give the
6 totals, okay, and try to balance it back to the
7 statement.
8         And I send it back to her just for, as
9 I say, to attach copy of the invoices, as well
10 as the - get approved from her superior.
11   Q.   Okay.  And if you sent, for example,
12 the debit card transaction table, which is
13 shown on the first page Exhibit 14, would you
14 e-mail Ms. Holcombe a copy of an Excel
15 spreadsheet?
16   A.   Yes.
17   Q.   Is that how you would do that?
18   A.   Yes.  Yes.
19   Q.   Okay.  And, so, for example, the one
20 shown in Exhibit 14, you would have put in the
21 data that's shown there, and if I understand
22 you correctly, you would ask her to provide
23 supporting invoices, is that right?
24   A.   Absolutely, yes.
25   Q.   Okay.  And I see on some pages of

108

1 Exhibit 14 there is some handwriting.  For
2 example, on the third page of Exhibit 14, being
3 the fourth page --
4    A.   Yes.
5    Q.   -- do you see those?
6    A.   Yes.  Yes.
7    Q.   Do you recognize the handwriting?
8    A.   Yes.
9    Q.   Whose handwriting is it?
10   A.   That one here says "not submitted",
11 this is my handwriting.
12   Q.   Okay.
13   A.   That says "not submitted yet", okay,
14 I'm just telling it --
15   Q.   On the third page, okay.
16   A.   Yes.  Here is I'm telling her: You
17 haven't sent it yet, okay?  The other one, this
18 is what - this is Reema's handwriting, okay?
19   Q.   Reema?
20   A.   Reema, which is the lady that worked
21 for me, because I prepare everything, when I
22 get everything I give it to her, she process
23 everything, okay?  And she's saying that, you
24 know, for example, people here should be - oh!
25 I remember that very well.  She messed up the

109

1 date here.  She messed up the date here.  She
2 put half of February and half of March.
3    Q.   "She" being?
4    A.   Sorry, Alexa.
5    Q.   Okay.
6    A.   Or Hillary.  I remember that.  And
7 then, if you could see here, the lady that she
8 worked for me, which her name was Reema, should
9 be to 24 March, and that's when the statement,
10 you know, ends, 24th of March, usually.  Okay?
11   Q.   Okay.
12   A.   So, again, here, she mixed up two
13 months together, you know.
14   Q.   Okay.
15   A.   Or actually she missed here 10 days
16 from - she started correctly 24th of February,
17 she should end up at 24th of March.  So, she
18 missed this.
19   Q.   Got it.  And then, on the final page
20 of Exhibit 14, you should have that page?
21   A.   Yes.
22   Q.   There's some more handwriting.  Whose
23 is that, do you know?
24   A.   That would be - that's not my writing,
25 this would be Reema's writing.

**110**

1    Q.   Okay, it says "missing report", do you
2  see that?
3    A.   Yes, report.
4    Q.   And it looks like Reema, I suppose, or
5  whoever put a --
6    A.   Yes.
7    Q.   -- drew or put a bracket around all
8  those items shown on that page.  So, am I
9  understanding correctly that what is meant
10 there is there was no expense report submitted
11 for those items?
12   A.   Exactly, exactly, because she stopped
13 on the 14th of March; she should have gone till
14 the 24th of March.
15   Q.   Okay, all right.  Okay, Mr. Agha, I'm
16 showing you a document now that's marked for
17 identification as Exhibit number 15.  Have you
18 ever seen Exhibit 15 before?
19   A.   Yes.
20   Q.   What do you recognize Exhibit 15 to
21 be?
22   A.   It's again my request for - from Alexa
23 or - to send me some kind of information, you
24 know, which is the credit statement for a
25 certain period, as well as the March statement.

**111**

1    Q.   Okay.  And I see you cc'ed Mr. Ali on
2  that, correct?
3    A.   I always used to cc Ali.
4    Q.   Okay.
5    A.   So, Ali is aware of everything that is
6  done, anything that's really - any
7  communication that I do between me and anybody
8  else in the department or someone else.
9    Q.   Okay.  I'm showing you now a document
10 marked for identification as Exhibit number 16.
11 Have you seen Exhibit 16 before?
12   A.   I did.
13   Q.   What do you recognize Exhibit 16 to
14 be?
15   A.   Yes.  There's certain items on the
16 credit card, okay, it says here - the bank
17 statement, sorry - and the debit card
18 transactions, I sent her the populated sheet
19 with the spreadsheet that I sent her for that
20 period, and the request, what it says is: Just
21 write me a description, because there are some
22 invoices, suppose, for $1,000.  I know the
23 supplier, but it doesn't tell me what's the
24 nature of the expense.  Tell her, just, you
25 know: Give me the nature of the expenses,

**112**

1  description of the transaction, and attach copy
2  of the invoices, okay?  Because, to me, when
3  you say, well, you know, a restaurant, I know
4  it's food, okay, but when you - an invoice from
5  a supplier that I never heard of before, I
6  need, you know, some more information.
7    Q.   So, all right, Exhibit 16 appears to
8  be an e-mail from you to Ms. Holcombe dated May
9  7, 2017, correct?
10   A.   Yes.
11   Q.   Okay.  And I believe you testified
12 earlier that you had actually had a face-to-
13 face meeting with her back in March 2017 to
14 help her understand the process.
15   A.   Even earlier.  I had a meeting with
16 her, in 2016, when she came - when she was
17 hired as a contractor.  She came with Reno and
18 I explained to her everything.
19   Q.   Okay.
20   A.   And then, subsequently, every time she
21 comes, I will ask her for the same thing and
22 explain to her.
23   Q.   Okay.  How many face-to-face meetings
24 did you have with Ms. Holcombe?
25   A.   I would say three.

**113**

1    Q.   Okay.
2    A.   Yes.  It could be two, I'm not sure
3  really, but I say three.
4    Q.   And did you always - I mean, in each
5  meeting did you go over the same process with
6  her?
7    A.   Yes.
8    Q.   Okay.  So, by the date of the e-mail
9  shown in Exhibit 16, how many meetings had you
10 had with her at that point?
11   A.   I would say a total of three.  Yes.
12   Q.   Okay.  And is it fair to say that you
13 were still having the same issues with her that
14 you had had before?
15   A.   I would say yes.
16   Q.   Okay.  I'm now showing you a document
17 marked for identification as Exhibit number 17.
18   A.   Okay.
19   Q.   Have you ever seen Exhibit 17 before?
20   A.   Yes, sir.
21   Q.   What do you recognize Exhibit 17 to
22 be?
23   A.   Again some communication between
24 myself and Alexa concerning certain statements,
25 credit card statements, debit card statements,

## 114

1  for various periods, going back from February
2  to April 2017.
3      Q.  Okay, and the date on this e-mail was
4  May 18, 2017, is that right?
5      A.  Yes.  The date was, yes, May 18, yes,
6  correct.
7      Q.  Okay.  And then, on the first page of
8  Exhibit 17 there's one line that appears to be
9  highlighted, do you see that?
10     A.  Yes.
11     Q.  Did you do that highlighting?
12     A.  Yes.
13     Q.  Okay.  And that states - or the line
14 that's highlighted states:
15         "You have not sent me any
16          petty cash reports in
17          2017."
18 Is that right?
19     A.  Yes.
20     Q.  So, does that mean that from the
21 beginning of 2017 to May 18th, Ms. Holcombe had
22 not provided any petty cash reports at all?
23     A.  Correct.
24     Q.  Okay.  Normally, how often would you
25 be receiving petty cash reports?

