Exhibit 19

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

------------------------------------

NorthStar Aviation, LLC, et al.,

    Plaintiff,

         v.                          Civil Action

                            No: 1:18cv191

Alden Burt Alberto,
  a/k/a Reno Alberto,

    Defendant.

------------------------------------

                   Thursday, August 30, 2018

                   Tysons Corner, Virginia

Deposition of:

VULCAN AVIATION

(ALDEN "RENO" BURT ALBERTO)

called for examination by counsel for the Plaintiffs, pursuant to Notice, taken at the law offices of Bennett & Ludwig, 8300 Boone Boulevard, 22182 beginning at 9:37 a.m., before Lu Anne Dawson, Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

1  the responsive pleadings to the documents requested

2  for production in your deposition, and you had stated

3  that you had given responsive documents to your

4  counsel, correct?

5       **A.    That's correct.**

6       Q.    I'm going to hand you what has been

7  marked as Vulcan Number 2, and this is Bates stamped

8  starting with Vulcan 0114.

9            (Thereupon, Vulcan Deposition Exhibit

10 Number 2 was marked for identification.)

11 BY MR. FONTANEZ:

12      Q.    Are you familiar with that document?

13      **A.    (Witness reviewed document.)**

14           MR. JOHNSON:  Do you have a copy?  If

15 not, no big deal.

16           MR. FONTANEZ:  There's a copy.  You can

17 hand those out.

18           THE WITNESS:  Not the details, but I

19 recognize it as a Vulcan Aviation bank statement.

20 BY MR. FONTANEZ:

21      Q.    Does that document have a balance on it

22 or does it show a balance in that account?

1	Q.	Go ahead.
2	A.	I'm sorry.  I was saying -- excuse me,
3	counsel.  I could have inquired with other people
4	what they thought about it, but I specifically
5	brought that name.
6	Q.	Fair enough.  The time frame listed on
7	the formation is October 19th, 2017.
8	A.	Yes.
9	Q.	Were you employed with anyone else at
10	that date?
11	A.	I was employed with NorthStar USA.
12	Q.	So why did you decide to start Vulcan?
13	A.	I formed Vulcan as a contingency plan.
14	The Sheik Ahmedbin Saif Al-Neyhan, the owner of
15	Rotana Jet, which is the parent company of NorthStar,
16	USA, had indicated that he wanted to shut down U.S.
17	operations and focus all the business in the UAE.  So
18	I came up with a plan B to continue operations in the
19	U.S., and that's, that was really why I formed
20	Vulcan.
21	Q.	You said the Sheik informed you that he
22	wanted to shut down U.S. operations.

1	A.	He didn't inform me personally.  He
2	communicated through Salem Al-Dhaheri, S-a-l-e-m
3	A-l -- to be the best of my knowledge, this is the
4	way he spells his last name -- D-h-a-h-e-r-i, Salem
5	Al-Dhaheri.
6	Q.	And who is that?
7	A.	He is a current employee and advisor
8	to -- current -- excuse me.  He's a current employee
9	of NorthStar Aviation UAE and an advisor for Sheik
10	Ahmedbin Saif Al-Neyhan.
11	Q.	You didn't independently verify the
12	statement from the Sheik that he wanted to stop
13	operations in the United States?
14	A.	He had mentioned it in the past in some
15	of our meetings in passing that he only wanted to
16	focus on UAE business, and so --
17	Q.	He mentioned that?  In what venue would
18	he have mentioned that to you?
19	A.	In, in one of our meetings.
20	Q.	About when was the first time you heard
21	that?
22	A.	Probably two years ago.  I'm sorry.  Two

1　years from when I was last employed that he had
2　mentioned in the past.
3　　　Q.　And did you discuss any solutions with
4　him at that time when you heard that that might be
5　able allow you to keep having a U.S.-based business?
6　　　A.　Well, I, I don't remember specifically,
7　you know, on that specific date, but I didn't agree
8　with his assessment.
9　　　　　He didn't really understand the ITAR,
10　the ITAR requirements from the State Department, and
11　so I tried to explain that to him.
12　　　Q.　Did you at any time tell him you were
13　forming another entity as a result?
14　　　A.　I didn't.
15　　　Q.　Did you receive any assistance in
16　forming that entity or did you form it yourself?
17　　　A.　With assistance from counsel, I did.
18　　　Q.　Who was that counsel?
19　　　A.　I believe that was Bergstrom Taylor.
20　　　Q.　About what time did you first contact
21　that law firm to form that entity?
22　　　A.　I don't recall the exact date, but

1  The documents that you produced for
2 Vulcan, we went over all those documents with respect
3 to your checking, correct?
4     **A.**    **Yes.**
5     Q.    And those reflect all the documents with
6 respect to Vulcan's payment for any services?
7     **A.**    **I believe so. Yeah.**
8     Q.    And there was not any services listed
9 for this law firm in those documents, correct?
10     **A.**    **It doesn't appear so.**
11     Q.    But Bergstrom did help you form Vulcan
12 LLC?
13     **A.**    **They did.**
14     Q.    And per the documents that were
15 provided, there's no evidence that Vulcan paid for
16 that formation.
17     **A.**    **It appears so, yes.**
18     Q.    Do you know how much those services
19 cost, approximately?
20     **A.**    **I don't recall the exact amounts, but**
21 **probably less than 10,000.**
22     Q.    Would $5,000 be accurate?

