Exhibit 23



Dated March 19, 2014

# NORTHSTAR AVIATION USA, LLC

AND

# Alden (Reno) Alberto

# EMPLOYMENT AGREEMENT

## TABLE OF CONTENTS

| Section | Title | Page |
|---|---|---|
| Section 1 | Introduction | 3 |
| Section 2 | Term | 3 |
| Section 3 | Duties | 3 |
| Section 4 | Place of Work/Working Hours | 4 |
| Section 5 | Compensation | 4 |
| Section 6 | Benefits | 5 |
| Section 7 | Allowances | 6 |
| Section 8 | Expenses | 6 |
| Section 9 | Termination | 6 |
| Section 10 | Obligations Upon Termination | 9 |
| Section 11 | Restrictive Covenants | 9 |
| Section 12 | Governing Law and Arbitration | 11 |
| Section 13 | Representations and Warranties | 12 |
| Section 14 | Tax Matters | 12 |
| Section 15 | General | 13 |

THIS EMPLOYMENT AGREEMENT (the Agreement), dated March 1, 2014 (the Effective Date), is entered into by and between:

(1) **NORTHSTAR AVIATION USA, LLC** a limited liability company incorporated in the state of Delaware with an address of 1000 Connecticut Ave., NW, Suite 900, Washington, D.C. 20036 (the **Company**); and

(2) **Reno Alberto,** an American, holder of Passport No:483709584 (**Executive**).

Section 1    **Introduction**

WHEREAS, the Company wishes to avail itself of the services of Executive and Executive is willing to provide such services in each case on the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Executive (collectively the **Parties** and each a **Party**) agree as follows:

Section 2    **Term**

The **Initial Term** of this Agreement shall begin on the Effective Date and shall continue until the earlier of the one (1) year anniversary of the Effective Date or the date on which the employment relationship is terminated pursuant to Section 9 of this Agreement for any reason. Upon expiration of the Initial Term, this Agreement shall be automatically renewed for additional one (1) year terms (the Initial Term and any additional terms are collectively referred to herein as the **Term** of this Agreement), unless either Party issues a notice of nonrenewal to the other Party ninety (90) days prior to the expiration date of the then current Term or the employment relationship is otherwise terminated pursuant to Section 9 of this Agreement.

Section 3    **Duties**

3.1    Executive shall be an exempt employee of the Company and shall serve as Chief Executive Officer reporting to the Chairman of the Board

3.2    Executive agrees to perform such responsibilities and duties, and undertake such authorities commensurate with Executive's position.

3.3    Executive shall perform his duties faithfully to the best of his ability and devote all working time and efforts to the business of the Company. Executive shall not, without the prior written approval of the Company, receive compensation or any direct or indirect financial benefit for services rendered to any person or entity other than the Company during the course of his employment with the Company.

3.4    Executive acknowledges and agrees that Executive owes a fiduciary duty of loyalty, fidelity and allegiance to the Company, and, in accordance with such duty, Executive agrees to act at all times in the best interest of the Company and to do no act that would knowingly injury the business, interests, or reputation of the Company. In keeping with these duties Executive shall make full disclosure to the Company of all significant business opportunities that pertain to the Company's business and Executive shall not appropriate for Executive's own benefit business opportunities concerning the subject matter of the fiduciary relationship.

3.5 Executive shall comply with all reasonable and lawful rules, policies, and procedures that the Company may issue from time to time in its sole discretion. To the extent that there is any conflict between the terms of this Agreement and any rule, policy, or procedure that the Company may issue, this Agreement shall prevail.

3.6 Executive shall not disclose any confidential, proprietary, or trade secret information in any Media communications. Any Media communications issued by Executive relating to the Company or Group Company, or any of their respective officers, employees, customers, suppliers, distributors, agents or shareholders shall comply with all Company policies, including, but not limited to, policies regarding confidential information and/or discrimination and harassment. Any Media communications by Executive shall not include discriminatory remarks, harassment, threats of violence, or similar inappropriate language or conduct. Executive also shall refrain from using statements, photographs, video, or audio that reasonably could be viewed as malicious, obscene, threatening, or intimidating; disparaging customers, distributors, or suppliers; or harassment or bullying. Any Media communications by Executive shall be honest and accurate and shall not contain information Executive knows to be false regarding the Company or Group Company, or their respective officers, employees, customers, suppliers, distributors, agents or shareholders. For the purpose of this Section, **Media** shall include, but is not limited to, television, radio, newspaper, magazine, other journalistic or third party publications, blogs, chat rooms, online message boards, social networking websites or profiles, and online discussion groups.

