Exhibit 28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

------------------------------------x

NORTHSTAR AVIATION, LLC, et al.,      :

 Plaintiffs/Counterclaim Defendants,: Civil Action

        vs.                    : No. 1:18cv191-

ALDEN BURT ALBERTO,                   : TSE-JFA

 a/k/a Reno Alberto,                  :

  Defendant/Counterclaim Plaintiff. :

------------------------------------x


VIDEOTAPED DEPOSITION OF ALDEN BURT ALBERTO

Leesburg, Virginia

Wednesday, November 28, 2018

10:02 a.m.


Reported by:  Elizabeth Mingione, RPR

No.: 44524

1    So we were talking about summer, fall, of

2    2017, shortly before we went on break.  And you

3    mentioned what you thought about the situation.  And I

4    appreciate the explanation.  I've also seen used in

5    this case -- and I think in some of your interrogatory

6    answers, and also the Vulcan deposition, reference to

7    a Plan B.

8    My first question is what was Plan B?

9    A.    Discussions with the sheikh sometime in

10   2017 or earlier.  He discussed possibilities of

11   closing down U.S. operations, you know, once the

12   contract was delivered.  I had to explain to him that

13   one of the requirements for the licensing is that

14   NorthStar USA had to exist because NorthStar UAE was a

15   foreign-owned corporation and couldn't apply for ITAR

16   licensing.  And -- I'm sorry, I just lost track.

17   Could you repeat the exact question.

18   Q.    Yeah.  My question essentially is what was

19   Plan B?

20   A.    So after -- as I discussed earlier, I was

21   made aware of that PowerPoint to oust me as CEO, close

22   down the USA office.  And my concern was for employees

1    having jobs, and the desire to continue operations in

2    the U.S. both personally and for employees.  So Plan B

3    was to set up a new company, either set up a new

4    company, or have the ability to continue run NorthStar

5    USA possibly independently from -- from NorthStar UAE.

6    Those were the thoughts that were going through my

7    mind to continue operations for NorthStar USA.

8            So Vulcan Aviation was formed with that

9    intent as a Plan B.  In the event that the sheikh

10   closed down U.S. operations, I would be able to

11   provide jobs to a lot of loyal employees that we've

12   had for, you know, several years.

13       Q.    So after you saw the PowerPoint

14   presentation, you took steps to form Vulcan.  What did

15   you do to do that?  What steps did you take?

16       A.    Well it wasn't, you know, it wasn't until

17   the sheikh revoked -- wrongfully revoked my power of

18   attorney.  I believe that was October 17, that I

19   actually -- or excuse me.  That was October 19, I

20   believe, is when my revocation of power of attorney

21   was actually signed, that I set up Vulcan Aviation as

22   that Plan B.

1      Q.      After you received the revocation of power

2  of attorney?

3      **A.      There were discussions, I believe, before**

4  **that to potentially do that, in the event, you know,**

5  **he decided to close U.S. operations.  After he revoked**

6  **my power of attorney, that's kind of what triggered,**

7  **you know, my desire to set up Vulcan.**

8      Q.      Now, at some point you resigned from

9  NorthStar Aviation.  And I've seen a couple

10  resignation documents in the file.

11              Can -- first of all, when did you resign?

12              MR. JOHNSON:  Objection to form.  Which

13  entity?

14      **A.      I resigned as CEO for NorthStar UAE, as I**

15  **recall, October 24, 2017.**

16      Q.      And when did you resign from NorthStar USA

17  as CEO?

18      **A.      I resigned from NorthStar USA as CEO, I**

19  **believe it was November 6, 2017.**

20      Q.      And how do you distinguish between

21  resigning from one role versus the other role?

22      **A.      Can you clarify?**

1          (A document was marked as Deposition

2    Exhibit Number 4.)

3                    -    -    -

4          BY MR. BENNETT:

5     Q.    Mr. Alberto, do you recognize Exhibit 4?

6     **A.    I recognize it as a Wells Fargo banking**

7    **statement for NorthStar Aviation.**

8     Q.    Okay.  And if you look at the top

9    right-hand corner, it says Wells Fargo Business Card

10   Visa.  And then there's an account number to the left

11   of that.

