IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

NORTHSTAR AVIATION L.L.C., et al.,

*Plaintiffs/Counterclaim-Defendants,*

v.

ALDEN BURT ALBERTO,

*Defendant/Counterclaim-Plaintiff.*

Case No. 1: 18-cv-00191 (TSE-JFA)

**ALDEN BURT ALBERTO'S OPPOSITION TO NORTHSTAR'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY FROM MR. ALBERTO'S EXPERT, BRUCE BENESH**

Date: February 14, 2019

Nicholas R. Johnson, Esq. (VSB No. 80525)
njohnson@berenzweiglaw.com
Declan C. Leonard, Esq. (VSB No. 40292)
dleonard@berenzweiglaw.com
Clyde E. Findley, Esq. (VSB No. 48277)
cfindley@berenzweiglaw.com
David B. Deitch, Esq. (VSB No. 74818)
ddeitch@berenzweiglaw.com
Ryen C. Rasmus, Esq. (VSB No. 84346)
rrasmus@berenzweiglaw.com
Samantha K. Collins, Esq. (VSB No. 89010)
sbernstein@berenzweiglaw.com
scollins@berenzweiglaw.com
BERENZWEIG LEONARD, LLP
8300 Greensboro Drive, Suite 1250
McLean, Virginia 22102
(703) 760-0402 (telephone)
(703) 462-8674 (facsimile)

*Counsel for Defendant Alden Burt Alberto*

**TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................................1

II. FACTUAL EXPLANATION ....................................................................................1

III. ARGUMENT ...........................................................................................................7

A. MR. BENESH'S OPINION IS BASED ON FACTS SUPPORTED BY THE RECORD. ..........7

B. NORTHSTAR DOES NOT CHALLENGE MR. BENESH'S METHODOLOGY. .................9

C. MR. BENESH EFFECTIVELY REBUTS MR. ROBSON'S OPINION. ............................11

D. MR. ROBSON'S OPINION CANNOT BE REVIVED BY DIVERSION TACTICS. ............13

IV. CONCLUSION .......................................................................................................14

## I. INTRODUCTION

Defendant/Counterclaim Plaintiff Alden Burt Alberto respectfully submits this Memorandum in Opposition to Plaintiffs'/Counterclaim Defendants' Motion *in Limine* to Exclude Testimony from Mr. Alberto's Expert, Bruce Benesh.

The Court should deny Plaintiffs' Motion *in Limine* in its entirety. Rather than offer a well-reasoned critique of Mr. Benesh's methodology – which should be the focus of any valid *Daubert* challenge – Plaintiffs instead attempt to argue that Mr. Benesh has relied on the wrong facts, even though his cited facts are easily found in the record produced by NorthStar and are supported by substantial evidence. This is an inappropriate application of the *Daubert* doctrine. To the extent Plaintiffs believe that Mr. Benesh has relied on the wrong facts, Plaintiffs are free to cross-examine him at trial. There is no legitimate reason why Mr. Benesh's expert report or testimony should be excluded.

## II. FACTUAL EXPLANATION

This case concerns bonus payments issued by Mr. Alberto when he was NorthStar's CEO, which NorthStar now alleges were excessive. At trial, the critical evidence will involve NorthStar's contemporaneous *knowledge* of Mr. Alberto's bonuses and the extent to which NorthStar *authorized* Mr. Alberto to issue the challenged bonuses.

To rebut Mr. Alberto's evidence that NorthStar authorized the bonus payments, NorthStar will likely attempt to ask its expert, Mr. Leslie Robson, to testify that the bonus payments were excessive, even if they were authorized. Mr. Alberto, on the other hand, will rely on his expert, Mr. Bruce Benesh, to explain why the bonus payments were reasonable and justified. To satisfy their Rule 26 disclosure requirements, both experts submitted reports

explaining their respective "excessive" and "reasonable" positions, and both parties have submitted motions asking the Court to exclude the opposing party's expert testimony.