## 115

1      A.  Monthly.
2      Q.  Okay.
3      A.  Monthly.
4      Q.  Did she ever give any explanation as
5  to why she had not submitted any reports?
6      A.  No.  No.
7      Q.  Okay.  Did you ever raise that
8  omission with anyone other than her?
9      A.  Well, as you could see, Nrasib Ali was
10 copied on all these e-mails.
11     Q.  Right.
12     A.  And he never took any action.  Usually
13 if somebody working for me and request for
14 something more than once from somebody, I jump
15 in and I take charge, okay?
16     Q.  Okay.
17     A.  But he never - I mean, all these e-
18 mails because of lack of support from my boss.
19 That's it.
20     Q.  Did you ever ask Mr. Ali for
21 authorization to try to do anything to remedy
22 this problem you were having with Ms. Holcombe?
23     A.  He couldn't do anything, okay, and we
24 couldn't do anything.  This is the way we were
25 living and we had to continue this way.  I

## 116

1  mean, you could see from the e-mails going back
2  and forth, we got exhausted, okay, just we
3  wanted - I mean, we did the job, all that we
4  need from her is to attach copy of the invoices
5  and get it approved and send it back.  And
6  that's very hard for her to do.
7      Q.  When you said "we couldn't do
8  anything", what do you mean by that?
9      A.  Because at one point in time, Reno
10 said to Ali, not to me, by e-mail I think, that
11 was an e-mail, I don't know if I received a
12 copy of that e-mail or not: We're not going to
13 be concerned about petty charges, okay.
14     Q.  Okay, all right.  I'm showing you now
15 a document marked for identification as Exhibit
16 number 18.  Take a moment and look at Exhibit
17 18, please.
18     A.  Okay.
19     Q.  Have you ever seen any part of Exhibit
20 18 before?
21     A.  Yes, I've seen.
22     Q.  What part or parts of Exhibit 18 have
23 you seen before?
24     A.  Well, the second part is my e-mail to
25 Alexa requesting some information from her.

## 117

1  The second e-mail is really from Ali to Reno
2  Alberto.  And as you could see that, my name is
3  not there neither, you know, so, I'm out of the
4  picture again here.  So, again, Reno is asking
5  - sorry, Ali is asking Reno's help, you know,
6  to get the solution to the problems that we're
7  facing with Alexa.  And as you could see from
8  Reno's reply, you know: Let's discuss that
9  today.
10     Q.  Okay, so, prior to today, had you ever
11 seen the two e-mails at the top of page 1 of
12 Exhibit 18 before?
13     A.  I believe Ali forwarded that to me
14 later on, I believe.
15     Q.  Both e-mails or just his?
16     A.  I think his, okay, because I'm not
17 sure of that for the first one, I'm not sure of
18 that one.
19     Q.  Okay.
20     A.  Okay?
21     Q.  And this is - well, the last e-mail in
22 this chain is dated May 18, 2017, correct?
23     A.  Yes.
24     Q.  Okay.
25     A.  But again, Ali is not kind of a guy

118

1  that likes to write, okay? And even he wanted
2  an e-mail, he would ask me to write an e-mail
3  for him, okay? And from time to time, you
4  know, after when he saw all the traffic, the e-
5  mails going back and forth, back and forth, he
6  wrote that e-mail to Ali. And most probably I
7  had pressed for that e-mail, okay?
8     Q.   Does Mr. Ali speak English?
9     A.   He speaks very well English, yes.
10    Q.   Okay.
11    A.   By the way, the language in the UAE is
12 English, the business language is English.
13    Q.   Okay.
14    A.   Even though it's an Arabic country,
15 but everything is dealt with English.
16    Q.   Okay. I'm now showing you a document
17 marked for identification as Exhibit 19.
18    A.   Okay.
19    Q.   Just take a moment and look at Exhibit
20 19. I'll ask you a few questions about it.
21    A.   Yes.
22    Q.   Have you ever seen Exhibit 19 before?
23    A.   Yes.
24    Q.   What do you recognize Exhibit 19 to
25 be?

119

1     A.   This is a bank statement for the month
2  of May that I have sent her requesting from her
3  the proper, you know, to send me all the proper
4  documents, supporting documents, for the
5  statements.
6     Q.   Okay. And looking at Exhibit 19,
7  there appears to be some handwritten
8  underlining on a couple of items.
9     A.   Yes.
10    Q.   Do you see those?
11    A.   Yes.
12    Q.   Did you do that underlining?
13    A.   Yes.
14    Q.   Okay.
15    A.   Because it looks too big the amount
16 and we don't know what is that exactly. So,
17 usually, we, you know, to make sure that she
18 understands that we need copy of the invoices.
19    Q.   Okay.
20    A.   And as you know, there are other
21 things that were erased from the statement as
22 well that is to do with salaries. So, I
23 usually hide the salaries so she wouldn't see
24 how much - what we paid in the payroll for Reno
25 and --

120

1     Q.   Got it.
2     A.   Okay?
3     Q.   And looking at the right-hand side of
4  the lines on Exhibit 19, there are, next to
5  some of them, checkmarks --
6     A.   Yes.
7     Q.   -- and then what appear to be like
8  maybe arrows, symbols or something.
9     A.   Yes. Yes.
10    Q.   Did you write those?
11    A.   Yes, because what will happen is here
12 because they have bought something in Hamburg
13 and there is, for using the credit card in
14 foreign countries, there's what they call
15 international purchase transaction. What I'm
16 trying to say is these two together, they
17 should be together, related, you know I'm
18 saying?
19    Q.   Got it, that's what the brackets
20 represent?
21    A.   Exactly.
22    Q.   Okay. Now, how about the checkmarks,
23 what do the checkmarks indicate?
24    A.   It could be that I did it when I'm
25 trying to balance the statement --

121

1     Q.   I see.
2     A.   -- to make sure that everything was
3  taken into consideration.
4     Q.   Okay. Now, you referenced Hamburg,
5  are you referring to Hamburg, Germany?
6     A.   Yes. Yes.
7     Q.   Do you know of a business trip taken
8  to Germany?
9     A.   We don't have any business in Germany.
10 I cannot tell that - did he go to Germany for
11 business or not, I cannot tell, okay?
12    Q.   Okay.
13    A.   Because I did not know really the
14 dealing that he did. But I know we don't have
15 any businesses in Germany, okay.
16    Q.   Okay. So, if I understand your
17 testimony, when you reviewed the bank statement
18 shown in Exhibit 19, you did not have any
19 independent idea of why there were expenses
20 from Germany?
21    A.   Exactly.
22    Q.   Okay. I'm now showing you a document
23 marked for identification as Exhibit number 20.
24 Have you ever seen Exhibit 20 before?
25    A.   Yes.

**122**

1    Q.   What do you recognize Exhibit 20 to
2  be?
3    A.   Oh! this is only communication between
4  me and Alexa concerning the May bank statement,
5  plus including the spreadsheet that I have sent
6  her requesting from her some nature of expenses
7  that they have spent in Germany in this case,
8  or somewhere else, and ask her to attach copy
9  of the invoices and get the report approved by
10  Reno simply.
11    Q.   Okay. I'm showing you now a document
12  marked for identification as Exhibit 21.  Have
13  you seen Exhibit 21 before?
14    A.   Yes, I did.
15    Q.   What do you recognize Exhibit 21 to
16  be?
17    A.   Just that's her reply to my e-mail
18  that was sent on the 4th of June.
19    Q.   Okay.
20    A.   She will have: I'll have this back to
21  you, supporting documents, by tomorrow.  So,
22  she's promising that she'll send me the
23  information in the following day.
24    Q.   Right.  And I see she, in her e-mail
25  to you there at the top of Exhibit 21, she

**123**

1  references or she says:
2        "We completed our move to
3        the new office today."
4    A.   Yes.
5    Q.   Do you know what she was talking about
6  there?
7    A.   Yes.  We were in a smaller office and
8  went to a bigger office in Virginia, okay?
9    Q.   Okay.
10    A.   So, simply - so, they were moving, I
11  think.
12    Q.   Okay.  Did she ever tell you that any
13  delays were occasioned by the move from one
14  office to the other?
15    A.   Well, that's what she's trying to say
16  here, okay?
17    Q.   Okay.
18    A.   But in reality, move, they haven't
19  done anything, the guy comes and move them.
20  You know, like I said, we're not talking about
21  moving a house, it was just a small office
22  we're moving.
23    Q.   And sitting here today, do you recall
24  whether she did in fact get you the supporting
25  documents by the next day?