1      A.    It could be.  Again, I don't recall the
2 amounts.
3      Q.    But less than 10,000?
4      A.    If I -- to the best of my memory,
5 somewhere around there.
6      Q.    Did Vulcan ever have an operating
7 agreement?
8      A.    No.
9      Q.    Articles of organization?
10     A.    When it was first formed, yes.
11     Q.    And those were produced, I believe, to
12 us, the articles of organization?
13     A.    Articles of incorporation?
14     Q.    Well, I think, I believe for an LLC in
15 Virginia, it's articles of organization.  I believe
16 those were produced.
17           (Thereupon, Vulcan Deposition Exhibit
18 Number 17 was marked for identification.)
19 BY MR. FONTANEZ:
20     Q.    What is that document previously marked
21 as Vulcan Number 17?
22     A.    Yes.

```
 1              (Thereupon, Vulcan Deposition Exhibit
 2   Number 18 was marked for identification.)
 3   BY MR. FONTANEZ:
 4       Q.   I am going to hand you Exhibit Number
 5   18.  What does this document reflect?
 6       A.   Statement of Change of Registered Office
 7   and/or Registered Agent.
 8       Q.   So what does that represent?
 9       A.   It shows the registered agents for
10   Vulcan Aviation.
11       Q.   You just previously said that you have
12   always been the registered agent for the entity.  Was
13   that a mistake?
14       A.   It looks like Bergstrom applied as
15   registered agent and then I am now the registered
16   agent.
17       Q.   So that's what the current status is?
18       A.   I believe so, yes.
19       Q.   Is Bergstrom no longer the registered
20   agent for that entity?
21       A.   According to this, it looks like it
22   doesn't appear so.
```

```
 1              (Thereupon, Vulcan Deposition Exhibit
 2   Number 19 was marked for identification.)
 3   BY MR. FONTANEZ:
 4       Q.   I'm handing you Exhibit Number 19.  What
 5   is that document?
 6       A.   It looks like an assignment of an EIN
 7   number, Employer Identification Number.
 8       Q.   And what is that number?
 9       A.   The EIN number is 82-3141340.
10       Q.   Is that the current number?
11       A.   I haven't made any changes to it, so I
12   assume so, yes.
13       Q.   Who assisted Vulcan in getting that EIN?
14       A.   I don't remember specifically, but I
15   believe it was Bergstrom attorneys, as well.
16       Q.   At the time of its formation, what
17   was -- I know you mentioned that it was or you wanted
18   it to be a, kind of a backup plan?
19       A.   Yes.
20       Q.   As a backup plan, what did you intend
21   Vulcan's operations to be?
22       A.   At that time it was just very
```

1  speculative.  I'm not sure what niche in the aviation
2  industry we'd get into, but I did want to -- that's
3  what I've been doing for the past several years, so I
4  knew I was going to start some type of aviation as a
5  plan B but not sure exactly what it was.
6       Q.   Would it be fair to say that it would be
7  similar operations and services as NorthStar?
8       A.   Yes, it could be.
9       Q.   Other than what was shown as the
10 transaction of $25,000 to Vulcan, was there any
11 attempts to seek other capitalization for Vulcan?
12      A.   No.
13      Q.   Did you reach out to any investors?
14      A.   For Vulcan capitalization?
15      Q.   Yes.
16      A.   No.
17      Q.   Did you reach out to any employees of
18 NorthStar?
19      A.   Yes.
20      Q.   For Vulcan capitalization?
21      A.   No.
22      Q.   What did you reach out to NorthStar

1    employees for?

2        A.    I didn't specifically, but my senior
3    vice president did, Terry Key.

4        Q.    And what was the nature of his
5    communications?

6        A.    The essence of it was, you know,
7    everyone had heard that the Sheik wanted to shut down
8    operations in the U.S., and both Terry and I had been
9    working with all these employees for the last several
10   years so we felt a certain obligation to keep them
11   employed, concern for their future.

12             And so Terry reached out to some of the
13   employees, Listen, we're trying to set up a new
14   company since the Sheik wants to shut down operations
15   in the U.S.  We want to continue operations, so we're
16   looking to set up a new company that hopefully, you
17   guys can come to.

18       Q.    Were those employees from NorthStar USA
19   or were they from NorthStar Aviation LLC?

20       A.    I believe they were both.

21       Q.    So both the UAE employees --

22       A.    Yes.

1     Q.    What does the aviation certificate that
2  was suspended refer to?
3           MR. JOHNSON:  Objection.  Calls for
4  speculation.
5           Only answer what you know.
6           THE WITNESS:  You know, this is from
7  Terry.  I can't, I can't tell you specifically, no.
8  BY MR. FONTANEZ:
9     Q.    But you endorse his, that statement as
10 accurately reflecting the situation at that time?
11    **A.    I endorse it to -- let me -- I endorse**
12 **the statement that comes from Terry key.**
13    Q.    But you don't know what aviation
14 certificate he's referring to?
15    **A.    I believe he was referring to Sheik**
16 **Ahmed's GCAA certificate.  It's FAA equivalent.**
17 **There were rumors that he had lost his GCAA**
18 **certificate because of nonpayment of maintenance**
19 **crews and ground crews of millions of dollars.**
20    Q.    Did he, in fact, lose that certificate?
21    **A.    I can't tell you for certain.**
22    Q.    Who is Greg Huber?