### Section 4  Place of Work/Working Hours

4.1 Executive's primary work locations shall be at the Company's office in Washington, DC, United States of America; provided, however, that Executive acknowledges and agrees that his services shall be performed at any place that the Company reasonably requires for the proper performance and exercise of Executive's duties.

4.2 Executive's normal working hours shall be between 8:30 am and 5:30 pm during the normal work week (inclusive of a one hour, unpaid lunch) and such additional hours as are necessary for the proper performance of Executive's duties.

4.3 Executive agrees to travel for business purposes as may be required for the proper performance of Executive's duties.

### Section 5  Compensation

For services rendered hereunder, the Company shall compensate Executive as follows:

5.1 **Base Salary**

Executive shall be paid a base salary of US$1,000,000.00 per annum (**Base Salary**) less applicable withholdings for taxes and authorized deductions. Such Base Salary shall be payable in arrears in accordance with the Company's normal payroll procedures. Executive's Base Salary may be increased from time-to-time in the sole discretion of the Company, but in no event shall Executive's Base Salary be reduced without Cause (as defined below).



5.2  **Discretionary Bonus**

(a) The Company may in its absolute discretion pay Executive a bonus of such amount, at such intervals, and subject to such conditions as the Company may in its absolute discretion determine from time to time.

(b) Any bonus payment to Executive shall be purely discretionary and shall not form part of Executive's contractual remuneration under this Agreement. If the Company makes a bonus payment to Executive it shall not be obliged to make subsequent bonus payments.

(c) If awarded, such bonus shall be payable in the calendar year following the fiscal year to which the bonus is applicable.

5.3  **Tax Equalization**

As the basis upon which Executive is compensated has changed, the Company shall provide tax equalization assistance to cover 100% of any individual income tax burden incurred by Executive on an annual basis on his Base Salary and Allowances (as discussed in Section 7 of this Agreement). The Company shall determine the tax equalization amount to be paid to Executive based on the individual income tax rate applicable to Executive in the relevant tax year. The tax equalization amount shall be subject to review on an annual basis to account for changes in the applicable individual income tax rate. The tax equalization amount calculated by the Company shall be determinative. The tax equalization amount shall be payable in equal installments during the applicable tax year in accordance with the Company's normal payroll procedures. For the 2014 tax year, the tax equalization amount shall equal US$873,000.00 which shall be payable within the 2014 tax year in equal installments in accordance with the Company's normal payroll procedures.

## Section 6   Benefits

The Company shall provide Executive the following benefits:

6.1  **Insurance**

Executive shall be entitled to participate in any employee benefit plans, including life and health insurance plans, the Company, in its discretion, maintains for employees of Executive's level. The Company expressly reserves the right to modify, substitute, or eliminate such employee benefit plans at any time.

6.2  **Paid Leave**

(a) Executive shall be entitled to thirty (30) days of paid leave in each leave year (in addition to national holidays declared, or days in lieu where the Company requires Executive to work on such national holidays). The Company leave year is the calendar year. In the event Executive's employment commences part way through the leave year, Executive's leave entitlement during the first year of employment shall be calculated by the Company on a pro-rata basis.

(b) If either Party has issued a notice of nonrenewal of the Term or notice to terminate employment, the Company may require Executive to take any accrued but unused paid leave during the notice period.



Employee Initials: _PA_

Section 7    **Allowances**

7.1    **Vehicle Allowance**

To the extent Executive has satisfied all requirements of local law, Executive shall be eligible to receive an annual allowance of US$39,996.00 for a leased vehicle, or an allowance in an amount predetermined by the Company, in its discretion, to offset transportation expenses, which, in either case, shall be payable in accordance with the Company's normal payroll procedures.

7.2    **Cost of Living allowance**

Executive shall be required to relocate to Washington, DC in order to regularly communicate with the various US government agencies and departments regarding the introduction and presentation of the Company's Aircraft program to various other countries. Due to the higher cost of living in the Washington, DC area, the Company shall pay Executive a Cost of Living allowance equal to US$225,688.00 annually. Such Cost of Living allowance shall be payable on a monthly basis in accordance with the Company's normal payroll procedures.