12          Do you recognize this statement to be for

13   the Wells Fargo credit card for NorthStar USA?

14    **A.    Yes.**

15    Q.    Okay.  And if you look at the statement

16   closing dates on the left-hand side, the date

17   reflected on there is November 24, 2017, top left-hand

18   corner.

19    **A.    Yes.  11/24/2017.**

20    Q.    And I want to ask you about some of the

21   transactions on this statement.

22    **A.    Sure.**

83

1    Q.    If you look down toward the bottom of the
2    page, there's a -- an October 26 transaction that's
3    the third transaction from the top of the list.
4    **A.    Yes.**
5    Q.    To Bergstrom Attorneys Trust for $5,000.
6    Do you have any knowledge of what that charge was for?
7    **A.    It was work for -- I can't tell**
8    **specifically.  If you have got follow-on**
9    **documentation, I can tell you exactly.**
10    Q.    Bergstrom is the firm that you hired to set
11    up Vulcan for you, correct?
12    **A.    Yes.  They are the law firm.**
13    Q.    Do you know whether that $5,000 charge was
14    for the services in connection with setting up Vulcan?
15    **A.    It could have been.**
16    Q.    And there's another entry directly
17    underneath that for $1,140 to Bergstrom as well.  Do
18    you -- do you know what that charge was for?
19    **A.    Not with looking -- not without looking at**
20    **the follow-on documentation.**
21    Q.    Okay.  Could it have also been in relation
22    to your setting up of Vulcan?

1    12th of October?

2        **A.    Right.**

3        Q.    And it's I think the fifth one up.  Do you

4    have any understanding of what that transaction is?

5        **A.    No.  I mean, Ali had access to the account,**

6    **obviously.  And his name is referenced there on that**

7    **line.  So he was making online transactions.**

8        Q.    I'm going to ask you to flip over to the

9    next page.  There's a transaction on the 19th of

10   October of 2017.  It says it's an online transfer to

11   Alberto A Way2Save Checking, with an account ending in

12   589 of $550,000.

13            Do you recognize what that transaction is?

14       **A.    I do.**

15       Q.    And what is that transaction?

16       **A.    It's a transaction to myself for $550,000.**

17       Q.    And --

18       **A.    To my savings.**

19       Q.    Okay.  And what --

20       **A.    Or, I'm sorry, my checking account.**

21       Q.    Why was that transaction made on the 19th

22   of October?

1      A.    I made that transaction because I was

2   informed by the bank manager that someone was trying

3   to access the NorthStar accounts illegally, and that's

4   what locked out access to the account on line.  I met

5   with the bank manager in person.  She also said that

6   someone from NorthStar was trying to either close the

7   account, withdraw money, you know, that wasn't

8   supposed to have access to these accounts.

9           So, you know, you've got to understand my

10  mind set, again, is that -- so what I did was in order

11  to protect that money.  And that's why I transferred

12  it to my savings account -- or checking account.

13      Q.    And was that money ever transferred back to

14  NorthStar?

15      A.    It was not.

16      Q.    Did the money remain in your personal

17  assets in your personal account?

18      A.    I believe so.  I, you know, when you look

19  at the -- when you look at the big picture is -- in my

20  mind set at the time, like I said, I was a founder of

21  NorthStar Aviation UAE.  The sheikh just revoked my

22  power of attorney, blocking access to all bank

1    **NorthStar -- NorthStar was going to be doing in the**

2    **UAE, what we were going to be exporting, and the**

3    **people that were involved, essentially the scope of**

4    **the whole contract and business.**

5         Q.    Do you recall around the time you were

6    looking at the Iraq contract and the Afghanistan

7    contract, Ali transferring five million dollars over

8    to the NorthStar USA bank account from the NorthStar

9    UAE account?

10        **A.    The five million dollars, if we are talking**

11   **about right -- the same transfer, was transferred as a**

12   **bonus to myself for work performed in 2016.  And that**

13   **went through payroll, Wells Fargo payroll, and then**

14   **deposited in my checking account.**

15        Q.    Well, let me show you the transaction I'm

16   thinking of.