NorthStar's present motion to exclude Mr. Benesh's testimony is largely based on NorthStar's position that its sole shareholder, Dr. Ahmed Bin Saif,[1] invested approximately $80 million into the company, rather than the relatively small sum of $40,875 cited and relied upon by Mr. Benesh.[2] Assuming, without any evidentiary support, that the much larger sum is the true amount, NorthStar asserts that Mr. Benesh's conclusions are wrong because he relied on the wrong facts, and therefore his methodology is flawed and his testimony must be rejected. *See generally*, Pls.' Mem. (ECF No. 193).

NorthStar offers no explanation for how there can be such a large discrepancy about its shareholder's total investment in the company ($80 *million* versus $40 *thousand*). Instead, NorthStar simply digs in, ignores the problem lurking behind the scenes, and maintains without clarification or evidentiary support that Mr. Benesh is wrong, arguing that his cited evidence "rests upon 'altered facts and speculation designed to bolster [Alberto's] position.'" Pls.' Mem. (ECF No. 193) at 11 (internal citations omitted).

There is a legitimate explanation for the discrepancy, however. It is grounded in undisputed facts. Like most financial disputes, it requires following the money. And the explanation will illuminate the issues and inform the Court about the real reason why NorthStar wants to exclude Mr. Benesh's testimony.

---

[1] Technically, NorthStar has two shareholders: Rotana Jet and Dr. Ahmed Bin Saif. But Rotana Jet is 100% owned by Dr. Bin Saif, so for all intents and purposes, he is NorthStar's sole shareholder. Bin Saif Tr. (Ex. 1) at 32:13-14 (Q. Are you the sole owner of Rotana Jet? A. Yes."). *See also* Robson Tr. (Ex. 3) at 57:11-13 (Rotana Jet is 100% owned by the Sheikh).

[2] Due to several factors, including currency exchange rates and some confusion about the exact amount and context of the multiple financial transactions comprising the $80M amount, the parties as well as some witnesses state that the amount is $85M, $89M and/or $100M.

The money trail shows that Dr. Bin Saif invested only $40,875 into NorthStar and no more. The money trail also shows, and even NorthStar's expert concedes, that in exchange for his investment of $40,875, Dr. Bin Saif received at least $37M in return.[3] This results in a phenomenal return-on-investment ratio of at least 905 to 1.[4]

The money trail begins in 2010, well before NorthStar was founded. Late in that year, Mr. Alberto was asked by fellow retired Navy SEAL, Erik Prince, to take over the management of Reflex Responses (also called "R2").[5] Reflex Responses was a UAE company providing military training services to the United Arab Emirates ("UAE"). Alberto Tr. (Ex. 2) at 19:7-22; 24:4-22; 25:4-22. After some coaxing, Mr. Alberto accepted the job, moved to Abu Dhabi, and began fixing a host of problems that had been plaguing the company. Alberto Tr. (Ex. 2) at 20:12-23:4. One of the things Mr. Alberto did to fix R2's problems was to terminate approximately 65 employees. Alberto Tr. (Ex. 2) at 26:1-27:3. Mr. Alberto believes that one of those terminated employees approached the New York Times with an adverse story about R2. Alberto Tr. (Ex. 2) at 27:4-9. After the New York Times published that story on May 14, 2011,[6] the UAE asked Mr. Alberto to "wind down R2 operations." Alberto Tr. (Ex. 2) at 27:4-28:6. During the process of winding down R2, the UAE authorized Mr. Alberto to start a new company using approximately $100 million that had been previously allocated to R2. Alberto Tr.

---

[3] Robson Tr. (Ex. 3) at 86:8-14 (Dr. Bin Saif received more than $15M in dividends); *Id*. at 81:21-82:16 (NorthStar is currently worth at least $22M). Mr. Robson also concedes that the disputed $80 million originally came from the UAE government, not from Dr. Bin Saif. Robson Tr. (Ex. 3) at 56:19-21.

[4] ($15M + $22M) / $40,875 = 905.2. Mr. Robson agreed that this method (Mr. Benesh's method) of calculating return-on-investment would result in a "large amount of return." Robson Tr. (Ex. 3) at 96:9-17.

[5] Mr. Alberto served on Seal Team 8 under Erik Prince for about 18 months. Alberto Tr. (Ex. 2) at 19:7-22.