**124**

1    A.   I don't recall really, I cannot really
2  recall.
3    Q.   All right.  Did there come a time when
4  NorthStar began to lay off personnel?
5    A.   Yes.
6    Q.   When was that?
7    A.   Well, they talked about it - they
8  start talking about it in February, okay, but
9  start doing that later on, I don't know really
10  exactly the date, because certain people left
11  at different periods, okay?
12    Q.   Okay, February of when?
13    A.   Of 2017.
14    Q.   Okay.  Do you know why there were
15  layoffs at that time?
16    A.   They didn't have any contract and the
17  money was limited.  It's common sense to say
18  that if the business is not doing well, you
19  have to reduce your expenses, and I understand
20  that.
21    Q.   Okay.  And do you know who decided to
22  have layoffs?
23    A.   Well, it could be - it would be the
24  CEO.
25    Q.   Right, okay.

**125**

1  BY MR. DEITCH:
2    Q.   I'm sorry, did you say it would be or
3  it could be?
4    A.   It could be the CEO.
5    Q.   Oh! it could be, okay.
6    A.   Yes.  I mean, it could be that human
7  resources had discussed that with him, telling
8  him that: Listen, you know.
9    Q.   I didn't mean to interrupt --
10    A.   No, no.
11    Q.   -- I couldn't hear whether you said
12  "could" or "would".
13    A.   No, no, sorry, that's fine.
14  BY MR. STREIT:
15    Q.   Do you know who was laid off
16  initially?
17    A.   I could tell you there's Lyle Becka
18  who used to be the next in line in operation,
19  I think he used to be deputy Vice-president,
20  and he was stationed in Florida.
21        There was as well Adam Gunn, and he
22  was stationed in Florida as well, and he used
23  to be the production director in Montreal, but
24  he moved to the States.
25        My name was on the list, okay.

126

1        Mr. Farag's name was on the list as
2 well.
3        They were - these are the major ones,
4 I would say, you know.  There are other small
5 ones maybe from the operation.
6        Q.   You said Mr. Becka and Mr. Gunn were
7 in Florida, is that right?
8        A.   Yes.
9        Q.   Did NorthStar USA have an office in
10 Florida?
11       A.   We had a hangar, yes, we had a hangar
12 there, we have an office, yes.
13       Q.   A hangar?
14       A.   A hangar.
15       Q.   And do you know what exactly Mr. Becka
16 and Mr. Gunn did in Florida for NorthStar USA?
17       A.   They used to - when the aircraft comes
18 green - green means like civilian as-is, no
19 modification done on it - it goes to Florida,
20 they do all the modifications on it, together
21 with subcontractors.  I think Northwest, if I
22 recall the name of the company, I'm not sure.
23       Then, that aircraft is flown to Abu
24 Dhabi, almost completed, and Abu Dhabi they do
25 the final touches and deliver it to the client.

127

1        Q.   Okay.  When you say "final touches",
2 can you give me any examples?
3        A.   For example, you don't have the
4 propeller, they cannot put them on the
5 aircraft, they're done later on.  Things, it's
6 operation.  But I know in general it's not
7 everything done, only certain touches that they
8 could do in Abu Dhabi, they're done in Abu
9 Dhabi.
10       Q.   And what kind of modifications were
11 performed on the helicopters in Florida?  They
12 get them from what you call green to the point
13 when they would be sent to Abu Dhabi?
14       A.   Okay, many, they convert the aircraft
15 into a military aircraft, okay?  They install
16 all the necessary equipment.  For example, they
17 install the dash to be a military cockpit I
18 should say.  The flare, they install flares
19 that, you know, up to specification of the
20 client, and everything else that a military
21 aircraft needs.  And the reason why they buy
22 this one from us is because if they want to
23 buy, for example, a military, directly military
24 made aircraft, it would cost maybe double the
25 price.  So, it was really cheap compared to

128

1 what the other suppliers were selling it for.
2        Q.   Okay.  To your knowledge, was that
3 NorthStar's business plan, if you will?
4        A.   Well, from the beginning, yes, that
5 was their plan, okay, that was their plan.  And
6 that's what they did actually.  They had a
7 contract of 30 aircraft and delivered the 30
8 aircraft successfully.
9        Q.   All right.  You say layoffs began, I
10 believe you testified around February or so --
11       A.   They were talking about it in
12 February.
13       Q.   Talking about it in February.
14       A.   Yes, yes.  Yes.
15       Q.   Okay.  Do you know when the first
16 layoffs happened?
17       A.   I don't recall.
18       Q.   Okay.
19       A.   I don't recall.
20       Q.   Now, during this --
21       A.   Even though I did all the calculation
22 - but again, you know, I don't recall exactly.
23       Q.   Okay.  When you say you did all the
24 calculation, what do you mean by that?
25       A.   Because what happens is every time we

129

1 lay off somebody we'll have to do what we call
2 as end-of-service calculation, okay, because in
3 the United Emirates the law says that you'll
4 have to - the employer has to give the employee
5 certain - well, it is about 25 days for each
6 year of service, okay?  And after five years of
7 service, then you get a month payment,
8 severance, for each year of service.  So, I do
9 the calculation, if there's vacation
10 outstanding or severance, and plus the end-of-
11 service.  So, I did the calculation, and based
12 on that, that's what we give the employee when
13 he leaves.
14       Q.   Okay.  Now, from February 2017 onward,
15 do you recall whether bonus payments were being
16 processed for senior management personnel?
17       BY MR. DEITCH:
18           Objection to form.
19       BY THE WITNESS:
20           There was only payment that was made
21 I believe in June, and that was done for
22 certain people only, not to all the staff.
23       BY MR. STREIT:
24       Q.   Do you remember who received bonuses?
25       A.   Yes, the people that received it is

**130**

1 Reno, Ali, Terry, and I believe Salem, as well
2 as Alexa.
3    Q.   Okay.  And when was that exactly?
4    A.   I think in June, if I'm not mistaken.
5 It could be a few days before, a few days
6 after, but I think it's in June.
7    Q.   Okay.  Do you remember if there had
8 been any layoffs yet by that time?
9    A.   I cannot recall the date really.
10    Q.   Okay.
11    A.   I cannot recall the date, I just --
12    Q.   Do you know if there was a - well,
13 strike that.  Did there - well, strike that as
14 well.
15        At what point did your employment with
16 NorthStar come to an end?
17    A.   Well, my last day was September - end
18 of September 2017.
19    Q.   Okay.  I'm showing you now a document
20 marked for identification as Exhibit number 22.
21    A.   Yes.
22    Q.   Have you ever seen Exhibit 22 before?
23    A.   Yes.
24    Q.   What do you recognize Exhibit 22 to
25 be?