1  **Rotana Jet?**

2       Q.   Yes.

3       **A.   I don't believe he was the source of**
4  **that, no.**

5       Q.   What about, was NorthStar Aviation
6  having financial difficulties as a result of the
7  Sheik's financial difficulties?

8       **A.   No.**

9       Q.   So if NorthStar was not having financial
10 difficulties, what was your basis for forming Vulcan
11 Aviation LLC?

12      **A.   Well, because the Sheik was suffering**
13 **from financial difficulties in his own company,**
14 **Rotana Jet, and, you know, we were really uncertain**
15 **what he was going to do with the U.S. operations.  So**
16 **we wanted to continue operations, and that was the**
17 **basis of forming Vulcan.**

18           **And also, you know, like I said, we've**
19 **been working with a lot of these employees for**
20 **several years and we felt an obligation to provide**
21 **them employment.  Where it was going to come from, we**
22 **weren't sure, so I think we felt an obligation**

1　**Department.**

2　　　Q.　And so why is Amy Styers assisting you
3　with getting ITARs registration for a company that
4　she is not a part of?

5　　　**A.　That's, that's a good question.  And**
6　**that was really the environment at the time, is no**
7　**one knew what was, what was going on nor what the**
8　**Sheik was going to do with U.S. operations.**

9　　　　　**So everyone was assuming that the Sheik**
10　**was going to close U.S. operations.  We wanted to**
11　**continue it.  We started Vulcan, and she was hoping**
12　**to be part of this new organization.**

13　　　Q.　So she was performing or she was
14　essentially performing Vulcan Aviation business as an
15　employee of NorthStar?

16　　　**A.　Yes.**

17　　　Q.　How was she paid for that?

18　　　**A.　She wasn't paid from Vulcan.**

19　　　Q.　So she was paid from NorthStar to
20　conduct Vulcan Aviation business?

21　　　**A.　Yes.**

22　　　Q.　Thank you.

1   Exhibit 25, it refers, attachment 1 refers to an
2   unsigned pdf application.
3        A.   Okay.
4        Q.   Is Exhibit Number 27 that application,
5   as far as you know?
6        **A.   I believe, yeah, it's Page 5 of 5 where**
7   **it requires a signature.  I believe that's what it**
8   **refers to.**
9        Q.   And so you ultimately did sign the --
10       A.   Yes.
11       Q.   This attachment, what is this
12  attachment?
13       **A.   This is the DS-2032 Statement of**
14  **Registration for Vulcan Aviation with the State**
15  **Department.**
16       Q.   Was this application completed at your
17  request?
18       A.   Yes.
19       Q.   In your capacity as the owner of Vulcan
20  Aviation LLC?
21       A.   Yes.
22       Q.   The email from Amy Styers to you on that

1  day kind of indicates that she assisted you in
2  preparing this application.
3      A.   Yes.
4      Q.   And so essentially, NorthStar funds were
5  used to completely prepare this application?
6      A.   Yes.
7      Q.   On this application there's a
8  registration fee; do you see that?
9      A.   Yes.
10     Q.   How was that registration fee paid?
11     A.   **It was paid out of the Wells Fargo**
12  **account.  It's on the statement that we -- one of**
13  **your exhibits that you previously handed over.**
14     Q.   A Vulcan Wells Fargo account?
15     A.   **It was a Wells Fargo checking account of**
16  **Vulcan, I believe, yes.**
17     Q.   On Page 5 of 5 of Exhibit Number 27, is
18  that your signature?
19     A.   **It is.**
20     Q.   This application complete with your
21  signature was submitted to the Department of State?
22     A.   **Yes, one of its offices.**

1			CERTIFICATE OF NOTARY PUBLIC

2			I, LU ANNE DAWSON KIRKLAND, the officer

3	before whom the foregoing deposition was taken,

4	do hereby certify that the witness whose testimony

5	appears in the foregoing deposition was duly sworn by

6	me; that the testimony of said witness was taken by

7	me in shorthand and thereafter reduced to typewriting

8	by me; that said deposition is a true record of the

9	testimony given by said witness; that I am neither

10	counsel for, related to, nor employed by any of the

11	parties to the action in which this deposition was

12	taken; and, further, that I am not a relative or

13	employee of any attorney or counsel employed by the

14	parties thereto, nor financially or otherwise

15	interested in the outcome of the action.

16

17				LU ANNE DAWSON KIRKLAND

18				Notary Public in and for

19				the Commonwealth of Virginia

20

21	My Commission expires:

22	November 30, 2019