Section 8    **Expenses**

8.1    Executive may be required to make payments for business-related travel, entertainment of business associates, and similar business-related expenses. The Company shall pay or reimburse Executive for all reasonable business expenses incurred by Executive in the performance of his duties in accordance with the Company's expense reimbursement policy.

8.2    The Company shall provide Executive with a mobile phone and company computer, which shall be used to conduct Company business. For calls made on a mobile phone provided to Executive by the Company, the Company shall pay all reasonable expenses to conduct Company business. At its sole discretion, the Company may also provide Executive with access to air cards, tools, and other equipment that the Company may determine is reasonably necessary for Executive to perform his duties under this Agreement from time-to-time. The mobile phone, company computer, and other tools and equipment are the sole property of the Company and must be returned by Executive upon termination of Executive's employment for any reason.

Section 9    **Termination**

9.1    The employment relationship between Executive and the Company is "at-will," which means that either Party may terminate the employment relationship at any time, for any reason or no reason, with or without notice, and without cause. Upon termination of Executive's employment with the Company, Executive shall be entitled only to such compensation and benefits as described in this Section 9. The date on which the termination of the employment relationship is effective is referred to herein as the **Termination Date**. The Termination Date shall be Executive's last day of employment for all purposes and shall be the last day of the Term of this Agreement. Following the Termination Date Executive and the Company shall comply with all obligations under this Agreement that expressly survive termination of Executive's employment. Participation in and coverage under all employee benefit plans, programs, and perquisites sponsored by or through the Company shall terminate in accordance with the applicable provisions of such plans or programs, subject to any conversion or continuation rights provided by the terms of such plans or programs or

applicable law. Notwithstanding the foregoing, nothing in this Section 9 shall be construed to limit Executive's right to any benefit, payment, or reimbursement under any employee benefit plan, policy, or arrangement for claims incurred or benefits earned before the Termination Date, nor any claim for indemnification existing under any other written agreement between the Company and Executive.

9.2 Executive's employment shall terminate automatically upon death or Disability (as defined below). If Executive's employment terminates on account of death or – Permanent Disability (after an initial 6 months), then the Company shall pay Executive, or Executive's estate or beneficiaries, as applicable, any wages earned but not paid through the Termination Date and any vested but unpaid compensation or benefits due under employee benefit plans, less applicable withholdings and authorized deductions. Such compensation shall be payable within thirty (30) days following the Termination Date. Following this payment, the Company shall have no further liability or obligation to Executive or to Executive's estate or beneficiaries, as applicable, under this Agreement.

9.3 If the employment relationship is terminated before the expiration of the Term by the Company for Cause (as defined below), by Executive for any reason, or due to nonrenewal of the Term of this Agreement, then the Company shall pay Executive any wages earned but not paid through the Termination Date and any vested but unpaid compensation or benefits due under employee benefit plans, less applicable withholdings and authorized deductions. Such compensation shall be payable within thirty (30) days following the Termination Date. Following this payment, the Company shall have no further liability or obligation to Executive under this Agreement.

9.4 If the employment relationship is terminated by the Company without Cause before the expiration of the Term, then the Company shall:

(a) Pay Executive any wages earned but not paid through the Termination Date and any vested but unpaid compensation or benefits due under employee benefit plans, less applicable withholdings and authorized deductions within thirty (30) days following the Termination Date;

(b) Pay Executive ninety (90) day notice period.

(c) Pay Executive an amount equal to 24 month(s) of Executive's base salary immediately preceding the Termination Date (**Severance Payment**). Executive's entitlement to the Severance Payment shall be consideration for and contingent upon Executive's execution and non-revocation of a separation agreement and release of claims (**Release**) and shall be contingent upon Executive's continued compliance with the restrictive covenants set forth in Section 11 of this Agreement. The Severance Payment shall be payable in a lump sum amount issued on the sixtieth (60th) day after the Termination Date. Following payments of amounts in this Section 9.4, the Company shall have no further liability or obligation to Executive under this Agreement.

9.5 For the avoidance of doubt, upon termination of the Employment relationship, Executive shall not be entitled to any bonus payment that might otherwise have been payable after the Termination Date.