17        **A.    Okay.**

18        Q.    And let's see if we can figure out what it

19   is.  So Exhibit 6.

20                          -   -   -

21             (A document was marked as Deposition

22   Exhibit Number 6.)

1                           -   -   -

2               THE WITNESS:  Ellis?

3               MR. BENNETT:  Yes.  You need a break?

4               THE WITNESS:  Is now a good time to --

5               MR. BENNETT:  Yes.  It's fine.  Yeah.

6    Absolutely.  That's fine.

7               THE WITNESS:  Sorry.  I've got to use the

8    restroom.

9               VIDEOGRAPHER:  Off the record at 1408.

10                          -   -   -

11              (Recessed at 2:08 p.m.)

12              (Reconvened at 2:27 p.m.)

13                          -   -   -

14              VIDEOGRAPHER:  On the record at 14:27.

15              BY MR. BENNETT:

16       Q.    Mr. Alberto, right before we went on break,

17   I had just handed you what's been marked Deposition

18   Exhibit 6.  And we prior to that have been talking

19   about a five-million-dollar transaction.  So if you

20   could look at the second page of Exhibit 6.  And it's

21   the transaction dated the 19th of September 2017.

22              There's a five million dollar deposit into

1    the NorthStar USA account?

2         A.    Yes.

3         Q.    Do you see that transaction?

4         A.    Yes.

5         Q.    Do you have any understanding of what that

6    five million dollars was intended for?

7         A.    **That five million dollars was intended as a**

8    **bonus for myself for work performed in 2016.**

9         Q.    Okay.  And that's the only question I have

10   about Exhibit 6.

11               Was any money ever deposited into the

12   NorthStar USA account in September of 2017 that was

13   essentially earmarked for the Iraq contract?

14        A.    **There could have been.  Ali could have made**

15   **a transfer, but not that I'm specifically recall.**

16        Q.    Had the Iraq contract been procured, would

17   there have been essentially start-up costs for that

18   contract?

19        A.    **Yeah.  Just like any other contract.**

20        Q.    And what kind of start-up costs would we

21   have been talking about in terms of dollars?

22        A.    **Depending upon the contract size, a lot of**

1      that took essentially my ability to effectively run

2      NorthStar, to do any day-to-day management, to make

3      any financial decisions, operations, you know,

4      everything.

5          Q.    As the owner of NorthStar, Dr. Bin Saif,

6      Sheikh Ahmed was the holder of the power of attorney,

7      meaning that he had the power to revoke it, correct?

8              MR. JOHNSON:  Objection to the extent it

9      calls for a legal conclusion.

10         A.    I don't know UAE law, but obviously that

11     occurred.  But, you know, by my --

12         Q.    He's the one that granted you the power

13     that you had under the power of attorney initially

14     when the power of attorney was signed, correct?

15             MR. JOHNSON:  Same objection.

16         A.    Yes.  I believe so.  Yes.

17         Q.    And I know you don't have it in front of

18     you now, but that power of attorney sets forth several

19     things that you have the power to do while you hold

20     the power of attorney.  Would you agree with that?

21         A.    Yes.  It gave me broad authority to run

22     NorthStar, run the day-to-day operations, made hiring

1    **and firing decision, operations.  Essentially there**

2    **were no limits.  It was a -- and that was one of the**

3    **requirements from me that I run the company without**

4    **interference.**

5            **So it gave me broad compensation for**

6    **compensation, setting compensation, including bonuses.**

7    **And that gave me full authority to run NorthStar UAE.**

8        Q.    You would agree with me that there are

9    several paragraphs in the power of attorney that

10   enumerate different powers.  I think there are a

11   number -- or they are lettered paragraphs A through S,

12   if I remember correctly?

13           MR. JOHNSON:  Objection.  The document

14   speaks for itself.  You can answer.

15       **A.    Yes.  There were several paragraphs**

16   **delineating my power of attorney.**

17       Q.    And would you agree that you had no broader

18   powers than what was delineated in those paragraphs?

19           MR. JOHNSON:  Objection to form.

20       **A.    I believe an intent was as well, is that**

21   **essentially the only thing I couldn't do was sell the**

22   **company.**

1          BY MR. BENNETT:

2      Q.    Mr. Alberto, I realize this is a lengthy

3  document.  And, don't worry, I'm not going to ask you

4  about every page of it.