[6] *Secret Desert Force Set Up by Blackwater's Founder*, NY Times, May 15, 2011, attached as Exhibit 4.

(Ex. 2) at 27:10-29:2; 68:19-70:6. Roughly $34 million of that money was intended for aircraft operations. Alberto Tr. (Ex. 2) at 27:10-29:2; 37:3-39:16; 41:16-42:20. *See also*, Reflex Responses Liquidation Instructions, attached as Exhibit 5 (including instructions to transfer $26M + $1M to NorthStar for an aircraft project).

Following the UAE's authorization to wind down R2 and start a new company, Mr. Alberto initially formed Vulcan Management Consultancy ("VMC"). Alberto Tr. (Ex. 2) at 28:21-29:2; 40:4-13. Because all companies in the UAE must be majority owned by an Emirati citizen,[7] Mr. Alberto had to look for a UAE sponsor. He interviewed at least two people for that position and ultimately selected Dr. Ahmed Bin Saif. Alberto Tr. (Ex. 2) at 41:16-42:20; 67:3-68:12; 149:6-151:4. All of the $100M in cash and assets that funded VMC were provided by the UAE government via R2. Alberto Tr. (Ex. 2) at 42:13-20; 69:2-9. None of VMC's funding came from Dr. Bin Saif. *Id*. Dr. Bin Saif had no ownership interest in R2, nor was he involved in R2's liquidation. Bin Saif Tr. (Ex. 1) at 59:1-10; 61:20-62:7.

Soon after Mr. Alberto formed VMC, he formed NorthStar Aviation. Alberto Tr. (Ex. 2) at 41:16-42:20; 43:11-19; 43:20-44:5. The intent was for VMC to focus on military training business and NorthStar to focus on aviation business. Alberto Tr. (Ex. 2) at 41:16-42:3; 43:3-10; 43:20-44:5. Early on, however, VMC's business model became unviable, so it terminated operations, and all of its assets were transferred to NorthStar. Alberto Tr. (Ex. 2) at 43:3-16.

NorthStar's corporate formation document, a Memorandum of Association, indicates that the company was initially capitalized with only $40,875.[8] Mem. of Assoc. (Ex. 6) at ¶ 6.1. Both

---

[7] It is undisputed that all companies in the UAE must be majority owned by an Emirati citizen. *See* Alberto Tr. (Ex. 2) 67:12-21.

[8] The Memorandum of Association says NorthStar was capitalized with "One Hundred and Fifty Thousand UAE Dirhams (AED 150,000)." This equals $40,875 at the generally accepted conversion rate of 0.2725 Dirhams to U.S. Dollars.

Mr. Robson and Mr. Benesh agree that Dr. Bin Saif contributed that amount, and *only* that amount, of his own money to NorthStar. Robson Tr. (Ex. 3) at 56:10-58:3; Benesh Tr. (Ex. 8) at 86:13-21; 91:9-18; 97:14-21. This undisputed fact flies directly in the face of the now manufactured argument by NorthStar that Dr. Bin Saif invested approximately $80 million. Dr. Bin Saif also stated on the record that he did not contribute any other funds to capitalize NorthStar. Bin Saif Tr. (Ex. 1) at 90:15-92:19. All of the funding to capitalize NorthStar (except the initial $40k) came from the UAE government. *Id.*; Robson Tr. (Ex. 3) at 56:10-58:3. And substantial evidence supports Mr. Alberto's contention that NorthStar received $100M in funding from the UAE government due to Mr. Alberto's successful work at Reflex Responses. Alberto Tr. (Ex. 2) 67:3-68:12; 68:19-70:7.

None of these facts are legitimately disputed by contrary evidence. How, then, can NorthStar maintain with a straight face that Dr. Bin Saif contributed more than $80 million?