**131**

1    A.   Well, this is the letter that was
2 given to me by NorthStar Aviation for my
3 release from the company.
4    Q.   Okay.  And it's dated July 25th, 2017,
5 is that right?
6    A.   Right.
7    Q.   Okay.  And paragraph A on Exhibit 22
8 states that your employment is terminated
9 effective 30th September.
10    A.   Yes.
11    Q.   Do you see that?  Was that in fact
12 your final day at NorthStar?
13    A.   No, no, because I - this is usually -
14 the notice - September is the real notice
15 period.  And they asked me to work and I worked
16 till they say: Well, we don't need you anymore.
17 So, I left earlier than that.
18    Q.   And who --
19    A.   I think I - sorry?
20    Q.   I'm sorry, you say "they asked me",
21 who in particular?
22    A.   Yes, Ali.
23    Q.   Mr. Ali?
24    A.   Yes.
25    Q.   Okay.  Okay.

**132**

1    A.   I stayed there as long as they wanted,
2 as they needed me, and I wanted to make sure
3 that I leave on a good term and I have no, you
4 know, no issue with them.  And that's what I
5 did in my entire life, you know, even though
6 I'm going to retire, but still I care about my
7 reputation.
8    Q.   Sure.
9    A.   Yes.
10    Q.   Speaking of Mr. Ali, have you ever
11 heard him referred to as Nrasib Ali Tahir?
12    A.   His name is Nrasib Ali Tahir.  Well,
13 his first name is Nrasib, but we always call
14 him Ali.  If you call him Nrasib, nobody will
15 know who is Nrasib, except the guys that
16 they're in the Finance department, and maybe
17 Mr. Hani knew his Nrasib name, but everybody
18 calls him Ali, and he's known as Ali.
19    Q.   So, that's just how everybody called
20 him, Ali?
21    A.   Yes.
22    Q.   Okay.
23    A.   You know, in the - sorry, I'm jumping
24 somewhere else.  In the Pakistani culture, they
25 don't have a family name, they always carry the

**133**

1 name, the father name, and so on.  So, this is
2 the way it works.  So, you call him Ali, you
3 call him Nrasib, the same thing to them.
4    Q.   Okay.  All right.  Mr. Agha, I'm
5 showing you a document now that's been marked
6 for identification as Exhibit number 23.
7    A.   Yes.
8    Q.   If you would take a moment and look at
9 that, I'll ask you a few more questions.
10    A.   Sure.  Yes.
11    Q.   Have you ever seen Exhibit 23?
12    A.   Yes.
13    Q.   What do you recognize Exhibit 23 to
14 be?
15    A.   This is my - I should say the position
16 or this is the information that I have given
17 you stating some facts that happened while I
18 was working at NorthStar Aviation.
19    Q.   Okay.  And do you recall how you came
20 to - well, let me represent first Exhibit 23 is
21 what I would call a declaration --
22    A.   Declaration.
23    Q.   -- that you signed.  And do you recall
24 how you came to sign the declaration shown in
25 Exhibit 23?

**134**

1    A.    Yes, it's, what happened is actually
2 we had a talk on the phone and we sort of like
3 went through - you asked me a few questions,
4 and some of the questions - some of the
5 comments that I made, plus the answers that I
6 gave you, we concluded that that's the
7 statement or declaration.
8         We went back and forth, we made some
9 corrections, and this is how we ended up with.
10   Q.    And the telephone interview you just
11 described, also present was Hani Farag, is that
12 right?
13   A.    Correct.
14   Q.    You and he were present together --
15   A.    Yes.
16   Q.    -- at the time that we were all on the
17 phone, right?
18   A.    Correct.
19   Q.    And the information reflected in
20 Exhibit 23, you told that information to me in
21 his presence, is that right?
22   A.    Yes.
23   Q.    Was that the first time, that day of
24 our telephone conference, was that the first
25 time you had ever told Mr. Farag the things

**135**

1 that are stated in this declaration?
2    A.    Mr. Farag and I, we had, as I said, we
3 are very close friends and discuss many things
4 together.  So, some of them were discussed long
5 time ago, before even we came back here.  You
6 know, some of that is common knowledge,
7 everybody knew at the office.  But there's no
8 proof to certain - some of them, and some of
9 them they're, you know.  But back to your
10 answer, no, some of them are not the first
11 time.
12   Q.    Okay.  Okay.  And if you look at the
13 last page of Exhibit 23, is that your
14 signature?
15   A.    Yes.
16   Q.    Okay.  And according to the line above
17 it, you executed that or signed it on the 3rd of
18 September in Montreal, is that right?
19   A.    Yes.
20   Q.    Okay.  Okay.  And is all of the - or
21 let me rephrase.  Did all of the information
22 stated in Exhibit 23 originate with you?
23   A.    Yes.
24   Q.    Okay.  Was there ever a point during
25 your employment at NorthStar when you suspected

**136**

1 that the relationship between Mr. Alberto and
2 Ms. Holcombe was improper in some way?
3    BY MR. DEITCH:
4         Objection to form.
5    BY THE WITNESS:
6         When I request some information
7 sometimes from her, and he gets annoyed
8 sometimes.  And if somebody requests from my
9 employee for information and she's not
10 providing that information, I would push her to
11 that information too, you know.  But in his
12 case, he was sort of defensive.  So that, it
13 gives an indication where we're going, okay?
14 You know, I could have the - maybe my thoughts
15 are going too far, I don't know, but - why
16 would I protect somebody I'm paying $120,000
17 per year and they cannot produce simple
18 statement, okay?
19    BY MR. STREIT:
20   Q.    When you say "he was defensive", can
21 you give me any examples of what you mean by
22 that?
23    A.    Well, you know, he gets annoyed
24 somehow, okay, and sometimes, like from his e-
25 mail: We'll discuss it later on.  You know.

**137**

1 Instead of saying: Well, okay, I'll take care
2 of it, I'll speak to her, okay, she will make
3 sure that things are sent tomorrow whatever.
4 But this is not happen, okay?  Beside his trips
5 to Abu Dhabi, I notice that, you know, she has
6 the credit card, debit card, she goes, she buys
7 everything she wants, you know, coffee and
8 whatever.  Every time she buys a coffee for
9 her, she buys to him.  They go to Abu Dhabi,
10 they spend two, three nights over there.
11 They're coming to Dubai, to Abu Dhabi, they go
12 to Dubai, they spend, you know - and again,
13 this is - it gives an indication why, okay?
14   Q.    Had Mr. Alberto taken his previous
15 assistants with him on trips like this?
16    A.    Well, his previous assistants, I don't
17 - no, not - Cindy - not Cindy - Susan Bergman,
18 he only took her for a meeting in Florida, I
19 think once or twice.  They used to have a
20 yearly meeting with senior management.  And he
21 took her, I think, once or twice, that's it.
22 Not outside of USA.
23   Q.    How about Cindy, did he take her?
24    A.    No, not Cindy, no.
25   Q.    How about Laurie Holcombe?