7 of 15          Employee Initials: ___

9.6 For purposes of this Agreement, Cause means the occurrence of any one or more of the following events:

(a) Executive's material breach of the rules or regulations of any regulatory agency or body applicable to the Company or any Group Company;

(b) Executive's material breach of this Agreement or of any duty owed to the Company, including, but not limited to, a material breach of any restrictive covenant in Section 11 of this Agreement, representation in Section 13 of this Agreement, or fiduciary duty, or gross negligence or willful misconduct in Executive's performance of duties;

(c) Executive's material failure to follow any lawful policy, code of practice, or rule issued by the Company (as amended from time-to-time), including policies regarding discrimination or harassment, workplace safety, or workplace violence, or Executive's failure to comply with a reasonable and lawful directive of the Company;

(d) Executive's conviction of, or entry of a plea of guilty or *nolo contendere* with respect to any felony or with respect to any crime involving fraud or criminal perjury;

(e) Executive's fraud, embezzlement, misappropriation of property, or any material act of dishonesty, whether by commission or omission, with respect to the Company;

(f) Executive's act or omission that results in substantial economic injury or reputational harm for the Company or any Group Company or that is materially adverse to the interests of the Company or any Group Company;

(g) Executive's abuse of alcohol or use of controlled drugs (other than in accordance with a physician's prescription) that in the reasonable determination of the Company substantially interferes with Executive's performance of duties;

(h) Executive's absence from work without prior approval; or

9.7 For purposes of this Agreement, Disability means Executive has been unable to perform his duties, with or without reasonable accommodation, by reason of illness or incapacity for a continuous period of one hundred eighty (180) consecutive days, or such longer period of leave allowed by Company policy or law, in any case as determined in good faith by the Company in accordance with applicable law.

9.8 Any termination of Executive's employment, except for a termination upon Executive's death, shall be communicated by written notice to the other Party. Such written notice shall (a) indicate the specific termination provision in this Agreement relied upon, and (b) set forth the Termination Date. Any reasonable delay by the Company in exercising its right to terminate for Cause shall not constitute a waiver thereof.



Section 10    **Obligations Upon Termination**

10.1   On termination of employment for any reason, Executive shall:

(a)   Immediately deliver to the Company all documents, books, materials, records, correspondence, papers and information (on whatever media and wherever located) relating to any intellectual property rights, the business or affairs of the Company, Group Company or its business contacts, and any keys, credit card, mobile phone, company computer, other tools and equipment or any other property of the Company or any Group Company, which is in his possession or under his control;

(b)   At the Company's instruction, irretrievably delete any information relating to the business of the Company stored on any magnetic or optical disk or memory and all matter derived from such sources that are in his possession or under his control outside the Company's premises; and

(c)   Provide a signed statement that his has complied fully with his obligations under this Section 10.

Section 11    **Restrictive Covenants**

11.1   The Parties agree that Executive will have access to confidential information in conjunction with the performance of his duties under this Agreement. Executive acknowledges that this creates a special relationship of trust and confidence between the Company, Executive, and the Company's current and prospective customers. Executive further acknowledges that there is a high risk and opportunity for any person given such responsibility and confidential information to misappropriate the relationship and goodwill existing between the Company and the Company's current and prospective customers. Executive, therefore, agrees to hold in a fiduciary capacity and not disclose, any nonpublic information, knowledge, or data that relates to customers, finances, technical data concerning products or services, or any other trade secret, proprietary, or confidential information of the Company or any Group Company to any person, firm, or corporation other than the Company or persons or entities designated by the Company. The restrictions on the disclosure of confidential information in this Section are applicable to Executive during his employment and following the termination of his employment for any reason. Executive also agrees to sign a nondisclosure agreement in consideration for his initial and continued employment with the Company.

11.2   During the Term of this Agreement and for twelve (12) months after the Termination Date, Executive shall not either directly or indirectly own, have a proprietary interest of any kind in, be employed by, serve as a consultant to, or serve in any other capacity with any entity, whether Government, public, or private, that (a) is a client or customer of the Company or any Group Company, or (b) engaged in a business that is competitive with the Company or any Group Company in any state within the United States or other country in which the Company or any Group Company has business operations or has active plans for business operations.