5      **A.    Okay.**

6      Q.    And if you flip to the second page of the

7  exhibit, there's I guess my first question is do you

8  recognize that page?

9      **A.    I don't recognize it, I mean, the details**

10 **of it but, yeah, I mean, I trust that this is true.**

11     Q.    Do you recognize your signature?

12     **A.    Yes.  That's my signature.**

13     Q.    And this looks to be a document associated

14 with a bonus payment you took.  It says discretionary

15 bonus of 1.2 million dollars on January 27, 2014.  Doe

16 that appear to be the case?

17     **A.    Yes.  This was part of the bonus process**

18 **for employees as well as myself.**

19     Q.    And what was that bonus process?  We talked

20 about bonuses, but what was the process within the

21 company of -- of determining what the bonuses were?

22     **A.    Well, I think I discussed that earlier,**

1      A.     Well, I'll tell you why is, first of all,

2   it was for work that I completed.  When I was CEO of

3   R2, I was responsible for that success.  The sheikh

4   had nothing to do with R2.  He had nothing to do with

5   the contracts that were awarded to R2.  So he was well

6   compensated.

7           I mean, he got almost $15 million in total,

8   you know.  He's got no room to complain.  He got very

9   well compensated and above and beyond, you know, what

10  we agreed on.  And that doesn't include our agreement

11  to split the net proceeds of the performance bond

12  50/50.  To me --

13     Q.     We'll talk about that.

14     A.     To me, he got a great deal, you know.  You

15  can sit here and argue all day, but the sheikh got a

16  great deal.  For not -- for not contributing very

17  minimal capital, $40,000, he got close to a 300-to-1

18  return based on -- I'm not even using all $50 million.

19  I'm talking about eleven and a half, twelve million

20  dollars that he received in dividends.  That doesn't

21  include the three million we paid up front from R2

22  side to get the trade license, get the air operations

1    certificate.

2            And, additionally, when I left the company

3    in October -- when I resigned from the company, the

4    book value of the company was close to $36 million.

5    And, additionally, he received 4.540 million dollars

6    that basically is an agreement with our prior

7    agreement to split the net proceeds of the performance

8    bond.  And there's an additional $14 million that will

9    be released in February 2019 that I feel I'm entitled

10   to 50 percent of, per our agreement.

11       Q.    And what agreement is that?

12       A.    That agreement we made was to split the net

13   proceeds of the performance bond.  We had various

14   conversations, you know, in different meetings on at

15   least four occasions.  The first time I brought this

16   up was in June 2014 in New York.  The sheikh and Salem

17   AlDhaheri were visiting New York in June 2014.

18            I was up in New York.  They're meeting with

19   potential investors in the event that we wanted to

20   expand operations.  I met with Warburg Pincus, Caspian

21   Capital, and I also met with the sheikh.  And I met

22   him at his penthouse near South Central Park at the

1    Essex House.  We -- I remember very clearly we went to

2    a meeting room in the lobby.

3            And, you know, it had been about a year

4    since we got the contract.  And because the contract

5    value was a lot lower than anticipated on a per unit

6    basis, you know, he was wondering what essentially

7    what his share would be.  And because it was early on

8    in the contract, I wasn't aware of any -- I wasn't --

9    at that time I couldn't assess what any warranty

10   issues would come up, you know, because we just

11   started delivering these helicopters.

12           So for goodwill I said I'll split the

13   performance bond.  We had a total of $28 million up in

14   a performance bond.  And I said that in addition to

15   the dividends he was receiving, I would split the

16   performance bond, the net proceeds of the performance

17   bond 50/50, as we did in I believe June 2017.  I

18   received 4.540 million dollars, and he received an

19   equal amount.

20       Q.   So are you saying that you made this

21   agreement with Dr. Ahmed or Sheikh Ahmed in June of

22   2014?

1      A.     Yeah, in New York.  That was the first time

2    I brought it up, but it was reiterated at least on

3    three other occasions, and...

4      Q.     And as I understand it, there was no

5    writing, no written contract about this agreement?