The answer is: *an inter-company loan*. When NorthStar was formed, VMC and NorthStar purportedly entered into a loan agreement whereby VMC appears to have agreed to loan NorthStar up to $100 million for general corporate and working capital purposes. According to the loan document, this loan drew on the same funds that were transferred to VMC from R2 as authorized by the UAE government and secured by Mr. Alberto. The loan document appears to be executed by Mr. Alberto on behalf of both parties to the agreement. *See* VMC Loan (Ex. 7) at 3. Several years later, around the time VMC formally terminated its corporate existence, NorthStar executed a Board Resolution removing the VMC loan from its books and transferring

the funds, which by then had reached approximately $80 million,[9] to a financial category called shareholder equity.[10]

Because Dr. Bin Saif was technically VMC's owner at the time of the loan, NorthStar argues that the $80 million was in fact Dr. Bin Saif's money all along, and in effect, "Dr. Bin Saif passed that money from his right hand to his left" and therefore the $80 million could not have been "manna from heaven, procured for him thanks to Alberto's phenomenal acumen as a company officer." Pls.' Mem. (ECF No. 193) at 10.

Of course, NorthStar knows full well that its version of the facts only appears accurate when the true source of the $80 million – Reflex Responses – is omitted from the story. When

[9] Again, due to several factors, including currency exchange rates and some confusion about the exact amount and context of the multiple financial transactions comprising the $80M amount, the parties as well as some witnesses state that the amount is $85M, $89M and/or $100M

[10] Board Resolution, Dec. 15, 2015, attached as Exhibit 9.

the money trail is understood in its entirety, however, it is both clear and undisputed that Dr. Bin Saif never invested $80M of his own money into NorthStar. He only invested $40,875. This fact has a tremendous impact on the outcome of this case.

## III. ARGUMENT

If evidence showing that NorthStar received approximately $80 million from the UAE is ignored or excluded,[11] NorthStar can assert (falsely) that the $80M loan from VMC to NorthStar was *technically* Dr. Bin Saif's money at the time the loan was made. Based on that logic, NorthStar can also argue (again, falsely) that Mr. Benesh's expert opinion must be based on "false" facts or a defective methodology because he relies on the $80 million flowing into NorthStar from the UAE, not from Dr. Bin Saif. But as a review of the complete money trail reveals, none of NorthStar's claims about the source of the $80 million are supported by the evidence, and therefore, NorthStar's motion should be denied summarily.

### A. Mr. Benesh's Opinion is Based on Facts Supported by the Record.

Putting aside NorthStar's misrepresentations of Mr. Benesh's testimony and other distortions of the evidence, NorthStar essentially argues that Mr. Benesh's opinion differs in at least five material respects from the facts in the record. NorthStar is wrong about each one.

First, NorthStar claims "the initial capital investment in NorthStar was not limited to $40,875 but, rather, $80,934,779." Pls.' Mem. (ECF No. 193) at 10. This is flagrantly misleading because it appears to purposely conflate and confuse Dr. Bin Saif's minor investment of $40,875 with the approximately $80 million that Mr. Alberto obtained from the UAE via Reflex

[11] *See* NorthStar's Motion *in Limine* to preclude evidence pertaining to Reflex Responses (ECF No. 190) and corresponding Memorandum in Support (ECF No. 191).

Responses. *See* Section II *supra*. Mr. Benesh's opinion accurately follows the true money trail and is fully consistent with the facts in the record.

Second, NorthStar argues that the evidence shows Mr. Alberto only procured $31 million for NorthStar and not $80 million. Pls.' Mem. (ECF No. 193) at 10. This argument is not supported by the evidence. Although Mr. Alberto did allege in his Amended Counterclaim that he obtained approximately $31 million for NorthStar's aviation business (*see* ECF No. 100, ¶ 12), he made it clear in his deposition that he believed the actual number transferred from Reflex Responses was around $100 million. *See* Alberto Tr. (Ex. 2) at 37:21-39:16. Moreover – as NorthStar well knows – NorthStar's financial reports show that it received approximately $80 million in loans from VMC and the loan document itself shows that $100 million was available for NorthStar's use. *See* VMC Loan (Ex. 7) at 1. *See also* Ali Tr. (Ex. 10) at 48:5-50:8 (NorthStar's Director of Finance testifying that Mr. Alberto authorized approximately $100 million to be transferred from R2 to VMC). That money originally came from the UAE via Reflex Responses due to Mr. Alberto's efforts. *Id.; see also* Section II *supra*.[12]

Third, NorthStar claims Mr. Benesh ignored the fact that NorthStar initially received the $80 million capitalization as a "hefty loan" from VMC. Pls.' Mem. (ECF No. 193) at 10. This too is fiction. Mr. Benesh testified several times at his deposition that he understood the $80M (or $85M) capitalization was initially shown as a loan on NorthStar's books and was later converted to capital. Benesh Tr. (Ex. 8) at 82:15-83:9; 91:1-8; 93:12-16.