138

1  A.  Laurie, I think she came to Abu Dhabi,
2  I don't know if she went somewhere else, I'm
3  not sure.  She came to Abu Dhabi, yes, because
4  I met her in Abu Dhabi.
5  Q.  One time or more than once?
6  A.  I can't recall.  I know I met her.
7  Q.  Okay.  Okay.  But with Hillary
8  Holcombe, your testimony, and correct me if I'm
9  wrong, your testimony is that she regularly
10 accompanied Mr. Alberto on foreign --
11 A.  Sorry?
12 Q.  Did she regularly accompany
13 Mr. Alberto on foreign trips?
14 BY MR. DEITCH:
15     Objection to form.
16 BY THE WITNESS:
17     I think she did, okay.  I'm vague,
18 okay, I'm really vague, okay, but I think she
19 did.  But I know Alexa went with him all over,
20 okay?  But Hillary, maybe once or twice, I'm
21 not sure really, okay?
22 BY MR. STREIT:
23 Q.  Well, Hillary, do you understand
24 Hillary and Alexa --
25 A.  No, no, sorry, okay, sorry, sorry, I'm

139

1  sorry, okay, you're talking about Hillary, not
2  Laurie.
3  Q.  Right.
4  A.  Hillary, yes, sorry, sorry.  Hillary,
5  yes, she went with him all over.  She went to
6  him to Switzerland, to Germany, to Egypt, to
7  Australia, okay?
8  Q.  Okay.
9  A.  To Abu Dhabi, to Rome.
10 Q.  Okay.  Did anyone at NorthStar ever
11 express to you that they thought there was
12 something improper about the relationship?
13 A.  Well, I discussed that with Ali, Ali
14 knows all of that, and we noticed that it's
15 very improper to do that.
16 Q.  So, you heard that from Mr. Ali?
17 A.  Yes.  As well as from Mr. Hani.
18 Q.  From?
19 A.  From Mr. Hani.
20 Q.  Okay.
21 A.  Yes.
22 Q.  Anyone else?
23 A.  Even the cleaner used to talk about
24 that, you know, it's something - it's unusual
25 to have that in a business world, you know.

140

1  Q.  When you say "the cleaner", who are
2  you referring to?
3  A.  The guy that clean the, you know, that
4  make coffee or clean the office.
5  Q.  Which office?
6  A.  The Abu Dhabi office, you know.
7  Q.  Okay.
8  A.  Everybody noticed that, it's not -
9  it's, you know.
10 Q.  Okay.  Okay.  All right, I'm just
11 about done with my questions, Mr. Agha, and
12 then Mr. Deitch will have an opportunity to ask
13 you any questions he may have.
14     As I wind up my direct examination,
15 I'm just going to ask you a couple of things
16 that I'll represent I ask every witness I
17 depose, so, please, don't think this is
18 directed personally at you in some way.
19 A.  I understand.
20 Q.  Have you ever been convicted of a
21 felony?
22 A.  No.
23 Q.  Have you ever been convicted of a
24 misdemeanour involving lying, cheating or
25 stealing?

141

1  A.  No.
2  Q.  And have you answered all my questions
3  today fully, completely and truthfully?
4  A.  To my knowledge.
5  Q.  Okay.  I would like to ask you to take
6  just a moment to think back over the testimony
7  you've given so far and let me know if you
8  think there is anything you need to add,
9  supplement, whatever?
10 A.  Not really.  Not really.
11 Q.  Okay.  Well then, in that case, it's
12 Mr. Deitch's turn to ask you questions.  I
13 believe it may be about 12:30?
14 BY MR. DEITCH:
15     It is, it's 12:30.  Can we go off the
16 record?
17 OFF-THE-RECORD DISCUSSION
18 UPON RECESSING
19 UPON RESUMING
20     CROSS-EXAMINATION BY MR. DEITCH:
21 Q.  Good afternoon, Mr. Agha.
22 A.  Good afternoon.
23 Q.  My name is - I was introduced before -
24 is David Deitch, and with me is my colleague
25 Samantha Collins, and we represent Mr. Alberto

182

1 themselves.
2    Q.   How do you keep it quiet by
3 transferring the money to Wells Fargo rather
4 than transferring it directly to an employee?
5    A.   We have somebody called Mr. Salem Al
6 Dhaheri, okay, he's a local, and he was able to
7 get information about any transfer, okay, that
8 happens, and they always got worried if he will
9 be able to get that information if it's done
10 through our bank.
11        And one reason why they sent the money
12 to U.S. and disburse it from U.S. is mainly for
13 Salem to be unaware of what's happening.
14    Q.   So, there were some instances when
15 bonuses were paid by first transferring it to
16 Wells Fargo?
17    BY MR. STREIT:
18        Objection to form.
19    BY THE WITNESS:
20    A.   No, not before.  This is --
21    BY MR. DEITCH:
22    Q.   Not before what?
23    A.   I think this - there are instances
24 where - how could I - I'm just trying to recall
25 and remember exactly, because most of the time

183

1 lots of people requested to be paid to their
2 U.S. dollar account, okay, so, Salem will not
3 be able to trace it.
4    Q.   Okay, if I ask you a question and
5 you're not certain because you cannot recall --
6    A.   Yes.
7    Q.   -- you should just say you don't
8 recall.
9    A.   Okay, fine, okay.
10    Q.   Because that's your honest - if that's
11 your honest answer --
12    A.   Oh! okay, yes.
13    Q.   -- that's how you should --
14    A.   Sure.
15    Q.   So, I understand you're trying to be
16 helpful.
17    A.   Yes.
18    Q.   Okay.  Why was there a particular
19 concern about Mr. Dhaheri knowing about
20 transfers of money to people?
21    A.   Because of his relation with His
22 Highness, because he was very close to His
23 Highness.
24    Q.   Why was there a concern about Dr. bin
25 Saif knowing about the transfer of money to

184

1 people?
2    A.   Because I believe that they used to
3 give themselves bonuses more than they gave His
4 Highness.  And they were scared that if they
5 find that His Highness, you know, he's getting
6 less than what they're getting, then, he will,
7 you know, raise the question why.
8    Q.   Who is the "they" in that sentence?
9    A.   The executive, okay?
10    Q.   Which executive?
11    A.   They're talking about Reno, Ali,
12 Terry, and it would include Hani among them.
13    Q.   So, among the people that you say were
14 concerned about keeping information from
15 Dr. bin Saif, you include Mr. Farag?
16    A.   Well, no, Mr. Farag was an executive,
17 he was getting bonuses like everybody else.
18 It's not that he is saying that, but this is
19 again discussion between Ali and Mr. Reno more
20 than anybody else.
21    Q.   Is that something you assume or is
22 that something that you know?
23    A.   That I know.
24    Q.   And how do you know that?
25    A.   Because discussion with Ali that's

185

1 what happened, that's what he will tell me: We
2 need to do this in order for us to keep the
3 information from --
4    Q.   Okay.  In the office in Abu Dhabi,
5 there were copies of the bank statements,
6 correct?
7    A.   Yes.
8    Q.   And if Mr. Dhaheri had come and
9 requested a copy of a bank statement, would he
10 have been able to look at it?
11    A.   No.
12    Q.   Why is that?
13    A.   We will not give him.
14    Q.   If Dr. bin Saif had sent either
15 Mr. Dhaheri or Ms. Talkhan or some other person
16 on his behalf to ask to see the bank statement,
17 Dr. bin Saif would have seen it, correct?
18    A.   Yes.  Yes.  But not - if the request
19 came from His Highness, yes - but from
20 Mr. Dhaheri, no, we will not, unless if he
21 tells us, you know: I was requested by His
22 Highness to produce that, to get that
23 information, then, we will provide it to him.
24    Q.   The records of these transfers, the
25 way they are kept in the Abu Dhabi office, is

**198**

1     Q.   Let me ask a couple of other questions
2 about that. At the time when you were
3 terminated, did you have a disagreement with
4 the company about the amount of severance that
5 you would receive?
6     A.   No, I didn't have a disagreement; I
7 just asked Reno if he could enhance it a little
8 bit. And he came back and he says, "I have to
9 be equitable with other people.", and
10 therefore, he declined my - okay.
11     Q.   And you were disappointed by that,
12 weren't you?
13     A.   Absolutely. Absolutely, because I
14 know what happened in the past and I know what
15 his response was. Because I served him well
16 and I was always honest with him and I was -
17 you know, I always worked with integrity
18 regardless who is my boss.
19     Q.   All right. I've located the wayward
20 document, and we will mark it as an exhibit.
21 Okay, you've been handed what's been marked as
22 Exhibit 27. And do you recognize that this is
23 an e-mail, or a chain of e-mails, first between
24 you and Mr. Dhaheri, and then both Mr. Ali and
25 Mr. Alberto are included in the chain.