11.3   During the Term of this Agreement and for twelve (12) months after the Termination Date, Executive shall not solicit, call on, or in any way contact, either directly or indirectly, any supplier, customer, licensee, franchisee, or other person or entity that (a) Executive contacted, called on, or conducted business with during his employment with the Company; (b) Executive learned of or received confidential information about during his employment or as a result of his employment with the

Company; or (c) has or had a business relationship with the Company or any Group Company at any time within the twelve (12) months preceding such solicitation, in each case with an intention of inducing or attempting to induce such person or entity to cease doing business with the Company or any Group Company or to in any way interfere with such business relationship between the Company or any Group Company and such person or entity.

11.4 During the Term of this Agreement and for twelve (12) months after the Termination Date, Executive and any entity controlled by Executive shall not, directly or indirectly solicit or offer to hire any person who is or was an officer or employee of the Company or any Group Company at any time within the twelve (12) month period preceding the date of such solicitation in order to induce such person to discontinue his relationship with the Company or any Group Company, in order to accept employment by, or enter into a business relationship with, any other entity or person.

11.5 All intellectual property or work product, including, but not limited to, inventions and improvements conceived, invented or developed by Executive during his employment that relate to products or services to be manufactured, sold, or used by the Company or any Group Company, are in the process of development by the Company or any Group Company, or may be sold or used in competition with Company or Group Company products, shall be considered "work made for hire," as defined in 17 U.S.C. § 101 (§ 101 of the Copyright Act of 1976), and shall be the exclusive property of the Company, its successors, and assigns. Executive agrees to execute such assignments, instruments or other documents as the Company or its counsel may request to implement this Section.

11.6 Executive hereby covenants and agrees that during the course of his employment and thereafter, Executive shall not defame or otherwise make any disparaging statements regarding or relating to, the Company or Group Company or any of their respective products services, finances, financial conditions or other aspects of their business or any former or existing officers, employees, customers, suppliers, distributors, agents, shareholders or other parties contracting with the Company or any Group Company in any medium to any person or entity. Notwithstanding the foregoing, nothing in this Agreement shall preclude Executive from providing truthful testimony, to the extent mandated by subpoena, court order, or pursuant to an investigation by a government agency.

11.7 Executive acknowledges that the Company has a legitimate business interest in the protection of its goodwill and business relationships, and that it is fair and reasonable for the Company to take steps to protect itself from the risk of such misappropriation. Executive acknowledges and agrees that the provisions of this Section 11 are reasonable and necessary protections of the immediate and substantial interests of the Company and that the Company would not have entered into this Agreement with Executive without the additional consideration offered by Executive in binding himself to the provisions of this Section 11. Any breach, willfully or otherwise, of the restrictive covenants in this Section 11 shall cause continuing and irreparable injury to the Company for which monetary damages would not be an adequate remedy and, thus, the Company may seek all appropriate injunctive relief. Any such injunctive shall be cumulative and shall be in addition to any other equitable relief, damages, penalties, or other remedies available to the Company under applicable law.



11.8 If any court of competent jurisdiction determines that any of the restrictive covenants in this Section 11, or any part thereof, are unenforceable (whether because of duration, geographical scope, or otherwise), such court shall have the power to modify such provision to the minimal extent necessary to make such provision enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction or provision thereof contained in this Section 11 is unenforceable, and such restriction cannot be amended so as to make it enforceable, such restriction shall be deemed severed from this Agreement and shall not affect the enforceability of any of the other restrictions contained herein.

11.9 If Executive breaches any provision of Sections 11.2, 11.3, or 11.4 in any respect, the restrictive covenants contained in those sections shall be extended for a period equal to the period that Executive was in breach.

11.10 The respective rights and obligations of the Company and Executive under this Section 11 shall survive the termination of this Agreement or the termination of Executive's employment for any reason. Executive agrees to disclose the existence and terms of Section 11 to any person or entity to whom he may provide services during the respective duration of such covenants.