6      A.     No.  There is no writing.  There's only

7    evidence that -- that essentially, you know, I abided

8    by our agreement.  Performance bond was -- performance

9    bond was released.  He received half of it, as

10    evidenced by a canceled check to Rotana Jet.  And I

11    received the other half.

12      Q.     And that -- and when you received the other

13    half, that was later in 2017, correct?

14      A.     No.  That was summer 2017.  There's a

15    discovery document that I believe that dates it.  It

16    was a board resolution signed by me essentially

17    stating that the amount of the performance bond that

18    Sheikh Ahmed would receive.

19          MR. BENNETT:  Could you mark that as

20    Exhibit Number 19.

21                    -   -   -

22          (A document was marked as Deposition

1    Exhibit Number 19.)

2                            -   -   -

3            BY MR. BENNETT:

4        Q.    Mr. Alberto, you were just referencing a

5    board resolution.  Is Exhibit 19 that document that

6    you just testified about?

7        **A.    Yes.**

8        Q.    So is this the board resolution?

9        **A.    This is the document I was referring to.**

10       Q.    Okay.  Again, specifically I'm looking at

11   the second page that says Board Resolution at the top.

12   And there's a date on it that says the board

13   resolution was unanimously approved on June 29, 2017.

14           Do you see that?

15       **A.    Yes.**

16       Q.    And you signed this.  Do you recognize your

17   signature?

18       **A.    Yes.**

19       Q.    Was a board meeting called to pass this

20   resolution?

21       **A.    No.  I didn't need a board meeting to**

22   **approve a dividend payment to the sheikh.  I had full**

1    **authority to do so.**

2        Q.    So the last sentence that reads, The board

3    resolution was unanimously approved on 29 June 2017 is

4    not true?

5        **A.    The board resolution was unanimously**

6    **approved on -- I think it's just a matter of**

7    **semantics, but it was approved by me.**

8        Q.    Dr. Bin Saif was also on the board,

9    correct?

10       **A.    Yes.  And he freely accepted the check.  If**

11   **he had any argument with this, he could have returned**

12   **the check, but he didn't.**

13       Q.    So the statement on here that the board

14   unanimously approved this resolution is not true?

15           MR. JOHNSON:  Objection.  Asked and

16   answered.

17           THE WITNESS:  I'm sorry?

18           MR. JOHNSON:  Objection.  Asked and

19   answered, but you can answer again.

20           THE WITNESS:  Objection to what?

21           MR. JOHNSON:  I think the question was

22   asked for a second time.

1          BY MR. BENNETT:

2      Q.    I'll ask a different question.

3      **A.    Sure.**

4      Q.    Did the board unanimously approve this

5  board resolution?

6      **A.    I guess if you are looking at semantics,**

7  **you know, those words could be changed.  But either**

8  **way, it was approved, and it was accepted.**

9      Q.    I'm not looking at semantics.  I am asking

10  did the board unanimously approve this document?

11      **A.    As a board member, I approved it.**

12      Q.    And you do not constitute the full board?

13      **A.    No.  It was myself and the sheikh.  He --**

14  **Ellis, he could have disagreed.**

15      Q.    Did you show this board resolution to him?

16      **A.    This was sent over from -- by e-mail from**

17  **me to Ali.  And this was supposed to accompany the**

18  **check that was given to him in the amount of**

19  **4,540,000.**

20      Q.    What does the last page of this document

21  represent?

22      **A.    These are -- these are amounts that were**

1    paid out of the performance bond.

2        Q.    And who approved those amounts?

3        A.    I did.

4        Q.    Did the board unanimously approve those

5    amounts?

6        A.    I said that was myself alone that approved

7    that.

8        Q.    Is it your position that this document is

9    somehow written evidence related to the June 2014

10   agreement you reached with the sheikh in New York?

11            MR. JOHNSON:  Objection to the extent it

12   calls for a legal conclusion.  You can answer, if you

13   can.

14       A.    Yeah.  And from a legal perspective, as he

15   said, I can't judge that.  But I believe that is

16   evidence of me abiding by our original agreement,

17   which was to split the net proceeds of the performance

18   bond 50/50.