---

[12] NorthStar argues that Mr. Alberto's statement in his Amended Counterclaim about procuring $31 million constitutes a hard upper bound as a matter of law. Pls.' Mem. (ECF No. 193) at 8 n. 4. However, this argument is not supported by the caselaw, which is focused on concessions and judicial admissions, not initial allegations, which is the issue here. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 n. 6 (2013); *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963).

Fourth, NorthStar asserts that when Mr. Benesh calculated Dr. Bin Saif's return-on-investment, he did not take into account Mr. Alberto's "failure to procure new business for NorthStar," and therefore "any such return was effectively wiped out." Pls.' Mem. (ECF No. 193) at 9-10. There is no evidence that Mr. Benesh omitted anything from his calculations. Moreover, a return-on-investment calculation is not based on new business. It is based on the value returned to the shareholders divided by the shareholders' investment. *See* Benesh Report (ECF No. 193-2) at 14. Further, it is undisputed that Dr. Bin Saif invested only $40,875 of his own money into NorthStar and *received at least $37 million in return*. *See* Section II *supra*. Even Mr. Robson conceded that this was a "large amount of return." Robson Tr. (Ex. 3) at 96:9-17. NorthStar's assertion that Dr. Bin Saif's return was "effectively wiped out" is ridiculous.

Fifth and finally, NorthStar argues "there is no credible evidence of an agreement between Alberto and NorthStar for Alberto to take half of the performance-bond funds." Pls.' Mem. (ECF No. 193) at 10, 16. This is not true either. Mr. Alberto provided a list of significant evidence pertaining to the performance bond in Paragraphs 9 and 35 of his Memorandum in Opposition to NorthStar's Motion for Summary Judgment. *See* Def.'s Mem. in Opp'n (ECF No. 173) ¶¶ 9, 35. The evidence includes a Resolution by NorthStar's Board of Directors, deposition testimony of several witnesses (not just Mr. Alberto), and actual checks written to Dr. Bin Saif (via his company, Rotana Jet) reflecting payments flowing from the UAE's release of the performance bond. NorthStar has cited no evidence to the contrary.

**B.     NorthStar Does Not Challenge Mr. Benesh's Methodology.**

NorthStar claims that Mr. Benesh "applies a methodology which itself is flawed." Pls.' Mem. (ECF No. 193) at 11. But NorthStar does not criticize Mr. Benesh's overall methodology for determining the reasonableness of an executive's compensation. NorthStar only complains that Mr. Benesh offered "no explanation" for a small portion of his method: the part about how

he selected a group of comparator companies to determine a multiplier to calculate NorthStar's sale value based on its book value. *Id*. at 13. This is the so-called *book value multiplier*, and Mr. Benesh calculated it to be 2.01. *E.g.*, Pls.' Mem. (ECF No. 193) at 6, 12-13.

To select his group of comparator companies, Mr. Benesh searched a database of public companies within the Aerospace and Defense Industry to find ones that had a book value similar to that of NorthStar. *See* Benesh Report, Pls.' Exh. 2 (ECF No. 193-2) at 13, App'x. at 9; Benesh Tr. (Ex. 8) at 76:2-77:14; 163:7-19 (explaining his method of selecting comparator companies). He then extracted each of those companies' market capitalization values (*i.e.*, the sale value of the companies, as determined by multiplying the total number of shares by the then-current share price). *Id.* (both). He also looked at the companies' balance sheets. Once he had selected an appropriate set of comparator companies, he then calculated the book value multiplier for each of them, and then calculated their average. *Id*..