**199**

1     A.   Yes.
2     Q.   Okay, I want to focus on the --
3     A.   Oh! okay, so --
4     Q.   -- on the bottom e-mail from you to
5 Mr. Dhaheri.
6     A.   Okay, I sent it to the - yes, fine.
7     Q.   Okay, and this was sent on August 1st,
8 2017?
9     A.   Yes. Yes.
10     Q.   And you are letting Mr. Dhaheri know
11 that you've been told that you're being let go,
12 correct?
13     A.   Yes, exactly.
14     Q.   Do you see at the very end, the last
15 sentence of your - or the second-to-last
16 sentence of your e-mail, you say:
17         "I felt that you need to
18         know this information
19         especially if you are going
20         to go ahead with your
21         plans."
22     A.   Okay.
23     Q.   What plans?
24     A.   Hmm-hmm. I had discussed with him -
25 I had a feeling that this is what's going to

**200**

1 happen, that they will take the money when the
2 performance bond comes, and I was discussing
3 that with him hoping that he will talk to His
4 Highness, and I'm doing that for a while, okay?
5 And that's what I mean by plans.
6       But he mentioned to his Highness
7 apparently, according to him, but His Highness
8 wasn't too much concerned, okay. And that's
9 what I told him, this is the plans we're
10 talking about. It's simply because, I told
11 him, when it comes, when we get the performance
12 bond, it's gone, okay? I just had a feeling,
13 okay?
14       And I gave him a list of whatever we
15 have paid Reno Alberto from day 1 till a
16 certain date telling him this is how much he
17 made in the last few years and His Highness
18 should be aware of what's happening. That's
19 what I'm talking about.
20     Q.   When did you give him that list?
21     A.   I gave it to him about two, three
22 months before that.
23     Q.   Did you give it to him before or after
24 you were told you were being let go?
25     A.   Way way before. Way before. Way way

**201**

1 before.
2     Q.   When you said "they would take the
3 money", who were you referring to?
4     A.   I was referring to Reno Alberto.
5     Q.   So, earlier, you said that transfers
6 were made to the Wells Fargo account so that
7 Mr. Dhaheri would not be aware of what bonuses
8 were being paid, correct?
9     A.   Yes. Yes.
10     Q.   There was no secrecy about it because
11 you told him what bonuses were paid?
12     A.   I told him later on. Okay. Knowing
13 that the money is coming and everybody is
14 talking about it, Reno is going to take 50% of
15 it, that mean 50% would disappear. And as I
16 was putting him, before everything happened,
17 and in front, telling him: This is going to
18 happen. If he had taken action, nothing would
19 have happened. But according to me nothing has
20 happened.
21     Q.   When you gave this list of payments to
22 Mr. Dhaheri, was it before or after June 2017?
23     A.   Way before.
24     Q.   Okay. So, if you'll go back and look
25 at Exhibit 25 again, this was the big thick

**202**

1  exhibit with all the transfers.
2      A.   Sure.
3      Q.   And turn to page with the number
4  ending 649 at the bottom right, this is in
5  Exhibit 25.
6      A.   Yes.
7      Q.   Do you remember we looked at this page
8  which was the transfer of $4.5 million?
9      A.   Yes.
10     Q.   And do you remember we talked about
11  why it was transferred to Wells Fargo --
12     A.   Yes.
13     Q.   -- rather than directly to people's
14  accounts?
15     A.   Yes.
16     Q.   This transfer occurred on June 29th,
17  2017, correct?
18     A.   Correct.
19     Q.   So, this was after you had given
20  Mr. Dhaheri the list, correct?
21     A.   Yes.
22     Q.   So, why was there a need to send it to
23  Wells Fargo?
24     A.   Because Reno and I, they don't know
25  what am I discussing with Salem, okay, this is

**203**

1  only between Salem and I, advising him and
2  warning him that that's what will happen.
3      Q.   Okay.  And you were not just advising
4  Mr. Dhaheri of the amounts of monies that were
5  being paid; isn't it true that you were
6  advocating that they should get rid of
7  Mr. Alberto?
8      A.   No.
9  BY MR. STREIT:
10         Objection to form.
11  BY THE WITNESS:
12         My concern was - is NorthStar
13  Aviation.  And the way the money was
14  disappearing, okay, and disappearing fast.
15  Now, if they get rid of Reno, that will be even
16  better because the money was will survive for
17  another - God knows for how many years.
18  Because the $5 million they took here, $4.5
19  million, if it wasn't for his bonuses and
20  salary, the company could survive for another
21  10 years.  All the other employees could
22  survive.  That gives them the chance to look
23  for other businesses and make sure that there's
24  a continuity for the company.
25  BY MR. DEITCH:

**204**

1      Q.   Okay, you have in front of you what's
2  been marked as Exhibit 28.
3      A.   Sure.
4      Q.   Is this the list of payments that you
5  prepared and gave to Mr. Dhaheri?
6      A.   No.
7      Q.   Do you know what this list is?
8      A.   Oh! okay, okay.  It could be, sorry,
9  it could be, I'm not sure, but I know what is
10  that.  What I'm trying to say, compare what we
11  have paid to Rotana Jet, which is to His
12  Highness, versus to Reno, okay?  What we're
13  trying to say is - we know the company gets $8
14  million, Reno gets $15 million, which is, you
15  know - and that's what it is.
16     Q.   So, do you believe that this is the
17  list of payments that you gave to Mr. Dhaheri?
18     A.   I gave him more list than this one.
19  This is only comparison for these two.
20     Q.   You've been handed what's been marked
21  as Exhibit 29.  Do you recognize these
22  documents?
23     A.   Absolutely.
24     Q.   Are these documents that you prepared?
25     A.   Yes, I did.  He asked me - he asked me

**205**

1  to - make me some - because his language was
2  limited, okay?  He said: Do it for me, write it
3  to me, and I'll present it to His Highness.
4  Whether he presented it to His Highness or not,
5  and that's what I did.
6      Q.   Okay, and the "he" in that sentence is
7  Mr. Dhaheri?
8      A.   Yes, Mr. Dhaheri requested from me to
9  do that for him, it's not my initiative.
10     Q.   And the plan that is outlined in
11  Exhibit 29 includes getting rid of Mr. Alberto
12  as the CEO of the company, correct?
13     A.   There was no plan.  As I said, this
14  was a request from Dhaheri to prepare that for
15  him so he could present it to His Highness.
16     Q.   Okay.  Mr. Agha, do you see that on
17  line 12 there's a heading "Actions"?
18     A.   Yes.
19     Q.   And do you see that the first action
20  listed under there is "new CEO"?
21     A.   Yes.
22     Q.   If that were done --
23     A.   Yes.
24     Q.   -- that would mean replacing
25  Mr. Alberto, correct?