Section 12  **Governing Law and Arbitration**

The validity and interpretation of this Agreement and any of the terms or provisions as well as the rights and duties of the parties hereunder shall be governed by the laws of the District of Columbia, without reference to its conflict of law or choice of law principles that would cause the laws of any other jurisdiction other than the District of Columbia to be applied. Except in connection with the enforcement of the restrictive covenants in Section 11, any dispute between the Parties arising under this Agreement, or concerning its subject matter or formation, or any dispute arising under any statute, regulation, or ordinance in connection with Executive's employment, or termination thereof, shall be submitted to binding arbitration before the American Arbitration Association (**AAA**) for resolution. Such arbitration shall be conducted in the District of Columbia and the arbitrator shall apply District of Columbia law, including federal law as applied in District of Columbia Courts. The arbitration shall be conducted in accordance with the AAA's employment arbitration rules as modified herein. The arbitration shall be conducted by a single arbitrator, who shall be an attorney who specializes in the field of employment law, and who shall have prior experience arbitrating employment disputes. The award of the arbitrator shall be final and binding on the Parties, and judgment on the award may be confirmed and entered in any state or federal court in the District of Columbia. The arbitration shall be conducted on a strictly confidential basis, and Executive shall not disclose the existence of a claim, the nature of a claim, any documents, exhibits, or information exchanged or presented in connection with such a claim, or the result of any action, to any third party, with the sole exception of Executive's legal counsel, who also shall be bound by these confidentiality terms. In the event of any court proceeding to challenge or enforce an arbitrator's award, the Parties hereby consent to the exclusive jurisdiction of the federal district courts of the District of Columbia, or the state court for the District of Columbia only in the event that federal jurisdiction does not exist, and agree to venue in that jurisdiction. The Parties agree to take all steps necessary to protect the confidentiality of all confidential information in connection with any such court proceeding, including filing confidential information under seal or securing the entry of an appropriate protective order.



Section 13   **Representations and Warranties**

13.1   Executive represents and warrants that Executive has full power and authority to enter into this Agreement and perform the duties under this Agreement, and that Executive has no outstanding agreement, whether oral or written or any obligation that is or may be in conflict with any of the provisions of this Agreement or that would preclude Executive from complying with the provisions of this Agreement and that the performance of Executive's duties shall not result in a breach of, or constitute a default under, any agreement, whether oral or written, including, without limitation, any restrictive covenant or confidentiality agreement, to which Executive is a party or by which Executive may be bound.

13.2   Executive further represents and warrants that Executive has not misappropriated any confidential information and/or trade secrets of any third party that Executive intends to use in the performance of the duties under this Agreement. The Company disclaims any interest in any confidential information of any person or entity other than the Company and instructs Executive not to disclose or use such confidential information.

13.3   Executive further represents and warrants that by entering into this Agreement or performing any of his obligations under it, he shall not be in breach of any court order or any express or implied terms of any contract or other obligation binding on her.

Section 14   **Tax Matters**

14.1   All payments to Executive shall be subject to tax withholdings and applicable withholdings under the Federal Insurance Contribution Act in accordance with applicable law.  State taxes will only be withheld where it is the Company's responsibility to do so to comply with U.S. tax laws and regulations.  Executive shall be solely responsible for any additional taxes he incurs as a result of payments made hereunder.

14.2   Notwithstanding anything herein to the contrary, this Agreement is intended to be interpreted and applied so that the payments and benefits set forth herein shall either be exempt from the requirements of Section 409A of the Code, or shall comply with the requirements of Section 409A of the Code, and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be exempt from or in compliance with Section 409A of the Code. Notwithstanding anything in this Agreement or elsewhere to the contrary, a termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of Executive's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service" and the date of such separation from service shall be the Termination Date for purposes of any such payment or benefits.

14.3   To the extent that the Company determines that any provision of this Agreement would cause Executive to incur any additional tax or interest under Section 409A of the Code, the Company shall be entitled to reform such provision to attempt to comply with or be exempt from Section 409A of the Code through good faith modifications. To the extent that any provision hereof is modified in order to comply



12 of 15                     Employee Initials: ___

with Section 409A of the Code, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company without violating the provisions of Section 409A of the Code.

14.4 Notwithstanding any provision in this Agreement or elsewhere to the contrary, if on his Termination Date Executive is deemed to be a "specified employee" within the meaning of Section 409A of the Code, any payments or benefits due upon a termination of Executive's employment under any arrangement that constitutes a "deferral of compensation" within the meaning of Section 409A of the Code (whether under this Agreement, any other plan, program, payroll practice or any equity grant) and which do not otherwise qualify under the exemptions under Treas. Reg. § 1.409A-1 (including without limitation, the short-term deferral exemption and the permitted payments under Treas. Reg. § 1.409A-1(b)(9)(iii)(A)), shall be delayed and paid or provided to Executive in a lump sum (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) on the earlier of (a) the date which is six (6) months and one (1) day after Executive's "separation from service" (as such term is defined in Section 409A of the Code) for any reason other than death, and (b) the date of Executive's death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.