19       Q.    And the performance bond by its terms

20   cannot be released, the first portion, until at least

21   2017, correct?

22            MR. JOHNSON:  Objection.  The document

1  speaks for itself.

2      **A.    I believe there's release in 2017.**

3      Q.    And then there was --

4      **A.    -- sometime --**

5      Q.    -- an additional portion you mentioned that

6  is yet due to be released in 2019, I believe?

7      **A.    Around February 2019.**

8      Q.    Did -- back in June of 2014, did you and

9  the sheikh discuss any portion of the performance bond

10  being given to Hillary Holcombe?

11      **A.    No, not specifically.  She wasn't working**

12  **for the company.**

13      Q.    Did you discuss any part of the performance

14  bond being given to Mr. Ali?

15      **A.    No.  And, Ellis, here's why.  As I said,**

16  **the terms of the agreement were the net proceeds of**

17  **the performance bond that we'd split 50/50, net**

18  **proceeds being after I paid certain individuals.  It**

19  **was common practice that I implemented that after**

20  **performance bond's released, certain individuals, high**

21  **performers, were given, you know, discretionary**

22  **bonuses as evidenced by NSA 001759, Terry Key, Salem**

1    AlDhaheri, Nrasib Ali and Hillary Holcombe.

2              Those amounts were paid first.  And the net

3    proceeds after those amounts were paid were split

4    50/50 between myself and the sheikh, as per our

5    agreement.

6        Q.    As per the June 2014 agreement -- and you

7    never got any writing in June of 2014?

8        A.    No, but it was reiterated at least on three

9    other occasions, you know, over the years.

10       Q.    Wasn't it important to you if you had such

11   a lucrative contract to get something in writing?

12             MR. JOHNSON:  Objection to form.

13       A.    I mean, there was a element of trust I had

14   with the sheikh, and I believe he had with me.  And,

15   if anything, he obviously benefited from it.  I didn't

16   take the entire performance bond, which I could have,

17   but I didn't.  I abided by our agreement.

18             He trusted me to do that.  And, you know, I

19   trusted -- I had that same trust in him.

20       Q.    You did take the entire performance bond in

21   August 2015 for Vulcan though, right?

22             MR. JOHNSON:  Objection to form, and also

1        Q.    If you could look at the same exhibit,

2    Exhibit 18, at page 422.

3        **A.    Are we done with 19?**

4        Q.    We are.  This looks like some sort of

5    compensation document coming to you.

6              Do you have any understanding of what this

7    represents?  And it's dated February 3, 2013.

8        **A.    This was drafted by Hani, I believe.  Looks**

9    **like senior vice president of HR.**

10       Q.    And it looks like a salary, and maybe some

11   other payments being for your compensation with the

12   company?

13       **A.    Yes.**

14       Q.    And do you recognize your signature on the

15   document at the bottom?

16       **A.    I do.**

17       Q.    And there's a statement saying that you

18   confirm that you obtained the required approvals for

19   these payments.

20             Who did you get approval from for those

21   payments?

22       **A.    I approved these payments because I had**

1    **full authority to do so.**

2        Q.    So I'm going to refer you forward in the

3    exhibit to page number 505.  And this appears to be

4    payroll records for NorthStar Aviation USA.

5            Do you have any understanding of what this

6    2.3 million dollar payment was for?

7        **A.    It looks like it's characterized as a bonus**

8    **made out on 11/28/2016 for 2.3 million dollars.**

9        Q.    And it says after that, pay period,

10   1/1/2014.  Do you see that, like right after the date

11   of the document?  Any idea what that date represents?

12       **A.    I'm sorry.  Where are you looking?**

13       Q.    Just right after the check date of

14   11/28/2016, there -- the words pay period follow, and

15   then there's a date 1/1/2014.

16       **A.    I'm sorry, Ellis.  I'm not following you.**

17       Q.    It's right there.

18       **A.    Okay.  Okay.  I see that.**

19       Q.    Any understanding why there's a January

20   2014 date on that record?

21       **A.    I don't know.  This is Wells Fargo payroll**

22   **services.  How they reference different payments, I**

1    allowed to do a direct commercial sale.