NorthStar does not argue that Mr. Benesh's explanation is insufficient. Inexplicably, NorthStar instead argues that Mr. Benesh offered no explanation for how he went about selecting the comparator companies. But he obviously did offer an explanation, as described above. The explanation makes sense, and NorthStar has offered nothing to the contrary.

NorthStar then attempted to argue that a book value multiplier is of dubious use for calculating the value of a business, because it assumes, without evidence, that a company's market value is greater than its book value. *Id*. at 14. But this is exactly what Mr. Benesh's table of similar companies showed: all the companies Mr. Benesh identified as being similar to NorthStar in both size and business had market capitalization values that were substantially higher than their book values. Benesh Report, Pls.' Exh. 2 (ECF No. 193-2) App'x. at 9. Mr. Benesh did not just pull the number 2.01 out of thin air. He based it on the book value multiple

that he obtained from real world companies that matched NorthStar's characteristics. *Id*. Next, he used that multiple to estimate NorthStar's sale value, not to calculate it exactly. Mr. Benesh therefore did not "consider[] NorthStar's value in a vacuum, with no regard for changes in its industry." Pls.' Mem. (ECF No. 193) at 14. In fact, he did just the opposite. NorthStar has failed to show that Mr. Benesh's methodology is flawed in any way.[13]

Finally, NorthStar's own expert, Mr. Robson, testified that *NorthStar was worth at least its book value*: $22 million as of October 24, 2017. Robson Tr. (Ex. 3) 81:21-82:16. Mr. Robson also testified that Dr. Bin Saif received at least $15 million in dividends and other payments from NorthStar. Robson Tr. (Ex. 3) 86:8-14. This means that even if NorthStar's *book value multiple* is only 1.0 versus 2.01, Dr. Bin Bin Saif received at least $37M in return for his investment of $40,876, which yields a return-on-investment ratio of at least 905 to 1. This rate of return is still at least an order of magnitude higher than the highest performing companies Mr. Benesh identified, further demonstrating the strength and efficacy of Mr. Benesh's methods.

**C. Mr. Benesh Effectively Rebuts Mr. Robson's Opinion.**

NorthStar contends that Mr. Benesh did not disagree with Mr. Robson's opinions, and therefore, Mr. Benesh's report was not a proper rebuttal and it should be excluded. This is incredulous. Mr. Benesh's report addresses the same subject matter as Mr. Robson's report (the excessiveness versus reasonableness of Mr. Alberto's compensation). Mr. Benesh's report shows

[13] In a failed analogy, NorthStar tries to argue that Mr. Benesh's book value multiple of 2.01 is unsupported and untestable because it would not make sense in the context of a "dying industry" such as the 1999 retail video rental business. *See* Pls.' Mem. (ECF No. 193) at 14. This analogy is based on the premise that 2.01 is an assumed number, created "in a vacuum." *Id*. But Mr. Benesh's book value multiple of 2.01 is not assumed, nor is it created in a vacuum, nor would it apply to the 1999 retail video rental business. Mr. Benesh calculated that number, based on research to discover comparator companies with the same business characteristics as NorthStar. The analysis therefore takes into account market effects, such as dying industries.

how executive compensation should be analyzed by one skilled in the art, as opposed to Mr. Robson's *ad hoc* methods and admitted lack of knowledge.[14] And Mr. Benesh's report includes an entire section rebutting Mr. Robson's approach and conclusions. Benesh Report, Pls.' Exh. 2 (ECF No. 193-2) at 18-21. These cannot possibly constitute legitimate grounds to exclude an expert report.

It appears that the essence of NorthStar's argument is that because Mr. Benesh acknowledged at his deposition that he "neither analyzed nor opined upon NorthStar's financial condition (the subject of Mr. Robson's initial report)," he cannot testify in rebuttal to <u>any of</u> Mr. Robson's opinions. Pls.' Mem. (ECF No. 193) at 5. This is a disingenuous argument for three reasons. First, Mr. Benesh's so-called "acknowledgement" is limited to two statements he made in response to a question about his assignment. In both statements, Mr. Benesh simply agreed that his overall assignment was not to evaluate NorthStar's financial condition; it was to assess the reasonableness of the executive compensation paid to Mr. Alberto. *See* Benesh Tr. (Ex. 8) at 68:7-17; 197:6-16. Second, on cross-examination, Mr. Benesh explained that he did indeed look at NorthStar's financial reports in detail, so that he could "determine whether or not the company had adequate cash and adequate liquidity to make good on the incentive compensation arrangements that they had entered into with Mr. Alberto." Benesh Tr. (Ex. 8) at 200:3-15. Accordingly, Mr. Benesh's ultimate opinion on the reasonableness of Mr. Alberto's compensation rests firmly on his analysis and evaluation of NorthStar's financial condition. Finally, for the sake of argument, even if Mr. Benesh did not directly refute Mr. Robson's