**206**

1     A.   Yes.
2     Q.   If you'll turn to the second page of
3 Exhibit 29.
4     A.   Yes.
5     Q.   Do you see that you've listed payroll
6 savings --
7     A.   Yes.
8     Q.   -- at the top of the document?
9     A.   Yes.
10    Q.   Was the assumption in this that all of
11 the people listed there would be terminated
12 from NorthStar?
13    A.   Yes.
14    Q.   So, that includes Mr. Alberto?
15    A.   Yes.
16    Q.   It includes Mr. Key?
17    A.   That's the assumption.
18    Q.   That's Terry?
19    A.   But again, as I said, this is as per
20 discussion with Salem, it's not my own list.
21    Q.   Who is Karl?
22    A.   Karl was somebody that worked for
23 Terry.
24    Q.   And who is Ben?
25    A.   Ben, Ben, Ben, Ben, Ben - it's vague.

**207**

1     Q.   Is that Ben Baker?
2     A.   Exactly, yes, Ben Baker.
3     Q.   Was he an engineer?
4     A.   He was an engineer.
5     Q.   Alexa refers to Ms. Holcombe, correct?
6     A.   Yes.
7     Q.   Is Roy Grub?
8     A.   Roy Grub, exactly.
9     Q.   Who is Robert?
10    A.   Robert, could be Robert Adam, could
11 be, I'm not sure.
12    Q.   Who is Stephen?
13    A.   Again, Steven Champley, he used to
14 work in operation.
15    Q.   And Adam, is that Adam Gunn?
16    A.   Oh! sorry, Adam Gunn, Robert could be
17 some other Robert.  I don't know who is Robert,
18 okay?
19    Q.   But Adam is Adam Gunn?
20    A.   Adam Gunn, yes.
21    Q.   And Ali is Ali the director of
22 Finance?
23    A.   Yes.
24    Q.   So, you would be retained under this?
25    A.   No.  No.

**208**

1     Q.   You would not?
2     A.   No.  I told him, it's up to you to
3 decide, it's not me, all that is work, okay.
4 All that what he's suggesting here, he told me,
5 "Get me the information for that."  I never
6 even thought - I said, "You could choose anyone
7 you want, you could choose Ali, you could
8 choose me, you could choose anybody you want,
9 it's not me that I want for that position."
10    Q.   Who chose the people to list in that
11 section?
12    A.   Ali.  Sorry, Salem Al Dhaheri.
13    Q.   Okay.  When you were asked by
14 Mr. Dhaheri to prepare this document, did you
15 go tell Mr. Ali --
16    A.   No.
17    Q.   -- hey! listen, Mr. Dhaheri is trying
18 to take a plan to Dr. bin Saif that's going to
19 get everyone fired.
20    A.   No, I didn't talk to him, because I
21 know what Ali would do.  Because the company
22 was going down the drain and they're sucking it
23 dry.
24         And just to save the company, okay,
25 they just get rid or Reno alone, they would

**209**

1 have saved that $10 million that he took in the
2 last six months.
3     Q.   Do you know what NorthStar is doing
4 right now in terms of contracts?
5     A.   They have no contract.
6     Q.   Is that your belief?
7     A.   I believe so.  I have no information,
8 but I know when I left they was no nothing.
9     Q.   Okay.  Do you know for a fact whether
10 they have obtained any other contract since you
11 left?
12    A.   No.
13    Q.   You don't know either way?
14    A.   No.  But I know when I left there was
15 nothing.  Dry.
16    Q.   Okay, you've been handed what's been
17 marked as Exhibit 30.  Do you recognize Exhibit
18 30?
19    A.   Yes, I do.
20    Q.   Is this a PowerPoint version of the
21 information that we were just looking at in
22 Exhibits 28 and 29?
23    A.   Yes, correct.
24    Q.   Did Mr. Dhaheri ask you to put it in
25 a PowerPoint?

**210**

1    A.   This is in relation to the information
2 that I gave before, yes.
3    Q.   Do you know whether or not Mr. Dhaheri
4 discussed this with --
5    A.   His Highness?
6    Q.   -- with Dr. bin Saif?
7    A.   No idea.  I've been pressing for him
8 to do that, but never happened.  I don't know
9 if it happened.
10    Q.   Do you read and write Arabic?
11    A.   I do.
12    Q.   Did you create an Arabic version of
13 this?
14    A.   I did.
15    Q.   Okay.
16    A.   Because Mr. Dhaheri is not - his
17 English is not very strong.
18    Q.   So, after Mr. Dhaheri asked you to
19 create this, you created an English version and
20 then an Arabic version?
21    A.   He requested that, yes.
22    Q.   Oh! I see, you created it in English
23 and then he asked you to make an Arabic
24 version?
25    A.   Well, all that is his own dictation;

**211**

1 it's not my creation.
2    Q.   And am I correct that these documents
3 were all on your work computer at NorthStar?
4    A.   If you got them from my - you got them
5 from somewhere, you got them from my work
6 computer.
7    Q.   Okay.  Well, when you left the
8 company, they were still there, correct?
9    A.   Yeah.
10    Q.   Okay.  Just off the record for a
11 second.
12         OFF-THE-RECORD DISCUSSION
13 BY MR. DEITCH:
14    Q.   Okay.  In your testimony earlier do
15 you remember that you were asked a lot of
16 questions about expense reports?
17    A.   Yeah, yeah.
18    Q.   And making sure that these expense
19 reports were done correctly was a large part of
20 your job when you were at NorthStar, correct?
21    A.   It's not a large, but it became large.
22 It's a simple thing that we should process in
23 a matter of seconds, it was taking weeks.  We
24 have other things to do in the company; it's
25 not really only process expense reports and

**212**

1 travel expense.
2    Q.   You testified about one instance when
3 you said there was a baby-shower gift that was
4 on an expense report, and was that on
5 Mr. Alberto's expense report?
6    A.   I don't know if it's on petty cash, I
7 think, it was - I think Laurie Holcombe was
8 there at that time, okay, before Alexa came.
9 And I protest it and Reno said, "Put it on my
10 expense account."
11    Q.   Okay.  Were there other occasions over
12 time when you questioned an item that was
13 either from petty cash or in an expense report
14 and the amount of reimbursement was adjusted?
15    A.   Up to a certain period of time, I told
16 you, it was impeccable what Reno did, okay?
17 But the minute when the Holcombe family came to
18 existence, things changed.  He didn't have the
19 credit card, he had a credit card, he didn't
20 have the - and then - I'll tell you an example.
21 He was so generous, he will take a taxi from
22 here to three, he pays $50, he pay $30 tips,
23 okay?  Where is the support, how would I know
24 how much you paid?  It says - you have the
25 invoice from Uber, and usually the tips are

**213**

1 included, and then additional tip $30.  I mean,
2 how could I justify that, how will I
3 substantiate that, okay?  I'm a big tipper.  I
4 understand, but I need substantiation.  But
5 we're not talking about small money, it adds
6 up.
7    Q.   When the company was audited each
8 year, do you know, did the auditors raise any
9 question about the lack of support for any
10 particular expenses that were written off by
11 the company?
12    A.   I wasn't - as I said, they used to
13 come, I dealt with them on the payroll issue
14 only, because this is a major part, but on the
15 other issue, they dealt with Ali, okay?
16    Q.   During the time when the expenses were
17 primarily through either a credit or a debit
18 card, you eventually would see a copy of the
19 statements from Wells Fargo Bank, correct?
20    A.   Yes.
21    Q.   And those statements would reflect
22 clearly the recipient of whatever payment,
23 correct?
24    A.   Yes.
25    Q.   For example, it would say Uber --