14.5 For purposes of the application of Treas. Reg. § 1.409A-1(b)(4) (or any successor provision), each payment under this Agreement to Executive (including any installment payments) shall be deemed a separate payment.

14.6 In no event may Executive, directly or indirectly, designate the calendar year of any payment to be made under this Agreement or otherwise which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code.

14.7 With respect to any expense, reimbursement or in-kind benefit provided pursuant to this Agreement that constitutes a "deferral of compensation" within the meaning of Section 409A of the Code, (a) the expenses eligible for reimbursement or in-kind benefits provided to Executive must be incurred during the Term (or applicable survival period), (b) the amount of expenses eligible for reimbursement or in-kind benefits provided to Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to Executive in any other calendar year, (c) the reimbursements for expenses for which Executive is entitled to be reimbursed shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred, and (d) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit.

Section 15  **General**

15.1 Sections 9 through 12 of this Agreement inclusive shall survive and continue in full force in accordance with their terms notwithstanding the termination of Executive's employment for any reason or the nonrenewal of the Term of this Agreement.

15.2 If any provision of this Agreement is held by an arbitrator or a court of competent jurisdiction to be illegal, invalid, or unenforceable, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; and the remaining



Case 1:18-cv-00191-TSE-JFA   Document 30-4   Filed 04/13/18   Page 15 of 16 PageID# 279

provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

15.3 No delay or omission by either Party in exercising any right, power, or privilege under this Agreement will impair such right, power, or privilege, nor will any single or partial exercise of any such right, power, or privilege preclude any further exercise thereof or the exercise of any other right, power, or privilege.

15.4 Executive acknowledges and agrees that he has had an opportunity to review this Agreement with counsel of his choosing.

15.5 This Agreement may be executed in multiple counterparts, each of which will be deemed an original, and all of which together will constitute one and the same instrument.

15.6 The headings in this Agreement are for convenience of reference only and will not limit or otherwise affect any of the terms or provisions in this Agreement. Unless otherwise specified, references to "Section" shall be to Sections of this Agreement. As used herein, "days," "weeks," "months," or "years" mean calendar days, weeks, months, or years, as the case may be, unless otherwise explicitly specified. The use of the words "include," "includes," and "including" followed by one or more examples is intended to be illustrative and does not limit the scope of the description or term for which the examples are provided. The word "or" is used in the inclusive sense of "and/or", unless the context clearly indicates that the word "or" is intended in the exclusive sense of "one or the other, but not both." The Parties acknowledge that they have been equally involved in the drafting of this Agreement and that no provision of this Agreement shall be construed against or interpreted to the disadvantage of a Party by reason of such Party having or being deemed to have drafted such provision.

15.7 This Agreement will be binding upon and inure to the benefit of the Parties and will be enforceable by the personal representatives and heirs of Executive and the successors of the Company.

15.8 All notices and other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, mailed by certified mail, return receipt requested or sent via facsimile to the relevant address or facsimile number set forth below, or to such other address as either Party has furnished to the other in writing in accordance herewith; provided, however, that, (i) notices sent by personal delivery shall be deemed given when delivered; (ii) notices sent by facsimile transmission shall be deemed given upon the sender's receipt of confirmation of complete transmission; and (iii) notices sent by certified mail shall be deemed given two (2) days after the postmarked date.

If to Executive, to the address in the records of the Company.

If to the Company, to:
c/o VP Human Resources
NorthStar Aviation, LLC
P.O. Box 62127
Abu Dhabi
United Arab Emirates
Attention: Hani Farag

14 of 15   Employee Initials ____

15.9   This Agreement contains the entire understanding of the Parties, supersedes all prior agreements and understandings relating to the subject matter hereof and may not be amended except by a written instrument hereafter signed by each of the Parties.

**IN WITNESS WHEREOF** the Parties have caused this Agreement to be executed as of the date first above written by themselves or their duly authorized representatives.

Signed
By: Executive

_____
Alden (Reno) Alberto

**NORTHSTAR AVIATION USA LLC**

By: NorthStar Aviation LLC, its sole member

_____
Name: Hani Farag
Title: Vice President, Corporate

_____
Name: Nrasib Ali
Title: Director Finance