2         Q.    Which can be complicated by the ITAR laws

3    and --

4         A.    Yes.

5         Q.    -- U.S.?

6         A.    It would make it very complex.  So by

7    getting the FFL, I think that made NorthStar more

8    competitive and an easier, I think, buying decision

9    from a potential client.

10        Q.    Getting back to the day-to-day operations,

11   you were in the U.S. running operations for DC

12   essentially, and you had two locations, one in

13   Melbourne, Florida, one in Abu Dhabi.  How did you go

14   about doing that?  I'm assuming you had to rely on

15   your people underneath you, so I'm just generally, you

16   know, how did you run things on a day-to-day basis and

17   who did you rely upon in those locations?

18        A.    Well, in the UAE, as I said Terry Key

19   actually bounced back between the UAE and the U.S.

20   multiple times, keeping oversight both over Melbourne

21   as well as the UAE.  When Terry was in the UAE, Lyle

22   was in charge there in Melbourne.  And I was here in

1    the DC office or Northern Virginia.

2         Q.    And generally -- and I'm not expecting you

3    to say what you did every day, but generally what were

4    your day-to-day activities as CEO?  What did you?

5         A.    Yeah.  I mean, a couple of my primary roles

6    were developing a licensing strategy which required,

7    you know, lobbying efforts on Capitol Hill.  I met

8    with probably 25 to 30 embassies here in DC to --

9    trying to establish potential requirements for a light

10   attack helicopter and introduce NorthStar to these

11   embassies, and additionally meeting with key members

12   of the House of Armed Services Committee, as well as a

13   Senate Foreign Relations Committee, especially because

14   we were getting -- trying to get licensing, or trying

15   to do business in countries that weren't basically an

16   automatic check in the box to get licensing.

17          Egypt certainly wasn't an automatic check

18   in the box.  So I had to, you know, we spent a lot of

19   time meeting with members of those committees and

20   essentially informing them of potential areas we want

21   to do business, and trying to get a feel for would we

22   get resistance in licensing.

1          We did that for Bahrain, where we had
2     difficulty.  We were initially denied.  And over a
3     two-year period, after about two years, we were
4     actually able to get the State Department to rescind
5     and allowed us to basically to resubmit licensing and
6     we were approved.
7          So, it was a loft politicking and trying to
8     get support for providing armed helicopters to
9     different countries.And --
10        Q.    Go ahead.  I'm sorry.
11        A.    And my other primary role was -- that I
12    took was marketing, visiting -- basically doing
13    high-level meetings in various countries to find out
14    what the requirements were and hopefully potentially
15    submit a bid, or sometimes an unsolicited proposal, to
16    establish ourself in that country and sell them light
17    attack helicopters.
18        Q.    And we'll get back into that a little bit.
19    And I may have asked you this, and if I did, I
20    apologize, but during the time you were CEO, did you
21    ever call a board meeting?
22        A.    I never called a board meeting.

1      Q.    And during the time you were CEO, did you

2  ever call a general assembly?

3      A.    I never called a general assembly.  And,

4  you know, very early on the sheikh made it clear that

5  he wanted to dispense with those formalities.  He

6  didn't even want a board.  He suggested that we get

7  prominent businessmen in the UAE that would have

8  influence that would possibly help us and assist us

9  with getting new business, and he said -- he declined

10  to do that.

11      Q.    Your efforts on Capitol Hill, essentially

12  the lobbying efforts is what I'll call them, who

13  assisted you with those?  I think I've seen Akin

14  Gump's name associated --

15      A.    Yeah.  Akin Gump was -- took a primary role

16  in helping me set up those meetings, as well as a

17  person named April Redman who worked at the Department

18  of Commerce and assisted me getting meetings and calls

19  with countries that -- that I had met with, at least

20  here in their embassies.

21      Q.    And who specifically at Akin Gump did you

22  work with?

1        Q.     Okay. I want to ask you about this document

2    which is Exhibit 20.

3                         -    -    -

4             (A document was marked as Deposition

5    Exhibit Number 20.)

6                         -    -    -

7             BY MR. BENNETT:

8        Q.     First of all, and you can -- I'm just going

9    to ask you some very pointed questions about this.