---

[14] *See, e.g.*, Robson Tr. (Ex. 4) at 89:2-4 ("Q. Would you have a method of calculating how much of a bonus would be reasonable? A. No, sir."); *Id*. at 45:13-16 ("Q. In your report, you do not specify any method of calculating Mr. Alberto's compensation, do you? A. No.").

opinion that NorthStar's financial condition was poor, that does not justify excluding Mr. Benesh's opinions about the reasonableness of Mr. Alberto's compensation.

**D. Mr. Robson's Opinion Cannot be Revived by Diversion Tactics.**

Mr. Robson is not qualified to opine about executive compensation. *See generally*, Def.'s Mem. in Supp. of Mot. to Strike, ECF No. 189. Perhaps to rehabilitate Mr. Robson's testimony, NorthStar now claims Mr. Robson wasn't asked to provide an opinion about Alberto's compensation. *See* Pls.' Mem. (ECF No. 193) at 4 ("Mr. Benesh flatly misstated that Mr. Robson 'was engaged to provide an opinion on the reasonableness of [Alberto's] compensation.' … That was not Mr. Robson's assignment…") (emphasis in original, internal citations omitted). This is simply nonsense. NorthStar is playing a word substitution game – substituting *reasonable* for *excessive* – and hoping the Court will not notice that the meaning is the same. In his opening report, Mr. Robson states, "Alberto compensated himself during the time he was Managing Member and CEO at a level that was unreasonably high, and that excessive compensation contributed to NorthStar's reduced profitability, and sometimes unprofitability.") Robson Report (ECF No. 193-1) at 2 (final bullet point summarizing his opinions) (emphasis added). He also concluded "Alberto's compensation was disproportionately high given the lackluster to poor operating results the company produced under his management." *Id*. at 7.

Unless NorthStar can be understood to say that Mr. Robson will not testify on the subject of Mr. Alberto's compensation, none of these arguments make sense.

## IV. CONCLUSION

For the foregoing reasons, Mr. Alberto respectfully asks the Court to deny NorthStar's Motion *in Limine* to Exclude Testimony from Mr. Alberto's Expert, Bruce Benesh.

Respectfully submitted,

Date: February 14, 2019

/s/ Clyde E. Findley
Nicholas R. Johnson, Esq. (VSB No. 80525)
 njohnson@berenzweiglaw.com
Declan C. Leonard, Esq. (VSB No. 40292)
 dleonard@berenzweiglaw.com
Clyde E. Findley, Esq. (VSB No. 48277)
 cfindley@berenzweiglaw.com
David B. Deitch, Esq. (VSB No. 74818)
 ddeitch@berenzweiglaw.com
Ryen C. Rasmus, Esq. (VSB No. 84346)
 rrasmus@berenzweiglaw.com
Samantha K. Collins, Esq. (VSB No. 89010)
 sbernstein@berenzweiglaw.com
 scollins@berenzweiglaw.com
BERENZWEIG LEONARD, LLP
8300 Greensboro Drive, Suite 1250
McLean, Virginia 22102
(703) 760-0402 (telephone)
(703) 462-8674 (facsimile)

*Counsel for Defendant Alden Burt Alberto*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 14, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such electronic filing (NEF) to all counsel of record.

/s/ Clyde E. Findley
Clyde E. Findley VSB #48277
cfindley@berenzweiglaw.com
BERENZWEIG LEONARD LLP
8300 Greensboro Drive, Suite 1250
McLean, VA 22102
Telephone: (703) 760-0402
Facsimile: (703) 462-8674