226

1    A.   Yes.
2    Q.   All right, in 25 d., do you see that
3 you say:
4         "NorthStar senior directors
5          who actually deliver
6          NorthStar's sales program
7          with its only customer at
8          the time received a
9          substantially lower bonus."
10   A.   Sorry, which one is that, c.?
11   Q.   25 d. as in David.
12   A.   d., okay, okay.  Okay.
13   Q.   Okay?  Who are the senior directors to
14 whom you're referring there?
15   A.   I'm just trying to read here, d.:
16         "Alberto had also paid his
17          previous assistant --"
18 d. we're talking about?
19   Q.   Yes, let's go through it piece by
20 piece.
21   A.   Okay.
22   Q.   It says:
23         "Alberto paid his previous
24          assistant who was a
25          relative of Holcombe's a

227

1         $100,000 bonus upon her
2          resignation."
3 That's referring to Laurie Holcombe, correct?
4    A.   Yes, exactly.
5    Q.   And then it goes on to refer to
6 NorthStar's senior directors.  Who were you
7 referring to?
8    A.   We're talking about, there are
9 production director, like James Jett.  Okay.
10 And you have Deputy Vice-president of
11 Production, Lyle Becka.  These two guys, they
12 were running the company almost, and operation,
13 and they got less than $100,000 each.
14   Q.   You're talking about basically the
15 people who were reporting to Terry Key?
16   A.   Exactly.
17   Q.   Okay.  In paragraph 25 e., do you see
18 that you said - you talked about the trip to
19 Australia.
20   A.   Right.
21   Q.   Correct?
22   A.   Yes.
23   Q.   And you see in the second line of
24 that, you refer to NorthStar's Operations
25 personnel who attended that convention?

228

1    A.   Hmm-hmm.
2    Q.   Who are you talking about?
3    A.   Again, James Jett, one of them, okay,
4 and I don't recall the other guy, where I had
5 mentioned that they came to the show once or
6 twice, and the rest of the period, they haven't
7 showed up.
8    Q.   Okay.  Do you know how large a show
9 that was in Australia?
10   A.   It's about I think a few days, a week
11 maximum, and they stayed more than a week in
12 Australia, these guys.
13   Q.   They stayed more than a week?
14   A.   Well, what's his name, Alberto and
15 Alexa, they stayed more than a week, yes.
16   Q.   So, in your Affidavit, you said that
17 they submitted expense reimbursement requests
18 fo a full week's travel; you're now saying they
19 stayed more than a week?
20   A.   I could be wrong, okay, but I would
21 say minimum one week they have reported, yes.
22   Q.   Am I correct, as you sit here, you
23 don't remember how many days they travelled to
24 Australia, do you?
25   A.   Not that I don't remember, it's just

229

1 because it's been a while, and they travel so
2 long so much, okay, so sometimes, just, it is
3 very hard to keep track of what's happening
4 with these two guys.
5    Q.   I'm not suggesting it's unreasonable
6 if you don't remember, but is it correct that
7 you, as you sit here, you do not specifically
8 remember how long Mr. Alberto and Ms. Holcombe
9 were - how long they were in Australia --
10   A.   I would say --
11   Q.   Please let me finish my question.
12   A.   Sorry, go ahead.
13   Q.   How long they were in Australia,
14 according to their expense reports?
15   A.   More than one week.
16   Q.   Okay, so when you said for a full
17 week's travel in your Affidavit, you were
18 mistaken?
19   A.   I was incorrect, yes.
20   Q.   And what makes you think now that it
21 was more than a week?
22   A.   I remember when we processed the
23 report, the travel expenses, it was
24 highlighted, but how many days, I don't
25 remember.

230

1     Q.  So if Mr. Farag said in his Affidavit
2 that they were there for a week, he was
3 mistaken as well?
4     A.  I don't know.  I cannot speak for him.
5     Q.  And other than what you report here
6 that was reported to you by Operations
7 personnel, you have no personal knowledge about
8 whether or not Mr. Alberto and Ms. Holcombe
9 were at the conference for more than two days?
10     A.  Correct.
11     Q.  And in fact, other than what appears
12 in this Affidavit, you have no information that
13 - let me strike that question.  Strike that.
14     You don't - strike that.
15     In your Affidavit, you talk about
16 Mr. Alberto's relationship with Holcombe being
17 other than professional in nature.  Are you
18 referring to a sexual or a romantic
19 relationship?
20     A.  Not professional, it could be either.
21 The guy is married, I don't know what he does,
22 sexual or not, I cannot say.  But the way it's
23 been happening, when I travel with a secretary
24 to a very conservative country like Egypt, and
25 I take my secretary, okay, and she has nothing

231

1 to do with the business, or anything, that's -
2 okay, there's questions.  I mean lots of people
3 question, not only me, I mean, other people
4 that travel to Egypt had mentioned that to me.
5     Q.  My question is, when you say "other
6 than professional in nature", what do you mean
7 by that phrase?
8     BY MR. STREIT:
9     Objection, asked and answered.
10     BY THE WITNESS:
11     It's just exactly what I'm saying.  It
12 could be romantic, it could be, I don't know.
13 But it is not normal to see somebody taking
14 somebody with him all over the world because
15 she's pretty.  We have no business in Rome;
16 what they are doing in Rome?
17     BY MR. DEITCH:
18     Q.  Other than that, you have no basis for
19 saying that their relationship was other than
20 professional, correct?
21     A.  This is the only information I have is
22 through the expense reports that I get, and I
23 see where they stay, where they go, and so on.
24     Q.  Okay, do you see in paragraph 28 of
25 your Affidavit, do you see that you say:

232

1     "Alberto purported to
2     reduce expenses by laying
3     off 10 of the 46
4     individuals working for
5     NorthStar."
6 Those are the lay-offs that you testified about
7 earlier this morning?
8     A.  Yes.
9     Q.  And do you see, you describe them, you
10 say:
11     "Most of whom were
12     executive-level employees
13     who had questioned the
14     handling of NorthStar's
15     finances."
16 Most of the people laid off were not executive
17 level, were they?
18     A.  Not most of them, some of them, okay.
19 I don't consider myself executive.  I'm talking
20 director and higher.  We have one director, and
21 we had, what's his name as well, I think two at
22 a higher level.
23     Q.  So when you said in your Affidavit
24 that most of the people laid off were
25 executive-level employees, that was incorrect?

233

1     A.  Yes, I would say that.  I would
2 correct to that say, you know, middle
3 management and executives.
4     Q.  And isn't it true most of these people
5 had never questioned the handling of
6 NorthStar's finances?
7     BY MR. STREIT:
8     Objection to form.
9     BY THE WITNESS:
10     I'll tell you one thing, once we
11 receive a sum of money, okay, usually Terry,
12 he's the one who gets usually involved with the
13 clients for payments, okay.  And he asked me
14 how much we have money so he could keep track,
15 and I tell him how much we have money.  And I
16 told him, "We have so much."  And he says,
17 "Where did the money go?"  I said, "I'm not
18 going to tell you."  Okay.  So, people had
19 questions, they knew their money is going.
20     BY MR. DEITCH:
21     Q.  Okay, we'll do this the hard way.  Roy
22 Grub was one of the people who was laid off,
23 correct?
24     A.  Yes.
25     Q.  Did Roy Grub ever question the

254

1      I, DENISE TURCOT, bilingual Official Court
2  Reporter number 264848-2 duly sworn as such, do
3  hereby certify that the foregoing is a true and
4  accurate transcription of the evidence herein,
5  the whole in accordance with the law.
6
7  And I have signed,
8                              Signature numérique
9                              de Denise Turcot
10                             DN : cn=Denise Turcot
11                             Date : 2018.10.17
12                             17:36:24 -04'00'
13
14 DENISE TURCOT
15 Bilingual Official Court Reporter
16
17
18
19
20
21
22
23
24
25