10   And, first of all, let's -- I'll represent to you it

11   appears to be your March 19, 2014 employment

12   agreement.  And I want to refer you to the last page

13   of that document, just to see if you recognize your

14   signature on that page.

15       **A.     Yes.  That's my signature.**

16       Q.     And do you recognize this document as your

17   March 19, 2014 employment agreement?

18       **A.     Yeah.  I mean, I'll trust you that this is**

19   **the actual agreement but -- yeah, my employment**

20   **agreement.**

21       Q.     And I'll represent to you it's the document

22   that's been produced in --

1      A.    Okay.

2      Q.    -- discovery that's --

3      A.    So it's my employment agreement.

4      Q.    If you could turn in that document to the

5  page that ends in the numbers 436.

6      A.    Okay.

7      Q.    And I'm specifically looking at Section 11.

8      A.    Okay.

9      Q.    That reads -- the title of it is

10  Restrictive Covenants.  What's your understanding of

11  Section 11, your obligations under that section?

12      A.    Give me a minute to read it. Okay.

13      Q.    What's your -- and I'm not asking for a

14  legal opinion, but I'm just asking what --

15      A.    I mean, yeah, my interpretation is that I

16  had access to confidential information while I was

17  CEO, and not to disclose any non-public information or

18  knowledge of data, trade secrets, you know,

19  confidential information.

20      Q.    And have you had a chance to look at

21  Sections 11.2 and 11.3?

22      A.    I'll read that now.

1          So I didn't see that as competing with a

2  company that may or may not exist.

3      Q.    You have mentioned a few times during your

4  testimony about a desire to keep the people who work

5  for NorthStar Aviation in employment in some capacity.

6  What led to the layoffs in summer of 2017 of Lyle

7  Becka, for instance?  And there were several others.

8  I think Hani was part of that and Marwan.

9          What led to those layoffs in the summer of

10 2017?

11     A.    It's just the nature of the aviation

12 business.  You know, employment levels at all aviation

13 companies, I mean, Bell fired -- laid off 2,500 people

14 a couple years ago because of lack of contracts.  And

15 we were going through a similar thing.  We had -- you

16 know, aviation companies grow when they have got

17 contracts, and they shrink when they don't.

18          And we were going through that period where

19 we had to make some layoffs and, you know, that was a

20 hard decision, but I had -- it had to be done.

21     Q.    And during that same month that you laid

22 those people off, you took a 4.5 million dollar

1  payment, correct?

2      A.    Yes.  As per my agreement with the sheikh.

3  He only took his dividend payment as well.

4      Q.    And you gave several other large bonuses to

5  other employees.  For instance, you gave Terry Key I

6  think $300,000 in that same month you paid off these

7  people?

8      A.    As it's not only a bonus for performance,

9  but it's an incentive to retain key people.  Terry was

10 -- everyone I paid there was a key person.  Because at

11 the end of the day, NorthStar doesn't own anything.

12 We integrate commercial off-the-shelf products.

13          We don't own any intellectual capital or

14 IP.  That's owned by all our subcontractors.  So, you

15 know, at the end, all we have are employees.  And

16 because everyone -- it was very well-known that we

17 were on the tail end of our contract.  If all these

18 key employees left, there wouldn't be anything left of

19 NorthStar.

20          So, yes, I had to make a hard decision, lay

21 off people.  At the same time, I needed to retain

22 certain people, certain key people that I felt were

1                C E R T I F I C A T E

2    UNITED STATES OF AMERICA   )

3                             ss:

4    COMMONWEALTH OF VIRGINIA   )

5              I, ELIZABETH MINGIONE, Notary Public within

6    and for the Commonwealth of Virginia do hereby

7    certify:

8              That the witness whose deposition is

9    hereinbefore set forth was duly sworn, and that the

10   within transcript is a true record of the testimony

11   given by such witness.

12             I further certify that I am not related to

13   any of the parties to this action by blood or marriage

14   and that I am in no way interested in the outcome of

15   this matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand this _____day of _____, 20_____.

18

19                      _____

20   Notary Registration No. 104119

21   My Commission Expires:

22   May 31, 2019